**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                    :
GLEN CHAPMAN, ANDREA PETERSON                                       :
AND KEVIN KELLY, Individually and On                                :     19-cv-3260 (KPF)
Behalf of All Others Similarly Situated,                            :
                                                                    :
                         Plaintiffs,                                :
                                                                    :
            v.                                                      :
                                                                    :
MUELLER WATER PRODUCTS, INC.,                                       :
GREGORY E. HYLAND, J. SCOTT HALL,                                   :
EVAN L. HART and MARIETTA EDMUNDS                                   :
ZAKAS,                                                              :
                                                                    :
                         Defendants.                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Jay B. Kasner
Scott D. Musoff
Thania Charmani
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
jay.kasner@skadden.com
scott.musoff@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants Mueller Water*
*Products, Inc., J. Scott Hall, Evan L. Hart*
*and Marietta Edmunds Zakas*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND .......................................................................................................................3

    A.    The Company and the Individual Defendants ...........................................................3

    B.    The Company's Prompt Disclosures of Warranty Charges and Continuous
        Risk Disclosures........................................................................................................4

ARGUMENT............................................................................................................................7

I.    PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR
    MISLEADING STATEMENT UNDER SECTION 10(B) AND RULE 10b-5 .................7

    A.    Plaintiffs Have Not Alleged that Defendants' Estimates of the Company's
        Warranty Reserves Were Both False and Not Honestly Believed...........................7

    B.    Defendants' Descriptions of the Company's Warranty Costs Were Not
        False or Misleading.................................................................................................15

    C.    Defendants' Cautionary Statements Were Not False or Misleading .....................16

    D.    Mueller's Publicly Filed Statements Regarding Its Discrete Warranty
        Charge Were Not False or Misleading...................................................................17

    E.    Defendants' Statements During the April 28, 2017 Investor Conference
        Call Were Not False or Misleading .......................................................................18

    F.    Defendants' Statements During the May 8, 2018 Investor Conference Call
        Were Not False or Misleading ...............................................................................20

II.    PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG
    INFERENCE OF SCIENTER ..................................................................................21

    A.    Plaintiffs Do Not Sufficiently Allege Motive to Commit Fraud ..........................22

        1.    The Majority of Purported Sales Were Exercises of Vested Stock
            Options.....................................................................................................22

        2.    Plaintiffs Make No Particularized Allegations of Profits ..........................23

        3.    The Percentages of Divested Holdings Do Not Support an
            Inference of Scienter ................................................................................24

i

4.      The Timing of the Sales Negates Any Inference of Scienter....................25

5.      Other Factors Further Negate an Inference of Scienter ...........................27

B.      Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or
        Recklessness ................................................................................................28

III.    PLAINTIFFS' SECTION 20(A) CLAIMS SHOULD BE DISMISSED ..........................30

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMCERA Group, Inc.*,
       47 F.3d 47 (2d Cir. 1995)........................................................................................27

*In re AmTrust Financial Services, Inc.  Securities Litigation*,
       No.  17-CV-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept.  9, 2019).........................28

*In re Aratana Therapeutics Inc.  Securities Litigation*,
       315 F. Supp. 3d 737 (S.D.N.Y. 2018)..................................................................24

*ATSI Communications, Inc.  v. Shaar Fund, Ltd.*,
       493 F.3d 87 (2d Cir. 2007).........................................................................23

*In re Bank of America AIG Disclosure Securities Litigation*,
       980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)..................29

*Boguslavsky v. Kaplan*,
       159 F.3d 715 (2d Cir. 1998).......................................................................30

*In re CIT Group, Inc.  Securities Litigation*,
       349 F. Supp. 2d 685 (S.D.N.Y. 2004).......................................................15, 29

*City of Omaha, Nebraska Civilian Employees' Retirement System v. CBS Corp.*,
       679 F.3d 64 (2d Cir. 2012).........................................................................19

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
       752 F.3d 173  (2d Cir. 2014)......................................................................20

*City of Taylor General Employees Retirement System v. Magna International Inc.*,
       967 F. Supp. 2d 771 (S.D.N.Y. 2013)................................................22, 25, 26

*DHL Global Forwarding Management Latin America, Inc.  v. Pfizer, Inc.*,
       No.  13-cv-8218 (KBF), 2014 WL 5169033 (S.D.N.Y. Oct.  14, 2014) ..........................11

*In re Eaton Corp.  Securities Litigation*,
       No.  16-CV-5894 (JGK), 2017 WL 4217146 (S.D.N.Y. Sept.  20, 2017) .......................23

*ECA, Local 134 IBEW Joint Pension Trust of Chi.  v. JP Morgan Chase Co.*,
       553 F.3d 187 (2d Cir. 2009)........................................................................21

*Employees Retirement System of Providence v. Embraer S.A.*,
       No.  16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar.  30, 2018)......................18

*Fait v. Regions Financial Corp.*,
       655 F.3d 105 (2d Cir. 2011)..............................................................8, 18, 19, 20

*In re FBR Inc. Securities Litigation,*
544 F. Supp. 2d 346 (S.D.N.Y. 2008)..................................................................................16

*Fishbaum v. Liz Claiborne, Inc.,*
No. 98-9396, 1999 WL 568023 (2d Cir. July 27, 1999)...................................................25

*In re FVC.COM Securities Litigation,*
32 F. App'x 338 (9th Cir. 2002) .......................................................................................27

*In re Gentiva Securities Litigation,*
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..............................................................................24

*In re Gildan Activewear, Inc. Securities Litigation,*
636 F. Supp. 2d 261 (S.D.N.Y. 2009)....................................................................24, 25, 27

*Glaser v. The9, Ltd.,*
772 F. Supp. 2d 573 (S.D.N.Y. 2011)....................................................................22, 23, 24

*Harris v. AmTrust Financial Services, Inc.,*
135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)..............13, 14

*In re Health Management Systems, Inc. Securities Litigation,*
No. 97 CIV. 1865(HB), 1998 WL 283286 & n.3 (S.D.N.Y. June 1, 1998) ...............24, 27

*Hinerfeld v. United Auto Group,*
No. 97 CIV. 3533(RPP), 1998 WL 397852 (S.D.N.Y. July 15, 1998)...............................9

*Kalnit v. Eichler,*
264 F.3d 131 (2d Cir. 2001)..............................................................................................22

*Kuriakose v. Federal Home Loan Mortgage Corp.,*
897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom.*, *Central States, Southeast &
Southwest Areas Pension Fund v. Federal Home Loan Mortgage Corp.*, 543 F.
App'x 72 (2d Cir. 2013)....................................................................................................29

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v.
American Express Co.,*
724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)..................14

*Malin v. XL Capital Ltd.,*
499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009)..............14

*Matusovsky v. Merrill Lynch,*
186 F. Supp. 2d 397 (S.D.N.Y. 2002)...............................................................................10

*North Collier Fire Control & Rescue District Firefighter Pension Plan & Plymouth
County Retirement Ass'n v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS),
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)...................................................................22

iv

*NECA-IBEW Pension Trust Fund v. Bank of America Corp.*,
    No. 10 Civ. 440(LAK)(HBP), 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012)....................17

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................................29

*In re NTL, Inc. Securities Litigation*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004)...........................................................................9

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013).........................................................................13

*Omnicare, Inc. v. Laborers District Council Construction Industrial Pension Fund*,
    135 S. Ct. 1318 (2015).............................................................................8, 13, 14, 19

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018).....................................................................7, 26

*In re Party City Securities Litigation*,
    147 F. Supp. 2d 282 (D.N.J. 2001) .............................................................................25

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)..................7, 14, 28

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).......................................................................................15

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................................26, 27

*Sjunde AP-Fonden v. General Electric Co.*,
    No. 17-CV-8457 (JMF), 2019 WL 4094559 (S.D.N.Y. Aug. 29, 2019)........................19

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010).......................................................................................21

*Smart v. Goord*,
    441 F. Supp. 2d 631 (S.D.N.Y. 2006).........................................................................11

*Steinberg v. PRT Group, Inc.*,
    88 F. Supp. 2d 294 (S.D.N.Y. 2000)...........................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................................................7, 21

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016).........................................................................................8

v

*In re Turquoise Hill Resources Ltd.  Securities Litigation*,
     No.  13 Civ. 8846(LGS), 2014 WL 7176187 (S.D.N.Y. Dec.  16, 2014) .........................13

*In re Veon Ltd.  Securities Litigation*,
     No.  15-cv-08672 (ALC), 2018 WL 4168958 (S.D.N.Y. Aug.  30, 2018).........................30

*In re Wachovia Equity Securities Litigation*,
     753 F. Supp. 2d 326 (S.D.N.Y. 2011)..........................................................................9, 18

*In re WEBMD Health Corp.  Securities Litigation*,
     No.  11 Civ. 5382(JFK), 2013 WL 64511 (S.D.N.Y. Jan.  2, 2013) .................................28

*Wilson v. Merrill Lynch & Co.*,
     671 F.3d 120 (2d Cir. 2011).................................................................................30

*Wyche v. Advanced Drainage Systems, Inc.*,
     No.  15 Civ. 5955 (KPF), 2017 WL 971805 (S.D.N.Y. Mar.  10, 2017),
     *aff'd*, 710 F. App'x 471 (2d Cir. 2017).....................................................13, 14, 27, 28, 29

**STATUTES**

15 U.S.C. § 78u-4(b)(2)(A).......................................................................................21

Defendants Mueller Water Products, Inc. ("Mueller" or the "Company"), J. Scott Hall, Evan L. Hart, and Marietta Edmunds Zakas respectfully submit this memorandum of law in support of their motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and Section 21D(b)(1) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), to dismiss the Amended Class Action Complaint (the "Complaint" or "AC") (ECF No. 28) in its entirety with prejudice.[1]

## PRELIMINARY STATEMENT

Plaintiffs' claims are based on their hindsight disagreement with the calculation of "warranty reserves" for Mueller, which manufactures products used in the transmission, distribution and measurement of water in North America. Warranty reserves are an inherently subjective and uncertain expense that attempt to estimate future warranty claims based on numerous factors that apply across all of the Company's products nationwide. Because warranty reserves are the product of a significant amount of estimation and judgment, the alleged misstatements at issue are opinions subject to standards even more stringent than the already demanding standards governing securities fraud claims. To plead an actionable false statement of opinion, Plaintiffs must allege particularized facts demonstrating both that Defendants' statements were objectively false <u>and</u> not subjectively and honestly believed when made.

Plaintiffs do not come close to satisfying this exacting standard. Plaintiffs rely entirely on out-of-context, publicly available statements related to alleged failures of Mueller products in four locations: San Diego, California; Santee, California; Chillicothe, Missouri; and the state of Missouri more generally. For numerous reasons, however, those allegations are utterly deficient.

---

[1] Per the Notice of Suggestion of Death filed on October 3, 2019, Defendant Gregory E. Hyland is deceased. (ECF No. 34.) Plaintiffs have not indicated whether they intend to withdraw their claims against Mr. Hyland or attempt to substitute a proper party under Fed. R. P. 25(a)(1).

Plaintiffs' allegations that Mueller incurred significant warranty liabilities in San Diego and the state of Missouri are based on selective excerpts of newspaper articles and testimony provided to the Missouri Public Service Commission.  But it is evident that Plaintiffs mischaracterize the articles' contents and the Missouri Public Service Commission's findings.  The Court may thus disregard Plaintiffs' mischaracterized allegations and instead consider the sources of those statements themselves in deciding this motion.  Because Plaintiffs' claims are primarily based on allegations related to San Diego and Missouri, that conclusion all but dooms their claims.

Moreover, Plaintiffs do not sufficiently allege that Defendants failed to actually consider or account for these alleged product failures in estimating warranty reserves.  In other words, the Complaint is devoid of any internal analyses, confidential witness statements, or other particularized allegations indicating that Defendants' estimated warranty reserves ignored these areas or did not incorporate the isolated alleged product failures identified in the Complaint.  The Complaint is similarly devoid of any factual allegations from which one could infer that product failures in one location may simply be extrapolated to apply to all others.  And given Plaintiffs' failure to sufficiently allege that any of the reserves were false when issued, they clearly have not adequately alleged that Defendants knew they were false when issued.

In reality, it is evident that Plaintiffs brought this action solely because, in April 2017 and August 2018, Mueller announced additional increased warranty charges after certain products began failing at a higher-than-expected rate.  The theory underlying Plaintiffs' claims is essentially that, in light of those later discrete charges, Mueller <u>must</u> have failed to earlier account for the various alleged product failures identified in the Complaint.  But Plaintiffs have not sufficiently alleged that the bulk of the alleged product failures they identify were even

2

related to Mueller's later-taken discrete warranty charges.    These "fraud-by-hindsight" allegations do not state a securities fraud claim.

## BACKGROUND

### A.    The Company and the Individual Defendants

Defendant Mueller is a manufacturer and marketer of products and services used in the transmission, distribution and measurement of water in North America with consolidated net sales of $916.0 million in 2018.  (AC ¶ 47; Ex. A, 2018 10-K at 1.)  Mueller's products and services are used by municipalities and the residential and non-residential construction industries. (Ex. A, 2018 10-K at 1.)  Mueller operates its business through two segments, Infrastructure and Technologies.  (*Id.*)

The Individual Defendants are Scott Hall, who has been the President and Chief Executive Officer ("CEO") of the Company since January 23, 2017; Gregory Hyland, who served as the President and CEO of the Company from January 2006 to January 22, 2017 (and who is deceased (*see supra*, n.1)); Marietta Zakas, who has been the Chief Financial Officer of the Company since January 2018, and Evan Hart, who served as the CFO from July 2008 to December 31, 2017.  (AC ¶¶ 38-42.)

Among its numerous products and services, the Company's Technologies segment also produces water meters (and water meter parts), which are generally classified as either manually read meters or "smart meters" which are remotely read meters via radio technology.  (Ex. A, 2018 10-K at 3.)  A manually read meter consists of two components: a water meter and a register that gives a visual meter reading display.  (*Id.*)  A smart meter is the newest technology and consists of a water meter and a register but is also equipped with radio transmitters operating with fixed network advanced metering infrastructure systems ("AMI").  AMI eliminates the need for utility personnel to travel through service territories to collect meter reading data.  (*Id.*)

3

**B.**      **The Company's Prompt Disclosures of Warranty Charges and Continuous Risk Disclosures**

During the proposed Class Period, Mueller provided detailed disclosures about its warranty reserves estimates as well as the risks its business faced, especially the risks associated with new products and systems. The Company explained that "[t]he long-term success of our newer technologies, such as smart metering . . . depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems." (Ex. B, 2016 10-K at 11.) Its annual reports filed with the SEC disclosed:

> The success of our new products and systems will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems may have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance or reliability requirements. <u>Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance and warranties.</u> These challenges can be costly and technologically challenging, and <u>we cannot determine in advance the ultimate effect they may have.</u> Failure to successfully manage these challenges could result in lost revenue, <u>significant warranty and other expenses</u>, and harm to our reputation.

(Ex. C, 2017 10-K at 10; Ex. B, 2016 10-K at 11.)[2] The Company further disclosed its methodology in estimating warranty costs and explicitly cautioned investors that its estimates were not infallible and were subject to revision as information becomes available:

> We accrue for warranty expenses that can include customer costs of repair and/or replacement, including labor, materials, equipment, freight and reasonable overhead costs. We accrue for the estimated cost of product warranties at the time of sale if such costs are determined to be reasonably estimable at that time. Warranty cost <u>estimates</u> are <u>revised throughout applicable warranty periods as better information regarding warranty costs becomes available</u>.

(Ex. C, 2017 10-K at F-10; Ex. B, 2016 10-K at F-10.)

---

[2] All emphasis in quotations is added unless otherwise indicated.

4

On April 28, 2017, the Company disclosed that it "recently became aware that certain radio products produced between 2011 and 2014 were failing at a higher-than-expected rate. Consequently, cost of sales in the 2017 second quarter included a discrete $9.8 million charge to meet current and future warranty obligations." (Ex. D, Form 8-K, Conference Call Script at 5 (Apr. 28, 2017). In light of the recently discovered defects, Mueller "refined its estimates and increased the warranty reserve" and "carefully examined its product processes and accelerated lifecycle testing data with respect to radios manufactured after the period referenced above and expect[s] its warranty experience to be in line with industry standards. (*Id.* at 5.)

The Company cautioned investors that statements regarding the Company's "expectations for growth in our key end markets, <u>predictability of warranty experience</u> and financial results" are forward-looking statements within the meaning of the PSLRA. (*Id.* at 7.) The Company disclosed that these statements "are based on certain assumptions and assessments made by us in light of our experience and perception of historical trends, current conditions and expected future developments" and thus "[a]ctual results and the timing of events may differ materially from those contemplated by the forward-looking statements due to a number of factors. . . . Undue reliance should not be placed on any forward-looking statements." (*Id.*)

In its annual report for 2017, the Company again provided detailed disclosures relating to its warranty reserves:

> "During our second quarter, we became aware that some radio products produced between 2011 and 2014 and installed in particularly harsh environments were failing at a higher-than-expected rate. Consequently, we recorded a discrete warranty expense of $9.8 million associated with these products in our Technologies segment. We have carefully examined our product processes and accelerated lifecycle testing data with respect to radios produced after the period referenced above and expect our future warranty experience to be in line with industry norms."

(Ex. C, 2017 10-K at F-34.)  The report reiterated the risks associated with new technology, including the challenges presented by warranty reserves estimates and possible additional "significant warranty and other expenses."  (*Id.* at 10.)

On August 6, 2018, the Company issued a press release reporting its 2018 third quarter results.  (Ex. E, Form 8-K (Aug. 6, 2018).)  The Company reported net sales of $250.2 million and disclosed that it recorded a $14.1 million discrete warranty charge at its technologies segment.  (*Id.* at 10.)

The next day, on an investor conference call, the Company disclosed that during the third quarter of 2017, it recorded a $14.1 million warranty charge based on new information for potential claims years out into the future:

> During the quarter, we completed a <u>new</u> study of our historical warranty experience for products produced and sold through 2017.  We assess our warranty liabilities periodically and adjust amounts as necessary, using new information to update our estimates.  The charge is for warranty costs we expect to incur in periods between 2019 and 2027 reflecting our standard warranty terms for such products.  Based on our experience to date and <u>current expectations</u>, the reserve is *expected* to be adequate and sufficient to cover our obligations for these products over the remaining periods of warranty."

(Ex. F, Form 8-K, Conference Call Script, at 4-5 (Aug. 7, 2018).)

On September 30, 2018, Mueller filed its annual report for 2018, reporting total net sales of $916 million, and addressed again the two discrete warranty expenses of $9.8 million and $14.1 million.  (Ex. A, 2018 Form 10-K at 10.)  The Company explained:

> Warranty liabilities and the related reserve estimation process is <u>highly judgmental</u> due to the complex nature of these exposures and the unique circumstances of each claim.  Furthermore, once claims are asserted for a product defect, it can be difficult to determine the extent to which the assertion of these claims will expand geographically.
> . . . .
> Warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available. . . . These estimates are <u>inherently uncertain</u> as they are based on historical data.  If warranty claims are

made in the current period for issues that have not historically been the subject of warranty claims and were not taken into consideration in establishing the accrual or if claims for issues already considered in establishing the accrual exceed expectations, warranty expense may exceed the accrual for that particular product. . . .We monitor and analyze our warranty experience and costs periodically and may revise our warranty accrual as necessary.  However, as we cannot predict actual future claims, the potential exists for the difference in any one reporting period to be <u>material</u>.

(*Id.*)

## ARGUMENT

This Court is familiar with the standards governing a claim for securities fraud: Plaintiffs "must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the [PSLRA], meaning that the claim must 'stat[e] the circumstances constituting fraud with particularity.'"  *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 225 (S.D.N.Y. 2018) (Failla, J.)  (citation omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).

**I.    PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR MISLEADING STATEMENT UNDER SECTION 10(B) AND RULE 10b-5**

**A.    Plaintiffs Have Not Alleged that Defendants' Estimates of the Company's Warranty Reserves Were Both False and Not Honestly Believed**

Plaintiffs' claims are principally based on allegations that Mueller misrepresented its warranty reserves.  Plaintiffs, however, allege no particularized facts whatsoever to support that conclusion, which is subject to the more stringent standards for evaluating statements of opinion under the securities laws.  In *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No.  15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016), the court held that, unless plaintiffs can identify an "objective standard" for estimating warranty reserves, such estimates are matters of opinion and thus "are actionable only if they are 'both false and not honestly believed when they were made.'" *Id.*  at *8.  That holding is consistent with the Second Circuit's conclusion in an analogous

7

context that statements as to the adequacy of loan loss reserves "reflect management's opinion or judgment" and are "inherently subjective." *Fait v. Regions Fin.  Corp.*, 655 F.3d 105, 113 (2d Cir. 2011); *see also id.*  (to challenge adequacy of loan loss reserves, "plaintiff must allege that defendant's opinions were both false and not honestly believed when they were made").

The Supreme Court has similarly made clear that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc.  v. Laborers Dist.  Council Constr.  Indus.  Pension Fund*, 135 S. Ct. 1318, 1327 (2015).  Under *Omnicare*, a statement of opinion is actionable only if "the speaker did not hold the belief she professed," "the supporting fact[s] [the speaker] supplied were untrue," or the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning [the opinion], and . . . those facts conflict with what a reasonable investor would take from the statement itself." *Id.*  at 1327, 1329; *accord Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016).  Satisfying this standard "is no small task for an investor." *Omnicare*, 135 S. Ct. at 1332.  "A reasonable investor does not expect that <u>every</u> fact known to an issuer supports its opinion statement," but instead "understand[s] that opinions sometimes rest on a weighing of competing facts." *Id.*  at 1329.

Plaintiffs do not and cannot identify an objective standard for setting warranty reserves. To the contrary, Plaintiffs acknowledge that warranty reserves are "estimate[s]" involving "uncertainty as to possible loss in the future."  (AC ¶¶ 10, 12.)  Accordingly, Plaintiffs' claims are subject to the stringent standards applicable to opinion statements set forth in *Omnicare*.

Plaintiffs fall well short of satisfying those standards.  Plaintiffs challenge Mueller's warranty reserve estimates for each quarter and fiscal year between March 31, 2016 and March 31, 2018.  (*See* AC ¶¶ 114, 116, 119-22, 125, 134-36, 139, 152, 155-58, 163-64, 167-68, 170,

173, 176.)  But Plaintiffs allege no basis whatsoever for concluding that the actual estimates should have been higher, much less that Defendants believed they should have been higher when made over this two-year period.  Rather, Plaintiffs summarily assert that, "[h]ad Defendants undertaken the required [Generally Accepted Accounting Principles ('GAAP')] analysis they could not possibly have concluded that warranty liability" was what Defendants reported it to be. (AC ¶¶ 119, 125, 139.)  "Such generalized allegations fail to specify what caused the Defendants to know that the . . . reserves were insufficient." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 361-62 (S.D.N.Y. 2011) (rejecting similar allegations where plaintiffs did not "identify any contemporaneous internal document showing that [defendant's] loan loss reserves were improperly calculated" and otherwise offered no "particularized allegations that [defendant] was experiencing or internally predicting losses exceeding their set reserves"); *see also Hinerfeld v. United Auto Grp.*, No.  97 CIV. 3533 (RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) ("The failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws.").

The few specific instances of alleged product failures identified by Plaintiffs do not even remotely suggest otherwise.  Plaintiffs' allegations regarding alleged product failures in San Diego and Santee, for example, rely entirely on three newspaper articles incorporated into the Complaint.  (*See* AC ¶¶ 8, 82, 84, 86.)[3]  But the complete articles state something very different than the propositions for which Plaintiffs cite them.  The articles state that:

- Smart meters installed by the city of San Diego "could" have a glitch that prevents them from relaying water use wirelessly.  (Ex. G, Glitch in 57,000-Plus Smart Meters Prevents Them From Being Smart.)

- The potential glitch at issue affected 250 smart meters, and it was "unclear" if those

___

[3] The Court may consider the entire contents of those articles in deciding this motion.  *See In re NTL, Inc.  Sec.  Litig.*, 347 F.  Supp. 2d 15, 21 (S.D.N.Y.  2004).

9

meters had been replaced.  (*Id*.)

- The glitch at issue "did not impact customers or city operations," and San Diego had "no exceptional or unexpected problems regarding the [smart meter] equipment supplied by [their] vendors." (Ex. H, City Water Department Resisted Oversight, Downplayed Smart Meter Problems; *accord* Ex. G, Glitch in 57,000-Plus Smart Meters Prevents Them From Being Smart (describing the glitch as "minor" and stating that "no corrective action was required").)

- Mueller noted that it "shipped 'just under 400' replacement parts to San Diego," which was "small compared with the 75,000 smart meter parts the city has gotten from Mueller since 2010." (Ex. H, City Water Department Resisted Oversight, Downplayed Smart Meter Problems.)

- While San Diego had purportedly purchased more than 74,000 smart meters from Mueller, only 12,000 to 15,000 had actually been "connected to the smart water meter system." (Ex. G, Glitch in 57,000-Plus Smart Meters Prevents Them From Being Smart; *accord* Ex. I, City Water Bill Mess Puts Attention on the Water Department and Its Lack of Oversight (stating that only 15,000 meters were "sending wireless signals to the water department").)

- The remaining 59,000 to 62,000 meters were "not fully activated because they lack the complete radio equipment needed to allow them to send real-time water use data," not because of any malfunction of parts supplied by Mueller. (Ex. H, City Water Department Resisted Oversight, Downplayed Smart Meter Problems.)

It is thus evident that Plaintiffs' audacious assertions that "smart meters in San Diego failed at rate of 83%" and that Mueller was required to replace "90,000 meters" that it sold to San Diego (AC ¶ 85) are their own mischaracterizations of the articles, rather than particularized factual allegations.  As a result, they should not be considered by the Court.  *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (allegations contradicted by documents integral to the complaint cannot defeat motion to dismiss).  This conclusion all but dooms Plaintiffs' claims, which rely heavily and repeatedly on the allegations that Defendants "were aware that the failure rate associated with their AMI smart meters was an astounding 83%" and that "all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely."  (AC ¶¶ 116, 122;

*accord id.* ¶¶ 24, 84-85, 129, 136, 145, 155, 170, 176.)

Similarly, Plaintiffs' allegations regarding product failures experienced by Missouri American Water Company ("MAWC") are contradicted by matters of which the Court may take judicial notice. In support of those allegations, Plaintiffs rely on testimony provided to the Missouri Public Service Commission (the "Commission") in March 2016 regarding an investigation into MAWC's handling of faulty water meters. (*See* AC ¶ 66.) The Commission's Final Report on that investigation—which explicitly relies on the testimony cited by Plaintiffs (*see* Ex. J, MAWC Report at 3 n.1)—states that, while MAWC removed approximately 23,833 Mueller water meters between 2012 and 2015, "[t]he removals were due to <u>possible</u> imperfections" based on MAWC's "decision to start a change-out of meters that had a higher <u>potential</u> of being defective." (*Id.* at 5; *see also id.* at 16 ("MAWC took a more aggressive approach by removing more of the installed Mueller meters beyond the number range on the list of defective serial numbers.")); *see Smart v. Goord*, 441 F. Supp. 2d 631, 637 (S.D.N.Y. 2006) ("[T]he Court may take judicial notice of records and reports of administrative bodies." ). The report further states that "[a] total of 850 Mueller meters were returned by MAWC to Mueller," for a total refund of $101,520.91. (*Id.* at 13, 16.) Accordingly, Plaintiffs' repeated allegation that Mueller was aware of and failed to account for MAWC's replacement of approximately 22,000 defective meters (*see* AC ¶¶ 78, 116, 122, 129, 136, 155) is inconsistent with the Commission's final report and should not be considered by the Court. *See DHL Glob. Forwarding Mgmt. Latin Am., Inc. v. Pfizer, Inc.*, No. 13-cv-8218 (KBF), 2014 WL 5169033, at *4 (S.D.N.Y. Oct. 14, 2014) ("The Court need not accept as true any allegations that are contradicted by . . . materials amenable to judicial notice." (citation omitted)).

Moreover, Plaintiffs have not sufficiently alleged that any of the product defects

11

experienced by San Diego or MAWC were even related to the discrete warranty charges that Mueller announced in April 2017 and August 2018.  To the contrary, according to Plaintiffs, the glitch experienced by San Diego was "in the gears of the water meter's register"—the part of the meter that measures water flow.  (AC ¶ 83.)  By contrast, the April 2017 warranty charge related to a potting issue in the radio, the part of the meter that sends and receives radio signals (AC ¶¶ 28, 140), and the August 2018 warranty charged related to failures in certain unspecified "other [Mueller] Technologies products."  (Ex. A, 2018 Form 10-K at F-31.)

The remaining allegations offered as "support" for Plaintiffs' claims fare no better.  Plaintiffs allege that Mueller replaced smart meters sold to CMU at the following rates: 445 or 22% in 2015, 646 or 41.5% in 2016, 581 or 59% in 2017, 608 or 77.5 % in 2018, and 386 or 89% in 2019.  (AC ¶¶ 74-75.)  Plaintiffs also allege that, of 5,000 meters sold to the city of Santee, "only about half are still on the ground."  (*Id*.  ¶ 88.)  But Plaintiffs allege no facts whatsoever suggesting that Defendants failed to account for any of the above product defects in estimating warranty reserves.  To consider just one example, Plaintiffs do not explain specifically why the $2.1 million warranty liability disclosed in December 2016 failed to account for the 3,146 meters allegedly replaced by Santee and CMU.[4]  (*See id*.  ¶ 108.)  Of course, Plaintiffs do not and cannot allege that failure rates experienced by one municipality may simply be extrapolated to apply to others.  There are myriad reasons why products might fail at higher rates in one location than in others, including climate and weather.  (*See, e.g.,* AC ¶¶ 188-89 (certain radio products were failing in "humid and warm" climates and "particularly harsh environments").)

The accuracy of the Company's financial statements, including its warranty reserves, is

---

[4] Although the Court should not consider the additional alleged product failures experienced by San Diego and MAWC (*see supra*, pp. 9-11), the same conclusion would apply even if the Court were to consider those alleged product failures.

further supported by the fact that those statements were audited by an independent registered public accounting firm.  (Ex. B, 2016 10-K at 37, F-1; Ex. C, 2017 10-K at 35, F-1); *see Wyche v. Advanced Drainage Sys., Inc.*, No.  15 CIV. 5955 (KPF), 2017 WL 971805, at *17 (S.D.N.Y. Mar.  10, 2017) (Failla, J.), *aff'd*, 710 F. App'x 471 (2d Cir. 2017); *In re Turquoise Hill Res.  Ltd. Sec.  Litig.*, No.  13 Civ. 8846(LGS), 2014 WL 7176187, at *6 (S.D.N.Y. Dec.  16, 2014) (no inference of scienter where complaint lacked allegations that company's auditors disagreed with challenged accounting); *Harris v. AmTrust Fin.  Servs., Inc.*, 135 F. Supp. 3d 155, 161 n.9 (S.D.N.Y. 2015) ("A plaintiff alleging a GAAP violation when a restatement did not occur (as here) faces a high hurdle to allege a GAAP violation (as opposed to mere error in judgment) . . . ."), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

Nor do Plaintiffs allege any facts demonstrating that Defendants did not honestly believe that their warranty reserves were adequate when issued, that any supporting facts were untrue, or that their opinions omitted material facts about their inquiry into or knowledge about their opinions that would mislead a reasonable investor.  *See Omnicare*, 135 S. Ct. at 1327, 1329. Courts have rejected similar allegations where plaintiffs rely only on publicly available documents to argue that these facts "should have informed defendants of the increased risk to which [they] w[ere] exposed." *Okla.  Firefighters Pension & Ret.  Sys.  v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497–98 (S.D.N.Y. 2013) (dismissing claims where complaint failed to identify any "internal reports," "communications among employees, or firsthand accounts from confidential witnesses from which one could reasonably conclude that defendants manipulated or did not actually perform the . . . analysis they said they did" to determine loan reserves).

In sum, Plaintiffs do not and cannot cite to any internal analyses or reports contradicting any of Mueller's warranty reserve estimates when issued, much less sufficiently allege that

13

Defendants were aware that the Company's reserves were understated when issued. *See Pirnik*, 2016 WL 5818590, at *9 (dismissing claims based on allegedly understated warranty reserves where reports relied on by plaintiffs "did not directly 'contradict' [defendant's] estimates" and "were not 'internal analyses' of what [defendant's] estimates should really have been"); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 463 (S.D.N.Y. 2010) (dismissing as "fraud by hindsight" plaintiff's claim that loss reserves were misrepresented where plaintiff failed to allege "specific adverse credit data showing that loss reserves were too low"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 161 (D. Conn. 2007) (dismissing claim relating to inadequate loss reserves where plaintiffs "fail[ed] to reference any actual reports . . . that indicated that [defendant's] loss reserves were not sufficient"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).[5]

Finally, even if Plaintiffs could somehow overcome all of the above hurdles, Defendants' disclosures of Mueller's warranty reserves must be considered "in [their] full context," i.e., "in light of all [of their] surrounding text, including hedges [and] disclaimers." *Omnicare*, 135 S. Ct. at 1330. In a portion of its 10-K incorporated by reference into its 10-Qs (*see, e.g.*, Ex. K, 10-Q at 16 (Aug. 8, 2016)), Mueller specifically cautioned that:

> [t]he long-term success of our newer technologies, such as smart metering . . . depends on market acceptance and our ability to manage the risks associated with

---

[5] Plaintiffs' reliance on the GAAP principles articulated under Accounting Standards Codification ("ASC") 450 and 275 does not change the analysis. (AC ¶¶ 116, 122, 129, 136, 145, 155, 159, 167, 170.) For the reasons described above, Plaintiffs have not sufficiently alleged that Defendants failed to accrue a probable and reasonably estimable loss contingency under ASC 450, or failed to disclose the existence of a reasonably possible and material change in its estimates under ASC 275. *See Wyche*, 2017 WL 971805, at *17; *see also Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("It is well-settled that GAAP provisions are subject to interpretation and 'tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.'" (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)), *aff'd*, 649 F. App'x 7 (2d Cir. 2016). Nor have Plaintiffs alleged that Defendants knowingly failed to comply with those principles. *See Wyche*, 2017 WL 971805, at *16.

the introduction of new products and systems[,] . . . including costs associated with . . . warranties.  These challenges can be costly and technologically challenging, and we cannot determine in advance the ultimate effect they may have.  Failure to successfully manage these challenges could result in lost revenue, significant warranty and other expenses, and harm to our reputation.

(Ex. C, 2017 10-K at 10.)  Investors were thus aware of the risk that Mueller's products could fail, that the Company's success depended upon its ability to manage the risks associated with warranty costs, that the Company could not determine in advance the ultimate effect those risks would have, and that those risks could lead to significant warranty expenses.  A reasonable investor therefore would have viewed Mueller's warranty reserves for what they were— uncertain estimates that could prove inaccurate to the Company's detriment.  Plaintiffs' claims fail for this additional reason.  *See In re CIT Grp., Inc.  Sec.  Litig.*, 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (holding that "statements would not have misled a reasonable investor" in part based on "the extensive cautionary language that surrounded the statements, . . . [and] the explanation that the chosen level of reserves was the product of 'estimates and significant judgment'"); *see also Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004).

B.    **Defendants' Descriptions of the Company's Warranty Costs Were Not False or Misleading**

Plaintiffs also challenge the accuracy of Mueller's description of how it accrued for warranty expenses in its 2016 and 2017 10-K.  (*See* AC ¶¶ 128, 163.)  Plaintiffs assert that this description was false or misleading because Mueller "under-reserved for warranty costs" and "did not revise its warranty cost estimates based on the information it obtained concerning the product failures Missouri and San Diego experienced."  (*Id.*  ¶¶ 132-33, 167.)

Plaintiffs' claim fails for the reasons described above.  In short, Plaintiffs have alleged no particularized facts whatsoever demonstrating that Mueller understated its warranty liabilities or failed to appropriately revise its warranty liability estimates based on the few specific instances

15

of alleged product failures relied on in the Complaint.  This claim should thus be dismissed.[6]

### C.    Defendants' Cautionary Statements Were Not False or Misleading

Plaintiffs' challenges to the accuracy of the cautionary statements quoted above similarly fail.  (*See* AC ¶¶ 115, 117-18, and as repeated throughout.)  Plaintiffs specifically allege that, because some of Mueller's products had already failed and the Company had already incurred warranty costs, the Company's statements warning of a "risk" of potential product failures and warranty expenses were false or misleading.  (*See id.*)

But the Company's warnings that its products may fail and that it may incur warranty costs were not a guarantee that none of its products had actually failed or that it had not actually incurred any warranty costs.  To the contrary, a reasonable investor would understand that product failures and warranty costs are a routine part of business for most companies.  Plaintiffs' claims should therefore be dismissed.  *See In re FBR Inc.  Sec.  Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (company's description of regulatory risks "could not have been misleading to a reasonable investor" because "no reasonable investor would infer anything about the state of [the company's regulatory] compliance"); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 311 (S.D.N.Y. 2000) (holding that "cautions that [certain] business might not materialize" were "not inconsistent" with "the historical fact" that defendant had not received that type of business).  In any event, the Company did, in fact, inform investors that some of the risks at issue had materialized.  The Company stated its warranty liabilities in all of its public filings (*see supra*, pp. 8-9) and, starting in its September 30, 2016 10-Q, noted that certain products "have been failing

---

[6] Plaintiffs also claim that the statement that "warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available" was false and misleading because, in the third quarter of 2018, the Company conducted a "new study of [its] historical warranty experience."  (AC ¶ 167; *accord id.* ¶ 184.)  That claim is meritless.  That Mueller conducted a "new study" of warranty costs in mid-2018 does not suggest that the Company failed to properly account for warranty costs prior to that date.

at higher-than-expected rates," resulting in an additional warranty expense. (AC ¶ 154.)

### D.    Mueller's Publicly Filed Statements Regarding Its Discrete Warranty Charge Were Not False or Misleading

Plaintiffs' challenges to Mueller's statements regarding its additional $9.8 million warranty charge are more of the same. (*See* AC ¶¶ 140, 154, 175.)  Plaintiffs assert that the statements at issue were false or misleading because (i) Defendants were "aware of . . . product failures since at least January 2016 and failed to increase Mueller's warranty expense to account for these product failures"; (ii) Mueller "later admitted that it would take an additional $14.1 million warranty charge based on a purported 'new analysis of our historical warranty expense'"; and (iii) "Defendants were aware that it was probable that additional warranty expenses were necessary and Defendants were able to reasonably estimate the amount." (AC ¶¶ 143, 179.)

Plaintiffs' claims are unavailing for multiple reasons. First, as noted, Plaintiffs have not pled facts demonstrating any relation between the Company's additional warranty charges and the vast majority of the alleged product failures cited in the Complaint.  Defendants' purported awareness of those product failures (which also has not been sufficiently pled) does not suggest that the Company's subsequent unrelated warranty charge was belated or otherwise inaccurate.

Second, as also noted, to the limited extent Defendants were allegedly aware of radio product failures in January 2016, Plaintiffs have not alleged any specific facts demonstrating that Defendants failed to properly account for those failures in estimating warranty reserves.

Finally, the premise of Plaintiffs' claim—that the Company's statement describing its response to product failures must have been inaccurate because it experienced additional product failures and incurred additional warranty charges—is a classic "fraud-by-hindsight" theory that has been repeatedly rejected by courts. *See NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, No.  10-Civ.-440 (LAK)(HBP), 2012 WL 3191860, at *10 (S.D.N.Y. Feb.  9, 2012)

17

("[T]hat defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think [the] reserves were adequate at the time the registration statement and prospectus became effective."); *In re Wachovia*, 753 F. Supp. 2d at 361 ("[A] 'massive increase' to loan loss reserves 'is not, in itself, an indicator that the previous reserve levels were inadequate'").[7]

### E.    Defendants' Statements During the April 28, 2017 Investor Conference Call Were Not False or Misleading

Plaintiffs also challenge certain statements regarding the Company's $9.8 million warranty charge made by Defendants Hall and Hart during an April 28, 2017 investor conference call. (*See* AC ¶¶ 146, 148.) Plaintiffs allege that the statements at issue were false or misleading because (1) "Mueller would take another $14.1 million warranty charge just 15 months later based upon defective products that were manufactured after the 2011-2014 time frame"; (2) "the $9.8 million warranty charge was not sufficient to cover the product failures and defendants Hall and Hart were aware of this fact"; and (3) the Company's statements "assured investors that the Company had determined what the problem with the 2011-2014 products was and had tested the newer products and determined that they would not fail at above average rates," but "Mueller's AMI products continued to fail." (AC ¶¶ 149-50.)

As a threshold matter, however, Plaintiffs do not allege facts demonstrating that the Company's April 2017 $9.8 million warranty charge was insufficient to cover "issues with the radios produced between 2011 and 2014." (AC ¶ 148.) To the contrary, the Company's public filings state:

---

[7] *See also Fait*, 655 F.3d at 107 (rejecting challenge to the adequacy of reported loan loss reserves even where company "doubled its loan loss provision to $1.15 billion as compared to a year earlier"); *Emps. Ret. Sys. of Providence v. Embraer S.A.*, No. 16 . 6277 (RMB), 2018 WL 1725574, at *9 (S.D.N.Y. Mar. 30, 2018).

In 2017, our warranty analysis identified certain <u>Technologies radio products</u> produced prior to 2017 and installed in particularly harsh environments that had been failing at higher-than-expected rates. . . . As a result, we recorded an additional warranty expense of $9.8 million in the second quarter of 2017. . . . During the quarter ended June 30, 2018, we completed a similar analysis and determined, based on this new information, that certain <u>other Technologies products</u> had been failing at higher-than-expected rates <u>as well</u>, and that the average cost to repair or replace certain products under warranty was higher than previously estimated.  As a result, in the third quarter of 2018, we recorded an additional warranty expense of $14.1 million associated with such products.

(Ex. A, 2018 Form 10-K at F-31.)  Those statements clearly indicate that the Company's two discrete warranty charges related to different products.[8]

More importantly, Hart's statement that he "think[s]" the Company's warranty charge was adequate was clearly an opinion.  (AC ¶ 148); *see Omnicare*, 135 S. Ct. at 1326 (discussing how use of the phrases "I believe" or "I think" denote opinions); *cf. Fait*, 655 F.3d at 113 (statements regarding the "adequacy" of loan loss reserves are opinions).   Even assuming, *arguendo*, that Hart was mistaken as to the adequacy of the Company's April 2017 warranty charge, there is absolutely no indication in the Complaint that he was or should have been aware of that fact.   Allegations that Defendants "'possess[ed] facts which should have led them' to make further inquiry . . . without more, 'do not sufficiently allege that the individuals' disbelieve their stated opinions." *Sjunde AP-Fonden v. Gen.  Elec.  Co.*, No.  17-CV-8457 (JMF), 2019 WL 4094559, at *10 (S.D.N.Y. Aug.  29, 2019) (citation omitted); *City of Omaha.  v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) (per curiam) (concluding that "plausibly plead[ing] that defendants were aware of facts that should have led them" to undertake goodwill impairment testing did not suffice to allege that "defendants did not believe in their statements of opinion

---

[8] Further, contrary to Plaintiffs' allegation, the Company's August 8, 2018 10-Q does not establish otherwise.  (*See* AC ¶ 189).  There, the Company stated only that it took an additional $14.1 million warranty charge because "certain Technologies products have been failing at higher-than-expected rates." (*Id.)*

regarding . . . goodwill at the time they made them"); *Fait*, 655 F.3d at 110, 112 (finding that "clear indications that impairment testing was necessary" did not "plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them").

Similarly, Plaintiffs do not allege any facts establishing the falsity of Hart's statements that Mueller had conducted "advanced life cycle testing" on products made after 2014 and that those tests indicated a failure rate that was "better than industry averages." (AC ¶ 148.) The mere allegation that the Company took an additional warranty charge over a year later is plainly insufficient. There are no specific allegations connecting the products referenced in Hart's statements to those related to the Company's August 2018 warranty charge and, in any event, this claim again relies on a blatant "fraud-by-hindsight" theory that should be rejected. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 & n.68 (2d Cir. 2014) ("We do not recognize allegations of 'fraud by hindsight.'" (citation omitted)).

Nor is there any merit to Plaintiffs' challenge to Hall's statement that the Company had "error-proofed the manufacturing process, so this particular failure mode won't repeat itself." (AC ¶ 146.) Plaintiffs have not sufficiently alleged that the products referenced in that statement—i.e., products manufactured <u>after</u> the allegedly defective "radios produced between 2011 and 2014" (AC ¶ 148)—continued to fail in the same manner.[9]

### F.     Defendants' Statements During the May 8, 2018 Investor Conference Call Were Not False or Misleading

Plaintiffs' claims based on statements made during a May 8, 2018 investor conference call are similarly unavailing. (*See* AC ¶ 180.) Plaintiffs allege that "Defendants' Hall's and

---

[9] Plaintiffs also challenge Defendant Hart's statement that the Company "recently became aware" of certain radio product failures, alleging that "Defendants were aware of these failures by January 2016 at the latest but failed to disclose them and failed to adequately reserve for warranties associated with the product failures." (AC ¶ 149.) This claim fails for the reasons already described. (*See supra*, pp. 9-15.)

Zakas's statements in the Company's May 8, 2018 conference call above were materially false and misleading because Defendants . . . were either aware of or recklessly disregarded the fact that the $9.8 million warranty expense was insufficient to cover the expected warranty costs associated with defective smart meters and there would in fact be an 'overhang' in terms of substantial additional warranty expenses associated with defective smart meters."  (AC ¶ 181.)

This claim fails for the reasons already described.  Plaintiffs have not sufficiently pled that the $9.8 million warranty charge was insufficient to cover the products it addressed, that Defendants could not have believed their opinions as to the adequacy of that charge, or that Hall could not have believed his opinion that he "think[s]" Mueller had "licked it."  (AC ¶ 180.)[10]

## II.     PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which is "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 308, 319.  This is a high bar: the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Slayton v. Am.  Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010).  "[S]cienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Local 134 IBEW Joint Pension Tr.  of Chi.  v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Here, Plaintiffs do not satisfy either requirement.

---

[10] Plaintiffs also appear to suggest that, during an August 7, 2018 conference call, Hall misled investors to believe that the Company's August 2018 discrete warranty charge was unrelated to the product failures that necessitated its April 2017 warranty charge.  (*See* AC ¶¶ 186-89.)  But Plaintiffs have alleged no specific facts demonstrating that this statement was misleading for the reasons already explained.

21

### A.    Plaintiffs Do Not Sufficiently Allege Motive to Commit Fraud

To establish a motive to engage in fraud, "plaintiffs must assert a concrete and personal benefit" to the individuals who allegedly carried out the fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs almost exclusively attempt to establish scienter by alleging that Defendants Hyland and Hart sold shares during the Class Period. But Second Circuit law is clear that stock sales alone cannot satisfy the PSLRA's stringent pleading requirement where plaintiffs do not also show that the trades were "unusual or suspicious." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011). Plaintiffs make no such showing here.

### 1.    The Majority of Purported Sales Were Exercises of Vested Stock Options

Plaintiffs allege that Defendants' fraud was motivated by their desire "to prop up the price of Mueller's stock while the Individual Defendants unloaded millions of dollars in Mueller stock." (AC ¶ 29.) This allegation is contradicted by the publicly available SEC "Form 4" filings that Plaintiffs rely on. Plaintiffs either deliberately misstate those filings or simply do not understand them, as they show that the majority of the transactions listed in the Complaint (AC ¶ 196) were not stock sales, but instead were the exercise of stock options that would otherwise expire and be canceled without any consideration. Courts have consistently held that the exercise of expiring stock appreciation rights does not demonstrate a defendant's motive to defraud. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) ("The fact that [defendant] exercised the expiring options and sold his newly-purchased shares does not, in and of itself, demonstrate a motive to defraud."); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (individual defendants' trades "involved the exercise of stock appreciation rights that were set to expire . . .

22

[or] involved the withholding of shares to satisfy tax requirements on vesting restricted stock" and thus the nature of the trades "suggests the absence of fraudulent motive"); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007) ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle, such as . . . convertible preferred stock . . . , creates an opportunity for profit through manipulation.").

Six out of the eleven allegedly improper transactions listed in the Complaint were exercises of stock options soon to expire. Specifically, Hyland's five sales between November 22, 2017 and November 29, 2017 represent his exercise of an option that was scheduled to expire on November 29, 2017, and was exercised in increments over the period of November 22, 2017 to November 29, 2017. (Ex. L, Nov. 27, 2017 Form 4; Ex. M, Nov. 29, 2017 Form 4.) Similarly, Hart's sale on November 3, 2017, represents his exercise of options, one of which was set to expire by November 29, 2017. (Ex. N, Nov. 6, 2017 Form 4.)

In addition, Plaintiffs offer no particularized allegations to show that the remaining five trades were "unusual or suspicious" in timing or scope. *Glaser*, 772. F. Supp. 2d at 587. Whether trading was unusual or suspicious turns on factors such as "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Eaton Corp. Sec. Litig.*, No. 16-CV-5894 (JGK), 2017 WL 4217146, at *11 (S.D.N.Y. Sept. 20, 2017); *Glaser*, 772. F. Supp. 2d at 587. Plaintiffs summarily assert that the relevant trades were "disproportionate in both the number of insider sales executed during this period as well as the proceeds received" (AC ¶ 197), but offer no factual allegations to support that assertion.

### 2.    Plaintiffs Make No Particularized Allegations of Profits

Plaintiffs also make no allegations regarding the net profit accruing to either Hart or Hyland. "Plaintiffs must allege not only the insider defendants' selling activity during the

relevant period, but also those defendants' net profits as opposed to gross proceeds . . . ." *Glaser*, 772 F. Supp. 2d at 587. The Complaint merely alleges that Hyland and Hart "illegally profited in these trades" (AC ¶ 198) along with the amount of gross stock proceeds, without any explanation as to the amount of net proceeds for each Defendant. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) ("[A]llegations of reaped 'proceeds' are insufficient, as the complaint does not identify net profits."); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270-71 (S.D.N.Y. 2009) ("While Plaintiffs allege that the . . . insider sales amount[] to $96 million in gross proceeds during the Class Period, they fail to allege any facts relating to the amount of profit the Individual Defendants garnered from their sales.").

### 3. The Percentages of Divested Holdings Do Not Support an Inference of Scienter

Further, Plaintiffs do not allege the total percentage of holdings Hart and Hyland retained. *See Glaser*, 772 F. Supp. 2d at 587 ("Plaintiffs must allege . . . overall percentage changes in defendant's holdings.") It is well-settled that a "decisive [factor] in assessing whether an insider's sales are indicative of scienter is "how many shares the insider sold during the class period relative to the total number of shares that he or she <u>could have</u> sold." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763 (S.D.N.Y. 2018). "Such a number appropriately captures not only the fact of sales, but also the extent to which the insider availed himself or herself of, or forwent, the opportunity to turn a profit before disclosure of concealed bad news." *Id.* Here, Defendants Hart and Hyland on average sold 19.6% and 8.6% of their holdings, respectively, and retained over 80.3% and 91.3% of their holdings, respectively. Courts have consistently held that such percentages do not support an inference of scienter. (*See* Ex. O, 2017 Proxy Statement, at 39); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865 (HB), 1998 WL 283286, at *6 & n. 3 (S.D.N.Y. June 1, 1998) (sales of 22.94%, 23.53%,

24

24.92% and 81.9% of holdings not suspicious when viewed in light of other relevant factors); *In re Gildan Activewear*, 636 F. Supp. 2d at 270-71, n. 5 (plaintiffs failed to plead that trades of 25% and 53% were "unusual").

### 4.     The Timing of the Sales Negates Any Inference of Scienter

Nor do Plaintiffs make any effort to explain how the timing of the sales at issue was in any way unusual or suspicious, a deficiency that is especially glaring given that none of the trades align with the alleged misstatements. (*See* AC ¶ 196 (reflecting trades spread across the Class Period—February 6, 2017 through December 5, 2017).) Setting aside sales attributable to expiring options, two sales occurred on February 6, 2017, and three sales occurred on November 8, 2017, November 29, 2017, and December 5, 2017, respectively. (AC ¶ 196.) "A broad temporal distance between [the] stock sales and a disclosure of bad news defeats any inference of scienter." *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (finding no inference of scienter where defendants "sales took place . . . twelve, four and three months, respectively," before correction of the alleged misstatements); *see also Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. July 27, 1999) (finding no inference of scienter where "the timing of the insider sales did not closely coincide with alleged false statements"). Plaintiffs offer no allegations as to how Defendants Hart and Hyland derived an improper financial benefit from sales that occurred almost three months before the first additional warranty charge on April 27, 2017, and nine months before the second additional warranty charge on August 6, 2018. *See City of Taylor*, 967 F. Supp. 2d at 800 ("[E]ven if plaintiff had demonstrated suspicious or unusual circumstances surrounding defendants' trading activity, the allegations. . .would nonetheless fail to persuasively show that the <u>timing</u> of those sales was 'calculated to maximize the personal benefit from undisclosed inside information'

25

[because] [n]either [defendant] sold his stock at the end of the putative class period, when insiders would have rushed to cash out." (citations omitted)).

Moreover, Plaintiffs' theory contravenes the foundational assumption behind all insider sales allegations: that defendants seek to maximize profits. *See id.* Here, Hyland and Hart did not maximize their potential return, as the sales in question took place at times when the trading price was low relative to the price at other dates within the Class Period, further negating an inference that they timed any sales to reap the benefits of insider information.[11] *See id.* (rejecting scienter allegations based on insider sales where "defendants sold their shares throughout the class period, and at times when the trading price was low."); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no inference of scienter where "the sales do not appear calculated to maximize the personal benefit from undisclosed inside information").

Plaintiffs' insider sales allegations are also subject to more compelling, non-fraudulent inferences. *See Ong*, 294 F. Supp. 3d at 227 ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."). In particular, Defendant Hyland stepped down as President and CEO in January 2017, announced his retirement on January 24, 2018 (eight months before the end of the Class Period), and passed away on April 12, 2019. (Ex. P, Form 8-K, Press Release, dated Jan. 24, 2018 (Jan. 29, 2018); ECF No. 34.) Therefore, a more compelling and non-culpable explanation for Hyland's sales is that he was preparing for estate planning in light of retirement and illness. *See City of Taylor*, 967 F. Supp. 2d at 799 (rejecting scienter inference

---

[11] *Compare* https://finance.yahoo.com/quote/MWA/chart (showing closing price on February 6, 2017 ($13.01), November 8, 2017 ($12.12), November 29, 2017 ($12.48), December 5, 2017 ($12.23)), *with, e.g., id.* (showing stock price on December 9, 2016 ($14.05), December 20, 2016 ($13.81), January 26, 2017 ($13.76), February 1, 2017 ($13.66), April 26, 2017 ($12.77), October 3, 2017 ($12.91), December 18, 2017 ($12.93) and August 2, 2018 ($12.50)).

where defendant "liquidated most, if not all of his shares during the putative class period" because he was "plan[ing] his retirement" and, in fact, "resigned as the Company's Chairman approximately three months before the class period ended"); *In re Health Mgmt. Sys.*, 1998 WL 283286, at *6 n. 3 (finding a lack of scienter where a defendant sold 81.9 percent of his holdings "most likely on account of the fact that he resigned" as a company director and "was divesting himself of his shares"); *see also Ronconi*, 253 F.3d at 435 ("A corporate insider may sell stock to fund major family expenses, diversify his portfolio, or arrange his estate plan.) .

In addition, while Hart and Hyland do not have a significant trading history to compare to their Class Period sales, there is a simple, non-culpable explanation for that fact. On January 10, 2017, the Company announced that it sold its Anvil International division for $315 million in cash. (Ex. Q, Form 8-K at 1 (Jan. 10, 2017).) Thus, any inference of scienter is not as compelling as an alternative nonfraudulent inference that Defendants were subject to closed trading windows the year preceding this transaction. *See In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 342 (9th Cir. 2002) ("[A]n enforced absence of trading history does not make sales suspicious."); *see also Wyche*, 2017 WL 971805, at *10.

### 5.    Other Factors Further Negate an Inference of Scienter

Other circumstances surrounding the purportedly improper sales further negate an inference of scienter. "Plaintiffs have alleged insider trading by only two [Mueller] insiders; the absence of any allegations of other insider trades before [Mueller] announced the impact of the [warranty reserves] undercuts any finding of the requisite strong inference of scienter." *In re Gildan Activewear*, 636 F. Supp. 2d at 271-72; *In re Health Mgmt. Sys.*, 1998 WL 283286, at *6 (same); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

27

Finally, Mueller conducted two share repurchase programs during the Class Period[12]—a fact that undermines any inference of scienter. *See In re WEBMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382(JFK), 2013 WL 64511, at *14 (S.D.N.Y. Jan. 2, 2013) (scienter allegations insufficient where defendants argued that fraudulently inflating its stock price during a share buy-back "would defy economic reason").

### B.      Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or Recklessness

For substantially the same reasons as those described above, Plaintiffs allege no particularized facts demonstrating that Defendants were aware or should have been aware of any improprieties or inaccuracies in their estimation of the Company's warranty reserves. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *17 (S.D.N.Y. Sept. 9, 2019) (alleging a misrepresentation of opinion is essentially identical to alleging scienter). Plaintiffs utterly fail to offer any particularized allegations to support their claim that Defendants "were aware or recklessly disregarded" inaccuracies in their warranty reserve estimates or financial statements. *See Pirnik*, 2016 WL 5818590, at *9 ("Lacking internal analyses, confidential witnesses, or other particularized allegations, Plaintiffs fail to adequately allege scienter with respect to Defendants' reserve estimates and related statements."); *Wyche*, 2017 WL 971805, at *14 (rejecting allegation that defendants "had access to facts indicating that their representation of the Company's finances was false" because "Plaintiff has not identified contemporaneous facts, reports, or statements to which Defendants had access and which contained information contrary to the information Defendants conveyed to the public"). Instead, Plaintiffs' scienter allegations are based on a classic "fraud by hindsight" theory that this

---

[12] (*See* Ex. R, Form 8-K, Conference Call Script at 6 (Apr. 28, 2017) (stating that the Company initiated a share repurchase of $50 million shares); Ex. F, Form 8-K, Conference Call Script at 13 (Aug. 7, 2018) (stating that the Company returned $42 million cash to shareholders through dividends and share repurchases).)

Court and numerous other have rejected as inadequate. *See Wyche*, 2017 WL 971805, at *17; *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant. . . . [A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (revisions to loan loss reserves "provide[d] absolutely no reasonable basis" to conclude "defendants did not think reserves were adequate at the time" they were made).

Nor have Plaintiffs sufficiently pled conscious misbehavior or recklessness in connection with the few alleged misrepresentations that may not be subject to *Omnicare*, such as the Company's cautionary statements or Hall's statement that the Company had "error-proofed the manufacturing process, so this particular failure mode won't repeat itself." (AC ¶ 146.) For instance, even assuming, *arguendo*, that the latter statement was inaccurate, there are no allegations suggesting that Hall was or should have been aware of that fact. Rather, the far more reasonable inference is that Hall in fact believed that the Company had addressed the product defects that necessitated the April 2017 warranty charge. *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 587-88 (S.D.N.Y. 2013) (no scienter in light of "much more compelling" non-fraudulent inference), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).[13]

---

[13] Plaintiffs' allegations that Defendants' Sarbanes-Oxley ("SOX") certifications were knowingly false or misleading fail for the reasons described above. (*See* AC ¶¶ 191-94.) Plaintiffs have not sufficiently alleged that the Company's financial statements were inaccurate, much less that Defendants were aware of any inaccuracies or lack of sufficient internal controls. *See Wyche*, 2017 WL 971805, at *17 (SOX certifications not misleading despite confidential witnesses statements that defendants were aware of compliance issues because "differences of opinion, even stark differences, . . . do not reveal scienter"). That conclusion is supported by the fact that the Company's financials were audited by an independent auditor and that the Company never issued a restatement for its Class Period financials. *See id*; *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012).

**III.    PLAINTIFFS' SECTION 20(A) CLAIMS SHOULD BE DISMISSED**

In order to state a claim under Section 20(a), Plaintiffs must allege: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).  Here, for the reasons described above, Plaintiffs have not sufficiently alleged either a primary violation of Section 10(b) or that any individual defendant was a culpable participant in a primary violation.  *See In re Veon Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2018 WL 4168958, at *22 (S.D.N.Y. Aug. 30, 2018) (plaintiffs were unable to allege a "culpable participant" for the same reasons they failed to allege scienter).  Accordingly, their control person claims fail.  *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011).

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Complaint with prejudice.

Dated: New York, New York
　　　　November 1, 2019

Respectfully submitted,

/s/ Scott D. Musoff
Scott D. Musoff
Jay B. Kasner
Thania Charmani
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Phone: (212) 735-3000
scott.musoff@skadden.com
jay.kasner@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants Mueller Water Products, Inc., J. Scott Hall, Evan L. Hart and Marietta Edmunds Zakas*

30