# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLEN CHAPMAN, ANDREA PETERSON AND KEVIN KELLY<br><br>Individually and On<br>Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>MUELLER WATER PRODUCTS, INC., GREGORY E. HYLAND, J. SCOTT HALL, EVAN L. HART, and MARIETTA EDMUNDS ZAKAS,<br><br>        Defendants. | Case No. 19-cv-03260 (KPF)<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

Lead Plaintiff Andrea Peterson and named plaintiff Kevin Kelly ("Plaintiffs" or "Investors"), individually and on behalf of all other persons similarly situated, by Investors' undersigned attorneys, for Investors' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Investors and Investors' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Investors' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire, and press releases published by and regarding Mueller Water Products, Inc. ("Mueller" or the "Company"), investigative interviews with Mueller's customers and former employees, analysts' reports and advisories about the Company, and review of other publicly available information concerning Mueller.  Investors believe that

1

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants, who purchased publicly traded common stock of Mueller on the New York Stock Exchange ("NYSE") during the period from May 9, 2016 through August 6, 2018, inclusive (the "Class Period"). Investors seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

1. Mueller is a leading manufacturer and marketer of products used in the transmission, distribution and measurement of water in North America.

2. Mueller's key prospects for future growth rested on sales in its Technologies segment, specifically in a sub-segment called Mueller Systems.

3. Mueller Systems manufactures and sources a variety of water technology products, namely, water meters which Mueller sells to municipalities. Municipalities use these water meters to measure water consumption and bill residential and commercial property owners accordingly.

4. Prior to and during the Class Period municipalities entered into multimillion-dollar contracts with Mueller to purchase Mueller's advanced metering infrastructure ("AMI") systems. Mueller's AMI systems, known as "smart meters" collect data from utilities' water meters using a network of permanent data collectors or gateway receivers that are always active or listening for the radio transmission from the utilities' meters. Mueller AMI smart meter products also had higher margins associated with them than Mueller's traditional water meter products.

5.       Mueller's AMI smart meter systems eliminate the need for utility workers to physically travel through service territories to collect meter reading data.

6.       Indeed, more and more municipalities began replacing the old water meter systems of the past with AMI smart meters.  As demand for Mueller's AMI smart meters during the Class Period increased, Mueller reported increased net sales in its Technologies  as well as higher gross margins "primarily due to the growth in shipments of higher margin AMI products."

7.       Unbeknownst to investors, Mueller's AMI smart meters suffered from crippling defects. Defendants were aware of these defects and of steadily increasing failure rates associated with AMI smart meters beginning in January 2016, at the latest.

8.       Indeed, in April 2016 Mueller representatives flew to San Diego to meet with San Diego public utility department managers.  The Mueller representatives informed the San Diego public utility department managers about a "glitch" in "the gears of the water meter's register [that] could prevent a dial from turning properly, which in turn will set off an alarm and possibly prevent the meter from relaying water-use wirelessly."  The only way to fix this problem was to replace the meter's register entirely.  According to an article in the *Voice of San Diego,* the San Diego city water department spent about $60 million in purchasing and attempting to install 280,000 smart meters across the city.[1]

9.       Mueller's smart meter products had ten-year warranties, meaning that Mueller was responsible for the costs associated with replacing or remediating these smart meter product failures.

---

[1] *City Water Bill Mess Puts Attention on the Water Department and its Lack of Oversight*, Voice of San Diego, Feb. 12, 2018, Richard Rivard.

10.     Warranty costs are a key financial statement metric for companies like Mueller who sell water meters. From an accounting perspective, warranties are a type of contingent liability, i.e. a set of circumstances involving uncertainty as to possible loss in the future.

11.     Generally accepted accounting principles ("GAAP") require companies accrue for losses from warranty obligations on their financial statements if it is (i) probable that customers will make claims under warranties relating to goods or services that have been sold, and (ii) the amount of that loss can be reasonably estimated.

12.     To calculate and record warranty expenses a company considers factors such as the historical percentage of warranty expenses to sales for the same types of goods for which the warranty is being recorded, the nature of the goods and their similarity to a good with a long history of sales, the likelihood of the goods or components of those goods to fail, and the expected costs to repair those goods. Using this information, a company must estimate the amount of warranty liability that will be incurred with respect to its products and record that liability as its products are sold. A company will then determine a percentage to apply to the goods sold to accrue a warranty liability for those goods. This amount is charged to expense at the time the goods are sold and a warranty liability is established on the company's balance sheet.

13.     The warranty liability amount must be evaluated for each reporting period and adjusted to account for other factors related to the goods sold, such as early indications that a particular product had a higher than estimated failure rate.

14.     Excluding or under-accruing warranty expense distorts a company's financial results.

15.     Throughout the Class Period Mueller systematically understated its warranty expense for AMI smart meter products in violation of GAAP while continuing to tout increased

4

shipments and net sales associated with those products.  Defendants not only misrepresented the viability and success of its AMI smart meter products, they filed false financial statements that distorted the Company's financial results by materially understating warranty liability.

16.    For example, despite having actual knowledge by April 2016 that 90,000 smart water meters in San Diego would need replacing Mueller did not increase its warranty reserves.

17.    Additionally, despite having actual knowledge that product failures and increased warranty costs were occurring beginning no later than January 2016 Mueller included in its financial statements false and misleading boilerplate risk disclosures, telling investors that the Company's success would depend on risks associated with new products that *"may"* have defects and that these defects *"could"* result in significant warranty expense.  In reality, Defendants knew the AMI smart meter products had serious defects that were far greater than anticipated, given the modest $2.7 million in warranty liability that Mueller estimated for the *entire* Company, not just Technologies, for second quarter of 2016, (as Mueller stated in its May 9, 2016 10-Q).  When Mueller filed its May 9, 2016 quarterly report and subsequent financial reports with the SEC it was aware that these product defects necessitated materially increased warranty expenses.

18.    Rather than increase its warranty liability in subsequent quarters, Mueller actually *decreased* its warranty liability in the next two quarterly reports.  For the quarter ended June 30, 2016 Mueller reported warranty liability of $2.5 million and for the quarter ended December 31, 2016 Mueller reported warranty liability of only $2.1 million.

19.    It was not until April 2017 - one full year after Mueller privately acknowledged the product defects in a meeting with San Diego public utility officials- that Defendants began to disclose the product failures to investors.

20. On April 27, 2017, the Company disclosed that it would take a discrete $9.8 million warranty charge because it purportedly "recently became aware that some radio products produced between 2011 and 2014 were failing at a higher-than-expected rate." This $9.8 million warranty charge represented over half of the $18.1 million in net sales for the *entire* Technologies segment for the quarter. The $9.8 million charge was also a whopping 4.6 times the $2.1 million in warranty liability the Company estimated in the prior quarter.

21. On this news, the Company's share price fell $1.43 per share, more than 11% on April 28, 2017, trading at over six time the previous day's volume, damaging investors.

22. Defendants brazenly violated GAAP; though GAAP emphasizes that Defendants must consider all available information in reporting warranty liability. Despite having actual knowledge of the product defects that required materially increased warranty liability Defendants waited *one full year* to disclose the product failures and take a corresponding warranty charge.

23. Nevertheless, in the same breath as Mueller disclosed the outsized $9.8 million warranty charge it also touted the growth in AMI product sales, stating, with respect to Mueller Technologies, that the primary driver of the increase in net sales for the second quarter of 2017 was AMI shipments which "increased 40 percent in the quarter year-over-year."

24. Defendants also reassured investors that "We have also carefully examined our product processes and accelerated lifecycle testing data with respect to radios manufactured after the period referenced above and expect our warranty experience to be in line with industry standards." This statement was false. On a conference call Defendant Hall cited the "industry average" failure rate as near 0.4% In reality, the failure rates on Mueller's AMI smart meters were as high as *83%*. Had Defendants "carefully examined our product processes and lifecycle testing data" for later manufactured radios they would have discovered that their warranty experience was

6

way out of line with "industry standards" given the outsized $14.1 million warranty charge the Company would take related to these products just 15 months later.

25.    Defendants continued to lie to investors, assuring them that the Company would not incur additional warranty expenses of this magnitude and had "***error-proofed the manufacturing process, so this particular failure mode won't repeat itself*".**

26.    Defendants revealed the falsity of their statements approximately 15 months after they disclosed the $9.8 million warranty charge.  On August 6, 2018 the Company announced it would take a $14.1 million warranty charge.  This $14.1 million warranty charge represented over half of the quarter's net sales of $26.1 million (54%) in the *entire* Technologies segment.

27.    On this news, the Company's share price fell 6%, or $0.74 per share, to close at $11.58 per share on August 7, 2018, trading at over four times the prior day's volume, damaging investors.

28.    Defendants deceitfully attempted to dissociate the prior year's $9.8 million warranty charge from the current charge stating that the current $14.1 million charge was the result of "a new study of our historical warranty experience" the Company had just performed during the recent quarter. Mueller stated in its 10-Q that "certain Technologies products have been failing at higher-than-expected rates as well, and that the average cost to repair or replace certain products under warranty was higher than previously estimated." Mueller cited failures in "radio products produced prior to 2017 and installed in particularly harsh environments," the very *same* failures Mueller attributed to the $9.8 million warranty charge Mueller took 15 months earlier.  (*See infra* at 155).  In reality, Defendant were aware of steadily increasing AMI smart meter failure rates in each successive quarter following Defendants' disclosure of their $9.8 million warranty charge, yet they deceptively maintained that the $9.8 million was sufficient to cover the product failures,

7

waiting another fifteen months to adjust their warranty liability to account for the increasing failure rates.

29.    Defendants' fraud was motivated by their desire to make  Mueller's Technologies segment appear more profitable than it was and to prop up the price of Mueller's stock while the Individual Defendants unloaded millions of dollars in Mueller stock.

30.    Indeed, between February 6, 2017 and December 5, 2017 Defendants Hyland and Hart sold a total of 1,743,565 of Mueller stock for proceeds of $21,747,095.86, with Defendant Hyland unloading a whopping 1 million shares in a single transaction that took place on February 6, 2017 for proceeds of $12,490,000. These insider sales were completely out of line with Hyland's and Hart's prior trading history.  Indeed, *none* of the Individual Defendants sold *any* Mueller stock in 2015 or 2016.

## JURISDICTION AND VENUE

31.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

32.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

33.    Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

8

34.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

35.     Lead Plaintiff Andrea Peterson purchased Mueller stock at artificially inflated prices during the Class Period and has been damaged thereby.  Her PSLRA certification was previously filed with this Court. (Dkt. No. 13-2) and is incorporated by reference herein.

36.     Plaintiff Kevin Kelly purchased Mueller stock at artificially inflated prices during the Class Period and has been damaged thereby.  His PSLRA certification is attached hereto and is incorporated by reference herein.

37.     Defendant Mueller Water Products, Inc. ("Mueller" or the "Company") was incorporated in Delaware in 2005.  Mueller's principle executive offices are located in Atlanta, Georgia.  Mueller is a leading manufacturer of products and services used in the transmission, distribution and measurement of water in North America.  Its products and services are used by municipalities and the residential and non-residential construction industries.  Mueller's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "MWA."

38.     Defendant Gregory E. Hyland ("Hyland") was the President and Chief Executive Officer ("CEO") of Mueller from January 2006 to January 22, 2017.

39.     Defendant J. Scott Hall ("Hall") has been the President and CEO of Mueller since January 23, 2017.

40.     Defendant Evan L. Hart ("Hart") was the Chief Executive Officer ("CFO") of Mueller from July 2008 to December 31, 2017.

9

41.     Defendant Marietta Edmunds Zakas ("Zakas") has been the CFO of the Company since January 2018.

42.     Defendants Hyland, Hall, Hart, and Zakas are sometimes referred to herein as the "Individual Defendants."

43.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

44.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

45.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

10

46.    The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## Background of the Fraud

47.    Mueller is a leading manufacturer and marketer of products and services used in the transmission, distribution and measurement of water in North America.  Its products and services are used by municipalities and the residential and non-residential construction industries.

48.    The Company operates in two business segments: Infrastructure and Technologies.

49.    The Technologies segment offers residential and commercial water metering, water leak detection and pipe condition assessment products, systems and services.  In turn, the Technologies segment is comprised of the Mueller Systems and Echologics businesses.

50.    The fraud in this case concerns Mueller's Technologies segment, specifically Mueller Systems. Mueller Systems sells water metering systems, products and services directly to municipalities and to waterworks distributors.

51.    Prior to and during the Class Period revenue from Mueller's Technologies segment came primarily from sales in Mueller Systems.  Sales from Mueller Systems accounted for 83%, 83% and 88% of Mueller Technologies' net sales in 2017, 2016 and 2015, respectively.

52.    Mueller Systems manufactures and sources a variety of water technology products under the Mueller Systems and Hersey brand names.

53.    Residential and commercial water meters are either manually read or read remotely via radio technology.  A manually read meter consists of a water meter and register that gives a visual meter reading display. Remotely read meters, equipped with radio transmitters (endpoints) use encoder registers to convert the measurement data from the meter into an encrypted digital

11

format which is then transmitted via radio frequency to a receiver that collects and formats the data appropriately for water utility billing systems.

54.     Remotely read systems are either automatic meter reading ("AMR") systems or fixed network advanced metering infrastructure ("AMI" systems). In AMR systems the equipment for reading the meter, including a radio receiver, computer and reading software, collects the data from the utilities' meters.  In AMI systems, data is gathered using a network of permanent data collectors or gateway receivers that are always active or listening for the radio transmission from the utilities' meters.

55.     The benefit of AMI systems is that they eliminate the need for utility workers to physically travel through service territories to collect meter reading data. According to Mueller, AMI systems also provide the utilities with more frequent and diverse data from the meters at specified intervals.

56.     Mueller refers to its AMI systems as "smart metering." Prior to and during the Class Period Mueller was focused on the growth of its AMI products as a key to its future success.  For example, according to Mueller's 10-K filed on November 24, 2015, the "long-term success of our newer technologies- such as smart metering and leak detection and pipe condition assessment [ ] are key to the Mueller Technologies business...Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manual-read meters to automatically read meters."

57.     Throughout the Class Period Mueller emphasized that its growth strategy was focused on AMI segments of the market.

58.     In Mueller's investor presentation at the Gabelli 26th Annual Pump, Valve and Water Systems Symposium annexed to Mueller's February 25, 2016 8-K filed with the SEC

12

Mueller noted that it "transformed the Company by acquiring or developing new technologies, adjusting portfolio and improving processes." Mueller touted Smart Metering with "longer range AMI systems; remote disconnect meter (RDM); leak detection and consumer portal which utilized the existing infrastructure at Mueller Systems national operations center."

59.    Similarly, in its May 10, 2016 Oppenheimer 11th Annual Industrial Growth Conference presentation, attached to Mueller's May 10, 2018 8-K filed with the SEC, Mueller touted that it would "Expand Intelligent Water Technology Offerings…Enhance Advanced Metering Infrastructure (AMI) system with longer-range communications, capabilities, remote disconnect meter and consumer portal." Mueller also touted its "longer range AMI systems; remote disconnect meter; leak detection and consumer portal." Mueller's presentation represented to investors that: "Mueller Technologies remains focused on growing sales of its *higher-margin[2]* AMI and leak detection technologies, and on improving operating performance over the course of the year. Backlog and projects awarded at both Mueller Systems and Echologics continued to be up substantially on a year-over-year basis at the end of the quarter."

60.    100% of Mueller Technologies' sales during the Class Period came from municipal spending.

61.    Indeed, prior to and during the Class Period municipalities were rapidly trading in the old water metering systems of the past for new "smart meter" systems. Municipalities entered into multi-million-dollar contracts with Mueller (or competitor companies that offered similar technology) for smart meter systems. These contracts had ten-year warranties. For example, a board member of Columbus, Light and Water, the municipal utility company in Columbus, Mississippi stated "Besides just the basic warranty on these meters, we got a 10-year coverage.

---

[2] All emphasis is added unless otherwise noted.

13

We made sure we got a letter from the manufacturer saying if there's a mass failure (3 percent of the meters installed have malfunctions) that we've got a 10-year warranty and the company would go in and replace not only the meter but pay for the labor to replace it.[3]"

62.     Because municipalities were increasingly adopting AMI systems, AMI product sales increased and began to offset declines in AMR products sales.  For example, Mueller boasted that for the third quarter of 2016 shipments of AMI products represented more than 50 percent of Mueller Systems' net sales for the quarter.  In turn water metering products (either AMR or AMI) comprised 83%, 83% and 88% of sales in the Technologies segment in 2017, 2016, and 2015.  Accordingly, AMI products represented nearly 50% of Technologies' sales.

63.      As Mueller saw consistent increases in net sales in its Technologies segment due to higher shipments of AMI products, it also saw consistent and steadily increasing product failures. Despite being aware of these severe product defects and despite conversations with municipalities concerning the malfunctions in water meter reading these defects caused, Mueller continued to tout its AMI sales and failed to increase its warranty expense.  Even though Mueller knew that its warranty liability was steadily increasing and would continue to do so as municipalities continued to experience product failures associated with products that Mueller knew had defects, Mueller remained silent about both the product problems and the warranty liability associated therewith, in violation of GAAP.

64.     When Mueller finally admitted problems with its smart meter products and recorded a warranty charge of $9.8 million it continued to mislead investors, materially understating the liability associated with these failures and deceptively telling investors that no

---

[3] *The Dispatch*, Columbus and Starkville, Mississippi "Recently approved meter has mixed results in other towns," Nathan Gregory, March 29, 2014.

warranty charge of this magnitude would occur again and that the Company had "error proofed" the manufacturing process.  Just a little over one year later Mueller would take an even larger charge of $14.1 million, also associated with smart meter product failures.

#### **Defective Mueller Smart Meters in Municipalities Throughout the Country**

65.    While Mueller was touting increased revenues from sales of its AMI products to municipalities, municipalities throughout the country were experiencing failures with those very products.

*i)    Missouri*

66.    In March 2016, more than one year before Mueller would admit product failures, a Utility Regulatory Auditor from the Missouri Public Service Commission ("Missouri PSC") testified concerning the results of an audit in a Missouri water system rate proceeding[4] ("Missouri Case").  *See Missouri Public Service Commission, Commission Staff Division Auditing Department, Surrebuttal Testimony of John P. Cassidy, Missouri-American Water Company, Case No. WR 2015-0301, Jefferson City Missouri, March 21, 2016.*

67.    The auditor in the Missouri case, John P. Cassidy ("Cassidy") provided testimony concerning what he described as a "***significant and widespread faulty meter issue*** that [Missouri American Water Company ("MAWC")] brought to the Staff's attention during a meeting on February 22, 2016."  P. 1.

68.    Cassidy testified that on February 22, 2016 Missouri PSC staff met with MAWC to discuss an unusually large amount of overtime that was incurred on MAWC's books during

---

[4] A rate proceeding or rate case is the formal process used to determine the amounts to charge customers for electricity, natural gas, private water and steam service provided by regulated utilities.
https://www3.dps.ny.gov/W/PSCWeb.nsf/All/364D0704BEEC5B7D85257856006C56B3?Open Document

15

October 2015.  During this meeting, PSC Staff learned that *in early 2015* MAWC had "*detected a serious and widespread issue regarding unusually high levels of premature failure rates associated with approximately 97,000 meters that it has acquired from Mueller Systems."*  **P. 7.**

69.    Mueller smart meters were installed in most of MAWC's water districts over a period of time ranging from 2012 through very early 2015.  MAWC discovered that the Mueller smart meters had either a defective magnetic design or problems with other components of the meter.  This resulted in either no recorded water usage or lower than actual usage meter readings.  P. 8.

70.    Chillicothe, Missouri is an example of one of the municipalities in Missouri that experienced astronomical failure rates associated with Mueller's defective AMI smart meters.

71.    According to an executive at Chillicothe Municipal Utilities ("CMU"), in 2010 CMU purchased approximately 4,000 Hersey meters from Mueller. Mueller replaced 3,300 of these meters in 2013 due to moisture contained in the nodes.

72.    Then, the smart meters began consistently failing yet again due to problems with the batteries.

73.    The Mueller smart meters were purchased pursuant to a ten-year warranty. By 2019 CMU replaced a total of 2,945 out of the 3,300 smart meters installed since 2013, making the failure rate of the Mueller AMI smart meters an astounding *89%.*

74.    The Mueller smart meter failure rates per year that CMU experienced  were as follows: 2014: 279 replacements; 2015: 445 replacements; 2016: 646 replacements; 2017: 581 replacements; 2018: 608 replacements; 2019: 386 replacements.

75.    By 2015 the failure rate associated with the AMI smart meters Mueller sold to Chillicothe was 22% and by 2016, it had jumped to 41.5%. It steadily climbed each subsequent

year.  By 2017 the failure rate was 59%; by 2018 the failure rate was 77.5%; and by 2019 the failure rate was 89%. Defendants were required to utilize those failure rates to estimate warranty liability and increase warranty liability each quarter to account for the steadily increasing failure rates.

76.     In other words, because Mueller knew that by the end of 2015 at the latest failure rates were 22%, that by the end of 2016 at the latest failure rates were 41.5%, and that by the end of 2017 failure rates were 59%  Mueller was required to take this data into consideration in accruing warranty liability to account for the likelihood that customers would make warranty claims at these corresponding rates for the same defective products that were still on the market and were under warranty.

77.     MAWC in turn, estimated that it replaced approximately *22,000* meters primarily during the time period spanning August 2015 through January 2016.

78.     Because these products were covered by Mueller's ten-year warranty, Mueller was required to increase its warranty expense to cover the costs of replacement of these 22,000 meters as well as increase its warranty expense to cover the costs of product failures that had not yet been reported based upon the failure rates Missouri experienced.

### ii) San Diego

79.     The San Diego city water department spent about $60 million in purchasing and attempting to install 280,000 Mueller Systems' smart meters across the city.

80.     While Mueller was aware of defects in the smart meters and communicated this to San Diego water officials in an April 2016 private face-to-face meeting between two Mueller representatives and managers of San Diego's Public Utilities Department that took place in San

17

Diego, it was not until consumers began complaining of impossibly high water bills that the public became aware of the defective smart meters.

81.    From 2010 through 2015 alone the San Diego Public Utilities Department purchased more than 74,000 Hersey smart meters from Mueller Systems for more than $7 million dollars.

82.    An August 2, 2018 article published by nbcsandiego.com entitled "Glitch in 57,000-Plus Smart Meters Prevents Them from Being Smart" reported that millions of dollars of smart meters installed across homes in San Diego could have a glitch that could prevent them from relaying water use wirelessly.  News outlets began investigating a potential problem with San Diego's smart meters when customers began to contact them in mid-summer 2017 complaining of unjustifiably highwater bills.

83.    While the San Diego Public Utilities Department did not publicize the defects in the Mueller Smart meters, it did take the problem seriously.  In April of 2016 representatives from Mueller Systems flew to San Diego to meet with public utility department managers. According to Katie Keach, a spokesperson for the city of San Diego, "Mueller representatives told the Public Utilities Department that the glitch is in gears of the water meter's register and could prevent a dial from turning properly, which in turn will set off an alarm and possibly prevent the meter from relaying water-use wirelessly."  Mueller discovered the defect in Hersey meters manufactured from 2011-2013 and informed the San Diego Public Utilities Department that the only way to fix the problem was to replace the meter's register entirely.

84.    According to a February 12, 2018 *Voice of San Diego* news article, San Diego has installed 90,000 Mueller smart meters and of those, only 15,000 were actually sending wireless

18

signals to the water department.[5]  That only one of six of Mueller's smart meters functioned is astounding, making the product failure rate *83%*.  This is many multiples of the 0.4% failure rate that Defendant Hall cited as the "industry average."  (*See* infra ¶148).

85.    Because the 90,000 Mueller smart meters were covered by Mueller's ten-year warranty, Mueller was required to increase its warranty expense to cover the costs of replacement of these 90,000 meters as well as increase its warranty expense to cover the costs of product failures that had not yet been reported based upon the failure rates San Diego experienced. In other words, because Mueller knew by February 12, 2018, at the very latest, that the smart meters in San Diego failed at a rate of 83% Mueller was required to take that into consideration in accruing warranty liability to account for the likelihood that customers would make warranty claims at a rate of 83% for the same defective products that were still on the market and were under warranty.

*iii) Santee*

86.    In addition to San Diego, the general manager of the Padre Dam Municipal Water District in Santee, California bluntly described Mueller's smart meters as simply a "bad product" "*City Water Department Resisted Oversight, Downplayed Smart Meter Problems*, voiceofsandiego.org, July 12, 2018.

87.    Padre Dam realized that Mueller's smart meters had problems and kept failing to send radio signals.  Padre Dam's general manager stated that "we realized that it was a bad product, the product is not something we want representing our water district."

---

[5] "City Water Bill Mess Puts Attention on the Water Department and its Lack of Oversight," Richard Rivard, Feb. 12, 2018.

88.     Of the 5,000 Padre Dam Mueller made meters initially installed only about half are still in the ground.  When one of the Mueller meters fails, Padre Dam replaces it with a meter made by another company.

89.     ***Former Mueller Systems' Employees Confirm Astronomically High Failure Rates of Mueller's AMI Meters and Product Returns***

90.     Confidential Witness 1 ("CW1") is a former Territory Manager for Mueller Systems.  CW1 was a Territory Manager for Mueller Systems from between May 2015 through June 2019.  CW1's territory included West Virginia, Tennessee and Kentucky. CW1 reported to Southeast Regional Manager Brian Harwood who in turn reported to Mueller Systems General Manager Hassan Ali, who was later replaced with Mueller Water Products Vice President and General Manager John DeYarman.

91.     CW1 reported that he saw problems with the smart meters from "day one" and that while the industry standard failure rate for meters and electronics was about 1-2%, Mueller had several customers who experienced product failure rates of 15-20%. CW1 never received an explanation for why these products were failing at such a high rate, indicating that Mueller had no solution to or remedy for the product failures.

92.     CW1 confirmed that the Company had a systematic method for tracking product returns which gave them clear visibility on failure rates for specific products and customers.

93.     CW1 explained that the Mueller Systems Return Merchandise Authorization ("RMA") Department tracked product failure rates based on customer returns and conducted detailed analyses of specific product failures.  The RMA Department was able to break down the returns by a specific product failure for which the return was attributable.  CW1 was able to request a product failure report for a specific customer, called a Disposition Report.  The Disposition

Report was an excel spreadsheet for product failures by a specific customer. CW1 stated that Doug Jones was the manager of the RMA Department. However, Jones left Mueller in June of 2018. CW1 speculated that Jones quit because of the high rate of product returns.

94.    As to management's knowledge of the high rate of returns, CW1 stated that he was copied on emails that his boss, Brian Harwood sent to senior management concerning product failures.

95.    CW1 stated that Mueller had a "huge contract" with American Water, which CW1 described as a "national utility company." The contract ran from 2011-2015. However, Mueller lost the contract with American Water because there were "a lot of meter issues." CW1 explained that while the Mueller and American Water were attempting to renegotiate the contract, American Water delayed returning broken meters that were still under warranty but then shipped a massive amount back in 2016. CW1 stated that in 2016 there were semi-tractor trailer trucks on Mueller's lot filled with meters being returned by American Water.

96.    CW1 stated that product defects and returns became so prevalent that during the last two years of his employment at Mueller (June 2017-June 2019) honoring warranties became "the bane of my existence." CW1 explained that before Hassan Ali's departure, the Company provided customers with an advanced replacement- meaning that once the customer informed Mueller of the defect Mueller would immediately provide a replacement. However, once John DeYarman replaced Ali, the Company stopped doing advanced replacements. Defendants' sudden retraction of their advanced replacement policy indicates that despite knowing of the product failures they were intentionally forestalling recording warranty liability in order to make Mueller Technologies appear more profitable than it was.

97.     Confidential Witness 2 ("CW2") was a Proposal Coordinator for Mueller Systems from October 2016 until June 2018.  CW2 was responsible for preparing proposals in response to water districts' requests for information regarding a full AMI deployment (i.e. completely replacing existing meters with Mueller's AMI smart meters).  CW2 stated that because his department was within earshot of Mueller Systems' service department, he heard that failure rates on version 3 radios and hot rod radios were between 20-30%.

98.     CW2 stated that high smart meter failure rates were a major problem since he started working at Mueller Systems.  CW2 elaborated that the Company had "all hands" meetings in which product returns were a "big issue."  CW2 stated that these meetings took place both before and after Defendant Hall became CEO.  CW2 stated that Mueller Systems was unable to focus on new orders because it was dealing with so many returns.  CW2 stated that he was told that Defendant Hall was hired to "reorganize and focus on the warranty issue."

99.     Confidential Witness 3 ("CW3") worked for Mueller Systems from 2008 until March 2017.  From 2008 to 2013 CW3 was a Territory Manager covering the Northwest.  In 2013 CW3 was promoted to Western Regional Manager where he oversaw between three and five Mueller Systems Territory Managers.  In this role, CW3 reported to a number of different people including Vice President of Business Development Matt Thomas, Dan Hack, General Manager and Vice President Hassan Ali and Vice President of Sales Kevin Keim.

100.    CW3 participated in quarterly meetings with all of the Mueller Systems' Regional Managers and marketing staff as well as Mueller Systems' upper management, including Mueller's General Counsel and Chief Compliance Officer, Keith Belknap, the various Vice Presidents of Sales (Dan Hack and Matt Thomas) as well as Mueller Systems' General Manager Hassan Ali (the highest ranking Mueller Systems employee, who in turn reported to President of Mueller Water

22

Products, Greg Rogowski). These quarterly meetings were held in either North Carolina, Toronto or Middleboro, MA. CW3 stated that "San Diego was a constant subject of discussion" at these quarterly meetings. So too were product failure rates in general, including specific failure rates for San Diego and American Water.

101.    CW3 stated that San Diego was having problems with Mueller's AMI smart meters prior to CW3's promotion to Western Regional Manager in 2013. CW3 participated in a number of conversations between Mueller representatives, including Mueller Territory Managers Tom Worth and Bill Coffey, and representatives from San Diego. The primary problem with the meters was a connection problem between the meter register and its end point such that the data being collected did not register to the endpoint.

102.    CW3 explained that additional problems with the meters included moisture in the nodes and cracking of the meter casings. CW3 describes these issues as a "common complaint" which CW3 spoke about with a number of water districts.

103.    CW3 stated that "there was growing and continuing frustration [among Mueller sales personnel] from a manufacturing standpoint that we could not resolve those issues. It got to the point that we couldn't manufacture new products because we were so busy repairing returned products." CW3 stated that as a result of these issues the Company was "getting huge batches of meters and registers returned."

104.    CW3 stated that he was aware of higher than expected failure rates associated with version 3 radios at least three years prior to the Company's April 27, 2017 statement that it "recently became aware that some radio products produced between 2011 and 2014 were failing at higher than expected rate." Specifically, CW3 recalled that by 2014, CW3, Mueller Systems General Manager Hassan Ali, the Heads of Product Marketing, Product Manufacturing and

23

Operations and Mueller Systems Regional Managers (who in turn reported to the Mueller's Vice President of Sales) found out about "issues with the podding in the radio" (i.e. the issue Defendants cited as necessitating the April 2017 warranty charge). CW3 stated that "pretty much everyone" was aware of the failure rates by 2014.

105. CW3 stated that by 2014/2015 "we were shipping radios that we knew we were going to have to replace." CW3 elaborated that the problems with the Version 3 radios were so pervasive that the Company "put a stop to manufacturing on radio shipments in late 2015 or early 2016." CW3 estimated that Version 3 radios had a 50% failure rate during the 2015/2016 timeframe. CW3 stated that Mueller Systems had fully deployed meter systems in his region that required replacing. For example, CW3 cited as an example, the Knob Hill Water Association in Yakima, WA which had a completely installed meter system that needed to be replaced because of the faulty Version 3 radio.

106. Reacting to Defendant Hart's statement that the Company "error-proofed the manufacturing process" CW3 described the statement as laughable and stated that error-proofing the manufacturing process is not even possible. CW3 stated that based upon his experience at Mueller any manufacturing process is certain to have human error and mechanical breakdowns and that it is therefore next to impossible to "error proof" the manufacturing process.

107. Because all of the Version 3 radios by Mueller's ten-year warranty, Mueller was required to increase its warranty expense to cover the costs of total replacement for all of the Version 3 radios it had sold based on a failure rate of 50%. In other words, because Mueller knew in "2014/2015" that it would have to replace Version 3 radios based of failure rates of 50% it was required to take that into consideration in accruing warranty liability to account for the likelihood

24

that customers would make warranty claims at a rate of 50% for the same defective products that were still on the market and were under warranty.

***Accounting Principles Imposed a Duty to Disclose the Potential Financial Impact on Mueller of Warranty Claims due to Product Failures***

89.108.      The SEC requires that publicly traded companies, such as Mueller, present financial statements in accordance with generally accepted accounting principles ("GAAP"). 17. C.F.R. 210.4-01(a)(1). SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "...*will be presumed to be misleading or inaccurate*, despite footnote or other disclosures..." 17 C.F.R. 210.4-01(a)(1).

90.109.      GAAP are those principles recognized by the accounting profession and the SEC as the uniform rules, conventions, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured.

91.110.      The responsibility for preparing financial statements in conformity with GAAP rests with Mueller's management, as set forth in Section 110.03 of the American Institute of Certified Public Accountants ("AICPA") Auditing Standards (Responsibilities and Functions of the Independent Auditor):

> The financial statements are management's responsibility...Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record process and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and related assets, liability and equity are within the direct knowledge and control of management...Thus the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.
> (footnote omitted).

25

92.111.    A warranty expense or warranty liability is the cost that a company expects to or has already incurred for the repair or replacement of goods under warranty that it has sold. The total amount of the warranty expense is limited by the warranty period for the particular good sold.

93.112.    Warranty expense is a fundamental metric for companies like Mueller who are in the water meter business.  As one analyst stated: "***warranty costs are part of doing business in the metering business, and excluding such charges distorts the long-term profitability and return profile of the segment.***"[6]

94.113.    ASC 460-10-25 titled "*Guarantees*" governs the accounting for warranty obligations incurred in connection with the sale of goods or services.  ASC 460 states that because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a loss contingency as defined under ASC 450.  "Obligations related to product warranties and product defects" are among the specific examples of loss contingencies listed under ASC 450.

95.114.    Accordingly, warranties are a type of contingent liability. A contingent liability or loss contingency is "an existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ¶ 1 (1975) (FAS 5); ASC 450-20-20. (FAS 5 was codified as ASC 450, Contingencies, in the FASB Accounting Standards Codification, which became the official single source of authoritative nongovernmental U.S. Generally

---

[6] Ryan Connors, Boenning & Scattergood, April 28, 2017.

26

Accepted Accounting Principles on July 1, 2009, and was effective for interim and annual periods ending after September 15, 2009. Hereinafter, FAS 5 is referred to as ASC 450.)

96.115.    When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote.  ASC 450 "uses the terms probable, reasonably possible, and remote to identify three areas within that range, as follows:

    a.      Probable. The future event or events are likely to occur.

    b.      Reasonably possible. The chance of the future event or events occurring is more than remote but less than likely.

    c.      Remote. The chance of the future event or events occurring is slight.

ASC 450-20-20.

97.116.    An estimated loss from a loss contingency must be accrued by a charge to income on a company's financial statements if: 1) before the financial statements are issued (or are available to be issued), there is available information indicating that the impairment of an asset or incurrence of liability is probable and 2) the amount of loss can be reasonably estimated.  ASC 450-20-25-2.

98.117.    Under ASC 450, "if some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued." Disclosure of an additional amount of exposure to loss is required if there is a reasonable possibility that the additional loss will be incurred.  ASC 450-20-30-1; ASC 450-20-50-3b.

99.118.    Loss contingencies that do not meet both criteria for recognition (i.e., probable and estimable) still may need to be disclosed in the financial statements. ASC 450.

100.119.      ASC 450 requires the issuer to disclose a loss contingency if there is at least a reasonable possibility that a loss may have been incurred (i.e., the possibility of a loss is more than "remote").  ASC 450-20-50-3.

101.120.      Where the loss contingency is less than probable, but not remote, the disclosure shall include "the nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ASC 450-20-50-4.[7]

102.121.      Consequently, where it is reasonably possible that a material warranty claim will be asserted a company must disclose in the financial statements "the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made."   ASC450-20-50-6.

103.122.      The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, the disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

104.123.      Accordingly, under ASC 450 losses from warranty obligations shall be accrued if, based on available information at the date of an entity's financial statements, it is

---

[7] "Disclosure is not required of a loss contingency involving an unasserted claim or assessment if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless both of the following conditions are met: a. It is considered probable that a claim will be asserted. b. There is a reasonable possibility that the outcome will be unfavorable." ASC 450-20-50-6. This provision pertains to single, discrete potential claims, such as lawsuits, but is inapplicable to product warranties where estimating the amount of warranty liability is based on a statistical analysis of historical and expected failure rates associated with a given product.

probable that customers will make claims under warranties relating to goods or services that have been sold and the amount of that loss can be reasonably estimated.

105.124.    ASC 450-20-50-3 emphasizes that the disclosure obligation applies even if a charge to revenue is not actually taken on Mueller's financial statements, i.e., disclosure of the contingency must be made regardless.  ASC-450-20-50-4 requires that the disclosure include both (a) the nature of the contingency; and (b) an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made.

106.125.    ASC 275 requires specific additional disclosures regarding estimates of loss contingencies if information known to management prior to the issuance of the financial statements indicates that both of the following criteria are met:  1) it is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future events and 2) the effect of the change would be material to the financial statements.

107.126.    To supplement the disclosure requirements of ASC 450, ASC 275 provides:

> The disclosure shall indicate the nature of the uncertainty and include an indication that is at least reasonably possible that a change in estimate will occur in the near term.  If the estimate involves a loss contingency…the disclosure shall also include an estimate of the possible loss or range of loss, or state that such an estimate cannot be made.

108.127.    To calculate and record warranty expenses the Company is required to consider factors such as the historical percentage of warranty expenses to sales for the same types of goods for which the warranty is being recorded, the nature of the goods and their similarity to a good with a long history of sales, the likelihood of the goods or components of those goods to fail, and the expected costs to repair those goods. Using this information, the company determines a percentage to apply to the goods sold to accrue a warranty liability for those goods.  This amount is charged to expense at the time the goods are sold and a warranty liability is established on the

29

company's balance sheet.  The warranty liability amount must be evaluated for each reporting period and adjusted to account for other factors related to the goods sold, such as early indications that a particular product had a higher than estimated failure rate.

109.128.      The Company must record an expense on its income statement  by the full amount of warranty expense when a sale is recorded, even if there are no warranty claims in the period.  As the warranty claims appear in subsequent accounting periods, the company reduces the warranty liability account on its balance sheet as actual warranty claims are paid and/or settled.

110.129.      Beginning in January 2016 at the very latest and extending through August of 2018 Mueller's warranty costs rose dramatically in relation to the existing smart water meters it had previously sold to customers.

111.130.      Accordingly, smart water meter failure rates had significantly increased well beyond the amount Mueller had previously anticipated and this meant that Mueller's warranty costs would substantially increase in January 2016 through August 2018 and it was thus "at least reasonably possible" that Defendants' estimate of warranty costs' effect on Mueller's financial statements would change and that the impact on the Company's financial statements would be material. GAAP therefore required disclosure of both this contingency and an estimate of the potential range of loss Mueller might incur as a result.

112.131.      Because of the 10-year warranty that Mueller offered to municipalities for its smart meters, Mueller was required to maintain warranty reserves sufficient to cover its estimated future warranty costs on each of the smart meter products manufactured between 2011 and 2014 that it had sold.

113.132.      Despite having actual knowledge of the unexpectedly high number of defective smart meters with ten-year warranties that Mueller sold to various municipalities, and

30

thus the warranty costs associated therewith by no later than January 2016, Defendants materially understated Mueller's warranty expense so that it could continue to tout increased sales in their high margin AMI (i.e. smart meter) business, distorting its true profitability.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

114.133.      On May 9, 2016 the Company filed a quarterly report on Form 10-Q for the quarter ended March 31, 2016 (the "2Q16 10-Q"), in which it reported $283.6 million net sales including $15 million net sales in its Technologies segment.  In Note 7 of the financial statements "Supplemental Balance Sheet Information" Mueller reported warranty liability for the quarter of $2.7 million.

115.134.      The 2Q16 10-Q incorporated by reference the risks the Company had disclosed in the Company's Form 10-K for the fiscal year ended September 30, 2015.  Regarding product defects, the Company stated:

> ***The long-term success of our newer technologies- such as smart metering and leak detection and pipe condition assessment- which are key to the Mueller Technologies businesses, depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems***.
>
> Our newer technologies comprise smart metering and leak detection and pipe condition assessment products and services.  These technologies are principally associated with our Mueller Systems and Echologics businesses, respectively.  Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manual-read meters to automatically-read meters…
>
> In addition, the success of our new products will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems ***may*** have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance and reliability requirements.  Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance ***and warranties***.   These challenges ***can be*** costly and technologically challenging, and we cannot determine in advance the ultimate effect they may have. Failure to successfully manage these challenges could result in lost revenue, ***significant warranty and other expenses***, and harm to our reputation.

31

116.135. The financial statements contained in the 2Q16 10-Q above were false and misleading as a result of the Company's understatement of warranty reserves in violation of GAAP. By the time Defendants issued the 2Q16 10-Q they were aware that approximately 22,000 smart meters in Missouri had to be replaced and had "unusually high levels of premature failure rates," that smart meters in Chillicothe were failing at a rate of at least 22%, that Version 3 radios were failing at a rate of 50%, and that all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely. Once Defendants were aware of these facts, ASC 450 required them to utilize this information to estimate warranty liability costs for not only these existing warranty claims, but future warranty claims based upon the same product defects in products Mueller already sold. Had Defendants done so they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial statements. Defendants were able to estimate the range of loss because they were aware of the nature of the product failures, the magnitude of the product failures, the warranty terms associated with the failing products, the number of same products already on the market and the costs to repair or replace the products under warranty. Accordingly, ASC 450 required that Defendants not only disclose the nature of the contingency but accrue a charge on their financial statements in the amount of the estimated loss or range of loss associated with likely warranty claims for these product failures. At the very least, Defendants were aware that given the high rates of product failures in San Diego and Missouri it was reasonably possible that a change in estimate in warranty expense would occur in the near term and that the effect of that change would be material to Mueller's financial statements. Accordingly, ASC 275 required Defendants to disclose the nature of the uncertainty, that it was

reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.

117.136.    The 2Q-16 10-Q statement referred to above concerning the "***risk*** that new products ***may*** have quality or other defects or deficiencies…that result in their failure" was materially false and misleading because significant defects, deficiencies and failures associated with new products were ***already*** occurring.

118.137.    The 2Q-16 10-Q statement referred to above concerning the "risks, including the costs associated with…warranties," Mueller's inability to "determine in advance the ultimate effect they may have" and warning that "Failure to successfully manage these challenges could result in…significant warranty expense" was materially false and misleading as the risks associated with the cost of warranties were ***already*** occurring.

119.138.    The 2Q-16 10-Q statement referred to above concerning product warranties was false and misleading because the Company's warranty reserve was materially understated, in violation of GAAP.  Had Defendants undertaken the required GAAP analysis they could not possibly have concluded that warranty liability for the quarter was $2.7 million.

120.139.    On August 8, 2016 the Company filed a quarterly report on Form 10-Q for the quarter ended June 30, 2016 ("3Q16 10-Q").  The 3Q 10-Q reported that for Mueller Technologies net sales grew to $26.0 million from $24 million in the prior year period "*primarily due to $9.3 million in higher year-over-year shipments of AMI products.*" Gross profit in the quarter was $5.7 million compared to $4.3 million in the prior year period.  Gross margin increased 21.9% in the quarter compared to 17.9% in the prior year. *"These increases are primarily due to the growth in shipments of higher-margin AMI products.*" In Note 7 of the financial statements

33

"Supplemental Balance Sheet Information" Mueller reported warranty liability for the quarter of $2.5 million.

121.140.     The 3Q16 10-Q incorporated by reference the risks the Company had disclosed in the Company's Form 10-K for the fiscal year ended September 30, 2015.  Regarding product defects, the Company stated:

> ***The long-term success of our newer technologies- such as smart metering and leak detection and pipe condition assessment- which are key to the Mueller Technologies businesses, depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems***.
>
> Our newer technologies comprise smart metering and leak detection and pipe condition assessment products and services.  These technologies are principally associated with our Mueller Systems and Echologics businesses, respectively.  Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manual-read meters to automatically-read meters…
>
> In addition, the success of our new products will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems ***may*** have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance and reliability requirements.  Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance ***and warranties***.  These challenges can be costly and technologically challenging, and we cannot determine in advance the ultimate effect they may have. Failure to successfully manage these challenges could result in lost revenue, ***significant warranty and other expenses***, and harm to our reputation.

122.141.     The financial statements contained in the 3Q16 10-Q above were false and misleading as a result of the Company's understatement of warranty reserves in violation of GAAP.  By the time Defendants issued the 3Q16 10-Q they were aware that approximately 22,000 smart meters in Missouri had to be replaced and had "unusually high levels of premature failure rates," that smart meters in Chillicothe were failing at a rate of at least 22%, that Version 3 radios were failing at a rate of 50%, and that all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely.

34

Once Defendants were aware of these facts, ASC 450 required them to utilize this information to estimate warranty liability costs for not only these existing warranty claims, but future warranty claims based upon the same product defects in products Mueller already sold.  Had Defendants done so they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial statements. Defendants were able to estimate the range of loss because they were aware of the nature of the product failures, the magnitude of the product failures, the warranty terms associated with the failing products, the number of same products already on the market and the costs to repair or replace the products under warranty.  Accordingly, ASC 450 required that Defendants not only disclose the nature of the contingency but accrue a charge on their financial statements in the amount of the estimated loss or range of loss associated with likely warranty claims for these product failures.  At the very least, Defendants were aware that given the high rates of product failures in San Diego and Missouri it was reasonably possible that a change in estimate in warranty expense would occur in the near term and that the effect of that change would be material to Mueller's financial statements. Accordingly, ASC 275 required Defendants to disclose the nature of the uncertainty, that it was reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.

123.142.    The 3Q-16 10-Q statement referred to above concerning the "*risk* that new products *may* have quality or other defects or deficiencies…that result in their failure" was materially false and misleading because significant defects, deficiencies and failures associated with new products were *already* occurring.

124.143.    The 3Q-16 10-Q statement referred to above concerning the "risks, including the costs associated with…warranties," Mueller's inability to "determine in advance the

ultimate effect they may have" and warning that "Failure to successfully manage these challenges could result in…significant warranty expense" was materially false and misleading as the risks associated with the cost of warranties were ***already*** occurring.

125.144.    The 3Q-16 10-Q statement referred to above concerning product warranties was false and misleading because the Company's warranty reserve was materially understated, in violation of GAAP. .  Had Defendants undertaken the required GAAP analysis they could not possibly have concluded that warranty liability for the quarter was $2.5 million, $200,000 *less* than that estimated in the prior quarter.

126.145.    On November 22, 2016 the Company filed its 10-K for the fiscal year ended September 30, 2016 ("2016 10-K").  In the Technologies segment, The Company reported decreased net sales in 2016 to $84.9 million from $91.2 million in the prior year due to $6.4 million in lower shipment volumes, stating that the decrease in sales volume was *partially offset by increases in sales of AMI products.*  The Company reported flat gross profit of $17.2 million in 2016 compared to $17.1 million in the prior year and increased gross margin to 20.3% in 2016 compared to 18.8% in the prior year "due primarily to favorable product mix, *particularly the partial replacement of AMR sales with higher-margin AMI sales.*"

127.146.    Regarding product defects, the Company stated in its 2016 10-K:

> ***The long-term success of our newer technologies- such as smart metering and leak detection and pipe condition assessment- which are key to the Mueller Technologies businesses, depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems***.
>
> Our newer technologies comprise smart metering and leak detection and pipe condition assessment products and services.  These technologies are principally associated with our Mueller Systems and Echologics businesses, respectively.  Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manual-read meters to automatically-read meters…

36

In addition, the success of our new products will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems *may* have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance and reliability requirements.  Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance *and warranties*.    These challenges can be costly and technologically challenging, and we cannot determine in advance the ultimate effect they may have. Failure to successfully manage these challenges could result in lost revenue, *significant warranty and other expenses*, and harm to our reputation.

128.147.    Regarding warranty costs the Company stated in its 2016 10-K:

*Warranty Costs-*We accrue for warranty expenses that can include customer costs of repair and/or replacement, including labor, materials, equipment, freight and reasonable overhead costs. We accrue for the estimated cost of product warranties at the time of sale if such costs are determined to be reasonably estimable at that time. Warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available.  Activity in accrued warranty, reported as part of other current liabilities, is presented below.

|  | 2016 | | 2015 | | 2014 | |
|---|---|---|---|---|---|---|
|  | | | (in millions) | | | |
| Balance at beginning of year | $ | 2.9 | $ | 2.6 | $ | 2.8 |
| Warranty expense | | 5.3 | | 5.2 | | 4.1 |
| Warranty payments | | (6.2) | | (4.9) | | (4.3) |
| Balance at end of year | $ | 2.0 | $ | 2.9 | $ | 2.6 |

129.148.    The financial statements contained in the 2016 10-K above were false and misleading as a result of the Company's understatement of warranty reserves in violation of GAAP.  By the time Defendants issued the 2016 they were aware that approximately 22,000 smart meters in Missouri had to be replaced and had "unusually high levels of premature failure rates," that Version 3 radios were failing at a rate of 50%, that smart meters in Chillicothe were failing at a rate of at least 41.5%, and that all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely. Once Defendants were aware of these facts, ASC 450 required them to utilize this information to estimate warranty liability costs for not only these existing warranty claims, but future warranty

37

claims based upon the same product defects in all products Mueller already sold.  Had Defendants done so they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial statements. Defendants were able to estimate the range of loss because they were aware of the nature of the product failures, the magnitude of the product failures, the warranty terms associated with the failing products, the number of same products already on the market and the costs to repair or replace the products under warranty.  Accordingly, ASC 450 required that Defendants not only disclose the nature of the contingency but accrue a charge on their financial statements in the amount of the estimated loss or range of loss associated with likely warranty claims for these product failures.  At the very least, Defendants were aware that given the high rates of product failures in San Diego and Missouri it was reasonably possible that a change in estimate in warranty expense would occur in the near term and that the effect of that change would be material to Mueller's financial statements. Accordingly, ASC 275 required Defendants to disclose the nature of the uncertainty, that it was reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.

130.149.     The 2016 10-K statement referred to above concerning the "risk that new products may have quality or other defects or deficiencies…that result in their failure" was materially false and misleading because significant defects, deficiencies and failures associated with new products were *already* occurring.

131.150.     The 2016 10-K statement referred to above concerning the "risks, including the costs associated with…warranties," Mueller's inability to "determine in advance the ultimate effect they may have" and warning that "Failure to successfully manage these challenges could

38

result in…significant warranty expense" was materially false and misleading as the risks associated with the cost of warranties were already occurring.

132.151.     The 2016 10-K statement above concerning "warranty costs" was materially false and misleading because despite the fact that warranty costs were reasonably estimable at the time of sale, Mueller under-reserved for warranty costs, increasing its warranty expense by only $100,000 since the prior year despite the massive smart meter failures in San Diego and Missouri.

133.152.     The 2016 10-K statement that "Warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available" was materially false and misleading. Mueller did not revise its warranty cost estimates based on the information it obtained concerning the product failures Missouri and San Diego experienced. Had Mueller done so it would have increased its warranty liability in an amount sufficient to cover the costs of repairing and replacing not only the affected products in San Diego and Missouri but the costs of repairing and replacing all of Mueller's defective smart meter products on the market that were covered by warranty.

134.153.     On February 2, 2017 the Company filed a quarterly report on Form 10-Q for the quarter ended December 31, 2016 ("1Q 2017 10-Q"). The Company reported $167.2 million in net sales. With respect to Mueller Technologies the Company stated that net sales for the 2017 first quarter increased 13.6% to $20.9 million, as compared with $18.4 million for the 2016 first quarter, noting *"Increased net sales resulted primarily from higher AMI shipments which great 40 percent year-over-year."* Mueller Technologies' adjusted operating loss was $2.2 million, as compared with $3.3 million for the 2016 first quarter. The Company noted the improvement in operating results "*was due to higher AMI shipments* and decreased selling, general

39

and administrative expenses." In Note 8 to the Mueller's financial statements "Supplemental Balance Sheet Information" the Company reported $2.1 million in warranty liability.

135.154.    The 1Q17 10-Q incorporated by reference the risks the Company had disclosed in the Company's Form 10-K for the fiscal year ended September 30, 2016.  Regarding product defects, the Company stated:

> ***The long-term success of our newer technologies- such as smart metering and leak detection and pipe condition assessment- which are key to the Mueller Technologies businesses, depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems***.
>
> Our newer technologies comprise smart metering and leak detection and pipe condition assessment products and services.  These technologies are principally associated with our Mueller Systems and Echologics businesses, respectively.  Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manual-read meters to automatically-read meters…
>
> In addition, the success of our new products will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems ***may*** have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance and reliability requirements.  Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance ***and warranties***.  These challenges can be costly and technologically challenging, and we cannot determine in advance the ultimate effect they may have. Failure to successfully manage these challenges could result in lost revenue, ***significant warranty and other expenses***, and harm to our reputation.

136.155.    The financial statements contained in the 1Q17 10-Q above were false and misleading as a result of the Company's understatement of warranty reserves in violation of GAAP.  By the time Defendants issued the 2Q16 10-Q they were aware that approximately 22,000 smart meters in Missouri had to be replaced and had "unusually high levels of premature failure rates," that smart meters in Chillicothe were failing at a rate of at least 41.5%,  and that all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely.  Once Defendants were aware of these facts, ASC

40

450 required them to utilize this information to estimate warranty liability costs for not only these existing warranty claims, but future warranty claims based upon the same product defects in all products Mueller already sold.  Had Defendants done so they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial statements. Defendants were able to estimate the range of loss because they were aware of the nature of the product failures, the magnitude of the product failures, the warranty terms associated with the failing products, the number of same products already on the market and the costs to repair or replace the products under warranty.  Accordingly, ASC 450 required that Defendants not only disclose the nature of the contingency but accrue a charge on their financial statements in the amount of the estimated loss or range of loss associated with likely warranty claims for these product failures.  At the very least, Defendants were aware that given the high rates of product failures in San Diego and Missouri it was reasonably possible that a change in estimate in warranty expense would occur in the near term and that the effect of that change would be material to Mueller's financial statements.  Accordingly, ASC 275 required Defendants to disclose the nature of the uncertainty, that it was reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.

137.156.    The 1Q-17 10-Q statement referred to above concerning the "***risk*** that new products ***may*** have quality or other defects or deficiencies…that result in their failure" was materially false and misleading because significant defects, deficiencies and failures associated with new products were ***already*** occurring.

138.157.    The 1Q-17 10-Q statement referred to above concerning the "risks, including the costs associated with…warranties," Mueller's inability to "determine in advance the

41

ultimate effect they may have" and warning that "Failure to successfully manage these challenges could result in…significant warranty expense" was materially false and misleading as the risks associated with the cost of warranties were *already* occurring.

139.158.     The 1Q-17 10-Q statement referred to above concerning product warranties was false and misleading because the Company's warranty reserve was materially understated, in violation of GAAP. Had Defendants undertaken the required GAAP analysis they could not possibly have concluded that warranty liability for the quarter was $2.1 million, $400,000 *less* than that estimated in the third quarter of 2016.

140.159.     On April 27, 2017 the Company filed an 8-K with the SEC announcing its 2017 second quarter financial results. In the 8-K the Company disclosed that it would take a discrete $9.8 million warranty charge because it "recently became aware that some radio products produced between 2011 and 2014 were failing at a higher-than-expected rate. In connection with its second quarter 2017 financial results the Company stated:

> *Mueller Technologies*
>
> Mueller Technologies net sales in the 2017 second quarter increased 20.7 percent to $18.1 million, as compared with $15.0 million for the 2016 second quarter. AMI shipments, which increased 40 percent in the quarter year-over-year, were the primary driver of the increase.
>
> *We recently became aware that some radio products produced between 2011 and 2014 were failing at a higher-than-expected rate. Consequently, we refined our estimates and increased the warranty reserve. We have also carefully examined our product processes and accelerated lifecycle testing data with respect to radios manufactured after the period referenced above and expect our warranty experience to be in line with industry standards.*
>
> GAAP operating loss of $13.7 million in the 2017 second quarter included the discrete $9.8 million warranty charge mentioned above, compared with an operating loss of $4.9 million in the prior year. Adjusted operating loss improved by $1.1 million to $3.8 million, as compared with $4.9 million for the 2016 second quarter due to higher shipment volumes.

141.160.      On the news of the $9.8 million warranty charge Mueller's stock price fell $1.43 per share, more than 11% on April 28, 2017 trading at over six times the previous day's volume, damaging investors.

142.161.      Reacting to the news, one analyst noted that warranty reserves are a key metric in the water meter business and that excluding such charges distorts the Company's financial results.  Ryan Connors of Boenning & Scattergood stated: "Mueller Technologies grew 20.7% on the top-line, with the upside driven by a 40% increase in AMI sales.  Still, despite the stellar growth trajectory, profitability remains elusive, with segment operating margin plunging to -75.5% in 2Q17 as the company booked a reserve for warranty expenses.  *In our experience, warranty costs are part of doing business in the metering business, and excluding such charges distorts the long-term profitability and return profile of the segment.*"

143.162.      The statements in the Company's April 27, 2017 8-K were false and misleading because the Company did *not* "recently become aware that some radio products produced between 2011 and 2014 were failing at a higher-than-expected rate."  Rather, Defendants had been aware of these product failures since at least January 2016 and failed to increase Mueller's warranty expense to account for these product failures, in violation of GAAP.  Additionally, the Company did not "carefully examine[ ] our product processes and accelerated lifecycle testing data with respect to radios manufactured after the period referenced above" for purposes of determining warranty reserves because it later admitted that it would take an additional $14.1 million warranty charge based on a purported "new analysis of our historical warranty expense experience related to product produced through 2017."

144.163.      Further, Defendants' statement that they "refined their estimates" and increased warranty reserve demonstrates their recklessness, as GAAP requires an analysis each

43

quarter of warranty liability.  Had Defendants undertaken this analysis Mueller would have determined that it was required to materially increase its warranty liability by January 2016 at the latest, given the high rate of smart meter failures which Defendants were aware of. (Aug. 7, 2018 conference call transcript).

145.164.      Despite the fact that Defendants knew by the end of 2015 at the latest that smart meters in Chillicothe were failing at a rate of 22%, knew by April 2016 all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely, knew by 2015/2016 that Version 3 radios were failing at a rate of 50%, and knew by the end of 2016 at the latest that smart meters in Chillicothe were failing at a rate of 41.5% Defendants waited until the third  quarter of 2017 to "refine their estimates" in violation of ASC 450 which required Defendants to undertake an analysis *each quarter* based upon existing *and new* information in order to estimate warranty liability.  Had Defendants undertaken this analysis they would have determined, by January 2016 that their warranty liability would materially increase and would have an impact on Mueller's financial statements. At the very least, if Defendants could not estimate the liability by early 2016, ASC 275 required Defendants to disclose the nature of the uncertainty, that it was reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.

146.165.      The next day, in an April 28, 2017 investor conference call Defendants Hall and Hart discussed the $9.8 million warranty charge.  Defendant Hall stated: "During the quarter, we took a discrete $9.8 million charge to meet current and future warranty obligations associated with these products.  Evan [Hart] will speak in more detail about the accounting and handling of the charge.  I will speak a little about the steps we took to ensure this isn't repeated in the future.

44

*In particular, we error-proofed the manufacturing process, so this particular failure mode won't repeat itself.* And we instituted accelerated lifecycle testing on *all of* our radios. I believe we have correctly scoped and addressed this problem and implemented the corrective steps to ensure that our products meet industry and Mueller standards for reliability."

147.166.    Defendant Hart stated, with respect to Mueller Technologies: "Net sales in 2017 second quarter increased 20.7% to $18.1 million as compared with $15 million for the 2016 second quarter. As Scott *mentioned we recently became aware that in certain environments, some radio products produced between 2011 and 2014 were failing at a higher than expected rate.* Consequently, we refined our estimates and increased the warranty reserve. We have taken a discrete warranty charge of $9.8 million in the quarter to meet current and future obligations, of which $8.4 million is now reserved for future obligations."

148.167.    Responding to an analyst's question: "What's kind of the expectation on the warranty expense kind of going forward, any kind of cadence that you can call out?" Hart stated: "Well, Jose, with this particular issue, as we mentioned, we did record about $9.8 million in the quarter, and we were left with about an $8.4 million warranty reserve for this particular item. And I will note that back in Q1, we saw about $800,000 of expense for this particular problem and that was really the catalyst for us to take a more detailed look, *do an in-depth study and refine our estimates to come up with a particular charge in the second quarter*. *We think that the charge is adequate and sufficient to cover these issues with the radios produced between 2011 and 2014. I think going forward, we'll just have a normal warranty charge provision that we've always had, and so there's really nothing expected from a large magnitude like this in the future."* Defendant Hart added: "And I would like to go on and say that we did the advanced life cycle testing, Jose, on the things made after 2014. We've been running those environmental tests. And

45

the failure rate had been better than industry averages a lot, like near 0.4%....So I feel like the team.

I wasn't here, but whatever the changes when they realized, they were having some of these issues.

And basically, for everybody's benefit, it's when they're underwater in a pit environment in warm

climates. That's when they really start to have a problem."

149.168.      Defendant Hall's and Hart's statements on Mueller's April 28 conference

call were false and misleading because: (1) Defendants did not "error proof the manufacturing

process" and Hall's reassurance that the "this particular failure mode won't repeat itself was

untrue, as Mueller would take another $14.1 million warranty charge just 15 months later based

upon defective products that were manufactured *after* the 2011-2014 time frame; (2) Defendants

did not "recently become aware" of the product failures: in reality, Defendants were aware of these

failures by January 2016 at the latest but failed to disclose them and failed to adequately reserve

for warranties associated with the product failures; (3) the $9.8 million warranty charge was not

sufficient to cover the product failures and defendants Hall and Hart were aware of this fact.

150.169.      Additionally, Defendant Hart's statement that the Company did "advanced

life cycle testing...on the things made after 2014," that "the failure rate had been better than

industry average" and that the Company realized the failures occurred when the products were

"underwater in a pit environment in warm climates" was false and misleading and/or made without

a reasonable basis because it assured investors that the Company had determined what the problem

with the 2011-2014 products was and had tested the newer products and determined that they

would not fail at above average rates. In reality, Mueller's AMI products continued to fail,

necessitating the Company to take a discrete $14.1 million warranty charge just over a year later.

151.170.      Defendants' April 27, 2017 disclosure that Mueller would take a $9.8

million warranty charge only partially revealed the truth. In connection with the April 27, 2017

partial corrective disclosure Defendants continued to lie to investors, claiming that they had only recently become aware of the product failures, had "error-proofed" the manufacturing processes such that the product failures would not continue to occur, claiming that Mueller's products smart meter products had failure rates of "better than industry averages" and giving no indication that future warranty liability would be impacted by steadily increasing product failure rates.  [

152.171.    On August 9, 2017 Company filed a quarterly report on Form 10-Q for the quarter ended June 30, 2017 ("3Q 2017 10-Q").  The Company reported $232.2 million in net sales.  With respect to Mueller Technologies the Company stated that net sales for the 2017 third quarter decreased 5.4% to $24.6 million from $26.0 million in the prior year period and that lower net sales of AMR systems and visual read meters were partially offset by *higher shipments of* AMI and leak detection/condition assessment products." The Company noted that "*gross margin increased because sales of AMI and leak detection assessment products generally earn higher margins*." In Note 10 of the financial statements "Supplemental Balance Sheet Information" Mueller reported warranty liability for the quarter of $4.7 million.

153.172.    The 3Q17 10-Q incorporated by reference the risks the Company had disclosed in the Company's Form 10-K for the fiscal year ended September 30, 2016.  Regarding product defects, the Company stated:

> ***The long-term success of our newer technologies- such as smart metering and leak detection and pipe condition assessment- which are key to the Mueller Technologies businesses, depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems***.

> Our newer technologies comprise smart metering and leak detection and pipe condition assessment products and services.  These technologies are principally associated with our Mueller Systems and Echologics businesses, respectively.  Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manual-read meters to automatically-read meters…

In addition, the success of our new products will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems *may* have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance and reliability requirements.  Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance *and warranties*.  These challenges can be costly and technologically challenging, and we cannot determine in advance the ultimate effect they *may have*. Failure to successfully manage these challenges could result in lost revenue, *significant warranty and other expenses*, and harm to our reputation.

154.173.      With respect to warranty expense the 3Q 2017 10-Q, Note 14 "Commitments and Contingencies" states at follows: *Other matters*. Certain Mueller Technologies radio products produced between 2011 and 2014 and installed in particularly harsh environments have been failing at higher-than-expected rates.  During the quarter ended March 31, 2017, we conducted additional testing of these products and revised our estimated of related warranty expenses.  Consequently, we recorded an additional warranty expense of $9.8 million associated with these products in that quarter.

155.174.      By the time Defendants issued the 3Q17 10-Q they were aware that approximately 22,000 smart meters in Missouri had to be replaced and had "unusually high levels of premature failure rates," that smart meters in Chillicothe were failing at a rate of at least 41.5%, that Version 3 radios were failing at a rate of 50%, and that all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely.  Once Defendants were aware of these facts, ASC 450 required them to utilize this information to estimate warranty liability costs for not only these existing warranty claims, but future warranty claims based upon the same product defects in products Mueller already sold.  Had Defendants done so they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial

statements. Accordingly, ASC 275 required Defendants to disclose the nature of the uncertainty, that it was reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.

156.175.    The financial statements contained in the 3Q17 10-Q above were false and misleading as a result of the Company's understatement of warranty reserves in violation of GAAP.

157.176.    The 3Q-17 10-Q statement referred to above concerning the "*risk* that new products *may* have quality or other defects or deficiencies…that result in their failure" was materially false and misleading because significant defects, deficiencies and failures associated with new products were *already* occurring, and the $9.8 million charge in the prior quarter was insufficient to cover those product failures.

158.177.    The 3Q-17 10-Q statement referred to above concerning product warranties was false and misleading because the Company's warranty reserve was materially understated, in violation of GAAP, despite the discrete $9.8 million warranty charge in the prior quarter.

159.178.    The 3Q-17 10Q statement referred to above disclosing "Commitments and Contingencies" was incomplete because additional losses stemming from Mueller's radio products were probable and reasonably estimable.  At the very least, it was reasonably possible that a change in estimate in warranty expense would occur in the near term and that the effect of that change would be material to the financial statements.  Accordingly, ASC 275 and GAAP required Defendants to disclose the nature of the uncertainty, that it was reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.

160.179.    On November 21, 2017 the Company filed its annual report on Form 10-K for the fiscal year ended September 30, 2017 ("2017 10-K"). The Company reported increased net sales in 2017 of $826.0 million in 2017 compared to $800.6 million in the prior year. In the Technologies segment the Company reported net sales in 2017 of $86.1 million compared to net sales of $84.9 million in 2016.

161.180.    Regarding product defects, the Company stated in its 2017 10-K:

***The long-term success of our newer products and services, such as smart metering and leak detection and pipe condition assessment in Technologies, depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems***.

Technologies' smart metering and leak detection and pipe condition assessment products and services have much less market history than many of Infrastructure's products. Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manually-read meters to automatically-read meters. The market for AMI is relatively new and continues to evolve, and the U.S. markets for water meter products and systems are highly competitive. Water utilities have traditionally been slow adopters of new technology and may not adopt AMI as quickly as we expect, due, in part, to the substantial investment related to installation of AMI systems. The strong market positions of our primary competitors may also slow the adoption of our products. Similarly, the adoption of our leak detection and pipe condition assessment products and services depends on the willingness of our customers to invest in new product and service offerings, and the pace of adoption may be slower than we expect. If the market for AMI develops more slowly than we expect or if our new leak detection and pipe condition assessment products and services fail to gain market acceptance, our opportunity to grow these businesses will be limited.

In addition, the success of our new products and systems will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems ***may*** have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance or reliability requirements. Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance and warranties. These challenges can be costly and technologically challenging, and we cannot determine in advance the ultimate effect they may have. ***For example, during the quarter ended March 30, 2017, we recorded a discrete warranty expense of $9.8 million associated with certain radio products that Technologies produced between 2011 and 2014***, as described more fully in Note 17. to the Notes to the Consolidated Financial Statements. ***Failure to successfully manage these challenges could result in lost revenue, significant warranty and other expenses, and harm to our reputation.***

50

162.181.       Regarding warranty costs, the Company stated in its 2017 10-K:

163.182.       *Warranty Costs*-We accrue for warranty expenses that can include customer costs of repair and/or replacement, including labor, materials, equipment, freight and reasonable overhead costs. We accrue for the estimated cost of product warranties at the time of sale if such costs are determined to be reasonably estimable at that time. Warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available. As discussed in Note 17. we recognized $9.8 million of Technologies' warranty expense during the year ended September 30, 2017 related to certain radios sold in prior periods. Activity in accrued warranty, reported as part of both other current liabilities and other noncurrent liabilities, is presented below.

| | 2017 | 2016 | 2015 |
|---|---|---|---|
| | (in millions) | | |
| Balance at beginning of year | $      2.0 | $      2.9 | $      2.4 |
| Warranty expense | 12.3 | 5.3 | 5.1 |
| Warranty payments | (5.8) | (6.2) | (4.6) |
| Balance at end of year | $      8.5 | $      2.0 | $      2.9 |

164.183.       The financial statements contained in the 2017 10-K above were false and misleading as a result of the Company's understatement of warranty reserves in violation of GAAP.

165.184.       The 2017 10-K statement referred to above concerning the "risk that new products may have quality or other defects or deficiencies…that result in their failure" was materially false and misleading because significant defects, deficiencies and failures associated with new products were ***already*** occurring and continued to occur despite the $9.8 million warranty charge, which was insufficient to remediate the product defects.

51

185.    The 2017 10-K statement referred to above concerning the "risks, including the costs associated with…warranties," Mueller's inability to "determine in advance the ultimate effect they may have" and warning that "Failure to successfully manage these challenges could result in…significant warranty expense" was materially false and misleading the risks associated with the cost of warranties were already occurring despite the $9.8 million warranty charge, which was insufficient to remediate the costs associated with product defects.

186.    The 2017 10-K statement above concerning "warranty costs" was materially false and misleading because despite the fact that warranty costs were reasonably estimable at the time of sale, Mueller under-reserved for warranty costs. At the very least, it was reasonably possible that a change in estimate in warranty expense would occur in the near term and that the effect of that change would be material to the financial statements. Accordingly, ASC 275 and GAAP required Defendants to disclose the nature of the uncertainty, that it was reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.  Further, Defendants' statement that "warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available" was false and misleading.  In reality, Defendants failed to follow Mueller's stated accounting policy, as they would later admit that it was not until the third quarter of 2018 that they conducted  a "new study of our historical warranty experience".

187.    On February 8, 2018 the Company filed a quarterly report on Form 10-Q for the quarter ended December 31, 2017 ("1Q 2018 10-Q"). In the Technologies segment the Company reported net sales of $18.2 million compared to net sales of $20.9 million in the prior year. In Note 8 of the financial statements "Supplemental Balance Sheet Information" Mueller reported warranty liability for the quarter of $3.7 million.

169.188.	The 1Q 2018 10-Q incorporated by reference the risks the Company had disclosed in the Company's Form 10-K for the fiscal year ended September 30, 2017.  Regarding product defects, the Company stated:

> ***The long-term success of our newer products and services, such as smart metering and leak detection and pipe condition assessment in Technologies, depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems***.
>
> Technologies' smart metering and leak detection and pipe condition assessment products and services have much less market history than many of Infrastructure's products. Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manually-read meters to automatically-read meters. The market for AMI is relatively new and continues to evolve, and the U.S. markets for water meter products and systems are highly competitive. Water utilities have traditionally been slow adopters of new technology and may not adopt AMI as quickly as we expect, due, in part, to the substantial investment related to installation of AMI systems. The strong market positions of our primary competitors may also slow the adoption of our products. Similarly, the adoption of our leak detection and pipe condition assessment products and services depends on the willingness of our customers to invest in new product and service offerings, and the pace of adoption may be slower than we expect. If the market for AMI develops more slowly than we expect or if our new leak detection and pipe condition assessment products and services fail to gain market acceptance, our opportunity to grow these businesses will be limited.
>
> ***In addition, the success of our new products and systems will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems may have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance or reliability requirements. Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance and warranties***. These challenges can be costly and technologically challenging, and we cannot determine in advance the ultimate effect they may have. ***For example, during the quarter ended March 30, 2017, we recorded a discrete warranty expense of $9.8 million associated with certain radio products that Technologies produced between 2011 and 2014***, as described more fully in Note 17. to the Notes to the Consolidated Financial Statements. ***Failure to successfully manage these challenges could result in lost revenue, significant warranty and other expenses, and harm to our reputation.***

170.189.	The financial statements contained in the 1Q 2018 10-Q above were false and misleading as a result of the Company's understatement of warranty reserves in violation of GAAP.  By the time Defendants issued the 1Q 2018 10-Q they were aware that the failure rate

associated with their AMI smart meters was an astounding *83%*. *See supra* ▃▃.¶84.   Once Defendants were aware of this astounding failure rate ASC 450 required them to utilize that information to estimate warranty liability costs for existing and future warranty claims based upon this known failure rate.   Had Defendants done so they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial statements. Defendants were able to estimate the range of loss because they were aware of the nature of the product failures, the magnitude of the product failures, the warranty terms associated with the failing products, the number of same products already on the market and the costs to repair or replace the products under warranty.   Accordingly, ASC 450 required that Defendants not only disclose the nature of the contingency but accrue a charge on their financial statements in the amount of the estimated loss or range of loss associated with likely warranty claims for these product failures. At the very least, Defendants were aware that given 83% failure rate associated with 97,000 AMI smart meters in San Diego it was reasonably possible that a change in estimate in warranty expense would occur in the near term and that the effect of that change would be material to the financial statements.   Accordingly, ASC 275 required Defendants to disclose the nature of the uncertainty, that it was reasonably possible that a change in estimate would occur in the near term and estimate the loss or range of loss or state that such an estimate could not be made.

171.190.       The 1Q 2018 10-Q statement referred to above concerning the "risk that new products may have quality or other defects or deficiencies…that result in their failure" was materially false and misleading because significant defects, deficiencies and failures associated with new products were *already* occurring and continued to occur despite the $9.8 million warranty charge, which was insufficient to remediate the product defects.

54

172.191.    The 1Q 2018 10-Q statement referred to above concerning the "risks, including the costs associated with…warranties," Mueller's inability to "determine in advance the ultimate effect they may have" and warning that "Failure to successfully manage these challenges could result in…significant warranty expense" was materially false and misleading the risks associated with the cost of warranties were already occurring despite the $9.8 million warranty charge, which was insufficient to remediate the costs associated with product defects.

173.192.    On May 9, 2018 the Company filed its a quarterly report on Form 10-Q for the quarter ended March 31, 2018 ("2Q 2018 10-Q").  In the Technologies segment the Company reported net sales of $22.1 million compared to net sales of $18.1 million in the prior year. In Note 8 of the financial statements "Supplemental Balance Sheet Information" Mueller reported warranty liability for the quarter of $4.1 million.

174.193.    The 2Q 2018 10-Q incorporated by reference the risks the Company had disclosed in the Company's Form 10-K for the fiscal year ended September 30, 2017.  Regarding product defects, the Company stated:

> **The long-term success of our newer products and services, such as smart metering and leak detection and pipe condition assessment in Technologies, depends on market acceptance and our ability to manage the risks associated with the introduction of new products and systems**.
>
> Technologies' smart metering and leak detection and pipe condition assessment products and services have much less market history than many of Infrastructure's products. Our investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manually-read meters to automatically-read meters. The market for AMI is relatively new and continues to evolve, and the U.S. markets for water meter products and systems are highly competitive. Water utilities have traditionally been slow adopters of new technology and may not adopt AMI as quickly as we expect, due, in part, to the substantial investment related to installation of AMI systems. The strong market positions of our primary competitors may also slow the adoption of our products. Similarly, the adoption of our leak detection and pipe condition assessment products and services depends on the willingness of our customers to invest in new product and service offerings, and the pace of adoption may be slower than we expect. If the market for AMI develops more slowly than we expect

55

or if our new leak detection and pipe condition assessment products and services fail to gain market acceptance, our opportunity to grow these businesses will be limited.

***In addition, the success of our new products and systems will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems may have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance or reliability requirements. Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance and warranties***. These challenges can be costly and technologically challenging, and we cannot determine in advance the ultimate effect they may have. ***For example, during the quarter ended March 30, 2017, we recorded a discrete warranty expense of $9.8 million associated with certain radio products that Technologies produced between 2011 and 2014***, as described more fully in Note 17. to the Notes to the Consolidated Financial Statements. ***Failure to successfully manage these challenges could result in lost revenue, significant warranty and other expenses, and harm to our reputation.***

~~175.~~194.    Note 11 to the Company's 2Q-2018 financial statements, "Commitments and Contingences" states as follows:

*Other Matters.* Certain Technologies radio products produced between 2011 and 2014 and installed in particularly harsh environments have been failing at higher-than-expected rates. During the quarter ended March 31, 2017, we conducted additional testing of these products and revised our estimates of related warranty expenses. Consequently, we recorded an additional warranty expense of $9.8 million associated with these products in the second quarter of 2017. ***We have continued to process warranty claims with respect to these products and update our loss analysis using cost and product data collected since March 31, 2017 in order to assess the adequacy of our warranty reserve for this matter. Our analysis is continuing and thus we are unable to reasonably estimate additional loss, if any, at this time.*** It is possible that to the extent any additional warranty expense is recorded for this matter, such additional expense could be material to Technologies' operating results in future periods.

~~176.~~195.    The financial statements contained in the 2Q 2018 10-Q above were false and misleading as a result of the Company's understatement of warranty reserves in violation of GAAP.  By the time Defendants issued the 2Q 2018 10-Q they were aware that the failure rate associated with their AMI smart meters was an astounding *83%. See supra* ¶84.  Once Defendants were aware of this astounding failure rate ASC 450 required them to utilize that information to estimate warranty liability costs for existing and future warranty claims based upon this known

failure rate.   Had Defendants done so they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial statements. Defendants were able to estimate the range of loss because they were aware of the nature of the product failures, the magnitude of the product failures, the warranty terms associated with the failing products, the number of same products already on the market and the costs to repair or replace the products under warranty.  Accordingly, ASC 450 required that Defendants not only disclose the nature of the contingency but accrue a charge on their financial statements in the amount of the estimated loss or range of loss associated with likely warranty claims for these product failures.

177.196.    The 2Q 2018 10-Q statement referred to above concerning the "risk that new products may have quality or other defects or deficiencies…that result in their failure" was materially false and misleading because significant defects, deficiencies and failures associated with new products were *already* occurring and continued to occur despite the $9.8 million warranty charge, which was insufficient to remediate the product defects.

178.197.    The 2Q 2018 10-Q statement referred to above concerning the "risks, including the costs associated with…warranties," Mueller's inability to "determine in advance the ultimate effect they may have" and warning that "Failure to successfully manage these challenges could result in…significant warranty expense" was materially false and misleading the risks associated with the cost of warranties were already occurring despite the $9.8 million warranty charge, which was insufficient to remediate the costs associated with product defects.

179.198.    The 2Q 2018 10-Q financial statement Note 11 concerning "Commitments and Contingencies" was materially false and misleading because Defendants were aware that it

was probable that additional warranty expenses were necessary and Defendants were able to reasonably estimate the amount.

180.199.    On May 8, 2018 the Company held its investor conference call to discuss its Q2 2018 financial results.  During the call, Defendants Zakas and Hall reassured the market that they were not tempering their expectation on growth in the Technologies segment despite the $9.8 million warranty charge the Company incurred in 2017 and assured investors that the Company performed reliability studies to determine warranty expense "all the time:"

> Hall:  And no, we are not tempering our expectations on Technologies. I think what happened in Technologies was, I was pretty pleased with the – what worked out to be a 25% conversion margin. And then we came over the top with the $9.8 million.  We remind investors and people on the call; we took a charge a year ago for some product that had been made prior to 2016. We had some true-up associated with what that population looked like and increased that population, so we took a charge.  We didn't adjust it this time because I just think we- it wasn't material, but- and the team has to overcome those kinds of things in the future anyway.  So, yeah, that's kind of where we ended up on the Technologies business. Was kind of in line with what we expected, but unfortunately had to take a warranty charge.
>
> ***
> Q: Okay. Thanks.  And then, sorry, just to go back to the warranty expense in the quarter.  ***Does that- should that be it then for expense going forward or does that continue to be an overhang in the following quarters?***
> Hall:  No. I think the—***I don't want to foreshadow one way or the other.  We do reliability studies on this stuff all the time***.  I think Martie [Zakas] is better prepared to answer how she does the true-up on the accruals every quarter that she looks for experience and things like that.  And I don't know where you are in that process for this quarter, but it will all happen again and again and again.
>
> Zakas:  Yes. No, look, that is something that we'll continue to evaluate over time. We do use third parties that will help us in terms of assessing various things in and around rate of failure, et cetera.  So that is, we will continue to monitor it and do expect to continue to monitor that to see where we are in terms of what the failure rates are that we're seeing, what our costs are to...remediate those, how we address our customers, et cetera.
>
> Hall:  ***I wouldn't want call it an overhang***.  I think I would just go back to what I said a year ago; look, there is a population that were plotted poorly prior to 2016.  That's part of being in this business and we have to find a way to make sure we manage to keep those customers happy.  ***But I'll reiterate it for everybody; ever since we put in the new plotting process, our experience with failure rates is way less than one half of 1%. So I think***

58

*we've licked it.* We're just going to have to live with these things. From time to time, whenever the Finance Department decides they want another reliability study, just—well go, ahead.

181.200.    Defendants' Hall's and Zakas's statements in the Company's May 8, 2018 conference call above were materially false and misleading because Defendants Hall and Zakas were either aware of or recklessly disregarded the fact that the $9.8 million warranty expense was insufficient to cover the expected warranty costs associated with defective smart meters and there would in fact be an "overhang' in terms of substantial additional warranty expenses associated with defective smart meters.

182.201.    On August 6, 2018 the Company filed an 8-K with the SEC announcing its third quarter 2018 financial results. In connection with its third quarter financial results the Company reported a $14.1 million warranty charge disclosing that "During the quarter we completed a new study of our historical warranty experience. As a result of this new information, we recorded a warranty charge of $14.1 million.

183.202.    On this news, the Company's share price fell 6% or $0.74 per share, to close at $11.58 per share on August 7, 2018 trading at over four times the prior day's volume, damaging investors.

184.203.    The Company's statement that the outsized $14.1 million warranty charge is the result of a "new study of our historical warranty experience" is an admission that Defendants did not comply with GAAP and ASC 450, which requires an analysis of warranty liability every quarter.

185.204.    GAAP required Mueller to have a continuous process in place to evaluate warranty costs each quarter in order to provide reasonable assurance that Mueller would properly estimate warranty liabilities in its financial statements.

186.205.    On August 7, 2018 the Company held its investor conference call to discuss its third quarter 2018 financial results.  With respect to the $14.1 million warranty charge Defendant Hall stated:

> At Technologies, we recorded a $14.1 million warranty charge.  During the quarter, we completed a new study of our historical warranty experience for products produced and sold through 2017.  We assess our warranty liabilities periodically, and adjust amounts as necessary, using new information to update our estimates.  The charge is for warranty costs we expect to incur in periods between 2019 and 2027, reflecting our standard warranty terms for such products.  Based on our experience to date and current expectations, the reserve is expected to be adequate and sufficient to cover our obligations for these products over the remaining periods of warranty.

187.206.    Defendant Zakas continued:

> As Scott mentioned, we assessed the adequacy of our recorded warranty liabilities periodically, and adjust amounts as necessary.  As part of this process, we estimate the liability based on our standard warranty terms, the historical and expected failure rate, and the cost to repair or replace our products under warranty. During the quarter, we completed a new analysis of our historical warranty expense experience relating to products produced through 2017.We revised our warranty cost and failure rate expectations using the new information.  As a result, we recorded a warranty charge of $14.1 million in the quarter.

188.207.    Defendants Hall and Zakas fielded analysts' questions concerning Defendants' about-face on the issue of warranty liability:

> Q: "…on the warranty charges in Technologies, is this driven by increased material cost inflation or was there something else?  ((p.7).
>
> Zakas: "Yes.  From time to time, what we do is, we will look at warranty.  We've engaged third-party and, as we looked at sort of historical experience as to what the rates are as well as what our expectations are going forward, and I think the key point in reference as well is what is that cost to repair and replace the product or remediate. ***So, with the updated study we've just completed, we did take a margin cost of $14.1 million in the quarter. And I'll just sort of remind you, as you put this in context, this is referencing sort of products that we have sold through 2017***, largely looking at our standard warranty terms for that-  for the warranty period that goes through 2026.  And that averages out to about $1.5 million a year."
>
> Q: "…***I did want to revisit quickly this issue of the warranty charge…we did have the charge last year specific to the radios and you did say at the time your felt you were pretty well reserved around the radio issue. So is this something different from the radios***

*themselves?*  Is this physical meters?  Or is there anything – any more color you can give us exactly what the functional issue is here in terms of product issue."

Hall:   "Sure. So, I'll remind everybody, a year ago we took a $9.8 million charge basically related to what we call a version 3 radio. And it had a podding issue basically and that podding issue, whenever you put it in a pit and it was humid and warm, the encapsulant would break down and have either a early failure mode on the radio or an early battery drain, so that the unit would become inoperable prior to its tenth year.

And you're correct in saying that I said we were basically well reserved with that $9.8 million for that issue. ***Of this $14 million, I think there is a piece, maybe $1 million or so, I don't know what the number is, but there is a piece that is fixing whatever the cost overruns in that campaign has been.  Everything else, basically the rest of the money that Martie [Zakas] has talked about has nothing to do with an issue that's going to be campaigned.  I think if I'm to use the correct accounting terms, and everybody forgive me, I'm not an accountant, but they would say it's a change in estimate for what the expense will be based on information around the cost to remediate and the frequency of remediation for the 10-year period from 2019 through 2027***.

~~189.~~208.      Despite Defendants' attempts to distinguish the reasons for the $14.1 million warranty charge from the product failures that necessitated the $9.8 million warranty charge the Company took in the third quarter of 2017, the Company's August 8, 2018 10-Q for the quarter ended June 30, 2018 (3Q 2018 10-Q) admitted that the $14.1 million warranty charge was due to "certain Technologies products failing at higher-than expected rates:"

Note 11 *Commitments and Contingencies*:

***Certain Technologies radio products produced prior to 2017 and installed in particularly harsh environments have been failing at higher-than-expected rates. During the quarter ended March 31, 2017 we conducted additional testing of these products and revised our estimates of related warranty expenses. As a result, we recorded an additional warranty expense of $9.8 million associated with these products in the second quarter of 2017***.

We monitor and analyze our warranty experience and costs periodically and may revise our warranty reserves as necessary. Critical factors in our reserve analyses include warranty terms, specific claim situations, general incurred and projected failure rates, the nature of product failures, product and labor costs, and general business conditions. ***During the quarter ended June 30, 2018, we completed such an analysis and determined, based on this new information, that certain Technologies products have been failing at higher-than-expected rates as well***, ***and that the average cost to repair or replace certain products under warranty was higher than previously estimated. As a result, in the third quarter of 2018, we recorded an additional warranty expense of $14.1 million associated with such products.***

61

190.209.    Analysts noted Defendants' about-face on the warranty issue given their assurance that the prior year's $9.8 million warranty charge would not recur.  One analyst from Boenning & Scattergood stated: "In April 2017, Mueller Water reported a 'discrete' $9.8 million warranty charge in the Technologies segment, saying on the conference call that 'going forward, there's nothing expected of a large magnitude like this in the future.'  Although warranty costs are a well-known issue in the metering space, the further $14.1 million warranty charge just 15 months later is eye-opening, bringing total warranty charges in less than two fiscal years to more than $24 million (for perspective, the business did less than $90 million in sales in FY2017)."

### *Defendants False and Misleading Sarbanes-Oxley ("SOX") Certifications*

191.210.    As set forth above, although the Company's false financial results in 10-Q and 10-K violated GAAP and SEC rules, Mueller's CEO and CFO signed sworn SOX certifications attached to each Form 10-K and 10-Q representing that the results in each respective 10-K and 10-Q:  (1) "do[ ] not contain any untrue statement of material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading" and (2) "fairly present in all material respects the financial condition, results of operation and cash flows of the registrant."

192.211.    The Company expressly assured investors in each 10-Q and 10-K that Mueller's CEO and CFO "evaluated the effectiveness of the design and operation of our disclosure controls and procedures" and that "based on this evaluation, those officers have concluded that…our disclosure controls and procedures were effective."

193.212.    In the SOX certifications that Mueller's CEO and CFO each separately signed and  attached to each Class Period 10-K or 10-Q Mueller's CEO and CFO represented under oath that they:

1) "are responsible for establishing disclosure controls and procedures [ ] and internal control over financial reporting";

2) "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision to provide reasonable assurance regarding the reliability of financial reporting and *the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*";

3) "designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information related to the registrant…*is made known to us* by others";

4) "*evaluated the effectiveness* of the registrant's disclosure controls and procedures…"

5) "*disclosed* in this report any change in the registrant's internal control over financial reporting…that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting";

6) disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information" and

7) disclosed "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

194.213.     Defendants' Sarbanes-Oxley certifications were false and misleading because Mueller's CEO and CFO either were aware of or recklessly disregarded the fact that (a) Mueller's Class Period financial statements did not "fairly present in all material respects the

63

financial condition, results of operation and cash flows of the registrant" because they understated warranty reserves in violation of GAAP; (b) Mueller's internal control over financial reporting was not designed to "provide reasonable assurance regarding the reliability of financial reporting and *the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*" because Mueller's Class Period financial statements did not comply with GAAP's rules for disclosure and accrual of warranty liability- instead, as Defendants admitted,  they irregularly "refined" their estimates and haphazardly conducted a "new study" of warranty liability, processes that are insufficient to result in reasonably accurate estimates of warranty liability; (c) GAAP required Mueller, and its CEO and CFO  to have continuous processes in place in order to provide reasonable assurance that Mueller would properly estimate warranty liabilities in its financial statements and (d) Defendants touted the success of Mueller's smart meter products and revenues generated therefrom in each Class Period 10-Q and 10-K while concealing the material fact that the products suffered from major defects.

**DEFENDANTS' INSIDER SALES**

~~195.~~214.        Beginning on February 6, 2017, just four days after the Company filed its 1Q 2017 10-Q announcing increased net sales in the Technologies segment *primarily from higher AMI shipments which great 40 percent year-over-year* and improved operating results "*due to higher AMI shipments* and decreased selling, general and administrative expenses" Defendants Hyland and Hart began selling Mueller stock at artificially inflated prices.

~~196.~~215.        While in possession of material non-public information concerning smart meter product defects and materially understated warranty reserves Defendants Hyland and Hart sold a total of 1,743,565 of Muller stock for proceeds of $21,747,095.86.  The chart below details Hyland's and Hart's Class Period insider sales:

64

| DEFENDANTS' CLASS PERIOD INSIDER SALES | | | | |
|---|---|---|---|---|
| **Date Sold** | **Seller** | **Shares** | **Price per Share** | **Proceeds** |
| 2/6/2017 | Gregory E. Hyland | 1,000,000 | $12.49 | $12,490,000.00 |
| 2/6/2017 | Evan L. Hart | 150,000 | $13.16 | $1,974,000.00 |
| 11/3/2017 | Evan L. Hart | 167,016 | $12.11 | $2,022,563.76 |
| 11/8/2017 | Evan L. Hart | 50,000 | $12.10 | $605,000.00 |
| 11/22/2017 | Gregory E. Hyland | 50,000 | $12.27 | $613,500.00 |
| 11/24/2017 | Gregory E. Hyland | 34,514 | $12.26 | $423,141.64 |
| 11/27/2017 | Gregory E. Hyland | 50,000 | $12.34 | $617,000.00 |
| 11/28/2017 | Gregory E. Hyland | 90,000 | $12.38 | $1,114,200.00 |
| 11/29/2017 | Gregory E. Hyland | 2,243 | $12.54 | $28,127.22 |
| 11/29/2017 | Evan L. Hart | 100,000 | $12.47 | $1,247,000.00 |
| 12/5/2017 | Evan L. Hart | 49,883 | $12.28 | $612,563.24 |
| **Total** | | **1,743,656** | | **$21,747,095.86** |

197.216.    These eleven suspiciously timed insider stock sales, nine of which took place in between the first and second warranty charges, are suspiciously disproportionate in both the number of insider sales executed during this period as well as the proceeds received.  In fact, none of the Individual Defendants sold *any* Mueller stock whatsoever in 2015 or 2016 evidencing that Defendant Hyland's and Hart's massive insider sales that began two months prior to the first corrective disclosure were motivated by Hyland's and Hart's desire to unload  Mueller stock at prices artificially inflated by Defendants' fraud, which Defendants Hyland and Hart were aware of.

198.217.    By engaging in these insider sales Defendants Hyland and Hart illegally profited in these trades between February 6, 2017, two months before Mueller announced its first warranty charge of $9.8 million and August 6, 2018, the date Mueller announced it would incur a second warranty charge of $14.1 million.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

### Fraud-on-the-Market Doctrine

199.218.    Investors are entitled to rely, and will rely, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.  the omissions and misrepresentations were material;

    c.  Mueller securities are traded in an efficient market;

    d.  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Mueller's securities; and

    e.  Investors and members of the Class purchased, acquired and/or sold Mueller securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

200.219.    At all relevant times, the market for Mueller securities was an efficient market for the following reasons, among others:

- Mueller's common stock met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

- During the Class Period, the average weekly trading volume for Mueller common stock on the NYSE was 5,588,869 shares, which represents approximately 3.5% of Mueller's outstanding common stock during the Class Period permitting a strong presumption of reliance;

- At least 10 stock market analysts followed Mueller and wrote a total of at least 75 reports on Mueller during the Class Period. Analysts covering Mueller included RBC Capital Markets, Boenning Scattergood, BBT Capital Markets, Northcoast Research and Janney Montgomery;

- Mueller regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- More than 19 member firms were active market-makers in Mueller common stock at all times during the Class Period;

- During the Class Period Mueller was eligible for S-3 registration;

- Mueller's market capitalization exceeded $1.6 billion on all days during the Class Period.

- Unexpected material news about Mueller was rapidly reflected and incorporated into the Company's stock price during the Class Period. For example, when Mueller disclosed that it would be taking warranty charges of $9.8 million and $14.1 million on April 27, 2017 and August 6, 2018, respectively, Mueller's stock price fell a material amount.

201.220.    As a result of the foregoing, the market for Mueller promptly digested current information regarding Mueller from all publicly available sources and reflected such information in Mueller's stock price. Under these circumstances, all purchasers of Mueller common stock during the Class Period suffered similar injury through their purchase of Mueller common stock at artificially inflated prices, and a presumption of reliance applies.

### *Affiliated Ute*

67

202.221.    Neither Investors nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## INVESTORS' CLASS ACTION ALLEGATIONS

203.222.    Investors bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased Mueller common stock during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

204.223.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Mueller's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Investors at this time and can only be ascertained through appropriate discovery, Investors believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Mueller or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

205.224.    Investors' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68

206.225.    Investors will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

207.226.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

208.227.    (a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

209.228.    (b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Mueller;

210.229.    (c)  whether the Individual Defendants caused Mueller to issue false and misleading statements during the Class Period;

211.230.    (d)  to what extent the members of the Class have sustained damages and the proper measure of damages.

212.231.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

69

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**

**Against All Defendants**

213.232.    Investors repeat and reallege each and every allegation contained above as if fully set forth herein.

214.233.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

215.234.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

216.235.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

217.236.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced

70

in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

218.237.      Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Investors and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Investors and the Class.

219.238.      As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Investors and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

220.239.      Had Investors and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse

71

information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

221.240.    As a result of the wrongful conduct alleged herein, Investors and other members of the Class have suffered damages in an amount to be established at trial.

222.241.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

223.242.    Investors repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

224.243.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

225.244.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

226.245.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

72

releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

227.246.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Investors and the other members of the Class complain.

228.247.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Investors demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Investors as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Investors and the Class by reason of the acts and transactions alleged herein;

73

C.      Awarding Investors and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Investors hereby demand a trial by jury.

Dated: ~~September 17~~December 6, 2019                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Sara Fuks*
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
Sara Fuks (SF 6034)
275 Madison Ave., 34th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Investors*

74