**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GLEN CHAPMAN, ANDREA PETERSON
AND KEVIN KELLY, Individually and On
Behalf of All Others Similarly Situated,

                           Plaintiffs,

                v.

MUELLER WATER PRODUCTS, INC.,
GREGORY E. HYLAND, J. SCOTT HALL,
EVAN L. HART and MARIETTA EDMUNDS
ZAKAS,

                         Defendants.

19-cv-3260 (KPF)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Jay B. Kasner
Scott D. Musoff
Thania Charmani
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
jay.kasner@skadden.com
scott.musoff@skadden.com
thania.charmani@skadden.com

*Attorneys for Defendants Mueller Water*
*Products, Inc., J. Scott Hall, Evan L.*
*Hart and Marietta Edmunds Zakas*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ...................................................................................................................3

    A.    The Company and the Individual Defendants ...........................................................3

    B.    The Company's Prompt Disclosures of Warranty Charges and Continuous
        Risk Disclosures ......................................................................................................3

ARGUMENT .........................................................................................................................6

I.      PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR
       MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5 .................6

    A.    Plaintiffs Fail to Allege that Defendants' Estimates of Mueller's Warranty
        Reserves Were False or Misleading ..........................................................................6

    B.    Plaintiffs' Confidential Witness Allegations Do Not Demonstrate that the
        Individual Defendants Were Aware of Specific Contradictory Information
        at the Time They Made an Alleged Misstatement ...................................................13

    C.    Plaintiffs Fail to Allege that Defendants' Descriptions of the Company's
        Warranty Costs Were False or Misleading .............................................................16

    D.    Plaintiffs Fail to Allege that Defendants' Cautionary Statements Were
        False or Misleading .................................................................................................16

    E.    Plaintiffs Fail to Allege that Mueller's Statements Regarding Its Discrete
        Warranty Charge Were False or Misleading ...........................................................17

    F.    Plaintiffs Fail to Allege that Defendants' Statements During the April 28,
        2017 Investor Conference Call Were False or Misleading ...................................18

    G.    Plaintiffs Fail to Allege that Defendants' Statements During the May 8,
        2018 Investor Conference Call Were False or Misleading ...................................21

II.     PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG
       INFERENCE OF SCIENTER ......................................................................................21

    A.    Plaintiffs Do Not Sufficiently Allege Motive to Commit Fraud ..........................22

        1.    The Majority of Purported Sales Were Exercises of Vested Stock
            Options ........................................................................................................22

2.      Plaintiffs Make No Particularized Allegations of Profits .........................24

3.      The Percentages of Divested Holdings Do Not Support an
        Inference of Scienter .................................................................................24

4.      The Timing of the Sales Negates Any Inference of Scienter......................25

5.      Other Factors Further Negate an Inference of Scienter ............................27

B.   Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or
     Recklessness .......................................................................................................28

III.   PLAINTIFFS' SECTION 20(a) CLAIMS SHOULD BE DISMISSED ...........................29

CONCLUSION...............................................................................................................30

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995)..........................................................................................28

*AG Funds, L.P. v. Sanofi (In re Sanofi Securities Litigation)*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d
   199 (2d Cir. 2016)........................................................................................................6

*In re AmTrust Financial Services, Inc. Securities Litigation*,
   No. 17-CV-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)...........................29

*In re Aratana Therapeutics Inc. Securities Litigation*,
   315 F. Supp. 3d 737 (S.D.N.Y. 2018)..........................................................................25

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...........................................................................................23

*In re Bank of America AIG Disclosure Securities Litigation*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014)..................30

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998).........................................................................................30

*Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 328–29 (S.D.N.Y. 2009), *aff'd*,
   371 F. App'x 212 (2d Cir. 2010) ....................................................................................3

*City of Taylor General Employees Retirement System v. Magna International Inc.*,
   967 F. Supp. 2d 771 (S.D.N.Y. 2013)..............................................................23, 26, 27

*Coronel v. Quanta Capital Holdings Ltd.*,
   No. 07-cv-1405(RPP), 2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ................................11

*DHL Global Forwarding Management Latin America, Inc. v. Pfizer, Inc.*,
   No. 13-cv-8218 (KBF), 2014 WL 5169033 (S.D.N.Y. Oct. 14, 2014) .............................10

*In re Eaton Corp. Securities Litigation*,
   No. 16-CV-5894 (JGK), 2017 WL 4217146 (S.D.N.Y. Sept. 20, 2017) ..........................24

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..........................................................................................22

*Employees Retirement System of Providence v. Embraer S.A.*,
   No. 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018)...................18, 20

iii

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011)....................................................................................6, 18, 20

*In re FBR Inc. Securities Litigation*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)................................................................................17

*In re FVC.COM Securities Litigation*,
    32 F. App'x 338 (9th Cir. 2002) ........................................................................................28

*Gavish v. Revlon, Inc.*,
    No. 00 Civ. 7291(SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ...........................13

*In re Gildan Activewear, Inc. Securities Litigation*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)..........................................................................25, 28

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...........................................................13, 23, 24, 25

*Harris v. AmTrust Financial Services, Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)....................15

*In re Health Management Systems, Inc. Securities Litigation*,
    No. 97 CIV. 1865 (HB), 1998 WL 283286 (S.D.N.Y. June 1, 1998) ...................25, 27, 28

*Hinerfeld v. United Auto Group*,
    No. 97 CIV. 3533 (RPP), 1998 WL 397852 (S.D.N.Y. July 15, 1998)...............................8

*In re JP Morgan Chase Securities Litigation*,
    No. 02 Civ. 1282(SHS), 2007 WL 950132 (S.D.N.Y. Mar. 29, 2007), *aff'd sub*
    *nom*, *ECA v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009)....................................12

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..............................................................................................22

*Kuriakose v. Federal Home Loan Mortgage Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Central States, Southeast &*
    *Southwest Areas Pension Fund v. Federal Home Loan Mortgage Corp.*, 543 F.
    App'x 72 (2d Cir. 2013)....................................................................................................30

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American*
    *Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)............14, 15

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ..........12, 15

*Matusovsky v. Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002)..................................................................................9

*North Collier Fire Control & Rescue District Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS),
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)....................................................................23

*NECA-IBEW Pension Trust Fund v. Bank of America Corp.*,
No. 10 Civ. 440(LAK)(HBP), 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012).....................18

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).............................................................................................29

*In re NTL, Inc. Securities Litigation*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004)..................................................................................8

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
951 F. Supp. 2d 479 (S.D.N.Y. 2013).............................................................................11

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015).............................................................................................7, 12, 20

*Ong v. Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018)..........................................................................6, 27

*In re Party City Securities Litigation*,
147 F. Supp. 2d 282 (D.N.J. 2001) ..................................................................................26

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)..........................6, 15

*In re PXRE Group, Ltd., Securities Litigation*,
600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd sub nom*, *Condra v. PXRE Group Ltd.*,
357 F. App'x 393 (2d Cir. 2009) .....................................................................................29

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .....................................................................................27, 28

*Sjunde AP-Fonden v. General Electric Co.*,
No. 17-CV-8457 (JMF), 2019 WL 4094559 (S.D.N.Y. Aug. 29, 2019)..........................20

*Slayton v. American Express Co.*,
604 F.3d 758 (2d Cir. 2010).............................................................................................22

*Smart v. Goord*,
441 F. Supp. 2d 631 (S.D.N.Y. 2006)..............................................................................10

*Steinberg v. PRT Group, Inc.*,
88 F. Supp. 2d 294 (S.D.N.Y. 2000)................................................................................17

*Stichting Pensioenfonds ABP v. Wachovia Corp. (In re Wachovia Equity Securities Litigation)*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)............................................................................7, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).........................................................................................................22

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016).............................................................................................12

*In re Veon Ltd. Securities Litigation*,
    No. 15-cv-08672 (ALC), 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018).........................30

*In re WebMD Health Corp. Securities Litigation*,
    No. 11 Civ. 5382(JFK), 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) .................................28

*Wilson v. Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011).............................................................................................30

*Wyche v. Advanced Drainage Systems, Inc.*,
    No. 15 Civ. 5955 (KPF), 2017 WL 971805 (S.D.N.Y. Mar. 10, 2017), *aff'd*, 710
    F. App'x 471 (2d Cir. 2017) ...............................................................12, 15, 16, 28, 29, 30

**STATUTES**

15 U.S.C. § 78u-4(b)(2)(A).........................................................................................................22

**OTHER AUTHORITIES**

*https://finance.yahoo.com/quote/MWA/chart* .............................................................................14

Defendants Mueller Water Products, Inc. ("Mueller" or the "Company"), J. Scott Hall, Evan L.Hart, and Marietta Edmunds Zakas (the "Individual Defendants") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and section 21D(b)(1) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), to dismiss the Second Amended Class Action Complaint (the "Complaint" or "SAC") (ECF No. 51) in its entirety with prejudice.[1]

## PRELIMINARY STATEMENT

Plaintiffs' claims are based on their hindsight disagreement with the calculation of "warranty reserves" for Mueller, which manufactures products used in the transmission, distribution and measurement of water in North America.  Warranty reserves are an inherently subjective and uncertain expense that attempt to estimate future warranty claims based on numerous factors that apply across all of the Company's products nationwide.  Because warranty reserves are the product of a significant amount of estimation and judgment, the alleged misstatements at issue are opinions subject to standards even more stringent than the already demanding standards governing securities fraud claims.

Plaintiffs do not come close to satisfying those exacting standards.  Plaintiffs' confidential witness ("CW") allegations amount to nothing more than vague and conclusory assertions that Mueller's products were failing at a high rate—a fact that Mueller specifically and repeatedly disclosed.  Plaintiffs do not and cannot explain how any of their CW allegations demonstrate that Defendants were aware of information contradicting any specific public statement.

---

[1] Per the Notice of Suggestion of Death filed on October 3, 2019, Defendant Gregory E. Hyland is deceased.  (ECF No. 34.)  Plaintiffs' untimely motion to substitute Mr. Hyland with his widow, as executor of his estate, is *sub judice*.  (ECF No. 53.)

Plaintiffs also rely on out-of-context, publicly available statements related to alleged failures of Mueller products in four locations: San Diego, California; Santee, California; Chillicothe, Missouri; and the state of Missouri more generally.  For numerous reasons, however, those allegations are also utterly deficient.  Plaintiffs' allegations that Mueller incurred significant warranty liabilities in San Diego and the state of Missouri are based on selective excerpts of newspaper articles and testimony provided to the Missouri Public Service Commission.  But it is evident that Plaintiffs mischaracterize the articles' contents and the Missouri Public Service Commission's findings.  The Court may thus disregard Plaintiffs' mischaracterized allegations and instead consider the sources of those statements themselves in deciding this motion.

In any event, even if the Court were to consider Plaintiffs' mischaracterized allegations, Plaintiffs do not sufficiently allege that Defendants failed to actually consider or account for any alleged product failures in estimating warranty reserves.  The Complaint is devoid of particularized allegations indicating that Defendants' estimated warranty reserves ignored these areas or did not incorporate the isolated alleged product failures identified in the Complaint.  The Complaint is similarly devoid of any factual allegations from which one could infer that product failures in one location may simply be extrapolated to apply to all others.  And given Plaintiffs' failure to sufficiently allege that any of the reserves were false when issued, they clearly have not adequately alleged that Defendants knew they were false when issued.

In reality, it is evident that Plaintiffs brought this action solely because in April 2017 and August 2018, Mueller announced additional increased warranty charges after certain products began failing at a higher-than-expected rate.  The theory underlying Plaintiffs' claims is essentially that, in light of those later discrete charges, Mueller must have failed to earlier account for the various alleged product failures identified in the Complaint.  But Plaintiffs have not sufficiently

2

alleged that the bulk of the alleged product failures they identify were even related to Mueller's later-taken discrete warranty charges. These "fraud-by-hindsight" allegations do not state a securities fraud claim.

## BACKGROUND[2]

### A.    The Company and the Individual Defendants

Defendant Mueller is a manufacturer and marketer of products and services used in the transmission, distribution and measurement of water in North America with consolidated net sales of $916.0 million in 2018. (SAC ¶ 47; Ex. A, 2018 10-K at 1.) The Individual Defendants occupied various executive positions at the Company. (SAC ¶¶ 38-41.) Among its numerous products and services, the Company's Technologies segment produces water meters (and water meter parts), which are generally classified as either manually read meters or "smart meters" which are remotely read meters via radio technology. (Ex. A, 2018 10-K at 3.)

### B.    The Company's Prompt Disclosures of Warranty Charges and Continuous Risk Disclosures

During the proposed Class Period, Mueller provided detailed disclosures about its warranty reserves estimates as well as the risks its business faced, especially the risks associated with new products and systems. For instance, the Company's annual reports filed with the SEC disclosed:

> The success of our new products and systems will depend on our ability to manage the risks associated with their introduction, including the risk that new products and systems may have quality or other defects or deficiencies in their early stages that result in their failure to satisfy performance or reliability requirements. <u>Our success will depend in part on our ability to manage these risks, including costs associated with manufacturing, installation, maintenance and warranties</u>. These challenges can be costly and technologically challenging, and <u>we cannot determine in advance the ultimate effect they may have</u>. Failure to successfully manage these challenges

---

[2] The materials that this Court may consider in deciding this motion are well-established. *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 328–29 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

could result in lost revenue, <u>significant warranty and other expenses</u>, and harm to our reputation.

(Ex. C, 2017 10-K at 10; Ex. B, 2016 10-K at 11.)[3]   The Company further disclosed its methodology in estimating warranty costs and explicitly cautioned investors that its estimates were not infallible and were subject to revision as information becomes available.  (*See* Ex. C, 2017 10-K at F-10; Ex. B, 2016 10-K at F-10.)

On April 28, 2017, the Company disclosed that it "recently became aware that certain radio products produced between 2011 and 2014 were failing at a higher-than-expected rate. Consequently, cost of sales in the 2017 second quarter included a discrete $9.8 million charge to meet current and future warranty obligations."  (Ex. D, Form 8-K, Conference Call Script at 5 (Apr. 28, 2017).) In light of the recently discovered defects, Mueller "refined its estimates and increased the warranty reserve" and "carefully examined its product processes and accelerated lifecycle testing data with respect to radios manufactured after the period referenced above and expect[s] its warranty experience to be in line with industry standards."  (*Id*. at 5.)

The Company cautioned investors that its statements regarding the predictability of its warranty experience "are based on certain assumptions and assessments made by us in light of our experience and perception of historical trends, current conditions and expected future developments" and thus "[a]ctual results and the timing of events may differ materially from those contemplated by the forward-looking statements due to a number of factors. . . . Undue reliance should not be placed on any forward-looking statements."  (*Id*.)

In its annual report for 2017, the Company again provided detailed disclosures relating to its warranty reserves:

---

[3] All emphasis in quotations is added unless otherwise indicated.

4

> "During our second quarter, we became aware that some radio products produced between 2011 and 2014 and <u>installed in particularly harsh environments</u> were failing at a higher-than-expected rate.  Consequently, we recorded a discrete warranty expense of $9.8 million associated with these products in our Technologies segment.  We have carefully examined our product processes and accelerated lifecycle testing data with respect to radios produced after the period referenced above and expect our future warranty experience to be in line with industry norms."

(Ex. C, 2017 10-K at F-34.)  The report reiterated the risks associated with new technology, including the challenges presented by warranty reserves estimates and possible additional "significant warranty and other expenses." (*Id*. at 10.)

On August 6, 2018, the Company issued a press release reporting its 2018 third quarter results.  (Ex. E, Form 8-K (Aug. 6, 2018).)  The Company reported net sales of $250.2 million and disclosed that it recorded a $14.1 million discrete warranty charge at its technologies segment. (*Id*. at 10.)

The next day, on an investor conference call, the Company disclosed that during the third quarter of 2017, it recorded a $14.1 million warranty charge based on new information for potential claims years out into the future:

> During the quarter, we completed a <u>new</u> study of our historical warranty experience for products produced and sold through 2017.  We assess our warranty liabilities periodically and adjust amounts as necessary, using new information to update our estimates.  The charge is for warranty costs we expect to incur in periods between 2019 and 2027 reflecting our standard warranty terms for such products.  Based on our experience to date and <u>current expectations</u>, the reserve is expected to be adequate and sufficient to cover our obligations for these products over the remaining periods of warranty.

(Ex. F, Form 8-K, Conference Call Script, at 4-5 (Aug. 7, 2018).)

On September 30, 2018, Mueller filed its annual report for 2018, reporting total net sales of $916 million, and addressed again the two discrete warranty expenses of $9.8 million and $14.1 million.  (*See* Ex. A, 2018 Form 10-K at 10.)

5

**ARGUMENT**

This Court is familiar with the standards governing a claim for securities fraud: Plaintiffs "must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the [PSLRA], meaning that the claim must 'stat[e] the circumstances constituting fraud with particularity.'" *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 225 (S.D.N.Y. 2018) (Failla, J.) (second alteration in original) (citation omitted).

**I.   PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5**

    **A.   Plaintiffs Fail to Allege that Defendants' Estimates of Mueller's Warranty Reserves Were False or Misleading**

Plaintiffs' claims are principally based on allegations that Mueller misrepresented its warranty reserves. Plaintiffs, however, allege no particularized facts whatsoever to support that conclusion, which is subject to especially stringent standards. In *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016), the court held that, unless plaintiffs can identify an "objective standard" for estimating warranty reserves, such estimates are matters of opinion and thus "are actionable only if they are 'both false and not honestly believed when they were made.'" *Id.* at *8 (citation omitted). That holding is consistent with the Second Circuit's conclusion in an analogous context that statements as to the adequacy of loan loss reserves "reflect management's opinion or judgment" and are "inherently subjective." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (to challenge adequacy of loan loss reserves, "plaintiff must allege that defendant's opinions were both false and not honestly believed when they were made"). Accordingly, "where plaintiffs allege a false statement of opinion, 'the falsity and scienter requirements are essentially identical.'" *AG Funds, L.P. v. Sanofi (In re Sanofi Sec. Litig.)*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) (citation omitted), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

6

The Supreme Court has similarly made clear that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). Under *Omnicare*, a statement of opinion is actionable only if "the speaker did not hold the belief she professed," "the supporting fact[s] [the speaker] supplied were untrue," or the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning [the opinion], and . . . those facts conflict with what a reasonable investor would take from the statement itself." *Id.* at 186, 189. Satisfying this standard "is no small task for an investor." *Id.* at 194.

Plaintiffs do not and cannot identify an objective standard for setting warranty reserves. To the contrary, Plaintiffs acknowledge that warranty reserves are "estimate[s]" involving "uncertainty as to possible loss in the future." (SAC ¶¶ 10, 12.) Accordingly, Plaintiffs' claims are subject to the stringent standards applicable to opinion statements set forth in *Omnicare*.

Plaintiffs fall well short of satisfying those standards. Plaintiffs challenge the warranty reserve estimates disclosed in Mueller's annual and quarterly filings between March 31, 2016, and March 31, 2018. (*See* SAC ¶¶ 133-95.) But Plaintiffs allege no basis whatsoever for concluding that the actual estimates should have been higher, much less that Defendants believed they should have been higher when made over this two-year period. Rather, Plaintiffs summarily assert that, "[h]ad Defendants undertaken the required [Generally Accepted Accounting Principles ('GAAP')] analysis they could not possibly have concluded that warranty liability" was what Defendants reported it to be. (SAC ¶¶ 119, 125, 139.) "Such generalized allegations fail to specify what caused the Defendants to know that the . . . reserves were insufficient." *Stichting Pensioenfonds ABP v. Wachovia Corp. (In re Wachovia Equity Sec. Litig.)*, 753 F. Supp. 2d 326, 361-62 (S.D.N.Y. 2011) (rejecting similar allegations where plaintiffs "[did] not identify any contemporaneous

internal document showing that [defendant's] loan loss reserves were improperly calculated" and otherwise offered no "particularized allegations that [defendant] was experiencing or internally predicting losses exceeding their set reserves" (citation omitted)); *see also Hinerfeld v. United Auto Grp.*, No. 97 CIV. 3533 (RPP), 1998 WL 397852, at \*7 (S.D.N.Y. July 15, 1998) ("The failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws.").

The few specific instances of alleged product failures identified by Plaintiffs do not even remotely suggest otherwise. Plaintiffs' allegations regarding alleged product failures in San Diego and Santee, for example, rely entirely on three newspaper articles incorporated into the Complaint. (*See* SAC ¶¶ 8, 82-84, 86.)[4] But the complete articles state something very different than the propositions for which Plaintiffs cite them. The articles state that:

- Smart meters installed by the city of San Diego "could" have a glitch that prevents them from relaying water use wirelessly. (Ex. G, Glitch in 57,000-Plus Smart Meters Prevents Them From Being Smart.)

- The potential glitch at issue affected 250 smart meters, and it was "unclear" if those meters had been replaced. (*Id.*)

- The water department reported that the glitch at issue "did not impact customers or city operations," and that San Diego had "no exceptional or unexpected problems regarding the [smart meter] equipment supplied by [their] vendors." (Ex. H, City Water Department Resisted Oversight, Downplayed Smart Meter Problems; *accord* Ex. G, Glitch in 57,000-Plus Smart Meters Prevents Them From Being Smart (describing the glitch as "minor" and stating that "no corrective action was required").)

- Mueller noted that it "shipped 'just under 400' replacement parts to San Diego," which was "small compared with the 75,000 smart meter parts the city has gotten from Mueller since 2010." (Ex. H, City Water Department Resisted Oversight, Downplayed Smart Meter Problems.)

- While San Diego had purportedly purchased more than 74,000 smart meters from Mueller, only 12,000 meters had actually been "connected to the smart water meter system." (Ex.

---

[4] The Court may consider the entire contents of those articles in deciding this motion. *See In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 21 (S.D.N.Y. 2004).

G, Glitch in 57,000-Plus Smart Meters Prevents Them From Being Smart; *accord* Ex. I, City Water Bill Mess Puts Attention on the Water Department and Its Lack of Oversight (stating that only 15,000 meters were "sending wireless signals to the water department").)

- The remaining meters were "not fully activated because they lack the complete radio equipment needed to allow them to send real-time water use data," not because of any malfunction of parts supplied by Mueller.  (Ex. H, City Water Department Resisted Oversight, Downplayed Smart Meter Problems.)

It is thus evident that Plaintiffs' audacious assertions that "smart meters in San Diego failed at rate of 83%" and that Mueller was required to replace "90,000 meters" that it sold to San Diego (SAC ¶ 85) are their own mischaracterizations of the articles, rather than particularized factual allegations.  As a result, they should not be considered by the Court.  *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (allegations contradicted by documents integral to the complaint cannot defeat motion to dismiss).  This conclusion all but dooms Plaintiffs' claims, which rely heavily and repeatedly on the allegations that Defendants "were aware that the failure rate associated with their AMI smart meters was an astounding 83%" and that "all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely."  (SAC ¶¶ 135, 189; *accord id.* ¶¶ 141, 148, 155, 164, 174, 195.)

Similarly, Plaintiffs' allegations regarding product failures experienced by Missouri American Water Company ("MAWC") are contradicted by matters of which the Court may take judicial notice.  In support of those allegations, Plaintiffs rely on testimony provided to the Missouri Public Service Commission (the "Commission") in March 2016 regarding an investigation into MAWC's handling of faulty water meters.  (*See* SAC ¶¶ 66-69.)  The Commission's publicly available Final Report on that investigation—which explicitly relies on the testimony cited by Plaintiffs (*see* Ex. J, MAWC Report at 3 n.1)—states that, while MAWC removed approximately 23,833 Mueller water meters between 2012 and 2015, "[a] total of 850

9

Mueller meters were returned by MAWC to Mueller," for a total refund of $101,520.91. (*Id.* at 13, 16); *see Smart v. Goord*, 441 F. Supp. 2d 631, 637 (S.D.N.Y. 2006) ("[T]he Court may take judicial notice of records and reports of administrative bodies."). The report further states that "[t]he removals were due to possible imperfections" based on MAWC's "decision to start a change-out of meters that had a higher potential of being defective." (Ex. J, MAWC Report at 5; *see also id.* at 16 ("MAWC took a more aggressive approach by removing more of the installed Mueller meters beyond the number range on the list of defective serial numbers.")). Accordingly, Plaintiffs' repeated allegation that Mueller was aware of and failed to account for MAWC's replacement of approximately 22,000 defective meters (*see* SAC ¶¶ 78, 135, 141, 148, 155, 174) is inconsistent with the Commission's final report and should not be considered by the Court. *See DHL Glob. Forwarding Mgmt. Latin Am., Inc. v. Pfizer, Inc.*, No. 13-cv-8218 (KBF), 2014 WL 5169033, at *4 (S.D.N.Y. Oct. 14, 2014) ("The Court need not accept as true any allegations that are contradicted by . . . materials amenable to judicial notice." (citation omitted)).

Moreover, Plaintiffs have not sufficiently alleged that any of the product defects experienced by San Diego or MAWC were even related to the additional warranty charges that Mueller announced. To the contrary, according to one of the articles relied on by Plaintiffs, the glitch experienced in San Diego was "in the gears of the water meter's register"—the part of the meter that measures water flow. (SAC ¶ 83.) By contrast, the April 2017 warranty charge related to a potting issue in the radio, the part of the meter that sends and receives radio signals (SAC ¶ 207), and the August 2018 warranty charged related to failures in certain unspecified "other [Mueller] Technologies products." (Ex. A, 2018 Form 10-K at F-31.)

The remaining allegations offered as "support" for Plaintiffs' claims fare no better. Plaintiffs allege that Mueller replaced smart meters sold to CMU at the following rates: 445 or 22%

10

in 2015, 646 or 41.5% in 2016, 581 or 59% in 2017, 608 or 77.5% in 2018, and 386 or 89% in 2019. (SAC ¶¶ 74-75.) Plaintiffs also allege that, of 5,000 meters sold to the city of Santee, "only about half are still on the ground." (*Id*. ¶ 88.) But Plaintiffs allege no facts whatsoever suggesting that Defendants failed to account for any of the above product defects in estimating warranty reserves. To consider just one example, Plaintiffs do not explain specifically why the $2.1 million warranty liability disclosed in December 2016 failed to account for the 3,146 meters allegedly replaced by Santee and CMU.[5] Of course, Plaintiffs do not and cannot allege that failure rates experienced by one municipality may simply be extrapolated to apply to others. There are myriad reasons why products might fail at higher rates in one location than in others, including climate and weather. (*See, e.g.,* SAC ¶¶ 207-08 (certain radio products were failing in "humid and warm" climates and "particularly harsh environments").)

Courts have rejected similar allegations where plaintiffs rely only on publicly available documents to argue that these facts "should have informed defendants of the increased risk to which [they] w[ere] exposed." *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) (dismissing claims where complaint failed to identify any "internal reports," "communications among . . . employees, or firsthand accounts from confidential witnesses from which one could reasonably conclude that defendants manipulated or did not actually perform the . . . analysis they said they did" to determine loan reserves). The Complaint is entirely devoid of the requisite particularized allegations demonstrating that "Defendants possessed—at the time they made the allegedly false statements concerning the reserve amounts— information contradicting their statements." *Coronel v. Quanta Capital Holdings Ltd.*, No. 07-cv-

---

[5] Although the Court should not consider the additional alleged product failures experienced by San Diego and MAWC (*see supra*, pp. 8-10), the same conclusion would apply even if the Court were to consider those alleged product failures.

11

1405(RPP), 2009 WL 174656, at *27 (S.D.N.Y. Jan. 26, 2009).

The accuracy of the Company's financial statements—and the honesty of Defendants' opinions regarding the Company's warranty reserves—is confirmed by the fact that those statements were audited by an independent registered public accounting firm, which did not result in any restatement.  (Ex. B, 2016 10-K at 37, F-1; Ex. C, 2017 10-K at 35, F-1); *see Wyche v. Advanced Drainage Sys., Inc.*, No. 15 Civ. 5955 (KPF), 2017 WL 971805, at *17 (S.D.N.Y. Mar. 10, 2017) (Failla, J.), *aff'd*, 710 F. App'x 471 (2d Cir. 2017); *see also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 148 (D. Conn. 2007) (plaintiffs failed to allege that loss reserves were inaccurate when reported where there was "no allegation . . . there has been any restatement of any financial statement or that any auditor or actuary has qualified or withdrawn its opinion"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009); *In re JP Morgan Chase Sec. Litig.*, No. 02 Civ. 1282(SHS), 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2007) (lack of restatement indicates that "reasonable accountants could differ" as to compliance with GAAP, which "defeats plaintiffs' claim of recklessness"), *aff'd sub nom. ECA v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009).

Nor do Plaintiffs allege any facts demonstrating that Defendants omitted material facts about their inquiry into or knowledge about their opinions that would mislead a reasonable investor. *See Omnicare*, 575 U.S. at 186, 189.  This standard requires that opinion statements "rest on some meaningful inquiry" or "fairly align[] with the information in the [defendant's] possession at [the] time" of an alleged misstatement. *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citation omitted); *see also Omnicare*, 575 U.S. at 189 ("An opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."). Plaintiffs do not and cannot allege that Defendants' statements regarding the Company's warranty reserves were not based on any meaningful inquiry.  In addition, for the reasons indicated both

12

above and below, any attempt to allege that Defendants' statements did not fairly align with the information in their possession at the time would fail.

> **B.** **Plaintiffs' Confidential Witness Allegations Do Not Demonstrate that the Individual Defendants Were Aware of Specific Contradictory Information at the Time They Made an Alleged Misstatement**

Plaintiffs' CW allegations only underscore the Complaint's shortcomings. It is axiomatic that vague or conclusory CW allegations do not support a securities fraud claim, as merely "affixing the phrase 'former employees have stated' to [an] otherwise totally unparticularized allegation does not transform it into an allegation that meets the particularity requirements of the PSLRA." *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291(SHS), 2004 WL 2210269, at \*14 (S.D.N.Y. Sept. 30, 2004). Plaintiffs' CW allegations amount to nothing more than vague and conclusory assertions that Mueller's smart meters were failing at high rates. (*See, e.g.,* SAC ¶¶ 91, 95 (CW allegations that "Mueller had several customers who experienced product failure rates of 15-20%" and that one customer experienced "a lot of meter issues" and "shipped a massive amount back in 2016"), 98 (CW allegations that "high smart meter failure rates were a major problem" and that the Company had "meetings in which product returns were a 'big issue'"), 100-03 (CW allegations that "product failure rates" were a "constant subject of discussion," that San Diego was "having problems with Mueller's AMI smart meters," and that "the Company was 'getting huge batches of meters and registers returned'").)[6] Plaintiffs do not and cannot explain how these allegations suggest that any of Defendants' specific warranty reserve estimates or other statements were false or misleading, much less that Defendants knew they were false or misleading. *See Glaser v. The9,*

---

[6] Based solely on a CW's allegation that Mueller stopped providing advanced replacements of defective products, Plaintiffs also speculate that Defendants were "intentionally forestalling recording warranty liability in order to make Mueller Technologies appear more profitable than it was." (SAC ¶ 96.) That Plaintiffs must resort to such overt speculation only highlights the infirmity of their claims.

*Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onfidential source allegations must show that individual defendants actually possessed . . . knowledge highlighting the falsity of public statements."). Indeed, Defendants specifically and repeatedly disclosed that certain products "were failing at a higher-than-expected rate." (SAC ¶¶ 159, 173, 194, 208.)

While Plaintiffs rely heavily on allegations made by CW3, those allegations are similarly deficient. According to CW3, "by 2014," he "found out about issues with the podding" in Version 3 radios, and he "estimated that Version 3 radios had a 50% failure rate during the 2015/2016 timeframe." (SAC ¶¶ 104-05.) From those allegations, Plaintiffs surmise that "Mueller knew in '2014/2015' that it would have to replace Version 3 radios based on failure rates of 50%." (*Id.* ¶ 107 and as repeated throughout.) According to Plaintiffs' own allegations, however, CW3 estimated that Version 3 radios had a 50% failure rate "during the 2015/2016 timeframe," not in "2014/2015." (SAC ¶ 105.) More importantly, Plaintiffs have not alleged facts demonstrating CW3's "estimate" was accurate, that Defendants were aware of that estimate, and that it contradicted any of their public statements. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) ("[A] close examination of [the CWs'] statements reveals the absence of any allegation that such data had been presented to management around the time of Defendants' allegedly misleading statements . . . . [The] allegations do not establish what specific contradictory information the Individual Defendants received or when they received it."), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

Even assuming, *arguendo*, that Version 3 radios had a 50% failure rate during the 2015/2016 timeframe and that Mueller was aware of that fact, there are no particularized allegations demonstrating that Defendants failed to account for such a failure rate in estimating warranty reserves. At their core, like Plaintiffs' allegations regarding product failures in certain

14

locations, Plaintiffs' CW allegations effectively rely entirely on a single assertion: that Defendants "could not possibly have concluded that warranty liabilit[ies]" were what they calculated them to be.  (SAC ¶¶ 138, 144, 158.)  Such blatant speculation cannot give rise to a securities fraud claim.

In any event, on April 27, 2017—shortly after "the 2015/2016 timeframe" referenced by CW3—Mueller disclosed that it "recently became aware that some radio products produced between 2011 and 2014 were failing at a higher-than-expected rate," necessitating an additional warranty charge.  (SAC ¶ 159.)  Nothing in CW3's allegations suggest that the use of the term "recently" was inaccurate or that the Company was required to disclose that information sooner.

In sum, Plaintiffs do not and cannot cite to any particularized allegations contradicting any of Mueller's warranty reserve estimates when issued, much less sufficiently allege that Defendants were aware that the Company's reserves were understated when issued.  *See Pirnik*, 2016 WL 5818590, at *9 (dismissing claims based on understated warranty reserves where reports relied on by plaintiffs "did not directly 'contradict' [defendant's] estimates" and "were not 'internal analyses' of what [defendant's] estimates should really have been" (citation omitted)); *Local No. 38*, 724 F. Supp. 2d at 463 (dismissing as "fraud by hindsight" plaintiff's claim that loss reserves were misrepresented where plaintiff failed to allege "specific adverse credit data showing that loss reserves were too low"); *Malin*, 499 F. Supp. 2d at 161 (dismissing claim relating to inadequate loss reserves where plaintiffs "fail[ed] to reference any actual reports . . . that indicated that [defendant's] loss reserves were not sufficient").[7]

---

[7] Plaintiffs' reliance on various GAAP principles adds no support to their claims.  (*See* SAC ¶¶ 135, 141, 148, 155, 164, 174, 195.)  For the reasons described above, Plaintiffs have not sufficiently alleged that Defendants failed to accrue a probable and reasonably estimable loss contingency under ASC 450, or failed to disclose the existence of a reasonably possible and material change in its estimates under ASC 275.  *See Wyche*, 2017 WL 971805, at *17; *see also Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("It is well-settled that GAAP provisions are subject to interpretation and 'tolerate a range of reasonable treatments, leaving the choice among alternatives to management.'" (quoting *Thor Power Tool Co. v. C.I.R.*,

**C. Plaintiffs Fail to Allege that Defendants' Descriptions of the Company's Warranty Costs Were False or Misleading**

Plaintiffs also challenge the accuracy of Mueller's description of how it accrued for warranty expenses in its annual reports. (*See* SAC ¶¶ 147, 182.) Plaintiffs assert that this description was false or misleading because Mueller "under-reserved for warranty costs" and "did not revise its warranty cost estimates based on the information it obtained concerning the product failures Missouri and San Diego experienced." (*Id.* ¶¶ 151-52, 186.)

Plaintiffs' claim fails for the reasons described above. In short, Plaintiffs have alleged no particularized facts whatsoever demonstrating that Mueller understated its warranty liabilities or failed to appropriately revise its warranty liability estimates based on the CW allegations or the few specific instances of alleged product failures relied on in the Complaint.[8]

**D. Plaintiffs Fail to Allege that Defendants' Cautionary Statements Were False or Misleading**

Plaintiffs' challenges to the accuracy of the Company's cautionary statements similarly fail. (*See* SAC ¶¶ 134, 136-37, and as repeated throughout.) Plaintiffs specifically allege that, because some of Mueller's products had already failed and the Company had already incurred warranty costs, the Company's statements warning of a "risk" of potential product failures and warranty expenses were false or misleading. (*See id.)*

But the Company's warnings that its products may fail and that it may incur warranty costs

---

439 U.S. 522, 544 (1979)), *aff'd*, 649 F. App'x 7 (2d Cir. 2016). Nor have Plaintiffs alleged that Defendants knowingly failed to comply with those principles. *See Wyche*, 2017 WL 971805, at *16.

[8] Plaintiffs also claim that the statement that "warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available" was false and misleading because, in the third quarter of 2018, the Company conducted a "new study of [its] historical warranty experience." (SAC ¶ 186; *accord id.* ¶ 203.) That claim is meritless. That Mueller conducted a "new study" of warranty costs in mid-2018 does not suggest that the Company failed to properly account for warranty costs prior to that date.

16

were not a guarantee that none of its products had actually failed or that it had not actually incurred any warranty costs.  To the contrary, a reasonable investor would understand that product failures and warranty costs are a routine part of business for most companies.  Plaintiffs' claims should therefore be dismissed.  *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (company's description of regulatory risks "could not have been misleading to a reasonable investor" because "no reasonable investor would infer anything about the state of [the company's regulatory] compliance" (alteration in original) (citation omitted)); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 311 (S.D.N.Y. 2000) (holding that "cautions that [certain] business might not materialize" were "not inconsistent" with "the historical 'fact'" that defendant had not received that type of business).  In any event, the Company did, in fact, inform investors that some of the risks at issue had materialized.  The Company stated its warranty liabilities in all of its public filings and, starting in April 2018, repeatedly noted that certain products were "failing at a higher-than-expected rate," resulting in an additional warranty expense.  (SAC ¶ 159, 173, 194, 208.)

E.      **Plaintiffs Fail to Allege that Mueller's Statements Regarding Its Discrete Warranty Charge Were False or Misleading**

Plaintiffs' challenges to Mueller's statements regarding its additional $9.8 million warranty charge are more of the same.  (*See* SAC ¶¶ 159, 173, 194.)  Plaintiffs assert that the statements at issue were false or misleading because (i) Defendants were "aware of . . . product failures since at least January 2016 and failed to increase Mueller's warranty expense to account for these product failures"; (ii) Mueller "later admitted that it would take an additional $14.1 million warranty charge based on a purported 'new analysis of our historical warranty expense'"; and (iii) "Defendants were aware that it was probable that additional warranty expenses were necessary and Defendants were able to reasonably estimate the amount."  (SAC ¶¶ 162, 198.)

Plaintiffs' claims are unavailing for multiple reasons.  First, as noted, Plaintiffs have not

17

pled facts demonstrating any relation between the Company's additional warranty charges and the vast majority of the alleged product failures cited in the Complaint. Defendants' purported awareness of those product failures (which also has not been sufficiently pled) does not suggest that the Company's subsequent unrelated warranty charge was belated or otherwise inaccurate.

Second, as also noted, to the limited extent Defendants were allegedly aware of radio product failures in January 2016, Plaintiffs have not alleged any specific facts demonstrating that Defendants failed to properly account for those failures in estimating warranty reserves.

Finally, the premise of Plaintiffs' claim—that the Company's statement describing its response to product failures must have been inaccurate because it experienced additional product failures and incurred additional warranty charges—is a classic "fraud-by-hindsight" theory that has been repeatedly rejected by courts. *See NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, No. 10 Civ. 440(LAK)(HBP), 2012 WL 3191860, at \*10 (S.D.N.Y. Feb. 9, 2012) ("[T]hat defendants later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think [the] reserves were adequate at the time the registration statement and prospectus became effective." (second alteration in original) (citation omitted)); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 361 ("[A] 'massive increase' to loan loss reserves 'is not, in itself, an indicator that the previous reserve levels were inadequate.'" (citation omitted)).[9]

### F. Plaintiffs Fail to Allege that Defendants' Statements During the April 28, 2017 Investor Conference Call Were False or Misleading

Plaintiffs also challenge certain statements regarding the Company's $9.8 million warranty

---

[9] *See also Fait*, 655 F.3d at 107 (rejecting challenge to the adequacy of reported loan loss reserves even where company "doubled its loan loss provision to $1.15 billion as compared to a year earlier"); *Emps. Ret. Sys. of Providence v. Embraer S.A.*, No. 16 Civ. 6277 (RMB), 2018 WL 1725574, at \*9 (S.D.N.Y. Mar. 30, 2018).

charge made by Defendants Hall and Hart during an April 28, 2017 investor conference call.  (*See* SAC ¶¶ 165, 167.)  Plaintiffs allege that the statements at issue were false or misleading because (1) "Mueller would take another $14.1 million warranty charge just 15 months later based upon defective products that were manufactured after the 2011-2014 time frame"; (2) "the $9.8 million warranty charge was not sufficient to cover the product failures and defendants Hall and Hart were aware of this fact"; and (3) the Company's statements "assured investors that the Company had determined what the problem with the 2011-2014 products was and had tested the newer products and determined that they would not fail at above average rates," but "Mueller's AMI products continued to fail."  (SAC ¶¶ 168-69.)

As a threshold matter, however, Plaintiffs do not allege facts demonstrating that the Company's April 2017 $9.8 million warranty charge was insufficient to cover "issues with the radios produced between 2011 and 2014."  (SAC ¶ 167.)  To the contrary, the Company's public filings state:

> In 2017, our warranty analysis identified certain <u>Technologies radio products</u> produced prior to 2017 and installed in particularly harsh environments that had been failing at higher-than-expected rates. . . . As a result, we recorded an additional warranty expense of $9.8 million in the second quarter of 2017. . . . During the quarter ended June 30, 2018, we completed a similar analysis and determined, based on this new information, that certain <u>other Technologies products</u> had been failing at higher-than-expected rates <u>as well</u>, and that the average cost to repair or replace certain products under warranty was higher than previously estimated.  As a result, in the third quarter of 2018, we recorded an additional warranty expense of $14.1 million associated with such products.

 (Ex. A, 2018 Form 10-K at F-31.)  Those statements clearly indicate that the Company's two discrete warranty charges related to different products.[10]

---

[10] Further, contrary to Plaintiffs' allegation, the Company's August 8, 2018 10-Q does not establish otherwise.  (*See* SAC ¶ 208).  There, the Company stated only that it took an additional $14.1 million warranty charge because "certain Technologies products have been failing at higher-than-expected rates."  (*Id.)*

19

More importantly, Hart's statement that he "think[s]" the Company's warranty charge was adequate was clearly an opinion.  (SAC ¶ 167); *see Omnicare*, 575 U.S. at 183-84 (discussing how use of the phrases "I believe" or "I think" denote opinions); *cf. Fait*, 655 F.3d at 113 (statements regarding the "adequacy" of loan loss reserves are opinions).  Even assuming, *arguendo*, that Hart was mistaken as to the adequacy of the Company's April 2017 warranty charge, there is absolutely no indication in the Complaint that he was aware of that fact or that any supporting facts he supplied were untrue.  Even allegations that Defendants "'possess[ed] facts which should have led them' to make further inquiry . . . without more, 'do not sufficiently allege that the individuals' disbelieve their stated opinions." *Sjunde AP-Fonden v. Gen. Elec. Co.*, 17-CV-8457 (JMF), 2019 WL 4094559, at *10 (S.D.N.Y. Aug. 29, 2019) (alteration in original) (citation omitted); *Fait*, 655 F.3d at 110, 112 (finding that "clear indications that impairment testing was necessary" did not "plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them" (citation omitted)).

Similarly, Plaintiffs do not allege any facts establishing the falsity of Hart's statements that Mueller had conducted "advanced life cycle testing" on products made after 2014 and that those tests indicated a failure rate that was "better than industry averages."  (SAC ¶ 167.)  The mere allegation that the Company took an additional warranty charge over a year later is plainly insufficient.  There are no specific allegations connecting the products referenced in Hart's statements to those related to the Company's August 2018 warranty charge and, in any event, this claim again relies on a blatant "fraud-by-hindsight" theory that should be rejected.

Nor is there any merit to Plaintiffs' challenge to Hall's statement that the Company had "error-proofed the manufacturing process, so this particular failure mode won't repeat itself." (SAC ¶ 165.)  Plaintiffs have not sufficiently alleged that the products referenced in that

20

statement—i.e., products manufactured <u>after</u> the allegedly defective "radios produced between 2011 and 2014" (SAC ¶ 167)—continued to fail in the same manner.[11]

### G. Plaintiffs Fail to Allege that Defendants' Statements During the May 8, 2018 Investor Conference Call Were False or Misleading

Plaintiffs' claims based on statements made during a May 8, 2018 investor conference call are similarly unavailing. (*See* SAC ¶ 199.) Plaintiffs allege that "Defendants' Hall's and Zakas' statements in the Company's May 8, 2018 conference call above were materially false and misleading because Defendants . . . were either aware of or recklessly disregarded the fact that the $9.8 million warranty expense was insufficient to cover the expected warranty costs associated with defective smart meters and there would in fact be an 'overhang' in terms of substantial additional warranty expenses associated with defective smart meters." (SAC ¶ 200.)

This claim fails for the reasons already described. Plaintiffs have not sufficiently pled that the $9.8 million warranty charge was insufficient to cover the products it addressed, that Defendants could not have believed their opinions as to the adequacy of that charge, or that Hall could not have believed his opinion that he "think[s]" Mueller had "licked it." (SAC ¶ 199.)[12]

## II. PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A),

---

[11] Plaintiffs also challenge Defendant Hart's statement that the Company "recently became aware" of certain radio product failures, alleging that "Defendants were aware of these failures by January 2016 at the latest but failed to disclose them and failed to adequately reserve for warranties associated with the product failures." (SAC ¶ 168.) This claim fails for the reasons already described.

[12] Plaintiffs also appear to suggest that, during an August 7, 2018 conference call, Hall misled investors to believe that the Company's August 2018 discrete warranty charge was unrelated to the product failures that necessitated its April 2017 warranty charge. (*See* SAC ¶¶ 205-08.) But Plaintiffs have alleged no specific facts demonstrating that this statement was misleading for the reasons already explained.

21

which is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 308, 319 (2007) (citation omitted).  This is a high bar: the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (citation omitted).  "[S]cienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Here, Plaintiffs do not satisfy either requirement.

### A.    Plaintiffs Do Not Sufficiently Allege Motive to Commit Fraud

To establish a motive to engage in fraud, "plaintiffs must assert a concrete and personal benefit" to the individuals who allegedly carried out the fraud.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiffs almost exclusively attempt to establish scienter by alleging that Defendants Hyland and Hart sold shares during the Class Period.  But the law is clear that stock sales alone cannot satisfy the PSLRA's stringent pleading requirement where plaintiffs do not also show that the trades were "unusual or suspicious." *Glaser*, 772 F. Supp. 2d at 587.  Plaintiffs make no such showing here.

#### 1.    The Majority of Purported Sales Were Exercises of Vested Stock Options

Plaintiffs allege that Defendants' fraud was motivated by their desire "to prop up the price of Mueller's stock while the Individual Defendants unloaded millions of dollars in Mueller stock." (SAC ¶ 29.)  This allegation is contradicted by the publicly available SEC "Form 4" filings that Plaintiffs rely on.  Plaintiffs either deliberately misstate those filings or simply do not understand them, as they show that the majority of the transactions listed in the Complaint (SAC ¶ 215) were

22

not stock sales, but instead were the exercise of stock options that would otherwise expire and be canceled without any consideration. Courts have consistently held that the exercise of expiring stock appreciation rights does not demonstrate a defendant's motive to defraud. *See City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) ("The fact that [defendant] exercised the expiring options and sold his newly-purchased shares does not, in and of itself, demonstrate a motive to defraud."); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (individual defendants' trades "involved the exercise of stock appreciation rights that were set to expire . . . [or] involved the withholding of shares to satisfy tax requirements on vesting restricted stock" and thus the nature of the trades "suggests the absence of fraudulent motive"); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007) ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle, such as . . . convertible preferred stock . . . , creates an opportunity for profit through manipulation.").

Six out of the eleven allegedly improper transactions listed in the Complaint were exercises of stock options soon to expire. Specifically, Hyland's five sales between November 22, 2017, and November 29, 2017, represent his exercise of an option that was scheduled to expire on November 29, 2017, and was exercised in increments over the period of November 22, 2017, to November 29, 2017. (Ex. K, Nov. 27, 2017 Form 4; Ex. L, Nov. 29, 2017 Form 4.) Similarly, Hart's sale on November 3, 2017, represents his exercise of options, one of which was set to expire by November 29, 2017. (Ex. M, Nov. 6, 2017 Form 4.)

In addition, Plaintiffs offer no particularized allegations to show that the remaining five trades were "unusual or suspicious" in timing or scope. *Glaser*, 772 F. Supp. 2d at 587. Whether

23

trading was unusual or suspicious turns on factors such as "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Eaton Corp. Sec. Litig.*, No. 16-CV-5894 (JGK), 2017 WL 4217146, at *11 (S.D.N.Y. Sept. 20, 2017) (citation omitted); *Glaser*, 772 F. Supp. 2d at 587. Plaintiffs summarily assert that the relevant trades were "disproportionate in both the number of insider sales executed during this period as well as the proceeds received" (SAC ¶ 216), but offer no factual allegations to support that assertion.

## 2. Plaintiffs Make No Particularized Allegations of Profits

Plaintiffs also make no allegations regarding the net profit accruing to either Hart or Hyland. "Plaintiffs must allege not only the insider defendants' selling activity during the relevant period, but also those defendants' net profits as opposed to gross proceeds . . . ." *Glaser*, 772 F. Supp. 2d at 587. The Complaint merely alleges that Hyland and Hart "illegally profited in these trades" (SAC ¶ 217) along with the amount of gross stock proceeds, without any explanation as to the amount of net proceeds for each Defendant. *See In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270-71 (S.D.N.Y. 2009) ("While Plaintiffs allege that the . . . insider sales amount[] to $96 million in gross proceeds during the Class Period, they fail to allege any facts relating to the amount of profit the Individual Defendants garnered from their sales.").

## 3. The Percentages of Divested Holdings Do Not Support an Inference of Scienter

Further, Plaintiffs do not allege the total percentage of holdings Hart and Hyland retained. *See Glaser*, 772 F. Supp. 2d at 587 ("Plaintiffs must allege . . . overall percentage changes in defendant's holdings."). A "decisive [factor] in assessing whether an insider's sales are indicative of scienter is how many shares the insider sold during the class period relative to the total number of shares that he or she could have sold." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp.

24

3d 737, 763 (S.D.N.Y. 2018). "Such a number appropriately captures not only the fact of sales, but also the extent to which the insider availed himself or herself of, or forwent, the opportunity to turn a profit before disclosure of concealed bad news." *Id.* Here, Defendants Hart and Hyland on average sold 19.6% and 8.6% of their holdings, respectively, and retained over 80.3% and 91.3% of their holdings, respectively. Courts have consistently held that such percentages do not support an inference of scienter. (*See* Ex. N, 2017 Proxy Statement, at 39); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865 (HB), 1998 WL 283286, at *6 & n.3 (S.D.N.Y. June 1, 1998) (sales of 22.94%, 23.53%, 24.92% and 81.9% of holdings not suspicious when viewed in light of other relevant factors); *In re Gildan Activewear*, 636 F. Supp. 2d at 271 n.5 (plaintiffs failed to plead that trades of 25% and 53% were "unusual").

### 4. The Timing of the Sales Negates Any Inference of Scienter

Nor do Plaintiffs make any effort to explain how the timing of the sales at issue was in any way unusual or suspicious, a deficiency that is especially glaring given that none of the trades align with the alleged misstatements. (*See* SAC ¶ 215 (reflecting trades spread across the Class Period— February 6, 2017, through December 5, 2017).) Setting aside sales attributable to expiring options, two sales occurred on February 6, 2017, and three sales occurred on November 8, 2017, November 29, 2017, and December 5, 2017, respectively. (*Id.*) "A broad temporal distance between [the] stock sales and a disclosure of bad news defeats any inference of scienter." *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) (finding no inference of scienter where defendant's "sales took place . . . twelve, four and three months, respectively," before correction of the alleged misstatements). Plaintiffs offer no allegations as to how Defendants Hart and Hyland derived an improper financial benefit from sales that occurred almost three months before the first additional warranty charge on April 27, 2017, and nine months before the second additional warranty charge on August 6, 2018. *See City of Taylor*, 967 F. Supp. 2d at 800 ("[E]ven if plaintiff had

25

demonstrated suspicious or unusual circumstances surrounding defendants' trading activity, the allegations . . . would nonetheless fail to persuasively show that the timing of those sales was 'calculated to maximize the personal benefit from undisclosed inside information' [because] [n]either [defendant] sold his stock 'at the end of the putative class period, when insiders would have rushed to cash out.'" (citations omitted)).

Moreover, Plaintiffs' theory contravenes the foundational assumption behind all insider sales allegations: that defendants seek to maximize profits. *See id.* Here, Hyland and Hart did not maximize their potential return, as the sales in question took place at times when the trading price was low relative to the price at other dates within the Class Period, further negating an inference that they timed any sales to reap the benefits of insider information.[13] *See id.* (rejecting scienter allegations based on insider sales where "defendants sold their shares throughout the class period, and at times when the trading price was low"); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (no inference of scienter where "the sales do not appear calculated to maximize the personal benefit from undisclosed inside information").

Plaintiffs' insider sales allegations are also subject to more compelling, non-fraudulent inferences. *See Ong*, 294 F. Supp. 3d at 227 ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."(citation omitted)). In particular, Defendant Hyland stepped down as President and CEO in January 2017, announced his retirement on January 24, 2018 (eight months before the end of the Class Period), and passed away on April 12, 2019. (Ex. O, Form 8-K, Press

---

[13] *Compare* https://finance.yahoo.com/quote/MWA/chart (showing closing price on February 6, 2017 ($13.01), November 8, 2017 ($12.12), November 29, 2017 ($12.48), December 5, 2017 ($12.23)), *with, e.g.*, *id.* (showing stock price on December 9, 2016 ($14.05), December 20, 2016 ($13.81), January 26, 2017 ($13.76), February 1, 2017 ($13.66), April 26, 2017 ($12.77), October 3, 2017 ($12.91), December 18, 2017 ($12.93) and August 2, 2018 ($12.50)).

Release, dated Jan. 24, 2018 (Jan. 29, 2018); ECF No. 34.)  Therefore, a more compelling and non-culpable explanation for Hyland's sales is that he was preparing for estate planning in light of retirement and illness.  *See City of Taylor*, 967 F. Supp. 2d at 799 (rejecting scienter inference where defendant "liquidated 'most, if not all of his shares' during the putative class period" because he was "plann[ing] his retirement" and, in fact, "resigned as the Company's Chairman approximately three months <u>before</u> the class period ended" (citation omitted)); *In re Health Mgmt. Sys.*, 1998 WL 283286, at *6 n.3 (finding a lack of scienter where a defendant sold 81.9 percent of his holdings "most likely on account of the fact that he resigned" as a company director and "was divesting himself of his shares"); *see also Ronconi*, 253 F.3d at 435 ("A corporate insider may sell stock to fund major family expenses, diversify his portfolio, or arrange his estate plan.").

In addition, while Hart and Hyland do not have a significant trading history to compare to their Class Period sales, there is a simple, non-culpable explanation for that fact.  On January 10, 2017, the Company announced that it sold its Anvil International division for $315 million in cash. (Ex. P, Form 8-K at 1 (Jan. 10, 2017).)  Thus, any inference of scienter is not as compelling as an alternative nonfraudulent inference that Defendants were subject to closed trading windows the year preceding this transaction.  *See In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 342 (9th Cir. 2002) ("[A]n enforced absence of trading history does not make sales suspicious."); *see also Wyche*, 2017 WL 971805, at *10.

### 5.    Other Factors Further Negate an Inference of Scienter

Other circumstances surrounding the purportedly improper sales further negate an inference of scienter.  "Plaintiffs have alleged insider trading by only two [Mueller] insiders; the absence of any allegations of other insider trades before [Mueller] announced the impact of the [warranty reserves] undercuts any finding of the requisite strong inference of scienter."  *In re Gildan Activewear*, 636 F. Supp. 2d at 271-72; *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47,

27

54 (2d Cir. 1995). Finally, Mueller conducted two share repurchase programs during the Class Period[14]—a fact that undermines any inference of scienter. *See In re WebMD Health Corp. Sec. Litig.*, No. 11 Civ. 5382(JFK), 2013 WL 64511, at \*14 (S.D.N.Y. Jan. 2, 2013) (scienter allegations insufficient where defendants argued that fraudulently inflating the defendant company's stock price during a share buy-back "would defy economic reason" (citation omitted)).

**B.    Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or Recklessness**

For substantially the same reasons as those described above (*see supra*, pp. 6-15), Plaintiffs allege no particularized facts demonstrating that Defendants were aware of any improprieties or inaccuracies in their estimation of the Company's warranty reserves. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at \*17 (S.D.N.Y. Sept. 9, 2019) (alleging a misrepresentation of opinion is essentially identical to alleging scienter). Plaintiffs utterly fail to offer any particularized allegations to support their claim that Defendants "[were aware] or recklessly disregarded" inaccuracies in their warranty reserve estimates or financial statements. *See Wyche*, 2017 WL 971805, at \*14 (rejecting allegation that defendants "had access to facts indicating that their representation of the Company's finances was false" because "Plaintiff has not identified contemporaneous facts, reports, or statements to which Defendants had access and which contained information contrary to the information Defendants conveyed to the public"); *see also In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y.) ("Second Circuit cases uniformly rely on allegations that [1] specific contradictory information was available to the defendants [2] at the same time they made their [allegedly] misleading statements." (first and

---

[14] (*See* Ex. Q, Form 8-K, Conference Call Script at 6 (Apr. 28, 2017) (stating that the Company initiated a share repurchase of $50 million shares); Ex. F, Form 8-K, Conference Call Script at 13 (Aug. 7, 2018) (stating that the Company returned $42 million cash to shareholders through dividends and share repurchases).)

second alterations in original) (citation omitted)), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).  Instead, Plaintiffs' scienter allegations are based on a classic "fraud [by] hindsight" theory that this Court and numerous others have rejected as inadequate.  *See Wyche*, 2017 WL 971805, at *17; *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

Nor have Plaintiffs sufficiently pled conscious misbehavior or recklessness in connection with the few alleged misrepresentations that may not be subject to *Fait*/*Omnicare*, such as the Company's cautionary statements or Hall's statement that the Company had "error-proofed the manufacturing process, so this particular failure mode won't repeat itself."  (SAC ¶ 165.)  For instance, even assuming, *arguendo*, that the latter statement was inaccurate, there are no allegations suggesting that Hall was aware of that fact.  Rather, the far more reasonable inference is that Hall in fact believed that the Company had addressed the product defects that necessitated the April 2017 warranty charge.  *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 587-88 (S.D.N.Y. 2013) (no scienter in light of "much more compelling" non-fraudulent inference), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).[15]

## III.    PLAINTIFFS' SECTION 20(a) CLAIMS SHOULD BE DISMISSED

In order to state a claim under Section 20(a), Plaintiffs must allege: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the

---

[15] Plaintiffs' allegations that Defendants' Sarbanes-Oxley ("SOX") certifications were knowingly false or misleading fail for the reasons described above.  (*See* SAC ¶¶ 210-13.)  Plaintiffs have not sufficiently alleged that the Company's financial statements were inaccurate, much less that Defendants were aware of any inaccuracies or lack of sufficient internal controls.  *See Wyche*, 2017 WL 971805, at *15 (SOX certifications not misleading despite confidential witnesses' statements that defendants were aware of compliance issues because "differences of opinion, even stark differences, . . . do not reveal scienter" (citation omitted)).  That conclusion is supported by the fact that the Company's financials were audited by an independent auditor, *see id.* at *17, and that the Company never issued a restatement for its Class Period financials.  *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013).

controlling person was in some meaningful sense a culpable participant' in the primary violation."

*Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citation omitted).  Here, for the reasons

described above, Plaintiffs have not sufficiently alleged either a primary violation of Section 10(b)

or that any individual defendant was a culpable participant in a primary violation.  *See In re Veon*

*Ltd. Sec. Litig.*, No. 15-cv-08672 (ALC), 2018 WL 4168958, at \*22 (S.D.N.Y. Aug. 30, 2018)

(plaintiffs were unable to allege a "culpable participant" for the same reasons they failed to allege

scienter).  Accordingly, their control person claims fail.  *See Wilson v. Merrill Lynch & Co.*, 671

F.3d 120, 139 (2d Cir. 2011).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the

Complaint with prejudice.

Dated: New York, New York
        January 31, 2020                          Respectfully submitted,

                                                  /s/ Scott D. Musoff
                                                  Scott D. Musoff
                                                  Jay B. Kasner
                                                  Thania Charmani
                                                  SKADDEN, ARPS, SLATE,
                                                  MEAGHER & FLOM LLP
                                                  Four Times Square
                                                  New York, NY 10036
                                                  Phone: (212) 735-3000
                                                  scott.musoff@skadden.com
                                                  jay.kasner@skadden.com
                                                  thania.charmani@skadden.com

                                                  *Attorneys for Defendants Mueller Water Products,*
                                                  *Inc., J. Scott Hall, Evan L. Hart and Marietta*
                                                  *Edmunds Zakas*

30