**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLEN CHAPMAN, ANDREA PETERSON, AND KEVIN KELLY Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> MUELLER WATER PRODUCTS, INC., GREGORY E. HYLAND, J. SCOTT HALL, EVAN L. HART, and MARIETTA EDMUNDS ZAKAS, <br><br> Defendants. | Case No. 19-cv-03260 (LJL) <br><br> <u>CLASS ACTION</u> |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................................1

II.  FACTS ....................................................................................................................................2

  A.  Background ......................................................................................................................2

  B.  Accounting Rules Mandate That Companies Record or Disclose Contingent Warranty Liabilities Along with Estimates Thereof .........................................................................4

  C.  Mueller Sells Defective Meters .......................................................................................5

   1.  Mueller Systems sells San Diego 15,000 Working and 75,000 Defective Meters ...................6

   2.  Mueller Systems Sells a Missouri Utility 97,000 Meters, of Which At Least 22,000 Are Defective .....................................................................................................................6

   3.  The Smart Meters Mueller Systems Sold To Missouri-American Water Had Four Fatal Defects and Failed In Nearly Every Climate In the U.S. ................................................7

   4.  Mueller Sells Defective Meters to Other Customers ................................................................8

   5.  Defendants Conceal Mueller's Warranty Liabilities Until They Can't ...............................9

III.  ARGUMENT .......................................................................................................................10

  A.  The Complaint Adequately Alleges Falsity ..................................................................10

   1.  Standards ................................................................................................................................10

   2.  Defendants Made Misleading Statements of Opinion .............................................................11

     a)  Having Offered Generous Warranties, Operating In An Industry In Which Warranty Liabilities Are Exceptionally Important, Defendants Made False Statements In "Weighty" Filings Misstating A Liability the SEC Has Cautioned Is Critical ..........................................11

     b)  Defendants' Warranty Liability Provisions Were Misleading .............................13

       (1)  San Diego .........................................................................................................14

       (2)  Missouri-American ...........................................................................................16

       (3)  The Problems Missouri-American and San Diego Experienced Were General ......17

       (4)  The Confidential Witnesses Further Show Defendants' Opinion Statements Are Misleading ..........................................................................................................17

       (5)  The Auditor Sign-off Is Properly Considered in Connection with Scienter and In Any Case Does Not Absolve Defendants .........................................................19

   3.  Defendants Made False Statements of Fact ............................................................................20

  B.  Defendants Made False Statements With Scienter ........................................................21

   1.  Standard ..................................................................................................................................21

   2.  Defendants Hyland and Hart Sold 44.6% and 65.6% of All Shares they Could Sell With the Majority of Sales Falling in the Quarter Before the First Accrual ......................................22

     a)  The amount of stock sold is suspicious ...........................................................22

         b)   **The Timing of the Stock Sales Was Suspicious** ................................................................**26**

    3.   **The Complaint Sufficiently Alleges Conscious Misbehavior or Recklessness**.....................**28**

         a)   **The Information Available to Defendants, Coupled With the Motive Allegations, Suffice 28**

  C.   **THE COMPLAINT SUFFICIENTLY ALLEGES SECTION 20(a) CLAIMS** ......................**30**

IV.   **CONCLUSION** ....................................................................................................................**30**

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ...................................................................................... 25

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) ................................................................................... 19

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) .................................................................................. 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................. 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ............................................................................... 22, 24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................................... 10, 11

*Carlson v. Xerox Corp.*,
   392 F. Supp. 2d 267 (D. Conn. 2005) .................................................................... 29

*City of Taylor Gen. Employees Ret. Sys. v. Magna Int'l Inc.*,
   967 F. Supp. 2d 771 (S.D.N.Y. 2013) ............................................................... 24, 27

*Cornwell v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010) .................................................................... 18

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ........................................................................ 24, 25, 28

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011) .................................................................................. 12

*Feasby v. Industri-Matematik Int'l Corp.*,
   No. 99CIV.8761(HB), 2000 WL 977673 (S.D.N.Y. July 17, 2000) ...................... 27

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017) ........................................................ 22, 24, 25, 29

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) ........................................................ 19, 22, 24

*Gormley v. Magicjack Vocaltec Ltd.*,
   220 F. Supp. 3d 510 (S.D.N.Y. 2016) ................................................................... 21

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
   No. 17-CV-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ................................... 12

*In re Avon Prod., Inc. Sec. Litig.*,
   No. 05 CIV.6803 LAK MHD, 2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) ........................... 27

*In re Avon Sec. Litig.*,
   No. 19 CIV. 01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ......................... 19, 29

*In re Carter-Wallace, Inc. Sec. Litig.*,
   No. 94 CIV. 5704 (KTD), 1999 WL 1029713 (S.D.N.Y. Nov. 10, 1999) .............................. 27

*In re Eaton Corp. Sec. Litig.*,
   No. 16-CV-5894 (JGK), 2017 WL 4217146 (S.D.N.Y. Sept. 20, 2017) ................................. 24

*In re Gildan Activewear, Inc. Sec. Litig.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................................... 25

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
   No. 97 CIV. 1865 (HB), 1998 WL 283286 (S.D.N.Y. June 1, 1998) ...................................... 27

*In re Insys Therapeutics, Inc. Sec. Litig.*,
   No. 17 CIV. 1954 (PAC), 2018 WL 2943746 (S.D.N.Y. June 12, 2018) .............................. 28

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................................... 12

*In re JP Morgan Chase Sec. Litig.*,
   No. 02 CIV. 1282 SHS, 2007 WL 950132 (S.D.N.Y. Mar. 29, 2007) ................................... 20

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ................................................................. 19

*In re Party City Sec. Litig.*,
   147 F. Supp. 2d 282 (D.N.J. 2001) ...................................................................... 28

*In re Perrigo Co. PLC Sec. Litig.*,
   No. 19CV70 (DLC), 2020 WL 377881 (S.D.N.Y. Jan. 23, 2020) ......................................... 20

*In re Salix Pharm., Ltd.*,
   No. 14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .............................. 22

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015) ..................................................................... 12

iv

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).................................................................................... 11, 25

*In re Silver Wheaton Corp. Sec. Litig.*,
   No. CV15-5146-CAS(JEMX), 2016 WL 3226004 (C.D. Cal. June 6, 2016) .......................... 21

*In re SLM Corp. Sec. Litig.*,
   740 F. Supp. 2d 542 (S.D.N.Y. 2010)................................................................................ 24

*In re Viropharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) ................................................................................. 26

*In re WEBMD Health Corp. Sec. Litig.*,
   No. 11 CIV. 5382 JFK, 2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ......................................... 25

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016).............................................................................................. 20

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)............................................................................................ 28

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)............................................................................................ 11

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010)............................................................................... 19

*Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*,
   No. 2:11-CV-289, 2013 WL 6728869 (D. Vt. Dec. 20, 2013) ............................................. 24

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) .............................................................................. 20

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partn*ers, Inc., No. 15 CIV. 6034 (RJS),
   2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ................................................................... 24

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018)............................................................................... 26

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)......................................................................................... 19, 22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ..................................................................................................... 12

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ............................... 12, 19

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) ................................................................................... 19

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ................................................................................................ 14

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999) ............................................................................................ 23, 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................................................... 21, 22

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ................................................................................................ 12

*United States v. Strother*,
  49 F.3d 869 (2d Cir. 1995) .................................................................................................. 29

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................................. 26

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) ..................................................................... 11

*Wyche v. Advanced Drainage Sys., Inc.*,
  No. 15 CIV. 5955 (KPF), 2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ................................. 20

## Regulations

15 U.S.C. § 78u-4(b)(1) ........................................................................................................... 11

## Rules

Fed. R. Civ. P. 9(b) .................................................................................................................. 11

## I.    INTRODUCTION

The 2010's saw a significant change in the water metering industry as utilities embraced advanced meters that could be read wirelessly eliminating the need for a physical visit traditional manually-read meters required.  Mueller developed, marketed, and sold advanced meters, and told investors that its meters let it seize this growing and profitable market. But Mueller had no foothold on the future because its meters were defective and routinely broke.

Mueller's meters broke in San Diego. They broke in Missouri. They broke in Indiana, Iowa, Kentucky, New Jersey, Pennsylvania, Illinois, Tennessee, and West Virginia. They broke because their radios broke. They broke because their magnets fractured. They broke because they accumulated water in their nodes. They broke because their casings broke. They broke because their engagement arms fractured, their bronze bodies weren't accurate, and their solid-state registers improperly reset. They broke when municipal utilities used them. They broke when investor-owned utilities used them. The meters manufactured in 2011-2014 broke. After Mueller assured investors the new meters it was producing were stable, the meters manufactured in 2015-2017 broke. Customers returned them *en masse*, and Mueller must replace them, at its own cost.

Because its meters broke, Mueller had to record an accounting charge for its warranty liabilities to reflect the payments Mueller would have to make in the future. Yet its longtime CEO and CFO delayed reporting any charge until just after they'd sold 1.15 million shares. When it made its first accrual, Mueller told investors its newly-manufactured meters worked. They didn't, but Mueller didn't tell investors that and didn't recognize a second even larger accrual until the CEO and CFO finished selling 46% and 66% of their shares, respectively.

The Complaint sufficiently alleges that Mueller's products didn't work. Two of Mueller's major customers, Missouri-American Water and San Diego, faced catastrophic failure rates of 23% and 83%, respectively. Many others, like a suburb San Diego and another smaller Missouri utility,

stopped using Mueller's products after nearly all the products they used failed. Confidential witnesses said failure rates were 15-20% and 20-30% for some products. One confidential witness reports that a utility returned literal truckloads of Mueller's products in 2016. Instead of arguing that these allegations do not state a claim, Defendants deny they are true by referencing "facts" not properly before the Court on a motion to dismiss. The Complaint thus adequately alleges falsity.

Defendants argue that the Complaint fails to allege scienter because many of Defendants' stock sales were shares they sold after exercising an option. Defendants are wrong on the law, and they also never explain why the holder of an option that doesn't expire until November 2021 must use it in 2017 or lose it. And while Defendants claim that the failure of a CEO and CFO who started in January 2017 and 2018, respectively, to sell shares exonerates all Defendants, they ignore the much simpler explanation: these Defendants did not sell any shares because they had few shares to sell. The extraordinarily well-timed and unusual large share sales demonstrate scienter.

The Complaint states a claim. The Court should deny Defendants' motion to dismiss.

## II.    FACTS[1]

### A.    Background

This action is brought on behalf of a class of persons who purchased Mueller common stock from May 9, 2016 through August 6, 2018. (Complaint page 2). Mueller was incorporated in 2005. ¶37. Defendant Hyland became Mueller's CEO and President months later in January 2006. ¶38. He served in this position until January 2017, ¶38, when Defendant Hall became its

---

[1] Citations to "¶_" are to paragraphs of the Second Amended Complaint, dkt. # 48. Citations to "MTD at _" are to pages of Defendants' Memorandum of Law in Support of their Motion to Dismiss, dkt. # 58. Citations to "Musoff Dec. Ex. _" are to the Declaration of Scott Musoff in Support of Defendants' Motion to Dismiss, dkt. # 59. Citations to "Horne Dec. Ex. _" are to Exhibits to the Declaration of Jonathan Horne in Opposition to Defendants' Motion to Dismiss, filed herewith.

President and CEO. ¶39. Defendant Hart was Mueller's CFO from July 2008 to December 31, 2017, ¶40, when he was replaced by Defendant Zakas. ¶41.

Mueller operates in two segments, Infrastructure and Technologies. Mueller Systems, accounting for more than 80% of Technologies' total sales in each of 2015, 2016, 2017, sells water metering systems, products, and services. ¶¶50-51.

Traditional manually-read meters require a utility or municipal employee to actually travel to the meter's physical location to read it. ¶55. Before and during the Class Period, municipalities were transitioning to new, modern Advanced Metering Infrastructure ("AMI"). ¶61.  Meters connected to AMIs are read remotely, obviating physical visits to the meters. ¶55. More, AMIs give utilities more frequent and diverse data, letting the utilities make better decisions. *Id.*

Mueller offers an AMI system that Mueller calls "smart metering." ¶56. In addition to a remote connection, smart metering offers longer-range communications, a remote disconnect meter, and leak detection, among other features. ¶58. Mueller also lets utilities use its national operations center to support customer service. ¶58.

Throughout the Class Period, Defendants focused investors' attention on Mueller's AMIs. ¶57. Defendants told investors in Mueller's 2014 10-K that "[o]ur investments in smart metering have primarily focused on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manual-read meters to automatically read meters." ¶56. Defendants also told investors that Technologies would "remain[] focused on growing sales of its [] AMIs," citing their "higher[] margin." ¶59. Ultimately, Mueller told investors that it had "transformed [itself] by acquiring or developing new technologies, adjusting portfolio and improving processes." ¶58.

**B.      Accounting Rules Mandate That Companies Record or Disclose Contingent Warranty Liabilities Along with Estimates Thereof**

Financial statements not prepared and presented in accordance with generally accepted accounting principles ("GAAP") are presumptively misleading or inaccurate. ¶108.  Under GAAP, warranty liabilities (i.e. costs that a company expects to or has already incurred for the repair or replacement of goods under warranty that it has sold) are contingent liabilities. ¶¶111, 114.

A company must accrue a warranty liability if, at the time the financial statements are issued, it is probable that the liability will occur and the amount of the liability can be reasonably estimated. ¶116. When the estimated liability falls within a range of possible outcomes. GAAP imposes a two-step process. If an amount in the range is a better estimate of the liability than any other amount, that amount shall be accrued. ¶117. If no amount is a better estimate than any other, the minimum amount in the range shall be accrued. ¶117.

If a warranty liability is not both probable and estimable, the company must still disclose the contingent liability in its financial statements so long as the liability is reasonably possible. ¶¶115, 118. "Reasonably possible" means that the likelihood of the event occurring is more than remote. ¶115. The company must also disclose "the nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ¶120. These requirements also mandate disclosure of the remainder of a range of contingent liability beyond the portion that a company accrues as probable. ¶117.

GAAP directs companies to consider historical factors to determine a percentage to apply to the goods sold to accrue a warranty liability for the goods. The company must charge the amount to expenses when the goods are sold and at that time establish a warranty liability on its balance sheet. ¶127. The company then reduces its warranty liability as it pays out or settles claims. ¶128.

4

But when the company learns new information about the goods it sells, it must *revisit* its initial estimate, ¶127, as Defendants specifically acknowledged. *E.g.* ¶147. The kinds of information the company must consider includes early indications that a particular product will break and be returned or repaired at a higher rate. ¶127.

Contingent liabilities are critical disclosures. In their quarterly filings, issuers may generally summarize rather than duplicate the disclosures made in their most recent annual audited financial statements. ¶122. But the SEC prohibits issuers from summarizing contingencies – even if there has been no change since the last audited financial statements. *Id.* Rather, issuers must repeat these same contingent liability disclosures. *Id.*

According to an analyst, "warranty costs are part of doing business in the metering business, and excluding such charges distorts the long-term profitability and return profile of the segment." ¶161. Moreover, Mueller sold AMI products with a 10-year warranty on terms favorable to the customer. ¶61. For example, in one contract, if 3% of the meters installed malfunctioned, Mueller was obligated not only to replace the meters but also pay for labor costs. ¶61.

### C.    Mueller Sells Defective Meters

Throughout the Class Period, Mueller Systems' meters broke at rates demanding high warranty charges. The Complaint highlights the experience of two utilities in San Diego and Missouri, whose Mueller meters broke at rates of 83% and 23%, respectively. Two smaller utilities stopped using Mueller meters because they nearly all broke. The Complaint cites confidential witnesses who report that the failure rates Mueller's meters showed in San Diego and Missouri were entirely typical. And a report Defendants themselves submitted to the Court claims that Mueller System's products were so defective that a large utility negotiated a broad settlement for Mueller to address deficiencies in 10 of the 15 states in which it operated.

1.      *Mueller Systems sells San Diego 15,000 Working and 75,000 Defective Meters*

Mueller sold the San Diego Public Utilities Department ("San Diego") about 90,000 meters. San Diego installed them, but 75,000 of them failed to send wireless to the water department, for an 83% failure rate. ¶84. San Diego bought most (74,000) of these meters between 2010 through 2015, paying more than $7 million. In April 2016, Mueller representatives flew to the city to meet with San Diego managers to discuss meter failures. ¶83. "Mueller representatives told [San Diego] that the glitch is in the gears of the water meter's register." *Id.* The glitch in the gears could "prevent the meter from relaying water-use wirelessly." *Id.* A July 2018 article quotes the general manager of San Diego suburb Santee's utility claiming Mueller's smart meters are a "bad product." ¶88. As of July 2018, that utility had replaced half of the Mueller smart meters. *Id.* When Mueller's smart meters fail, Santee replaces them with a competitor's product. *Id.*

2.      *Mueller Systems Sells a Missouri Utility 97,000 Meters, of Which At Least 22,000 Are Defective*

The Missouri-American Water Company ("Missouri-American") installed 97,000 Mueller Systems meters between 2012 through very early 2015. ¶69. In early 2015, Missouri-American detected a "serious and widespread issue": that these 97,000 meters had "unusually high levels of premature failure rates." *Id.* Missouri-American ultimately took more than 22,000 Mueller Systems meters out of circulation, citing various defects. ¶77. Based on this experience, Mueller had to increase its warranty expense to cover ***both*** the costs of replacing these 22,000 meters ***and*** failures that had not yet been reported but would occur. It did not. ¶78.

Another Mueller customer in Missouri, Chillicothe Municipal Utilities ("CMU") purchased 4,000 meters from Mueller in 2010. In 2013, Mueller replaced 3,300 because of moisture in the meters' nodes. ¶71. But by the end of 2016, CMU had replaced 1,370 of Mueller's 3,300 replacement meters, and it replaced another 581 in 2017. ¶74.

   3.    *The Smart Meters Mueller Systems Sold To Missouri-American Water Had*
         *Four Fatal Defects and Failed In Nearly Every Climate In the U.S.*

Defendants seek judicial notice of a final report by Missouri-American's regulator on Mueller System's product defects ("Report"). Musoff Dec. Ex. J. That Report shows that Mueller System's products failed in every climate in the country.

American Water is a holding company whose subsidiaries operate in 15 states. Missouri-American is one of these subsidiaries. American Water purchased Mueller Systems meters for all of its subsidiaries. Report at 3 (references to pages are to the numbers that appear at the bottom right corner of the document). Between 2012 and 2015, Mueller and American Water identified four "major problems" in Mueller's meters, each of which "prevented accurate measurement of water flow": "(1) magnet fracturing, (2) engagement arm fracturing, (3) bronze body accuracy failures, and (4) SSR [Solid State Registers] resetting." Report at 7 n.9. The defects led to multiple recalls before the Class Period even started.

The defects led to product recalls at all of American Water's subsidiaries. According to the Report, "[u]pon identifying the defective magnet issues as well as other issues, *Mueller instructed [American Water] and its operating subsidiaries* to return all of the defective meters", an instruction it repeated with the bronze body failures and SSR resetting. Report at 10. Mueller's meters were so bad that *not only* did American Water cancel its contract, and *not only* did it return tens or hundreds of thousands of Mueller's meters, but American Water "negotiate[d] a complete settlement with Mueller Systems" compensating American Water for labor costs of removing and replacing meters. Report at 13. As part of this settlement, Mueller paid American Water subsidiaries operating in at least 9 states other than Missouri: Indiana, Iowa, Kentucky, California, New Jersey, Pennsylvania, Illinois, Tennessee, and West Virginia. Report at 30.

7

Missouri-American purchased a total of 99,572 Mueller meters between early 2012 and mid-2015. Report at 15. 9,749 were on a list of serial numbers with one or more of the fatal defects. *Id.* 8,733 of these defective meters were identified before installation and were presumably returned for replacements. *Id.* Of the Mueller meters Missouri-American did install, it removed 23,833 between August and December 2015. *Id.* 1,016 were removed because they were on the defective meter list, and 22,817 because Missouri-American Water "determined [they] had either stopped working or were not recording any water usage at all." Report at 4, 15. Thus, counting the meters caught before installation, not 22,000 but *32,566* Missouri-American Mueller meters broke.

The number of products returned by American Water is staggering. According to CW1, a former Mueller Systems Territory Manager, Muller Water lost its contract with American Water because of "meter issues." ¶95. American Water did not return products during the negotiations, but then shipped full semi-tractor-trailers after contract renewal negotiations failed. *Id.*

### 4.    *Mueller Sells Defective Meters to Other Customers*

Since 2014, Mueller has known of multiple defects that caused its smart meters to fail at exceptionally high rates.  According to CW 3 (a 10 year-employee, the last four as its Western Regional Manager), Mueller Systems' products had connection problems. ¶101. But they *also had* moisture in their nodes, ¶102, and *also had* cracking meter casings. *Id.* These all were "common complaints." *Id.* "[F]rom a manufacturing standpoint [] *we could not resolve those issues*." ¶103.

Mueller Systems employees spent much of their time addressing the problem of returns. CW1, a Mueller Systems territory manager between May 2015 and June 2019, reported that in the last two years of his tenure ending June 2019, honoring warranties was "the bane of my existence." ¶96. CW1 noted that the problems began on "day one" of his tenure and that several Mueller customers saw failure rates of 15-20%. ¶91. CW2 reported that failure rates on two Mueller Systems products were between 20 and 30%. ¶97.

Mueller's senior personnel understood before the Class Period that Mueller was going to face returns far in excess of its warranty provision. CW2, a Mueller Systems Proposal Coordinator between October 2016 and June 2018, was told that Defendant Hall was hired specifically to "reorganize and focus on the warranty issue." ¶98. Indeed, both before and after Defendant Hall was hired as CEO, Mueller held "all hands" meetings where product returns were a "big issue". ¶100. CW3 also reports that he participated in quarterly Mueller Systems meetings with its General Manager Hassan Ali (among others), where San Diego, American Water, and failure rates in general were "constant[ly]" discussed. ¶100.

CW2 reports that with so many returns, Mueller could not focus on new orders. ¶98. So does CW3, who confirms that "we couldn't manufacture new products because we were so busy repairing returned products." ¶103. He adds that by 2014, Mueller knew of "issues with the potting in the radio" and by 2014/2015 was "shipping [Version 3] radios that we knew we were going to have to replace." ¶105. Mueller Systems even "put a stop to manufacturing on radio shipments in late 2015 or early 2016." *Id.* The Version 3 radios had a 50% failure rate in 2015/2016. *Id.*

5.    *Defendants Conceal Mueller's Warranty Liabilities Until They Can't*

During 2016, Defendants ***decreased*** Mueller's warranty provision, from $2.7 million in the quarter ending March 31 to a mere $2.1 million by the quarter ending December 31. ¶¶18, 153. Days after announcing these last results, Defendants Hyland and Hart sold 1 million and 150,000 shares, respectively, for proceeds of $12.5 million and $2.0 million. ¶215.

On April 27, 2017, announcing the following quarter's results, Defendants disclosed that Mueller would accrue a $9.8 million warranty liability charge relating to defective Technologies meters. ¶20. The charge amounted to over half of the Technologies segment's revenues for the quarter. *Id.* Mueller's share price fell $1.43 per share, or more than 11%, on high volume. ¶21.

9

This disclosure only partially revealed the fraud. Defendants said the reason for the charge was that Mueller's Version 3 radios had a defect that caused them to break at rates requiring a much higher warranty liability provision. ¶¶167, 207. In fact, Mueller learned of the defect in 2014 and stopped manufacturing the Version 3 radios in early 2016 at the latest because of it. ¶¶104-105. Moreover, by failing to recognize an additional warranty charge and claiming that newly-manufactured products were breaking at lower than industry-average rates, Defendants left investors with the misleading impression that the warranty problem was a thing of the past. And indeed, in quarterly and annual reports and associated press conferences for the periods ended June 30, 2017 through June 30, 2018, Defendants continued to represent that problems were limited to "warm climates" and "harsh environment[s]." ¶¶167, 173, 194. Defendants also told investors that Mueller "also carefully examined our product processes and accelerated lifecycle testing data with respect to radios manufactured after the period referenced above [2011-2014] and expect our warranty experience to be in line with industry standards." ¶24.

But Mueller Systems' products failed in San Diego, hardly known for its harsh climate, ¶173, and across American Water's entire operating area, which encompassed almost every climate in the U.S. Report at 30. And on August 6, 2018, Defendants announced that Mueller had taken another substantial charge of $14.1 million, this time for meters manufactured through 2017. ¶¶201, 205. One analyst called the charge "eye-opening". ¶209. On August 7, Mueller's share price fell $0.74, or 6%, damaging investors. ¶202.

## III.    ARGUMENT

### A.    The Complaint Adequately Alleges Falsity

#### 1.    Standards

In evaluating a Rule 12(b)6) motion to dismiss, courts "assum[e] that all the [factual] allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To

survive the motion, a complaint need only allege sufficient facts to "state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Rule 12(b)(6) does not countenance [] dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556.

Section 10(b) requires a plaintiff to plead, among other things, that the defendant: (1) made a misstatement or omission of material fact ("falsity") (2) with scienter. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).[2] Securities fraud claims are subject to Federal Rule of Civil Procedure 9(b) which demands that Plaintiffs "identify: (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent." *Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *5 (S.D.N.Y. Mar. 28, 2017). The PSLRA also requires that Plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Still, "[courts] do not require pleading of detailed evidentiary matters." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

> 2. *Defendants Made Misleading Statements of Opinion*
>
> a) Having Offered Generous Warranties, Operating In An Industry In Which Warranty Liabilities Are Exceptionally Important, Defendants Made False Statements In "Weighty" Filings Misstating A Liability the SEC Has Cautioned Is Critical

GAAP requires that companies accrue warranty liabilities. They further demand that companies increase the accrual once new information shows the existing accrual is too low. Defendants knowingly failed to do so.

---

[2]The remaining elements are not at issue.

A plaintiff may show that an opinion is false by "'identify[ing] particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).[3]

Securities claims arise in a "unique" context. *Id.* at 210. The Supreme Court in *Omnicare* "acknowledg[ed] the formality and legal weight of documents filed with the SEC." *Id.* It found that "'[i]nvestors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments." *Id.* (*quoting Omnicare*, 135 S. Ct. at 1330).

The SEC has further implicitly found that disclosures concerning contingent liabilities are especially important. The SEC requires that they be repeated, rather than summarized, in any quarterly filing, so that investors will see the full picture. And *Omnicare* noted that "investor[s]

---

[3]     Defendants disagree. They cite three different standards for false opinion statements in two pages. Defendants first claim plaintiffs must show Defendants disbelieved their statements, citing *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, at *8 (S.D.N.Y. Oct. 5, 2016). *Pirnik* relied on a Second Circuit case, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011). Next, Defendants claim "the falsity and scienter requirements are essentially identical," citing *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

    In fact, neither standard remains good law. Though Defendants claim the Second Circuit affirmed *Sanofi*, in truth it overruled the standard *Sanofi* applied. Instead, on appeal, the Second Circuit found that *Omnicare* had altered *Fait*, on which both *Sanofi* and *Pirnik* relied. *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

    In light of *Omnicare*, Plaintiffs need not identify facts showing the defendants disbelieved their opinion. *Id.* at 210. The Court must also separately analyze falsity and scienter. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 619 (S.D.N.Y. 2017) (finding that defendants made false statements but finding that certain defendants did not make the statement with scienter); *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *17 (S.D.N.Y. Sept. 9, 2019) (explaining that falsity of opinion imposes lower standard than scienter).

take into account the customs and practices of the relevant industry." In the water metering industry, "excluding [warranty liabilities] distorts the long-term profitability and return profile of the segment." ¶161.   Further, Mueller Systems offered generous 10-year warranties, making warranty liability that much more critical to its bottom line.

Thus, Defendants estimated Mueller's warranty liabilities, a critical provision, in "weighty" filings, in an industry that scrutinizes such disclosures, where Mueller offered ten-year warranties. Investors expected, and were right to expect, that Defendants would scrutinize warranty expenses and flyspeck their provision

> b) Defendants' Warranty Liability Provisions Were Misleading

By the beginning of the Class Period, Mueller had:

- Sold Missouri-American more than 99,000 units of which 23,000 were still defective after three recalls;
- Sold San Diego 90,000 meters for more than $7 million, 83% of which were defective;
- Sold products so defective that American Water, a 15-state utility, had refused to renew its contract because of four separate fatal flaws;
- Entered into a settlement calling for Mueller to pay the costs for 10 American Water utilities to replace defective Mueller meters in which Missouri-American alone received more than $100,000;
- Received literal truckloads of returns from American Water;
- Replaced more than three quarters of CMU's meter inventory, and then provided a warranty payment on return of 22% of the replacement meters, with further returns continuing apace;
- Stopped manufacturing Version 3 radios entirely because of defects for which it would later accrue a $9.8 million liability.

Notwithstanding these defects, Mueller's warranty liability provision was a mere $2.1 million. Mueller sold more than $5.5 million of defective products *to San Diego alone*.

Defendants reject the bottom-line conclusion that the failure to disclose these facts rendered the amount of the accrual misleading. But they do so by (1) improperly denying the facts

13

as to San Diego and Missouri-American, (2) ignoring the allegations concerning the Version 3 radios, and (3) ignoring the facts set out in the Report showing that Mueller's meters failed at unacceptable rates in every climate in the U.S.

(1)     San Diego

Plaintiffs rely on two articles to establish that 83% of the meters sold to San Diego were defective. One of these articles, dated February 12, 2018 ("February Article"), reports that only 15,000 of the 90,000 smart meters San Diego installed – 17% – were sending wireless signals. ¶84; Musoff Dec. Ex. I, at 3 (text obscured by CM/ECF notations) ("The city has installed about 90,000 of these [smart] meters. Of those, only 15,000 are sending wireless signals[.]") A separate August 2, 2018 article ("August Article") claims a "glitch" in more than 57,000 of Mueller's 70,000 smart meters purchased between 2010 and 2014 – at least 81.4% – prevented them from transmitting wirelessly. Musoff Dec. Ex. G. Thus, both the February and August Articles claim that slightly more than 80% of Mueller Systems' smart meters failed.

Defendants cite a July 12, 2018 article ("July Article") (Musoff Dec. Ex. H) that, Defendants say, reports that the smart meters did not have a glitch, but instead that San Diego never connected them wirelessly. Defendants' claim has no merit on a motion to dismiss.

First, Plaintiffs cite the July Article for an unrelated point.[4] Defendants do not dispute the point for which Plaintiffs cite that article nor Plaintiffs' interpretation thereof. Instead, Defendants cite other purported facts contained in the July Article and ask the Court to take those facts as true and dismiss Plaintiffs' Complaint. It may not. "[W]here public records that are integral to a fraud complaint are not attached to it," the court may consider the records "'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'" *Roth v. Jennings*, 489 F.3d 499,

---

[4] Plaintiffs cite the July 12 Article solely to quote *Santee*'s claims – not San Diego's – that Mueller's smart systems are a bad product. ¶86.

14

509 (2d Cir. 2007) (emphasis in original). Defendants can't dispute the February and August Article based on facts set out in the July Article without taking that Article as true.

Second, the claim that the glitch prevented about 83% of Mueller Systems' meters from being used correctly appears both before (the February Article) and after (the August Article) the July Article. Thus, the claim in the July Article was neither a new development nor later reporting that did not need to mention the failures because they were already established. It was an error.

Third, on a motion to dismiss Plaintiffs need only plead a plausible interpretation rather than one more plausible than Defendants'. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012). Moreover, Defendants' interpretation is implausible. San Diego purchased 74,000 Mueller meters in 2010-2014 for $7 million and spent more money installing nearly 70,000. Only 12,000 of these were connected to the AMI system which allows them to transmit water-use data wirelessly. Since the glitch prevents the meters from relaying water-use wirelessly, almost 58,000 are not connected because of the glitch, as the August Article's title alleges.

Defendants, however, maintain that the 58,000 Mueller meters have no defects. They do not explain why San Diego would buy and install 70,000 smart meters and then stop *just* short of making the meters useful by connecting them to the grid – what makes the smart meters smart.

Defendants also challenge Plaintiffs' interpretation of the August Article, an investigative article, but only by crediting the denials of the entity the article investigates. The August Article showed San Diego inappropriately concealed, and failed to act on, problems with the Mueller meters. Indeed, the August Article criticizes the City in its opening paragraph on grounds that it "***has no record of trying to fix or address the problem***." Yet Defendants cite as true San Diego's self-serving claim in its defense that the glitch was "minor" while taking the purported fact that the City had only "identified" 250 defective meters to Mueller as of June 2016 as evidence that

15

only 250 meters had the glitch. The Court should give no weight to San Diego's denial because the point of the article is that San Diego's response was inadequate and its statements misleading.

Thus, for purposes of Defendants' motion to dismiss, 83% of the meters Mueller sold to San Diego were fatally defective.

(2)    Missouri-American

The Complaint alleges, based on sworn testimony, that 23% of the meters Mueller sold to Missouri-American Water were fatally defective and had to be removed. Defendants do not dispute Plaintiffs' interpretation of the testimony. Instead, they declare that the Report found that the meters were not defective.

Yet the Report states no such thing. According to the Report, Missouri-American removed the meters either because they were on a list prepared by Mueller listing defective meters or because they "had either stopped working or were not recording any water usage at all." Report at 15. A meter that "stopped working" or "is not recording any water usage at all" is broken.

The Report likewise notes that American Water, Missouri-American's parent, negotiated a "complete settlement with Mueller Systems" including both returns and compensation for time spent replacing meters. The Report's promised discussion of the settlement appears behind a page blacked-out for reasons of confidentiality. Report at 17. In the page following that discussion, the report states Missouri-American Water's "share of the *refund*" was $101,520.91. Report at 18. Yet a refund from the settlement is distinct from Mueller's replacing defective meters in the ordinary course of business when Missouri-American exercised its rights under its warranties.

The Report also shows that Missouri-American's problems were general. The total American Water settlement was $706,634. Report at 28. American Water divided the settlement between states based on the number of meters returned for each type of defect. *Id.* Thus, Missouri-American defective meters were only one seventh of the total for American Water alone.

16

(3)    The Problems Missouri-American and San Diego Experienced Were General

Defendants claim that the problems Missouri and San Diego experienced were isolated occurrences. They say "Plaintiffs do not [] allege that failure rates experienced by one municipality may simply be extrapolated to apply to others." MTD at 11. The Complaint does not allege that Mueller must apply the San Diego and Missouri-American failure rates to all its customers, a straw man. But the Complaint alleges that Mueller must apply the lessons learned by Missouri-American and San Diego failure rates, which provided ample evidence that it was probable the products would fail at very high rates more generally. *E.g.* ¶¶135, 140, 148, 152, 155, 164, 174, 189, 195.

And the Complaint does allege specific facts showing that the problems were general. Mueller "[c]ouldn't manufacture new products because we were so busy repairing returned products." ¶¶98, 103. "[F]rom a manufacturing standpoint, [Mueller] could not resolve those issues." ¶103. Its new 2017 CEO had a mandate to "reorganize and focus on the warranty issue." ¶98. Mueller's high-level employees regularly discussed general high failure rates. ¶100.

Finally, Defendants purport to find a concession in the Complaint that meters only failed at high rates in "particularly harsh" and "humid" climates, but they cite their own false exculpatory statements quoted in the Complaint. San Diego's climate is neither harsh nor humid,[5] and the Report shows Mueller's meters failed in at least 10 states that span nearly every climate in the U.S.

(4)    The Confidential Witnesses Further Show Defendants' Opinion Statements Are Misleading

"Information presented through Confidential Witnesses [] is allowed as long as the witnesses are described in the complaint with sufficient particularity to support the probability that

---

[5] San Diego Union Tribune, *San Diego: No. 1 pleasant place in US*, available at https://www.sandiegouniontribune.com/business/growth-development/sdut-zillow-pleasant-cities-ranking-weather-2014dec19-htmlstory.html

17

a person in the position occupied by the source would possess the information alleged." *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010). Defendants concede that the Complaint sufficiently describes each confidential witness's title, dates of employment, position, job responsibilities, and how they learned the information they report.

The information the witnesses provide is relevant. The confidential witness allegations establish that Mueller Systems' products failed at high rates (15-20% for some customers, 20-30% for some products) and Mueller knew of the issue (returns were a "big issue" in high-level quarterly meetings, focusing on the warranty issue was within Hall's remit). Those are precisely the early warnings about higher-than-historical replacement rates mandating Defendants increase Mueller's liability accrual. The allegations are specific and Plaintiffs "explain how these allegations suggest that [] warranty reserve estimates or other statements were false or misleading." MTD at 13.

Indeed, Defendants do not address, but nitpick, the Complaint's most specific allegations. CW 3 sufficiently reports that he learned about defects in Version 3 radios in 2014, that Mueller was "shipping radios [it] knew [it] was going to have to replace" and stopped manufacturing altogether in late 2015 or early 2016. ¶105. Defendants knew the number of Version 3 radios Mueller had sold. They knew that many of those radios would fail – that's why Mueller stopped making them. They knew the costs of replacing defective Version 3 radios would be significant – indeed, the costs reached $9.8 million. Yet Defendants waited until April 2017 – after their stock sales – to acknowledge a problem. Defendants ignore these allegations, but instead treat the Complaint as if it only alleged that the failure rate in 2015/2016 turned out to be 50%. Their argument errs; the intervening warranty liability provisions were misleading.[6]

---

[6] Relatedly, Defendants claim that plaintiffs must allege facts showing that they were subjectively aware of CW3's estimate. The argument fails for the same reason – Defendants

18

Defendants also criticize the confidential witness allegations because the Complaint does not allege a direct contact with Defendants, an argument courts have rejected as "without merit." *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (indirectly quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)); *accord In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) ("[t]he notion that the [Confidential Witnesses] cannot be believed because none had direct contact with any individual Defendant is contrary to law.").[7]

> (5)     The Auditor Sign-off Is Properly Considered in Connection
> with Scienter and In Any Case Does Not Absolve Defendants

Defendants cite Mueller's auditor's sign-off, coupled with the lack of restatement, as evidence that they did not make false statements and that the statements were not made with scienter. In general, though, "the fact that the financial statements for the year in question were not restated does not end [plaintiff's] case when [plaintiff] has otherwise met the pleading requirements of the PSLRA." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (upholding complaint alleging securities fraud even in light of auditor's subsequent clean audit opinion on allegedly misstated financial results); *accord In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) (same). Indeed, the defendants made the same fruitless argument

---

knew there was a substantial problem, it does not matter what the exact size of the problem turned out to be.

[7] The witnesses in *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd sub nom. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011) not only had no contact with the defendants, they were entry-level employees at American Express. The employees reported anecdotes of poor credit decisions as well as summary opinions, but no hard information and data, as the CWs do here.  And the court was analyzing scienter, not falsity. In *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011), three of the witnesses worked for The9's *customer* and did not interact with anyone who worked for The9, while the fourth was inadequately described only as a "senior executive", while Defendants do not challenge that the CW are adequately described in this case. *Pirnik* does not require "internal analyses"; it used the term to distinguish a case in which plaintiffs cited some. *Pirnik*, 2016 WL 5818590, at *9.

to the Second Circuit in *Indiana Pub. Ret. Sys. v. SAIC, Inc*.,. Horne Dec Ex, 1 at 40. Further, the cases Defendants cite considered auditors' opinions in evaluating scienter. [8] Thus, the auditor's impact must be considered holistically with Plaintiffs' other scienter allegations.

### 3.      Defendants Made False Statements of Fact

Even if Defendants were not required to accrue a contingent liability, accounting standards required them to disclose facts that could possibly result in additional liabilities, and either estimate the potential liability amount or disclose that no estimate is possible. The failure to do so is a false statement of *fact*, not opinion, as mere "awareness of a possible, sizeable claim" suffices. *In re Perrigo Co. PLC Sec. Litig.*, No. 19CV70 (DLC), 2020 WL 377881, at *8 (S.D.N.Y. Jan. 23, 2020) (quoting *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (both analyzing disclosure claim as statement of fact)). In *SAIC* the Second Circuit held that the company's awareness that it had committed fraud that would cause material harm to itself compelled disclosure of a contingent liability even if the company was "uncertain about its likely effect." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016).

Before the start of the Class Period, Mueller stopped making Version 3 radios because they were defective. Defendants knew many of those Version 3 radios would have to be replaced –

---

[8] In *Wyche v. Advanced Drainage Sys., Inc.*, No. 15 CIV. 5955 (KPF), 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017), *aff'd,* 710 F. App'x 471 (2d Cir. 2017), the plaintiffs' only facts suggesting scienter were confidential witnesses who expressed a different opinion than defendants. Here, the complaint does not rely on differences of opinion, but on objective facts showing that Mueller's warranties had ballooned.  In *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 148 (D. Conn. 2007), *aff'd,* 312 F. App'x 400 (2d Cir. 2009), Plaintiffs merely alleged that "Defendants could not have actually believed that loan loss reserves were adequate because they later increased reserves." In *In re JP Morgan Chase Sec. Litig.*, No. 02 CIV. 1282 SHS, 2007 WL 950132, at *13–14 (S.D.N.Y. Mar. 29, 2007), *aff'd sub nom. ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009), plaintiffs did not point to contemporaneous information. Moreover, there, the misstatements were not even material so the plaintiff thus faced a substantially higher burden in showing they were made with fraudulent intent. *Id.*

20

that's why Mueller stopped making them. Yet in its financial statements, Mueller merely accrued a contingent liability and generally warned the liability might not be enough. When a company knows specific facts that might lead to a larger accrual, it is not enough to state, as Defendants did, that Mueller's products (like all products) might fail. MTD at 3-4. That is the kind disclosure courts find insufficient. *E.g. In re Silver Wheaton Corp. Sec. Litig.*, No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *10 (C.D. Cal. June 6, 2016).  Mueller did not mention the Version 3 radios or give any indication that its disclosure was anything more than boilerplate. Moreover, "[i]f the language has not changed over time to 'reflect new information and new risks,' the language 'may be boilerplate.'" *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 515 (S.D.N.Y. 2016). Mueller made substantially the same disclosure in 2013, 2014, and 2015. Horne Dec. Exs. 2, at 10, 3, at 11, and 4, at 12. Mueller violated GAAP by concealing that it faced a specific problem that would require accruing a liability.

Defendants also made false statements of fact in connection with their first accrual. Defendants said Mueller had "recently bec[o]me aware" of the defects in Version 3 radios, and claimed the catalyst was an $800,000 charge taken in the first three months of 2017. ¶¶166, 167. They had known since at least early 2016 that the Version 3 radios were defective. By falsely attributing the cause of the First Accrual to recent events, Defendants avoided disclosing to investors that their CEO and CFO delayed disclosure so they could sell their shares.

### B.     Defendants Made False Statements With Scienter

#### 1.     Standard

In evaluating scienter, "courts must, as with any motion to dismiss, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007). The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation [] meets that standard." *Id.* at 322-23.

21

The inference of scienter "need not be [] of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. "When the competing inferences rest in equipoise, the tie [] goes to the plaintiff." *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016).

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "Unusual" insider sales of stock establish motive. *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017). For recklessness, plaintiffs may "specifically allege [] defendants' knowledge of facts or access to information contradicting [defendants'] public statements," or allege that defendants "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 308, 311. Here, Plaintiffs plead scienter through both motive and opportunity and strong circumstantial evidence of conscious misbehavior or recklessness.

> 2. *Defendants Hyland and Hart Sold 44.6% and 65.6% of All Shares they Could Sell With the Majority of Sales Falling in the Quarter Before the First Accrual*

> a) The amount of stock sold is suspicious

As of January 2016, shortly before the Class Period, Hyland held 2,599,353 shares or vested options, of which 81.5% expired after November 2018. Horne Dec. Ex. 5, at 49, 53. During the Class Period, Hyland sold 1,226,757 shares. ¶65. At the close of the Class Period, he held 1,525,420 shares and vested options.[9] Horne Dec. Ex. 6 at 43. Thus, Hyland sold 1,226,757 of all 2,752,177 shares available for sale, or 44.6%.[10]

---

[9] 157,911 of the vested options Hyland held at the beginning of the Class Period were underwater stock options which expired unexercised.

[10] The Court is "free to consider defendants' SEC filings to fill gaps on a motion to dismiss." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).

22

As of January 2016, Hart held 721,119 shares. Horne Dec. Ex. 5, at 53. Of these, 241,172, or 72.5%, were options that expired November 2018 or later. *Id.* at 53. After his last Class Period sales, Hart held 271,436 shares and vested options. Horne Dec. Ex. 6 at 43. During the Class Period, he sold 516,889 shares, ¶65, or 65.6% of shares available for sale.

| | Hyland | Hart |
|---|---|---|
| Total number of shares and options | 2,971,162 | 721,119 |
| **Total vested options and shares** | **2,599,353** | **721,119** |
| Shares | 1,375,114 | 241,172 |
| Options expiring November 2017 | 226,757 | 10,459 |
| **Options expiring November 2018 or later** | **997,582** | **332,463** |
| **Percentage of options expiring in or after November 2018** | **81.5%** | **97.0%** |
| **Total remaining available for sale** | **1,525,420** (does not include 75,081 unvested RSUs) | **271,436** |
| **Total stock sales pled in Complaint** | **1,226,757** | **516,889** |
| **Shares eligible for sale** | **2,752,177** | **788,325** |
| ***Total percentage sold[11]*** | ***44.6%*** | ***65.6%*** |

Thus, Hyland and Hart sold 44.6% and 65.6% of all the shares they could sell, respectively.

Ringleaders' stock sales are especially probative of scienter. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999). Hyland and Hart were Mueller's long-time CEO and CFO. They were principally responsible for the fraud in that they failed to accrue *any* accounting charge for years even as Mueller's problems mounted. The Second Circuit recently found such sales from

---

[11] Total percentage sold is *total stock sales* divided *shares eligible for sale*.

the defendants principally responsible for the false statements sufficient to establish motive and opportunity. *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (sale of 18% and 38% were sufficient to establish scienter);[12] *see also Stevelman*, 174 F.3d at 82 (sales of 40% of shares from main defendant sufficed to plead motive and opportunity).[13]

Defendants argue that certain of the stock sales are not relevant because they were of shares obtained through options that were set to expire.[14] First, Defendants did not need to sell the shares they acquired through options; they could have held them. Indeed, courts have held that there is only a difference between sales of shares and sales of shares obtained from expiring options if it is undisputed that the latter were necessary to pay the exercise price and taxes. *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 n.6 (S.D.N.Y. 2010). Some go further than that. *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) ("Money is fungible; in-kind and take-home cash sales affect the seller's bottom line equally."). Here, Defendants do not contend they needed to sell stock to cover the costs of taxes and exercise prices.

---

[12] The percentages are set out in the opinion the Second Circuit reversed, *Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-CV-289, 2013 WL 6728869, at *12 (D. Vt. Dec. 20, 2013).

[13] Defendants assert Hart and Hyland sold 19.6% and 8.6% of their holdings. MTD at 25. Plaintiffs cannot reconstruct Defendants' arithmetic. In *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011), the seller's holdings *increased*. In *In re Eaton Corp. Sec. Litig.*, No. 16-CV-5894 (JGK), 2017 WL 4217146, at *12 (S.D.N.Y. Sept. 20, 2017), the defendants' pre-class period sales were larger than, and post-class period the same as, his class-period sales.

[14] In *City of Taylor Gen. Employees Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013), the selling defendant retained the "overwhelming majority" of his shares. In *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016), Defendants sold shares before they even allegedly knew their statements were false. In *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007), a case brought by a company against a short seller, the court held that simply purchasing a particular financial product (floorless convertible preferred stock) did not create an inference that the short seller was manipulating the stock price; to hold otherwise would effectively make such securities unlawful.

24

Second, Defendants did not sell shares they acquired through *expiring* options. Rather, 81.5% and 97.0% of Hyland and Hart's options, respectively, expired in November 2018 or later. Some expired in 2021. Hyland and Hart did not need to exercise options that would continue to be valid more than a year after their sales. Moreover, contrary to Defendants' claim, because net profits are nearly impossible to calculate pre-discovery (without information such as tax liabilities), courts routinely use gross proceeds to determine whether insider sales were unusual. *See, e.g.*, *Scholastic*, 252 F.3d at 74 (considering gross proceeds in scienter analysis); *Blanford*, 794 F.3d at 308-09 (same).

Defendants also cite Hall and Zakas's failure to sell shares. But plaintiffs need not point to insider sales by all defendants. *Fresno*, 268 F. Supp. 3d at 555. Further, Hall and Zakas's failure to sell shares is hardly surprising: they had few to sell. Horne Dec. Ex. 6, at 43 (showing Hall had 75,081 shares, all of which were restricted); Horne Dec. Ex. 8, at 38 (showing Zakas had 367,166 shares).[15]

Defendants also point to the share repurchases Mueller conducted. But crucially, they cite a case where there were no personal sales of stock. *In re WEBMD Health Corp. Sec. Litig.*, No. 11 CIV. 5382 JFK, 2013 WL 64511, at *13 (S.D.N.Y. Jan. 2, 2013). These cases reason that it would "defy economic reason" for a company to buy back its shares at a higher price. Buying back shares at an artificially inflated price harms the company but raises the stock price. If the defendants intend to defraud investors, then buying back shares without selling their own is irrational.

---

[15] In *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009), the court found that the plaintiffs' failure to identify non-defendant insiders with significant stock sales negated scienter, but the Second Circuit later focused on the stock sales of defendants alone. *Blanford*, 794 F.3d at 301. In any case, here, the only other insider with significant holdings Mueller Co.'s President, which has nothing to do with Technologies. In *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995), the only seller was an outside director.

But *here*, *the Defendants sold 45.8% and 65.6% of their shares*. There is a rational explanation for Defendants' conduct: they used a share repurchase program to prop up Mueller's stock price while they sold their own personally-held shares. If anything, the share buyback supports scienter. *Cf. In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 n.23 (E.D. Pa. 2014) (in case involving stock sales, because "[t]here are many inferences that a Court could draw from a stock repurchase" it "weighs neither in favor of nor against an inference of scienter.")

b)      The Timing of the Stock Sales Was Suspicious

The timing of stock sales is unusual where, as here, the sales were out of line with the seller's previous practice and the sales came shortly before corrective disclosures. *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 475 (S.D.N.Y. 2013); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 495 (S.D.N.Y. 2018).

The sales meet the first element. No insider had sold any shares of stock in 2015 or 2016. ¶216. Thus, the timing of the stock sales is out of line with previous practice. *Nguyen*, 297 F. Supp. 3d at 493–96 (sales support inference of scienter as "trades are unusual because [insiders] traded 'in amounts dramatically out of line with prior trading practices' and [ ] did not make a single trade in the 175 days between the end of the Class Period and the commencement of this action.").

Second, the stock sales came in the quarter just before Mueller accrued a liability. In 2015 and 2016, Hyland was Mueller's CEO, and therefore controlled its accounting decisions. In this time, Mueller failed to accrue a warranty liability or disclose it was reasonably possible it would be liable for a material warranty liability in the near future, even as problems mounted. Hyland could continue to cause Mueller to fail to accrue a charge while he remained Mueller's CEO.

In February 2017, Mueller filed its last 10-Q with Hyland at its helm. Thereafter, another CEO would control whether Mueller accrued a contingent liability. The largest stock sales during the Class Period, accounting for two-thirds of total sales, occurred days after Hyland relinquished

26

control. Hyland and Hart sold 1 million and 150,000 shares of stock, respectively. And in the next quarter, Mueller did in fact accrue a contingent liability. By failing to disclose the charge until after they had sold their shares, Hyland saved $1.43 million, and Hart $214 thousand.

For the same reason, Hyland's retirement is not exculpatory. Hyland sold most of his shares not when he announced his retirement nor when he wholly withdrew from the company, but instead immediately after the last quarter in which he controlled Mueller's disclosures and immediately before Mueller accrued a warranty provision. Indeed, Hyland's retirement gave him a motive **not** to accrue a provision until he retired and sold his shares. So Hyland's sales were suspicious.[16]

Defendants also speculate that they did not sell shares in 2016 was because insiders held material nonpublic information concerning negotiations to sell a Mueller subsidiary. The process of looking for strategic alternatives began in late 2015 and was hardly a secret. Horne Dec. Ex. 7 at 13 ("I would say that [selling the subsidiary] is something that we are giving a lot of attention to") (April 27, 2016). For at least nine months, the only non-public information Defendants would have is the number of pitchbooks they sent, which is hardly material. And even if Defendants had

---

[16] There were no similar circumstances in *City of Taylor Gen. Employees Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 776, 799 (S.D.N.Y. 2013), where the CEO maintained control for eight months after his sales and twelve months before the corrective disclosure, nor in any of the cases it cited. *In re Carter-Wallace, Inc. Sec. Litig.*, No. 94 CIV. 5704 (KTD), 1999 WL 1029713, at *5 (S.D.N.Y. Nov. 10, 1999), *aff'd sub nom. In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000) (only seller was low-level manager who was not involved in the false statements); *In re Avon Prod., Inc. Sec. Litig.*, No. 05 CIV.6803 LAK MHD, 2009 WL 848017, at *21 (S.D.N.Y. Feb. 23, 2009), *report and recommendation adopted,* No. 05 CIV. 06803 (LAK), 2009 WL 10698359 (S.D.N.Y. Mar. 18, 2009) (in case involving operational issues, retiring CFO sold shares, while CEO and COO increased the number of shares they held, and CFO's "sales" were a gift to his wife); *Feasby v. Industri-Matematik Int'l Corp.*, No. 99CIV.8761(HB), 2000 WL 977673, at *1 (S.D.N.Y. July 17, 2000) (seller was mere Sr. Vice President); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 CIV. 1865 (HB), 1998 WL 283286, at *1 (S.D.N.Y. June 1, 1998) (outside director).

shown they had material nonpublic information a year before the sale, they do not explain why they did not sell shares in 2015.[17]

Finally, Defendants claim they could not have committed fraud because they purportedly did not maximize the profit they could have earned. Defendants do not point to a trend, with Mueller Water's stock price either increasing after their sales or decreasing before. They simply pick dates throughout the Class Period on which Mueller Water's stock price traded slightly higher than on the days Defendants sold. Defendants' argument only proves that they are not clairvoyant and therefore unable to predict day-to-day variations in Mueller Water's stock price.

> 3.   *The Complaint Sufficiently Alleges Conscious Misbehavior or Recklessness*
>
>> a)   The Information Available to Defendants, Coupled With the Motive Allegations, Suffice

The Court analyzes scienter holistically. Thus, "even if the allegations of motive were weak, they can still support a strong inference of scienter when they are accompanied by "'extensive allegations of circumstantial evidence of recklessness and misconduct that strongly buttress the motive alleged.'" *In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17 CIV. 1954 (PAC), 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018).[18]

---

[17] In a throwaway argument, Defendants claim that the sales were not suspicious because they occurred less than three months before the first corrective disclosure. But the material non-public information Defendants concealed – that Mueller had to accrue a warranty liability – would only be disclosed when Mueller announced its results for the quarter ended March 31, 2017. Because Defendants had no reason to suspect the stock would either go up or down until then, their sales were suspicious. In *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 301 (D.N.J. 2001), the plaintiffs alleged that a delayed audit revealed that a company's financial systems were inadequate. The two insiders' combined sales of 8% of their shares three months before the audit was not suspicious *because it was consistent with their sales in previous years*. *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001).

[18] In *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001), the plaintiffs could not combine their motive allegations with recklessness allegations because they were not entitled to any weight. Here, Plaintiffs have alleged a concrete and personal benefit, with the only question whether that concrete benefit suffices. Since *Kalnit*, the Second Circuit has in fact considered stock sales alongside other scienter allegations. *Blanford*, 794 F. 3d at 309.

The allegations of recklessness themselves are substantial. First, the sheer magnitude of the accruals supports an inference of scienter. "The [] Second Circuit has held that the size of the purported fraud may contribute to an inference of scienter." *Fresno*, 268 F. Supp. 3d at 553. Here, Mueller's first $9.8 million accrual was 4.6 times the existing warranty accrued and over half of the $18.1 million in net sales for the *entire* Technologies segment for the quarter. After having assured investors that it had addressed defects in its products, 15 months later, Mueller accrued an even larger $14.1 million charge, or more than half of that quarter's entire net sales.

Second, Defendants' false exculpatory statements support scienter. *United States v. Strother*, 49 F.3d 869, 877 (2d Cir. 1995) ("False exculpatory statements [] are circumstantial evidence and have independent probative force."); *see also Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 285 (D. Conn. 2005) (same regarding statements made to investors in civil securities action)). When and after they announced the first accrual, Defendants maintained that they had first learned of defects in Version 3 radios in the quarter ended March 31, 2017, suggesting that they did not know of the issue when they sold 1.15 million shares of stock. In fact, Mueller stopped making Version 3 radios because of defects in early 2016. Defendants' false exculpatory statements concealed from investors, from the SEC, and from the Department of Justice that they had sold tens of millions of dollars of stock while in possession of material non-public information.

Defendants also entirely ignore the motive allegations in analyzing conscious misbehavior. These allegations are mutually reinforcing. Before the Class Period, Defendants had ample evidence that Mueller Water's products were being returned at alarming rates, including through American Water's returns and the defects encountered in San Diego. See p. 13, above. These allegations support conscious misbehavior or recklessness. *See, e.g., In re Avon Sec. Litig.*, No. 19 CIV. 01420 (CM), 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019)(strong inference of

29

scienter with respect to defendants who certified company's GAAP calculations during the class period where "Defendants continued to recognize revenue and make SOX certifications even after receiving reports showing higher rates of default on the questionable line items.").

In addition, though, Defendants made most of their Class Period-sales in February 2017, during the quarter before the new CEO would have a chance to recognize a new provision, which he did, causing Mueller's stock price to fall. Defendants' sales thus strongly contribute to the inference that they deliberately or recklessly concealed the problems until they could sell their shares. Adding the motive allegations to the recklessness allegations significantly strengthens both.

The culpable inference that Defendants delayed in accruing warranty liabilities so they could sell their shares, when coupled with the size of the accruals and Defendants' false exculpatory statements, is the most plausible of competing inferences.

### C.    THE COMPLAINT SUFFICIENTLY ALLEGES SECTION 20(a) CLAIMS

Defendants' only argument to dismiss Section 20(a) control person liability is that the Complaint fails to show a primary violation.  Because the Complaint adequately alleges a primary violation, it also sufficiently alleges the Section 20(a) claims.

### IV.    CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss.

Dated: March 16, 2020      Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Sara Fuks*
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
Sara Fuks (SF 6034)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Investors*

32

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March 2020, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Sara Fuks*