**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  :
GLEN CHAPMAN, ANDREA PETERSON                                     :
AND KEVIN KELLY, Individually and On                              :
Behalf of All Others Similarly Situated,                          :    19-cv-3260 (LJL)
                                                                  :
                            Plaintiffs,                           :
                                                                  :
              v.                                                  :
                                                                  :
MUELLER WATER PRODUCTS, INC.,                                     :
GREGORY E. HYLAND, J. SCOTT HALL,                                 :
EVAN L. HART and MARIETTA EDMUNDS                                 :
ZAKAS,                                                            :
                                                                  :
                            Defendants.                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Jay B. Kasner
Scott D. Musoff
Austin R. Winniford
Thania Charmani
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001

*Attorneys for Defendants Mueller Water*
*Products, Inc., J. Scott Hall, Evan L.*
*Hart and Marietta Edmunds Zakas*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

ARGUMENT .......................................................................................................................1

I.      PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR
        MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5 .................1

        A.      Plaintiffs Fail to Allege that Defendants' Estimates of Mueller's Warranty
                Reserves Were False or Misleading .........................................................................1

        B.      Plaintiffs' Confidential Witness Allegations Do Not Support Their Claims .........4

        C.      Defendants' Cautionary Statements Were Not False or Misleading ......................6

        D.      Plaintiffs Fail to Allege that Mueller's Statements Regarding Its
                Additional Warranty Charge Were False or Misleading.......................................6

II.     PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG
        INFERENCE OF SCIENTER .........................................................................................7

        A.      The Exercise of Expiring Stock Options Does Not Establish Motive to
                Commit Fraud .........................................................................................................7

        B.      The Timing of the Alleged Stock Sales Was Not Suspicious ...............................8

        C.      Other Factors Further Negate an Inference of Motive to Commit Fraud .............10

        D.      Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or
                Recklessness ..........................................................................................................12

CONCLUSION..................................................................................................................12

## TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Aceto Corp. Securities Litigation*,
    No. 2:18-cv-2425-ERK-AYS, 2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019).....................1

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ..................................................................................3, 4

*Altayyar v. Etsy, Inc.*,
    731 F. App'x 35 (2d Cir. 2018)...............................................................................1

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, No. 19-1132-cv, 2020 WL 1456482
    (2d Cir. Mar. 23, 2020) ...........................................................................................5

*In re Bausch & Lomb, Inc. Securities Litigation*,
    592 F. Supp. 2d 323 (W.D.N.Y. 2008)...................................................................8

*City of Brockton Retirement System v. Shaw Group Inc.*,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008) ....................................................................8

*Employees' Retirement System of Government of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)...................................................................................10

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011).....................................................................................1

*Fresno County Employees' Retirement Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...............................................................8, 12

*In re Gildan Activewear, Inc. Securities Litigation*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) ...............................................................10, 11

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...............................................................10, 11

*Gormley v. Magicjack Vocaltec Ltd.*,
    220 F. Supp. 3d 510 (S.D.N.Y. 2016) .....................................................................6

*Holmes v. Air Line Pilots Ass'n, International*,
    745 F. Supp. 2d 176 (E.D.N.Y. 2010) .....................................................................2

*Indiana Public Retirement System v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016).......................................................................................4

*K.D. ex rel. Duncan v. White Plains School District*,
921 F. Supp. 2d 197 (S.D.N.Y. 2013) ..................................................................8

*Lehmann v. Ohr Pharmaceutical Inc.*,
No. 18 Civ. 1284 (LAP), 2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019)...........................1

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American
Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)...............3, 4

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007).......................................................3, 10

*North Collier Fire Control & Rescue District Firefighter Pension Plan & Plymouth
County Retirement Ass'n v. MDC Partn*ers*, Inc.*,
No. 15 Civ. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)...........................7

*Oklahoma Firefighters Pension & Retirement System v. Student Loan Corp.*,
951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013).......................................................3

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015) ..........................................................................1

*In re Peritus Software Services, Inc. Securities Litigation*,
52 F. Supp. 2d 211 (D. Mass. 1999)..............................................................9

*Pirnik v. Fiat Chrysler Autos, N.V.*,
No. 15-CV-7199 (JMF), 2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ........................3, 4

*Salinger v. Projectavision, Inc.*,
972 F. Supp. 222 (S.D.N.Y. 1997) .............................................................2

*In re Salomon Analyst Level 3 Litigation*,
373 F. Supp. 2d 248 (S.D.N.Y. 2005) ..........................................................5

*In re Sanofi Securities Litigation*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d
199 (2d Cir. 2016) ...........................................................................6

*In re Scholastic Corp. Securities Litigation*,
252 F.3d 63 (2d Cir. 2001)....................................................................10

*In re SLM Corp. Securities Litigation*,
740 F. Supp. 2d 542 (S.D.N.Y. 2010) ..........................................................8

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)...................................................................1

*In re Wachovia Equity Securities Litigation*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ..............................................................................3

Defendants respectfully submit this reply in further support of their motion to dismiss the Complaint in its entirety with prejudice.[1]

## ARGUMENT

### I.  PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE FALSE OR MISLEADING STATEMENT UNDER SECTION 10(b) AND RULE 10b-5

#### A.  Plaintiffs Fail to Allege that Defendants' Estimates of Mueller's Warranty Reserves Were False or Misleading

Plaintiffs' opposition only underscores the infirmity of their claims.  The opposition is devoid of any authority suggesting that Plaintiffs have alleged a false or misleading warranty liability opinion under the Second Circuit's decision in *Fait v. Regions Financial Corp.*, 655 F.3d 105 (2d Cir. 2011) or the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).[2]

Regarding products sold to San Diego, Plaintiffs continue to misrepresent the contents of the articles on which their allegations are based.  None of the articles state that "slightly more than 80% of Mueller Systems' smart meters failed." (Opp. at 14.)  Rather, the August 2, 2018 article on which Plaintiffs heavily rely describes a potential glitch in Mueller products that, according to San Diego itself, impacted 250 water meters.  (Ex. G at 1.)  Although Plaintiffs criticize San

---

[1] Capitalized terms have the same definitions as described in Defendants' principal brief.  Pursuant to Your Honor's Individual Rules of Practice, Plaintiffs consented to the filing of a 12-page reply brief (out of the 15 pages requested). Defendants are available for argument on this motion at the convenience of the Court.

[2] Plaintiffs incorrectly contend that Defendants misstated the standard for evaluating opinion statements because *Fait* and its progeny are no longer "good law" in light of *Omnicare*.  (Opp. at 12 n.3.)  As the Second Circuit has recognized, *Omnicare* in fact confirmed the holding in *Fait* that opinion statements are actionable if "the speaker did not hold the belief she professed." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citation omitted).  *Omnicare* also identified an additional basis for opinion statement liability stemming from certain omissions.  *See Omnicare*, 575 U.S. at 176, 189.  Courts have thus recognized that "*Omnicare* did not reject the *Fait* . . . standard in the Second Circuit but expanded it," *Lehmann v. Ohr Pharm. Inc.*, No. 18 Civ. 1284 (LAP), 2019 WL 4572765, at *4 (S.D.N.Y. Sept. 20, 2019), and have continued to rely on *Fait* post-*Omnicare*. *See, e.g.*, *In re Aceto Corp. Sec. Litig.*, No. 2:18-cv-2425-ERK-AYS, 2019 WL 3606745, at *7 (E.D.N.Y. Aug. 6, 2019); *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 37 (2d Cir. 2018) (summary order).  Consistent with this analysis, Defendants argued in their principal brief that Plaintiffs failed to state a claim under both *Fait* and the "omissions" standard described in *Omnicare*.  (*See* Mot. at 7, 12-13.)

Diego's statement as "self-serving" (Opp. at 15), nothing in the article calls it into question. The article also states that, of the 70,000 smart meters installed by the city, only "12,000 are actually connected to the smart water meter system." (Ex. G at 1.) But the article itself does not attribute the failure to connect the remaining meters to a defective Mueller product,[3] and a separate article cited by Plaintiffs clarifies that those meters were "not fully activated because they lack the complete radio equipment needed to allow them to send real-time water use data." (Ex. H at 3.) Contrary to Plaintiffs' argument (Opp. at 14-15), the Court need not ignore such statements in documents selectively referenced in the complaint. *See Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 226 (S.D.N.Y. 1997). And "[i]f these documents contradict the allegations of the . . . complaint, the documents control and this Court need not accept as true [those] allegations." *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 193–94 (E.D.N.Y. 2010).

Nor should the Court credit Plaintiffs' allegation that Mueller failed to account for 22,000 defective meters replaced by MAWC, which is derived from testimony to the Commission regarding its investigation into the issue. (*See* SAC ¶¶ 66-69, 78, 135, 141.) Plaintiffs do not dispute that the Court may consider the Commission's final report, but they overlook the report's key point: MAWC returned only 850 meters to Mueller. (Ex. J at 13.) Plaintiffs' false assertion that MAWC "return[ed] tens or hundreds of thousands of Mueller's meters" is thus contradicted by the report. (*See* Opp. at 7.) And as the Complaint itself acknowledges, Mueller "tracked product failure rates based on customer returns." (SAC ¶ 93 (emphasis added).) Accordingly, regardless of MAWC's stated reasons for removing meters that were not returned,[4] the Company

---

[3] Remarkably, Plaintiffs concede that they are relying solely on the "title" of the August 2018 article for the allegation that 58,000 Mueller products were defective. (Opp. at 15.) But an article's title is not a substitute for its content.

[4] Plaintiffs focus on MAWC's own assertion that these meters "had either stopped working or were not recording any water usage at all." (Ex. J at 13; Opp. at 16.) But this ignores the Commission's contrary finding that the "[t]he removals were due to possible imperfections" based on MAWC's "decision to start a change-out of meters that had a higher potential of being defective." (Ex. J at 5; *accord id.* at 13, 16.)

2

would not have been aware of any alleged defects in the majority of the meters removed by MAWC.

Ultimately, however, it does not matter whether the Court credits the allegations contradicted by documents incorporated into the complaint or subject to judicial notice. Plaintiffs do not dispute that they failed to allege "that any of the product defects experienced by San Diego or MAWC were even related to the additional warranty charges Mueller announced" in April 2017 and August 2018. (Mot. at 10.)  And Plaintiffs fundamentally have not alleged that Mueller failed to account for those or any other purported defects in calculating warranty reserves.  In resisting this conclusion, Plaintiffs contend only that "the Complaint alleges that Mueller must apply the lessons learned by Missouri-American and San Diego failure rates." (Opp. at 17.)[5]  But there are no allegations demonstrating that Mueller did not apply those lessons.  Specifically why did the particular warranty reserve estimates disclosed during the Class Period allegedly fail to account for product failures of which the Company was aware at the time?  And specifically why do the allegations also demonstrate that Defendants allegedly did not believe those estimates or allegedly omitted material facts about their knowledge of the estimates that would mislead a reasonable investor?  Plaintiffs have no answers to these questions.  Plaintiffs do not cite a single case suggesting that they have stated a claim, and courts routinely hold that more is required.[6]

Plaintiffs similarly fail to rebut the authority demonstrating that any inference of material

---

[5] Plaintiffs also suggest that, because Mueller allegedly "sold more than $5.5 million of defective products to San Diego," the Company's $2.1 million warranty reserve estimate must have been inaccurate. (Opp. at 13.)  This assertion is unavailing for several reasons.  First, as noted, Plaintiffs have not sufficiently alleged that Mueller sold more than $5.5 million of defective products to San Diego.  Second, the Company's $2.1 million warranty liability charge was for the fourth quarter of 2016 (SAC ¶ 153), and there are no particularized allegations demonstrating that Defendants were aware of $5.5 million of defective products sold to San Diego at that time.  Third, this assertion fails to account for the complex nature of estimating warranty reserves for future potential claims.  (*See* SAC ¶ 12.)

[6] *See, e.g.*, *Pirnik v. Fiat Chrysler Autos, N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, at *9 (S.D.N.Y. Oct. 5, 2016); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 362 (S.D.N.Y. 2011); *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 463 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 161 (D. Conn. 2007).

inaccuracy or fraud is undermined where, as here, a company's financial statements are audited and not restated.  (*See* Mot. at 12).  Plaintiffs rely solely on the First Circuit's decision in *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002), as well as a Northern District of California decision quoting *Aldridge*.  (Opp. at 19.)  But *Aldridge* does not help Plaintiffs.  There, the First Circuit concluded that "the fact that the financial statements for the year in question were not restated does not end [plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA."  *Aldridge*, 284 F.3d at 83 (emphasis added).  Here, by contrast, Plaintiffs do not come close to satisfying the PSLRA's stringent pleading requirements.[7]

Finally, Plaintiffs' argument that Defendants' cases were addressing scienter is irrelevant.  (*See* Opp. at 20.)  Even post-*Omnicare*, the pleading requirements for falsity and scienter in this context overlap.  (*See supra* n.2); *Pirnik*, 2016 WL 5818590, at *8.  In any event, like falsity, scienter is an essential element of Plaintiffs' claims.  (*See* Mot. at 21-22.)

### B.    Plaintiffs' Confidential Witness Allegations Do Not Support Their Claims

Nor can Plaintiffs rehabilitate their deficient CW allegations.  Plaintiffs focus on the allegations of CW3 (*see* Opp. at 18), whose only remotely specific assertion is that he "estimated that Version 3 radios had a 50% failure rate during the 2015/2016 timeframe."  (SAC ¶ 105.)  This assertion is not helpful to Plaintiffs for several reasons.  First, Plaintiffs have not alleged facts demonstrating that the Individual Defendants were aware of CW3's estimate and, if so, when they were aware of it.  *See Local No. 38*, 724 F. Supp. 2d at 461 (rejecting CW allegations that failed to "establish what specific contradictory information the Individual Defendants received or when they received it" (collecting cases)).  In response to this point, Plaintiffs contend only that

---

[7] Plaintiffs also assert that "the defendants made the same fruitless argument to the Second Circuit in *Indiana Public Retirement System v. SAIC, Inc.*, [818 F.3d 85 (2d Cir. 2016)]."  (Opp. at 19-20.)  But the defendants in that case did not squarely raise the argument at issue and the Second Circuit did not address it.  (*See* Horne Decl. Ex. 1 at 40); *Ind. Pub. Ret. Sys.*, 818 F.3d at 92-98.

"Defendants knew there was a substantial problem, it does not matter what the exact size of the problem turned out to be." (Opp. at 18-19 n.6.) But this begs the question. There are no particularized allegations demonstrating that "Defendants knew there was a substantial problem" with Version 3 radios in 2015 or 2016.[8] Plaintiffs also cite cases rejecting "the notion that the [Confidential Witnesses] cannot be believed because none had direct contact with any individual Defendant." (Opp. at 20.) These cases are irrelevant. The issue is not whether the CW allegations should be believed, but whether the Individual Defendants were aware of those allegations at the time of an inconsistent statement, which bears on both falsity under *Fait*/*Omnicare* and scienter.

Second, Plaintiffs do not dispute that they "have not alleged facts demonstrating CW3's 'estimate' was accurate" (Mot. at 14) or that Defendants agreed with it. *Cf. In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005).

Third, Plaintiffs again fail to explain specifically why CW3's estimate or any of his other allegations contradicted the Company's particular warranty reserve estimates. Plaintiffs simply assert that, because CW3's allegations purportedly demonstrate that Defendants "knew" that "many" Version 3 radios would fail, "the intervening warranty liability provisions were misleading." (Opp. at 18.) But CW3's allegations do not establish that the Individual Defendants had such knowledge and, even if they did, Plaintiffs do not "demonstrate with specificity why" that knowledge would contradict the Company's warranty liability estimates throughout the Class Period. *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 747 (S.D.N.Y. 2018), *aff'd*, No. 19-1132-cv, 2020 WL 1456482 (2d Cir. Mar. 23, 2020).

---

[8] CW3's vague allegations that "he" learned about "defects" in Version 3 radios in "2014" and that "we were shipping radios we knew we were going to have to replace" in "2014/2015" do not establish otherwise. (SAC ¶¶ 104-05; Opp. at 18.) And while CW3 also alleges that Mueller "put a stop to manufacturing on radio shipments in late 2015 or early 2016" (*id.*), the significance of that allegation is unclear. As the Company disclosed, the Version 3 radios at issue were not produced after 2014. (*See* SAC ¶ 159 (disclosing that "some radio products produced between 2011 and 2014 were failing at a higher-than-expected rate").)

Finally, in April 2017—shortly after "the 2015/2016 timeframe" referenced by CW3—the Company in fact disclosed that it "recently became aware that some radio products produced between 2011 and 2014 were failing at a higher-than-expected rate." (SAC ¶ 159.) There are no particularized allegations demonstrating that Defendants had a duty to disclose that information sooner. Although Plaintiffs assert that Defendants "waited until . . . after their stock sales . . . to acknowledge a problem" (Opp. at 18), all but two of the eleven sales alleged in the Complaint occurred several months after the April 2017 disclosure. (SAC ¶ 215.)

## C. Defendants' Cautionary Statements Were Not False or Misleading

Plaintiffs also argue that the Company's statements warning of a "risk" of potential product failures and warranty expenses were misleading because, prior to April 2017, they failed to "mention the Version 3 radios or give any indication that [they were] anything more than boilerplate." (Opp. at 21.) That argument is meritless. As indicated, Plaintiffs have not sufficiently alleged that Defendants were aware of substantial problems with Version 3 radios when the Company made the cautionary statements at issue. And even if they were, Plaintiffs cite nothing indicating that such knowledge would render the Company's cautionary statements misleading. While Plaintiffs rely on *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510 (S.D.N.Y. 2016), that case stands for the irrelevant proposition that the PSLRA safe harbor applies if cautionary language is "not boilerplate and convey[s] substantive information." *Id.* at 515.[9]

## D. Plaintiffs Fail to Allege that Mueller's Statements Regarding Its Additional Warranty Charge Were False or Misleading

Nor have Plaintiffs alleged that the Company's statements regarding its April 2017

---

[9] In any event, the Company's risk disclosures cannot be deemed boilerplate. The Company specifically disclosed that its products may be defective and may fail, and that failure to manage the risks associated with defective products, including costs associated with warranties, could result in lost revenue and significant warranty expenses. (SAC ¶ 134) Because "[t]hese statements conveyed substantive information about the risk that ultimately materialized," "they were meaningful cautionary language, not mere boilerplate." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 536 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

warranty charge were false or misleading.   Plaintiffs' sole argument is that the Company's statement that it had "recently" become aware of defects in Version 3 radios was false because Defendants "had known since at least early 2016 that the Version 3 radios were defective."  (Opp. at 21.)  This argument, too, lacks merit.  Plaintiffs do not dispute that they "have not pled facts demonstrating any relation between the Company's additional warranty charges and the vast majority of the alleged product failures cited in the Complaint."  (Mot. at 17-18.)  And as already explained, CW3's allegations do not establish that Defendants were aware of substantial defects in Version 3 radios in early 2016.  (*See supra*, pp. 4-5.)[10]

## II.   PLAINTIFFS FAIL TO ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF SCIENTER

### A.   The Exercise of Expiring Stock Options Does Not Establish Motive to Commit Fraud

Plaintiffs also fail to plead facts giving rise to a cogent and compelling inference of motive to commit fraud through the stock sales alleged in the Complaint, most of which involved the exercise of expiring stock options.  Plaintiffs' reliance on various statistics not alleged in the Complaint is a mere distraction.  (*See* Opp. at 22-23.)  There are eleven alleged stock sales at issue in this case.  (*See* SAC ¶¶ 215-16.)  Six of those sales involved the exercise of stock options set to expire in November 2017, shortly after they were exercised.  (*See* Mot. at 22-23; Exs. K-M.)  As numerous courts have recognized, "the exercise of expiring stock appreciation rights . . . do[es] not demonstrate a defendant's motive to defraud."  *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (collecting cases).  These holdings

---

[10] Plaintiffs do not dispute that they failed to allege a false or misleading statement with respect to (1) Defendants' descriptions of the Company's warranty costs (*see* Mot. at 16); (2) Defendants' statements during an April 28, 2017 investor conference call (*id.* at 18-21); (3) Defendants' statements during a May 8, 2018 investor conference call (*id.* at 21); and (4) Defendants' SOX certifications (*id.* at 29 n.15).  Accordingly, these claims should be dismissed.

make perfect sense.  The most plausible inference under these circumstances is that defendants wished to exercise their options before they expired, not that they were engaged in fraud.[11]

In response, Plaintiffs contend that Hyland and Hart also had other stock options, many of which were set to expire later than November 2017.  (*See* Opp. at 25.)  This argument is a smokescreen.  With the exception of Hart's November 3, 2017 sale (*see* Ex. M), Plaintiffs have not alleged in the Complaint or even asserted in the opposition that Hyland or Hart actually exercised any of those options.  And to the extent Plaintiffs <u>are</u> attempting to allege additional sales in their opposition, it is well-established that "Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013).

### B.      The Timing of the Alleged Stock Sales Was Not Suspicious

Nor have Plaintiffs sufficiently alleged that the timing of the stock sales at issue was suspicious.  Plaintiffs focus solely on Hyland's and Hart's sales on February 6, 2017, "the quarter just before Mueller accrued a [warranty] liability" on April 27, 2017.  (Opp. at 26.)  But "the law in this Circuit is clear that . . . stock sales are not indicative of scienter when they are 'more than two months before the announcement' [of bad news] in question." *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008); *accord City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008).  Tellingly, Plaintiffs do not even attempt to explain

---

[11] As with many of Defendants' cases, Plaintiffs' sole response to this authority is to point out various immaterial factual distinctions between this case and the cases cited that have no bearing on the relevant holdings.  (*See* Opp. at 24 n.14.)  And Plaintiffs' cases are inapposite.  (*See* Opp. at 24.)  In *In re SLM Corp. Securities Litigation*, 740 F. Supp. 2d 542 (S.D.N.Y. 2010), the defendant sold 97% of his holdings in the context of an acquisition, *id.* at 558, and the court rejected as "dispute[d]" the defendant's argument that the "sales were necessary to pay the exercise price of expiring options and associated taxes." *Id.* at 558 n.6.  In *Fresno County Employees' Retirement Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526 (S.D.N.Y. 2017), the court rejected the defendants' argument that "'in-kind' sales (for example, sales to cover tax liabilities) should be discounted from the analysis because only sales that result in 'take-home cash' are indicative of fraudulent intent." *Id.* at 555.  Defendants have not raised the above arguments in this case, and Plaintiffs cannot dispute that several of the transactions at issue involved the exercise of expiring options.

why any of the remaining sales at issue were suspiciously timed.  Nor could they.  The remaining sales were made after the April 27, 2017 warranty charge disclosure that allegedly caused the Company's stock price to decline by more than 11 percent.  (SAC ¶ 160.)

Plaintiffs also fail to adequately address the compelling inference that Hyland was divesting his shares for estate planning purposes in relation to his stepping down as President and CEO in January 2017 and retirement in January 2018.  (*See* Mot. at 26-27; Ex. O at 7.)  Plaintiffs' sole response is that Hyland's sales were not perfectly timed with the announcement of his retirement.  (*See* Opp. at 27.)  But estate planning for retirement is a process.  Plaintiffs cite nothing suggesting that such unrealistic precision is required.

A different result is not warranted by the assertion that Hyland and Hart do not have significant prior trading histories.  (*See* Opp. at 26.)  Hyland's prior trading history requires no explanation, as all of his alleged sales are attributable to either the exercise of expiring options or estate planning for retirement.  In any event, both Hyland and Hart first sold shares less than one month after the Company announced the sale of one of its divisions (Mot. at 27), giving rise to a plausible inference that they were previously subject to closed trading windows.  *See In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 224–25 (D. Mass. 1999).  Plaintiffs assert that closed trading windows "do not explain why [Defendants] did not sell shares in 2015."  (Opp. at 27-28.)[12]  But a failure to sell shares in a single year is not unusual, especially given that Plaintiffs have identified only a few trades that did not involve the exercise of expiring options.

Finally, the Company's stock price on the dates of the alleged sales further undercuts any inference of scienter.  (*See* Mot. at 26.)  Plaintiffs contend only that "Defendants do not point to a trend, with Mueller Water's stock price either increasing after their sales or decreasing before."

---

[12] Although Plaintiffs also assert that "the only non-public information Defendants would have is the number of pitchbooks they sent" (Opp. at 27), this is pure speculation.

(Opp. at 28.)  In fact, the price was consistently higher in the months and weeks preceding the February 6, 2017 sales on which Plaintiffs focus their opposition.[13]

### C.    Other Factors Further Negate an Inference of Motive to Commit Fraud

Other factors further preclude any inference of scienter, including Plaintiffs' failure to allege profits, if any, resulting from the alleged sales.  Although Plaintiffs argue that they are not required to allege profits (Opp. at 25), numerous courts have held otherwise.  *See, e.g.*, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011); *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270-71 (S.D.N.Y. 2009).  Indeed, Plaintiffs' cases demonstrate this very point.  (*See* Opp. at 25.)  In both cases, though the court mentioned gross proceeds in summarizing the allegations, it proceeded to analyze stock sales based in part on alleged profits.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001) ("Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales.... Marchuk is alleged to have sold 80 percent of his holdings … for a not insignificant profit."); *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (concluding that "Blanford sold an additional 51,573 of his personal shares … for a personal profit of $3.6 million" and that "Rathke sold 337,500 shares for a personal profit of nearly $32.7 million").

In addition, though it may be true that "plaintiffs need not point to insider sales by all defendants" in all cases (Opp. at 25), Plaintiffs cannot dispute that their failure to do so at least undermines the requisite strong inference of scienter.  *See In re Gildan Activewear*, 636 F. Supp. 2d at 271-72.  Plaintiffs' reliance on sales made by supposed "ringleaders" (Opp. at 23) is not helpful given their failure to allege any sales made by Hall, Mueller's President and CEO

---

[13] (*Compare* SAC ¶ 215 (alleging that Hyland and Hart sold shares on February 6, 2017 for $12.49 and $13.16 per share, respectively)), *with* https://finance.yahoo.com/quote/MWA/chart (indicating the following closing prices: $14.05 on December 9, 2016; $13.81 on December 20, 2016; $13.76 on January 26, 2017; $13.66 on February 1, 2017); *see also Malin*, 499 F. Supp. 2d at 151 (taking judicial notice of stock prices).

10

throughout most of the Class Period and the defendant purportedly responsible for many if not most of the alleged misstatements made by individuals.[14]

Plaintiffs similarly fail to rebut the authority indicating that Mueller's share repurchase programs undermine any inference of scienter. (*See* Mot. at 28.) Plaintiffs incorrectly suggest that this authority does not apply where the individual defendants sold their own shares. (*See* Opp. at 25-26); *Glaser*, 772 F. Supp. 2d at 593 (rejecting scienter allegations predicated on insider stock sales in part because the defendant company's "repurchase of 4.3 million of its own shares during the Class Period . . . raises precisely the contrary inference from the one suggested by plaintiffs").

In light of the above analysis, it is clear that the alleged stock sales do not give rise to a strong inference of scienter, and the Court need not get bogged down in the precise percentage of holdings sold. Suffice it to note that, whereas Defendants calculated the average percentage of holdings sold for each alleged sale (Mot. at 25), Plaintiffs attempt to calculate the total percentage of holdings sold across the entire Class Period. (Opp. at 23.) But such an approach is misleading in this case because it incorporates sales that were not even arguably suspicious. In addition to incorporating expiring stock options and sales for estate planning purposes, Plaintiffs' percentages incorporate sales made after the Company's April 27, 2017 disclosure—sales that Plaintiffs do not even attempt to argue were suspiciously timed. Plaintiffs' approach thus improperly ignores the other factors relevant to the analysis. *See In re Gildan Activewear*, 636 F. Supp. 2d at 271 n.5 (indicating that percentages sold must be considered in combination with "other relevant factors" and that, in light of those factors, sale of 53% of holdings was not suspicious).

---

[14] Plaintiffs suggest that Hall could not sell his shares because they were "restricted" stock units. (Opp. at 25.) But that does not change the fact that Hall had no alleged motive to commit fraud. In any event, according to the December 14, 2017 proxy statement submitted by Plaintiffs, Hall's restricted shares would vest within 60 days. (Horne Decl., Ex. 6 at 42-43.) Hall thus could have sold his shares during the Class Period.

11

**D.      Plaintiffs Do Not Sufficiently Allege Conscious Misbehavior or Recklessness**

Nor have Plaintiffs sufficiently alleged conscious misbehavior or recklessness.   That conclusion follows from the analysis of falsity above.  (*See supra* pp. 1-7.)  Plaintiffs identify nothing to the contrary.  They argue that the size of the Company's April 2017 and August 2018 warranty charges suggests that Defendants must have known that the Company's prior warranty charges were understated.  (*See* Opp. at 29.)  But this a classic "fraud-by-hindsight" argument that has been repeatedly rejected by courts.  (*See* Mot. at 18.)  The authority cited by Plaintiffs does suggest that such arguments are viable and, in any event, did not involve statements of opinion subject to change.  *See Fresno*, 268 F. Supp. 3d at 553.

Plaintiffs' remaining scienter arguments should be rejected for the reasons already described.  (*See* Opp. at 29-30 (relying on Defendants' alleged awareness of substantial product defects and returns in early 2016); *id.* at 30 (relying on alleged stock sales).) [15]

## CONCLUSION

Defendants respectfully request that this Court dismiss the Complaint with prejudice.

Dated: New York, New York
      April 15, 2020              Respectfully submitted,

                        /s/ Scott D. Musoff
                        Scott D. Musoff (scott.musoff@skadden.com)
                        Jay B. Kasner (jay.kasner@skadden.com)
                        Austin R. Winniford (austin.winniford@skadden.com)
                        Thania Charmani (thania.charmani@skadden.com)
                        SKADDEN, ARPS, SLATE,
                        MEAGHER & FLOM LLP
                        One Manhattan West
                        New York, NY 10001
                        Phone: (212) 735-3000
                        *Attorneys for Defendants Mueller Water Products, Inc., J. Scott Hall, Evan L. Hart and Marietta Edmunds Zakas*

---

[15] Because Plaintiffs have not sufficiently alleged either a primary violation of Section 10(b) or that any individual defendant was a culpable participant in a primary violation, their control person claims should be dismissed.  (*See* Mot. at 29-30.)

12