UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                        :

GLEN CHAPMAN, ANDREA PETERSON, and KEVIN  :
KELLY, individually and on behalf of all others similarly  :
situated,                                :

                                     :      19-cv-3260 (LJL)

                                     :

                       Plaintiffs,     :     OPINION & ORDER
        -v-                               :

MUELLER WATER PRODUCTS, INC., GREGORY E.  :
HYLAND, J. SCOTT HALL, EVAN L. HART, and  :
MARIETTA EDMUND ZAKAS,               :

                       Defendants.    :

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendants Mueller Water Products, Inc. ("Mueller" or the "Company"), Gregory E.

Hyland ("Hyland"), J. Scott Hall ("Hall"), Evan L. Hart ("Hart"), and Marietta Edmunds Zakas

("Zakas") (collectively, "Defendants") move, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) to

dismiss the Second Amended Complaint ("SAC") against them. *See* Dkt. No. 57.

      For the following reasons, the motion to dismiss is granted.

## BACKGROUND

      The Court accepts the well-pleaded allegations of the SAC and the documents

incorporated therein as true for purposes of the motion to dismiss.[1]

------------------------------

[1] In reviewing a Rule 12(b)(6) motion, the court may consider the following materials: "(1) facts
alleged in the complaint and documents attached to it or incorporated in it by reference, (2)
documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated
by reference, (3) documents or information contained in defendant's motion papers if plaintiff
has knowledge or possession of the material and relied on it in framing the complaint, (4) public
disclosure documents required by law to be, and that have been, filed with the Securities and
Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule
201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*,

A.      **The Parties**

Mueller is a manufacturer and marketer of products used in the transmission, distribution, and measurement of water in North America.  SAC ¶ 1.  It manufactures and sources a variety of water technology products, including water meters that Mueller sells to municipalities that use these meters to measure water consumption and to bill residential and commercial property owners accordingly.  *Id.* ¶ 3.  Mueller's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "MWA."  *Id.* ¶ 37.

Hyland was the President and Chief Executive Officer ("CEO") of Mueller from January 2006 to January 22, 2017.  *Id.* ¶ 38.  He passed away on April 12, 2019.  *See* Dkt. No. 34.  Hall has been President and CEO of Mueller since January 23, 2017.  SAC ¶ 39.  Hart was Chief Financial Officer ("CFO") of Mueller from July 2008 to December 31, 2017.  *Id.* ¶ 40.  Zakas has been CFO since January 2018.  *Id.* ¶ 41.  Hyland, Hall, Hart, and Zakas are collectively referred to as the "Individual Defendants."

Named plaintiffs Andrea Peterson ("Peterson") and Kevin Kelly ("Kelly," and with Peterson, "Plaintiffs") are investors in Mueller common stock.  *Id.* ¶¶ 35-36.  The SAC alleges that they had purchased Mueller common stock at artificially inflated prices and suffered losses when the price of the Mueller common stock fell 11% and 6% on April 28, 2018 and August 7, 2018, respectively, after Mueller disclosed it would have to take additional warranty charges on products it had sold.  *Id.* ¶¶ 20-21, 27-28.  Plaintiffs sue individually and on behalf of a putative class of persons and entities who purchased Mueller common stock on the NYSE during the period from May 9, 2016 through August 6, 2018, inclusive (the "Class Period").  *Id.* at 2.

---

568 F. Supp. 2d 349, 352 n.1 (S.D.N.Y. 2008).  Plaintiffs do not object to the exhibits submitted by Defendants, which are incorporated in or otherwise integral to the SAC.  *See* Dkt. No. 62 ("Opposition" or "Opp. Br.") at 2 n.1, 7.

B.    **Mueller's Business**

The allegations of the SAC focus on fixed network advanced metering infrastructure ("AMI") systems that are colloquially referred to as "smart metering" and offer advantages over traditional water metering.  *Id.* ¶¶ 54, 56.  Traditional water meters, or automatic meter reading ("AMR") systems, require utility workers to physically travel through service territories to collect meter reading data.  *Id.* ¶¶ 53, 55.  Municipalities employing traditional water meters incur labor costs to keep track of water usage.  They also risk human error if the utility workers misread the data.  AMI systems avoid those costs.  The systems operate by gathering data using a network of permanent data collectors or gateway receivers that are always active or listening for the radio transmission from the utilities' meters.  *Id.* ¶ 54.  Thus, with AMI systems, there is no need for utility workers to physically travel through service territories to collect meter reading data.  *Id.* ¶ 55.  In addition, AMI systems provide the utilities with more frequent and diverse data from the meters at specified intervals.  *Id.*

Mueller operates in two business segments, Infrastructure and Technologies.  *Id.* ¶ 48. The Technologies segment offers residential and commercial water metering, water leak detection, and pipe condition assessment products, systems, and services through the Mueller Systems and Echologics businesses.  *Id.* ¶ 49.  Mueller Systems, a subsidiary of Mueller, manufactures and sells water metering systems, including both AMI and AMR systems, as well as products and services directly to municipalities and to waterworks distributors.  *Id.* ¶ 50.  Its water technology products are manufactured under the Mueller Systems and Hersey brand names.  *Id.* ¶ 52.

The AMI systems became an important part of Mueller's business and growth strategy. In its November 2015 Form 10-K, Mueller described "smart metering" as a "key to the Mueller Technologies business" and stated that its "investments in smart metering have primarily focused

3

on the market for AMI and have been based on our belief that water utilities will transition over time from traditional manual-read meters to automatically read meters." *Id.* ¶ 56.  In a February 2016 investor presentation, annexed to a Form 8-K, Mueller noted that it had "transformed the Company by acquiring or developing new technologies, adjusting portfolio and improving processes," and it celebrated smart metering as having "longer range AMI systems; [a] remote disconnect meter (RDM); leak detection and [a] consumer portal which utilized the existing infrastructure at Mueller Systems national operations center." *Id.* ¶ 58.  In a May 2016 investor presentation, annexed to a Form 8-K, Mueller also touted that it would "expand intelligent water technology offerings" and "enhance advanced metering infrastructure (AMI) system with longer-range communications, capabilities, remote disconnect meter and consumer portal." *Id.* Mueller represented to investors that it was "focused on growing sales of its higher-margin AMI and leak detection technologies, and on improving operating performance over the course of the year." *Id.* ¶ 59.  As municipalities began to increasingly adopt AMI systems, Plaintiffs allege that Mueller's AMI product sales increased and began to offset declines in AMR product sales. *Id.* ¶ 62.  Water metering products, both AMR and AMI, comprised over 80% of sales in the Mueller Technologies segment from 2015-2017, and AMI products represented nearly 50% of Mueller Technologies' sales. *Id.*

## C.    Allegations of Manufacturing Defects

Plaintiffs allege that Mueller's smart meter systems were plagued with defects and that Mueller was experiencing increasing product failures that eventually required Mueller to increase its warranty expense. *Id.* ¶ 63.  In particular, Plaintiffs allege that the AMI systems sold to the Missouri American Water Company ("MAWC") and to the public authorities in Chillicothe, Missouri and in San Diego and Santee, California were defective, but for varying reasons.

4

1.      **Missouri American Water Company**

MAWC was one of Mueller's customers and installed Mueller smart meter systems from 2012 to the middle of 2015.  *Id.* ¶ 69; *see* Dkt. No. 59 ("Musoff Decl."), Ex. J at 5.[2]  According to March 2016 testimony from a Utility Regulatory Auditor of the Missouri Public Service Commission ("PSC"), MAWC had, in early 2015, "detected a serious and widespread issue regarding unusually high levels of premature failure rates associated with approximately 97,000 systems that it ha[d] acquired from Mueller Systems."  SAC ¶¶ 66-68.  In particular, the defects were related to a "defective magnetic design or problems with other components of the meter" that "resulted in either no recorded water usage or lower than actual usage meter readings."  *Id.* ¶ 69.

As a result, on July 7, 2016, PSC and MAWC opened an investigation into the faulty water meters.  *See* Musoff Decl., Ex. J.  The final report on the investigation is dated March 31, 2017, and it states:

> Beginning in 2012 until summer 2015, MAWC installed Mueller Systems LLC ("Mueller") water meters that, unknown to MAWC, were potentially defective. Some of the defective meters were quickly identified by Mueller or American Water Works Company Inc. ("AWW") subsidiaries, and quickly addressed. The remaining meters otherwise appeared to function as well as past water meters previously used by AWW subsidiaries and MAWC. However, beginning in August 2015 continuing through December 2015, MAWC, along with other AWW subsidiaries, determined that problems with Mueller water meters were more extensive than first realized, with the meters failing due to several different kinds of defects. All of the defects prevented the meter from accurately reading the amount of water flow passing through the meter. Over the course of August 2015 to December 2015, MAWC replaced 23,833 meters.

*Id.* at 5.

---

[2] Citations to page numbers in the exhibits refer to the ECF page number unless otherwise indicated.

By August 2015, when MAWC began to become aware of the meter issues, MAWC had purchased approximately 99,500 new meters for use in its service districts. *Id.* at 5, 8; *see id.* at 16. As a result of learning of "the possibility that meters were prematurely dying and possibly underregistering," MAWC "made the decision to start a change-out of meters that had a higher potential of being defective." *Id.* at 8. During the period from September 2015 through December 2015, MAWC removed about 23,833 Mueller water meters it had installed between early 2012 and mid-2015 due to possible imperfections. *Id.* at 8-9, 16. Some of these meters were on a list of meters with serial numbers identified as having various defective manufacturing designs and components. *Id.* at 16. Others were not on the defective serial number list but were ones that MAWC had determined had either stopped working or were not recording any water usage at all. *Id.* MAWC also estimated that it had replaced approximately 22,000 meters primarily during the time period from August 2015 through January 2016. *Id.* at 6; SAC ¶ 77. A total of 850 Mueller meters were actually returned by MAWC to Mueller Systems for a refund of $101,521. *See* Musoff Decl., Ex. J. at 16, 19.

### 2.  Chillicothe, Missouri

In 2010, Chillicothe Municipal Utilities ("CMU") in Chillicothe, Missouri purchased approximately 4,000 Hersey meters from Mueller. SAC ¶ 71. In 2013, Mueller replaced 3,300 of these meters due to moisture contained in the nodes. *Id.* This defect was different than the defective magnetic design discovered by MAWC in 2015. Then, due to a problem concerning the batteries in the smart meters, the smart meters began failing, *id.* ¶ 72, and by 2019, CMU had replaced a total of 2,945 out of the 3,300 smart meters installed since 2013, *id.* ¶ 73. The failure rate associated with the AMI smart meters that Mueller sold to Chillicothe steadily climbed each year from 2015 to 2019, from a rate of 22% in 2015 to 89% by 2019. *Id.* ¶¶ 74-75.

### 3.    San Diego, California

In April 2016, a Mueller sales representative informed officials of the San Diego Public Utilities Department ("PUD") that the Mueller had become aware of a "glitch [] in the gears of the water meter's register [that] could prevent a dial from turning properly, which in turn will set off an alarm and possibly prevent the meter from relaying water-use wirelessly." *Id.* ¶ 83; *see* Musoff Decl., Ex. G at 2, Ex. H at 3.  The defect was discovered in Hersey meters manufactured from 2011 to 2013 and, as Mueller informed the PUD, the only way to fix the problem was to replace the meter's register entirely.  *Id.*, Ex. G at 2.

Newspaper articles upon which Plaintiffs rely contain reports about the defects. According to an August 2018 article, the PUD had purchased more than 74,000 Hersey smart meters from Mueller since 2010 for over $7 million dollars.  *Id.* at 1; *see also* SAC ¶ 81.  Of those 74,000 Hersey smart meters purchased, only 12,000 Hersey smart meters had been connected to the AMI system.  Musoff Decl., Ex. G at 2.  Those 12,000 Hersey smart meters represented nearly 80% of all 15,000 smart meters connected to the AMI system.  *Id.*  As of June 2016, the PUD had identified 250 Hersey meters as having the defect.  *Id.*

Plaintiffs rely on a February 2018 article to allege that of the 90,000 Mueller smart meters that San Diego had installed, only 15,000 were sending wireless signals to the water department.  SAC ¶ 84; *see also* Musoff Decl., Ex. I at 4.  A July 2018 article also contains this 15,000 figure and explains that only 15,000 smart meters were sending wireless signals because only 15,000 smart meters had the complete radio system needed to allow them to send real-time water use data.  Musoff Decl., Ex. H at 4.[3]  Both articles further report that San Diego had a $60

---

[3] Plaintiffs object to the use of this July 2018 article for allegations about the meters in San Diego and instead say that they cite the article solely to quote Santee's claims about Mueller's meters.  Opp. Br. at 14 n.4.  But Plaintiffs cannot cherry-pick facts from an article upon which they rely and ignore others that contradict their allegations.  *See San Leandro Emergency Med.*

million program to upgrade the city's water meters with 280,000 smart meters.  *Id.*, Ex. H at 3, Ex. I at 2.  The July 2018 article reported that with respect to the defect that had been identified in 2016, Mueller had shipped just under 400 replacement parts to San Diego compared to the 75,000 smart meter parts the city had received from Mueller since 2010.  *Id.*, Ex. H at 4.

### 4.  Santee, California

The July 2018 article reported that the Padre Dam Municipal Water District ("Padre Dam") in Santee, California started a smart meter program in 2009 but realized after several years that its meters, which were made by Mueller, were defective in that they failed to send radio signals.  SAC ¶¶ 86-87; *see also* Musoff Decl., Ex. H at 4.  The article quoted the general manager as stating that the Mueller smart meters were a "bad product" and "not something we want representing our water district."  SAC ¶ 87; Musoff Decl., Ex. H at 4.  The article reported that of the 5,000 Mueller water meters Padre Dam had initially installed, only half were still in the ground.  Musoff Decl., Ex. H at 4.

### D.  Mueller's Accounting for Warranty Costs

Mueller's fiscal year ends on September 30 of the reporting year.  For example, its first quarter of 2016 ended on December 31, 2015, its second quarter of 2016 ended on March 31, 2016, its third quarter of 2016 ended on June 30, 2016, and its fourth quarter of 2016 ended on September 30, 2016.

Mueller sells its AMI products with ten-year warranties covering the purchaser for the costs of replacement and repair.  SAC ¶ 9.  A warranty expense or liability is the cost that a company expects to or has already incurred for the repair or replacement of goods under the

---

*Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 808-09 (2d Cir. 1996).  Regardless, the Court need not rely on the text concerning San Diego in the July 2018 article to arrive at its conclusion.

warranty it has sold.  *Id.* ¶ 111.  In order to properly account for the costs associated with satisfying those warranties, at the time of sale, Mueller accrues an amount for the estimated cost of warranty expenses if such costs are determined to be reasonably estimable.  *Id.* ¶ 147.  For Mueller, warranty expenses can include customer costs for repair and/or replacement, including labor, materials, equipment, freight, and reasonable overhead costs.  *E.g.*, SAC ¶ 147; Musoff Decl., Ex. B at F-10, Ex. C at F-10.

Generally accepted accounting principles ("GAAP") dictate the appropriate accounting for warranty liabilities.  In particular, Accounting Standards Codification ("ASC") 460-10-25 titled "Guarantees," governs the accounting for warranty obligations incurred in connection with the sale of goods or services.  SAC ¶ 113.  That principle states that because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a loss contingency under ASC 450.  *Id.*

ASC 450 defines a "loss contingency" as an "existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."  SAC ¶ 114 (quoting ASC 450-20-20).  GAAP requires companies to accrue for losses on their financial statements if: 1) before the financial statements are issued, there is available information indicating that the impairment of an asset or incurrence of liability is *probable*, and 2) the amount of loss can be *reasonably estimated*.  SAC ¶¶ 116, 123; *see* ASC 450-20-25-2.

Where it is reasonably possible, but not probable, that a material warranty claim will be asserted, a company must disclose the loss contingency in its financial statements, including "the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made."  SAC ¶ 121 (quoting ASC 450-20-50-6).  Reasonably

possible means that the "chance of the future event or events occurring is more than remote but less than likely," whereas probable means that the "future event or events are likely to occur." *Id.* ¶ 115.  ASC 275 additionally requires disclosures regarding estimates of loss contingencies if it is "at least reasonably possible that the estimate . . . will change in the near term due to one or more future events" and the "effect of the change would be material to the financial statements." *Id.* ¶ 125.

According to Mueller's accounting policies, warranty cost estimates are revised throughout applicable warranty periods as better information regarding warranty costs becomes available.  *Id.* ¶ 147.  Thus, the reserves that Mueller accrues will be revised and adjusted as Mueller acquires more information about the performance of the products it has sold over the previous ten years and the costs associated with the warranties on those products.  *E.g.*, Musoff Decl. Ex. B, at F-10.

**E.     The Warranty Reserve Charges**

Mueller reported warranty liabilities for each period challenged during the Class Period. Mueller reported warranty liabilities of $2.7 million in the second quarter of 2016, SAC ¶ 133, $2.5 million in the third quarter of 2016, *id.* ¶ 139, $2.0 million for the fiscal year of 2016, *id.* ¶ 147, and $2.1 million in the first quarter of 2017, *id.* ¶ 153.

On April 27, 2017, for the second quarter of 2017, Mueller announced that it was taking a discrete $9.8 million charge to its warranty reserve in connection with the defects in "Version 3 radios" manufactured between 2011 and 2014.  *Id.* ¶¶ 20, 159, 207.  Mueller stated that the defect in the Version 3 radios was related to a "podding issue" such that when a meter was placed into "a pit and it was humid and warm, the encapsulant would break down and have either an early failure mode on the radio or an early battery drain, so that the unit would become inoperable prior to its tenth year."  *Id.* ¶ 207.  At the time, Defendant Hart stated that Mueller

10

expected "going forward" it would "just have a normal warranty charge provision that we've always had, and so there's really nothing expected from a large magnitude like this in the future."  *Id.* ¶ 167.  In the wake of this announcement, on April 28, 2017, Mueller's share price fell $1.43 per share, more than 11%, trading at over six times the previous day's volume.  *Id.* ¶ 160.

Mueller reported warranty liabilities of $4.7 million in the third quarter of 2017, *id.* ¶ 171, $8.5 million for the fiscal year of 2017, *id.* ¶ 182, $3.7 million in the first quarter of 2018, *id.* ¶ 187, and $4.1 million in the second quarter of 2018, *id.* ¶ 192.

On August 6, 2018, for the third quarter of 2018, the Company announced it would take a $14.1 million warranty charge.  *Id.* ¶ 201.  Mueller tied the timing of the charge to a "new analysis of [Mueller's] historical warranty expense experience relating to products produced through 2017," *id.* ¶ 206, and relating to "warranty costs [it] expect[ed] to incur in periods between 2019 and 2027," *id.* ¶ 205.  The next day, on August 7, 2018, Mueller's share price fell $0.74 per share, or 6%, to close at $11.58 per share, trading at over four times the previous day's volume.  *Id.* ¶ 202.

## F.    Confidential Witness Statements

Plaintiffs rely on statements from three purported confidential witnesses.  *See* SAC ¶¶ 90-107.  Certain of these statements elaborate on the defects in the Version 3 radios responsible for the April 2017 announcement of the warranty charge.  Other statements relate to the moisture issue experienced by PUD in San Diego.  Still others are more generalized.

Confidential Witness 1 ("CW1") was a territory manager for Mueller Systems from May 2015 through June 2019, covering a territory that included West Virginia, Tennessee, and Kentucky.  *Id.* ¶ 90.  CW1 reported that he "saw problems with smart meters from 'day one'" and that several customers experienced product failure rates of 15-20% as compared to the

industry standard failure rate for meters and electronics of 1-2%.  *Id.* ¶ 91.  CW1 reported to a regional manager who reported to the Mueller Systems general manager, *id.* ¶ 90, and CW1 stated he was copied on emails that his regional manager sent to "senior management" concerning product failures, *id.* ¶ 94.  CW1 stated that Mueller had lost a "huge contract" with American Water, a national utility company, because there were "a lot of meter issues."  *Id.* ¶ 95. He explained that while Mueller and American Water were attempting to renegotiate the contract, American Water delayed returning broken meters that were still under warranty but then shipped a "massive amount back in 2016."  *Id.*  CW1 also stated that product defects and returns became prevalent from June 2017 to June 2019 and that honoring the warranties associated with those products became "the bane of [his] existence."  *Id.* ¶ 96.  After the departure of Mueller Systems' general manager (the date of which the SAC does not specify), Mueller changed its previous advanced replacement policy under which Mueller would immediately provide a replacement upon a customer informing Mueller of a defect.  *Id.* ¶ 96. CW1 also "speculated" that the manager of the Mueller Systems "Return Merchandise Authorization Department"—which tracked product failure rates based on customer returns and conducted detailed analyses of specific product failures—left Mueller in June 2018 because of the high rate of product returns.  *Id.* ¶ 93.

Confidential Witness 2 ("CW2") was a proposal coordinator for Mueller Systems from October 2016 until June 2018.  *Id.* ¶ 97.  The SAC does not reflect his reporting line and instead states that his department "was within earshot of" the service department.  *Id.*  Without specifying the date of the incident, CW2 reported hearing that "failure rates on version 3 radios and hot rod radios were between 20-30%."  *Id.*  He also stated that parent company Mueller had "all hands" meetings in which product returns were a "big issue," both before and after Hall

became CEO in January 2017. *Id.* ¶ 98. CW2 was "told" (though by whom is not specified) that Hall was hired to "reorganize and focus on the warranty issue" as Mueller Systems "was unable to focus on new orders because it was dealing with so many returns." *Id.*

Confidential Witness 3 ("CW3") was a territory manager for Mueller Systems covering the Northwest from 2008 until 2013 and was the western regional manager from 2013 until March 2017. In the latter role, he reported to several different people at Mueller Systems, including the vice president of business development, the general manager and vice president, and two vice presidents of sales. *Id.* ¶ 99. He also participated in quarterly meetings with Mueller Systems' regional managers and marketing staff, as well as "Mueller System's upper management," including Mueller's general counsel and chief compliance officer and Mueller Systems' general manager and two vice presidents of sales. *Id.* ¶ 100. CW3 reported that "San Diego was a constant subject of discussion" at these quarterly meetings, as were product failure rates in general, including specific failure rates for San Diego and American Water. *Id.* According to CW3, in 2013, San Diego was experiencing problems with the AMI smart meters it had purchased, including a connection problem between the meter register and its end point such that the collected data did not register. *Id.* ¶ 101. CW3 says he participated in a number of conversations between "Mueller representatives, including" two territory mangers and "representatives from San Diego." *Id.* There were also additional problems, including moisture in the nodes and cracking of the meter cases—a "common complaint" which CW3 spoke about with "a number of water districts." *Id.* ¶¶ 101-02. CW3 stated that there was "growing and continuing frustration among Mueller Systems sales personnel from a manufacturing standpoint" where "[i]t got to the point that we couldn't manufacture new products because we were so busy

repairing returned products," and that, as a result of these issues, Mueller was "getting huge batches of meters and registers returned." *Id.* ¶ 103.

CW3 also reported that by 2014, the general manager and others in Mueller Systems, including the heads of product marketing and product manufacturing and operations and the regional managers, found out about "issues with the podding in the [Version 3] radio," that "pretty much everyone" was aware of the failure rates by 2014, and that "by 2014/2015, 'we were shipping radios that we knew we were going to have to replace.'" *Id.* ¶¶ 104-05. He estimated that the Version 3 radios had a 50% failure rate "during the 2015/2016 timeframe" and that the problems with the radios were so pervasive that Mueller "put a stop to manufacturing on radio shipments in late 2015 or early 2016." *Id.* ¶ 105.

## PROCEDURAL HISTORY

Plaintiffs filed a complaint against Defendants on April 11, 2019. Dkt. No. 1. On June 27, 2019, the Court entered an order appointing Andrea Peterson as lead plaintiff and The Rosen Law Firm, P.A. as lead counsel. Dkt No. 22.

Plaintiffs filed an amended complaint on September 18, 2019. Dkt. No. 28. On that same date, Plaintiffs also moved to transfer the case. Dkt. No. 29. On November 1, 2019, Defendants moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b). Dkt. No. 38.

On November 21, 2019, the Court held a hearing on the motion to transfer and denied the motion during the hearing. Dkt. No. 44. At the hearing, Plaintiffs stated that they intended to move to amend the amended complaint for a second time "due to additional evidence that [they] ha[d] discovered." *Id.* at 11:25-12:7. The Honorable Katherine Polk Failla, then presiding, asked the parties whether they could come to an agreement by which Plaintiffs would amend the complaint for a second time without opposition and thereafter Defendants would file a new

motion to dismiss or rely on their earlier briefing.  She indicated that she would likely "permit

the amended complaint anyway" and that such an agreement between the parties would allow for

"a last, final chance for [Plaintiffs] to get the pleadings where [they] want them to be, and then

an opportunity for the defense, I suspect, to move to dismiss just on one single complaint rather

than two."  *Id.* at 14:4-9.

Plaintiffs moved to amend and/or correct the amended complaint on December 12, 2019,

Dkt. No. 46, and the parties stipulated on December 20, 2019 that Plaintiffs would file a second

amended complaint without opposition, Dkt. No. 50.  Plaintiffs filed the SAC on December 25,

2019.  Dkt. No. 51.

On January 6, 2020, Plaintiffs filed a motion to substitute Brenda Hyland as executor for

the estate of Defendant Hyland for Defendant Hyland.

On January 31, 2020, Defendants moved to dismiss the SAC pursuant to Fed. R. Civ. P.

12(b)(6) and 9(b).  Dkt. No. 57; *see* Dkt. No. 58 ("MTD").

The case was assigned to the undersigned on February 4, 2020.  On March 3, 2020, the

Court denied the motion to substitute.  Dkt. No. 61.

Plaintiffs submitted their opposition to the motion to dismiss on March 16, 2020.  Dkt.

No. 62.  Defendants submitted their reply on April 15, 2020.  Dkt. No. 64 ("Reply").  The Court

heard oral argument on the motion to dismiss on May 26, 2020.

## LEGAL STANDARDS

### A.    Motion to Dismiss

Defendants move to dismiss on the grounds that the SAC fails to allege any actionable

false or misleading statement and fails to allege facts supporting a strong inference of scienter.

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must accept as true

all factual allegations in the complaint and draw all possible inferences from those allegations in

favor of the plaintiff.  *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004).  This requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

A complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

**B.     Section 10(b) and Rule 10b-5**

To plead a claim for damages under Section 10(b) and Rule 10b-5, a plaintiff must satisfy each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *accord Matrixx*, 563 U.S. at 37-38; *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations,

taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach*, 355 F.3d at 172 n.7).  This test is objective and looks to the understanding of the "ordinary investor."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015).  Moreover, under the federal securities laws, "literal accuracy is not enough.  An issuer must as well desist from misleading investors by saying one thing and holding back another."  *Id.* at 192.  Companies have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'"  *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. 240.10b-5(b)).  "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

To be actionable, a misrepresentation or omission also must be material, *i.e.*, a plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Ganino v. Citizen Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).  "In judging whether an alleged omission was material in light of the information already disclosed to investors, [the court] consider[s] whether there is 'a substantial likelihood that the disclosure of the [omitted material] would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information [already] made available.'"  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  However, Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information."  *Matrixx*, 563 U.S. at 44.  "Materiality alone does not demand

disclosure, nor does the duty to disclose encompass non-material information." *In re ProShares*, 728 F.3d at 102 (quoting *Panther Partners, Inc. v. Ikanos Comm'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008)).

When a claim sounds in fraud, such as claims under Section 10(b) and Rule 10b-5, the heightened pleading requirement of Fed. R. Civ. P. 9(b) also applies.  Under Rule 9(b), a "party must state with particularity the circumstances constituting fraud."  A complaint making such allegations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (internal quotation marks and citation omitted).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional requirements on a plaintiff bringing a private securities fraud action. *See* 15 U.S.C. § 78u-4(b)(1).  The "complaint [must] specify each statement alleged to have been misleading, the reasons or reason why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." *Id.*  The plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005).

Moreover, under the PSLRA, where the complaint alleges scienter, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind."  15 U.S.C. 78u-4(b)(2).  Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be "taken collectively" and "the court must take into account plausible opposing inferences."  *Id.* at 323.

## DISCUSSION

### A.    Alleged Misstatements

Plaintiffs make allegations about five separate sets of statements by Mueller:

1.  Reporting of Mueller's financial results and its warranty reserves in its quarterly and annual filings with the SEC for the second quarter of 2016 (SAC ¶ 133), third quarter of 2016 (*id.* ¶ 139), fiscal year 2016 (*id.* ¶¶ 145, 147), first quarter of 2017 (*id.* ¶ 153), third quarter of 2017 (*id.* ¶¶ 171, 173), fiscal year 2017 (*id.* ¶¶ 179, 181-82), first quarter of 2018 (*id.* ¶ 187), and second quarter of 2018 (*id.* ¶¶ 192, 194);

2.  Risk disclosures for the same periods and in those same filings (*id.* ¶¶ 134, 140, 146, 154, 172, 180, 188, 193);

3.  Statements regarding the $9.8 million warranty charge in Mueller's Form 8-K filed on April 27, 2017 (*id.* ¶ 159) and on its investor conference call on April 28, 2017 (*id.* ¶¶ 165-67);

4.  Statements discussing the results of the second quarter of 2018 on an investor conference call in May 2018 (*id.* ¶ 199); and

5.  SOX certifications signed by Mueller's CEO and CFO on the Forms 10-Q and 10-K (*id.* ¶ 210).

The Court examines each set of challenged statements in turn.

### 1.    Alleged Understatement of the Warranty Reserve

Plaintiffs allege that Mueller's accounting for its warranty reserve was materially understated for each reporting period during the Class Period and that, as a consequence, its statements of expenses and liabilities were also misstated for those same periods.

The operative principles for evaluating Plaintiffs' claim are set forth in the Second Circuit's decision in *Fait v. Regions Financial Corp.*, 655 F.3d 105, 113 (2d Cir. 2013), and the Supreme Court's decision in *Omnicare*.  Under *Fait*, accounting estimates that depend on management's determination or assumptions are "subjective" opinions and "not matters of objective fact."  655 F.3d at 110-11; *see In re Avon Sec. Litig.*, 2019 WL 6115349, at \*16 (S.D.N.Y. Nov. 18, 2019) ("[A]ctuarial or accounting assumptions 'depend[ ] on the particular methodology and assumptions used' and are not 'objective factual matters.'") (quoting *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 395 (S.D.N.Y. 2019) ("There is no dispute that, because there is no 'objective standard for setting reserves,' such statements are to be analyzed as opinions.") (internal citations omitted).

The standard requiring the warranty reserves to be assessed quarterly and adjusted to reflect the current estimate is "not an 'objective standard' in any meaningful sense of the word 'objective.'"  *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at \*8 (S.D.N.Y. Oct. 5, 2016); *see In re NovaGold Res. Inc.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) ("[T]he word 'estimate' connotes uncertainty.").  Instead, the warranty reserves may be deemed opinions, which are actionable under *Omnicare* only if plaintiff can allege that (1) "the speaker did not hold the belief she professed," (2) "the supporting fact[s] [Defendants] supplied were untrue," or (3) the stated opinion, "though sincerely held and otherwise true as a matter of fact," "omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 575 U.S. at 186, 194).

Plaintiffs fail to allege actionable opinions for several reasons.

Plaintiffs do not allege facts plausibly showing that Defendants held anything other than an "honest belief" that the warranty reserves were adequately stated. *See Fait*, 655 F.3d at 110; *see also In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) ("[W]here plaintiffs allege a false statement of opinion, 'the falsity and scienter requirements are essentially identical.'") (citation omitted).  Plaintiffs do not allege that Mueller "was experiencing or internally predicting losses exceeding their set reserves," *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 362 (S.D.N.Y. 2011), that Defendants "knew that the . . . evidence on which they relied" required them to take a larger reserve, *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 314 (S.D.N.Y. 2013), or that the Company's officers "understood that the publicly reported numbers were at odds with [their] internal analyses," *In re Convernium Holding AG Sec. Litig.*, 2006 WL 3804619, at *13 (S.D.N.Y. Dec 28, 2006).  Indeed, Plaintiffs do not "'specifically identify the reports or statements' that are contradictory to the statements made" by Defendants about the warranty reserves or "provide specific instances in which Defendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

Plaintiffs rely heavily on their CWs to allege that Defendants knew, as early as January 2016, that the smart meters were defective such that an adjustment to the warranty reserve was required.  *See* SAC ¶¶ 7, 132; Opp. Br. at 18.  But the CWs provide no such support, instead stating merely that there were "a lot of meter issues," SAC ¶ 95, product returns were a "big issue," *id.* ¶ 98, "San Diego was a constant subject of discussion as were product failure rates in general," *id.* ¶ 100, Mueller was "getting huge batches of meters and registers returned," *id.* ¶ 103, and that Mueller was "shipping radios that [it] knew [it was] going to have to replace," *id.*

¶ 105.  Those allegations might support a claim if they were concrete, if they showed knowledge

by Mueller senior management, and if Mueller had not already been accounting for warranty

reserves in the millions of dollars.  But they do not demonstrate that Defendants were aware, at

the time that Mueller released its financial statements, that they knew or believed that the

warranty reserves already taken in those statements were inaccurate.  *See, e.g., Local No. 38 Int'l*

*Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010)

(rejecting allegations that "do not establish what specific contradictory information the

Individual Defendants received or when they received it"), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

Nor do they even demonstrate that, at that time, Mueller's stated warranty reserves were in fact

inaccurate or that Defendants (or others, such as those in accounting) thought the warranty

reserves were false.  *See Rombach*, 355 F.3d at 174 ("[P]laintiffs must do more than say that the

statements in the press releases were false and misleading; they must demonstrate with

specificity why and how that is so."); *Pirnik*, 2016 WL 5818590, at *8 (rejecting Plaintiffs'

allegations for failing to point to "an objective standard for setting warranty reserves" to

demonstrate falsity).

Additionally, these allegations are largely based on "rumor or conjecture": CW1 "saw

problems with smart meters from 'day one,'" SAC ¶ 91, and speculated that a manager left

because of the high rate of product returns, *id.* ¶ 93; CW2 was "within earshot of" the service

department, *id.* ¶ 97; and CW3 felt that there was "growing and continuing frustration among

Mueller Systems sales personnel," *id.* ¶ 103, and "pretty much everyone" was aware of the

failure rates, *id.* ¶ 104.  Such "rumors cannot reasonably satisfy the requirement that the facts

alleged 'provide an adequate basis for believing that the defendants' statements were false.'"  *In*

*re Vertex Pharms., Inc., Sec. Litig.*, 357 F. Supp. 2d 343, 354 (D. Mass. 2005) (quoting *Novak*,

216 F.3d at 314); *see Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient.") (internal quotation marks and citations omitted); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) ("Plaintiffs cannot rely on assertions that the information presented by confidential witnesses was known or common knowledge within the company," which are "too vague and conclusory"). Importantly, Plaintiffs have not alleged facts demonstrating that persons in the positions of territory manager, proposal coordinator, and regional manager would be knowledgeable as to whether Mueller would be required to adjust its warranty reserve pursuant to GAAP accounting. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589-90 (S.D.N.Y. 2011).

The CWs did not report to any of the Individual Defendants, the Individual Defendants were not in their reporting line, and it is not alleged that the Individual Defendants or those responsible for the financial statements were at their quarterly meetings such that these CWs could "show that individual defendants actually possessed the knowledge highlighting the falsity of public statements." *Glaser*, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient.") (citing *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010)). Although CW1 says that he was copied on emails to "senior management" concerning product failures, SAC ¶ 94, he fails to identify the "senior management" on those emails (or that those emails included Individual Defendants or persons responsible for the financial statements). Similarly, CW2 states he attended an "all hands" meeting in which he was told—by whom is unclear—that Defendant Hall was hired to "organize and focus on the warranty issue," *id.* ¶ 98, but fails to identify the attendants at that meeting and

conspicuously fails to identify information provided at the meeting demonstrating that Individual

Defendants or anyone else involved in accounting would have been aware that the warranty

reserves were misstated. *See Local No. 38*, 724 F. Supp. 3d at 461 ("[A] close examination of

their statements reveals the absence of any allegation that such data had been presented to

management around the time of Defendants' allegedly misleading statements."). That certain

Mueller products required repair or replacement—which is what the CWs report—does not

speak to whether the already-stated reserves were sufficient or insufficient to address any

anticipated costs, much less that Defendants knew any such fact.

In the absence of any allegations demonstrating knowledge, Plaintiffs proceed in a

familiar but deficient manner. They identify circumstances where customers, *i.e.*, certain

municipalities, returned smart meters and proceed from that premise to conclude that Mueller's

warranty reserve had to be understated. But the fact that Defendants knew that certain smart

meters were being returned—which were manufactured at different times and returned for

different defects—does not mean that Defendants knew that Mueller's warranty reserves were

understated. "Such generalized allegations fail to specify what caused the Defendants to know

that the [warranty] reserves were insufficient." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp.

2d at 361. The financial statements themselves disclosed that some of Mueller's products could

fail and require either repair or return. *See, e.g.*, SAC ¶ 147 ("[W]arranty expenses . . . include

customer costs of repair and/or replacement."). The fact of product failure is implicit in the

taking of a warranty reserve in the first place. There would be no reason for any reserve, let

alone one in the millions, if every water meter manufactured and shipped by Mueller was

failsafe.

Indeed, Plaintiffs do not allege "defendants' knowledge of facts" demonstrating the inaccuracy of the financial statements. *Novak*, 216 F.3d at 308. Plaintiffs' allegations with respect to Defendants' knowledge of product failures at the time of the Form 10-Q for the second quarter of 2016 exemplifies the deficiency of their pleading approach. *See* SAC ¶ 135. In that filing, Mueller reported $283.6 million of net sales, including $15 million of net sales in the Technologies segment. It also reported warranty liability of $2.7 million. *Id.* ¶ 133. Plaintiffs allege that, at the time of this Form 10-Q, Defendants "were aware that approximately 22,000 smart meters in Missouri had to be replaced and had 'unusually high levels of premature failure rates,' that smart meters in Chillicothe were failing at a rate of 50%, and that all of the smart meters Mueller sold to San Diego (at least $7 million dollars' worth through the end of 2015) required replacing the meter's register entirely." *Id.* ¶ 135. Plaintiffs allege that ASC 450 required Defendants "to utilize this information to estimate warranty liability costs for not only these existing warranty claims, but future warranty claims based upon the same product defects in all products Mueller already sold" and that "[h]ad Defendants done so they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial statements." *Id.* Plaintiffs make similar allegations for each of the quarters. *See id.* ¶ 141 (third quarter of 2016); *id.* ¶ 148 (full-year 2016), *id.* ¶ 155 (first quarter of 2017); *id.* ¶ 174 (third quarter of 2017).

But Plaintiffs do not allege whether and how the Individual Defendants or any persons responsible for the financial statements were aware of this information concerning MAWC, San Diego, Chillicothe, and Santee, and further, they do not allege that such persons (or anyone else for that matter) were aware that this information would require an adjustment to the financial statements or were involved in that process. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2014

WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014).  If Plaintiffs intend to rely on the Individual

Defendants' positions as CEO and CFO to allege awareness both of the product issues and their

alleged accounting implications, such conclusory "accusations" are "founded on nothing more

than a defendant's corporate position [and] are entitled to no weight."  *Plumbers & Steamfitters*

*Local 773*, 694 F. Supp. 2d at 300; *see In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *7

(S.D.N.Y. Aug. 31, 2000) ("It is well established that boilerplate allegations that defendants

knew or should have known of fraudulent conduct based solely on their board membership or

executive positions are insufficient to plead scienter.").

Even if knowledge of the defects could be imputed to a person responsible for Mueller's

financial statements, that would not show that the Form 10-Q for the second quarter of 2016, or

any other reporting period, was false.  As an initial matter, Plaintiffs' claim mischaracterizes

their own allegations and the documents upon which those allegations rely.  The MAWC report

does not state that 22,000 units sold to MAWC had to be repaired or replaced *by Mueller* and

thus would be subject to a Mueller warranty charge.  *See* Musoff Decl., Ex. J.  Instead, the

22,000 smart meters replaced by MAWC between August 2015 and January 2016, and the

23,833 smart meters removed by MAWC between September 2015 and December 2015 were

replaced or removed because they had "a higher potential of being defective" as a result of

"possible imperfections."  *Id.* at 6, 8.  The actual number of Mueller smart meters that MAWC

returned to Mueller Systems was only 850.  *Id.* at 16.

Likewise, Plaintiffs' allegations, when read in their entirety, do not support the claim that

all of the smart meters sold to San Diego required replacing the meter's register entirely or, as

stated elsewhere in the SAC, that 83% of the 90,000 meters Mueller sold to San Diego for more

than $7 million were defective.  *See* SAC ¶¶ 84-85.  The documents Plaintiffs rely upon show

26

that the smart meters installed by the PUD were not yet fully activated and sending wireless

signals because the PUD had not installed the complete radio equipment needed necessary for

them to send real-time water use data.  *See* Musoff Decl., Ex. H at 4.  San Diego had identified

the glitch affecting the smart meter gears in only 250 smart meters by June 2016, but it was

"unclear" if those meters had been replaced.  *Id.*, Ex. G at 2.  Later information stated that

Mueller had only been required to ship "just under 400" replacement smart meters to San

Diego—out of 75,000 smart meters that San Diego had received from Mueller since 2010.  *Id.*,

Ex. H at 3.  When such articles "form the basis of the claim" and "contradict the allegations of

the amended complaint, the documents control and this Court need not accept as true the

allegations in the amended complaint."  *Rapoport v. Asia Electronics Holding Co., Inc.*, 88 F.

Supp. 2d 179, 184 (S.D.N.Y. Mar. 7, 2000); *see also In re Merrill Lynch & Co. Research*

*Reports Sec. Litig.*, 568 F. Supp. 2d at 362 (finding "the reports on their face contradict

[plaintiff's] claim that the [d]efendants knowingly concealed facts relating to [the company]'s

liquidity").

  More importantly, nothing in that information—whether the facts alleged by Plaintiffs or

their overstated mischaracterizations—demonstrates that the accounting for Mueller's warranty

reserves, at the time Mueller estimated the reserves, did not represent a fair estimate of Mueller's

probable expenses associated with product repair and replacement.  *See Okla. Law Enf't Ret. Sys.*

*v. Telefonaktiebolaget LM Ericsson*, 2020 WL 127546, at *6 (S.D.N.Y. Jan. 10, 2020)

(dismissing where it was "not even clear from [p]laintiffs' allegations that [defendant]'s

accounting deviated from its publicly stated practices"); *Okla. Firefighters Pension & Ret. Sys. v.*

*Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) ("[E]ach of [the financial

statements] clearly stated that its loss reserves were estimated figures subject to market

conditions and were by no means guarantees of the loss amounts likely to be incurred.").  The same can be said for every other financial statement challenged by Plaintiffs, including the financial statements that postdated Mueller's April 2017 announcement about the discrete charge for the Version 3 radios and predated its August 2018 announcement about the charge to the warranty reserve.

      For example, Plaintiffs challenge Mueller's accrual of $4.1 million for warranty expenses reported in the Form 10-Q for the period ended March 31, 2018 (*i.e.*, the second quarter of 2018).  SAC ¶¶ 192-95.  Plaintiffs claim that the warranty reserves were understated in violation of GAAP because "[b]y the time Defendants issued the 2Q 2018 10-Q they were aware that the failure rate associated with their AMI smart meters was an astounding 83%" and had Defendants utilized that information, "they would have determined that it was probable that their warranty liability would materially increase and would have an impact on Mueller's financial statements." *Id.* ¶ 195.  But the paragraph of the SAC to which they cite for the 83% figure, SAC ¶ 84, states nothing of the sort.  As discussed earlier, that 83% refers to the 15,000 out of 90,000 smart meters in San Diego that were "not fully activated" because they lacked radio equipment—a number that does not reflect defects or needed repairs.  Musoff Decl., Ex. H at 4.  And, even if it did reflect needed repairs or replacement, nothing in the SAC demonstrates that Mueller failed to take into account the appropriate information in the setting of its reserves.  Thus, Plaintiffs do not adequately allege that in setting the warranty reserve each quarter, Defendants "knew of and disregarded such information." *Student Loan Corp.*, 951 F. Supp. 2d at 497-98.

      Nor have Plaintiffs provided any evidence to conclude that Mueller did not timely take into account any of the other issues Plaintiffs allege.  A member of PUD stated that, as of sometime in June 2016, it had discovered 250 meters with the glitch in the gears of the water

meter's register.  Musoff Decl., Ex. G at 2.  Plaintiffs offer no basis to believe that Mueller did

not take the information available from San Diego into account in setting its reserve in the third

quarter of 2016 or when it became aware of the glitch.  For CMU, Plaintiffs state that Mueller

replaced an increasing number of its smart meters between 2015 and 2019, but do not allege how

Mueller's warranty liability failed to account for those replacements in its financial statements

such that the warranty reserves could be said to be false.  *See* SAC ¶¶ 75-76.  As for Santee, the

SAC is completely devoid of any information about when Padre Dam realized that the Mueller

smart meters "had problems," when Defendants learned there were problems, and whether and

how many smart meters Mueller itself replaced.  *Id.* ¶¶ 86-88; *see also* Musoff Decl., Ex. H at 3.

Ultimately, then, Plaintiffs' case rests on the fact that, in April 2017, Mueller announced

a discrete $9.8 million charge to its warranty reserve for radio products produced between 2011

and 2014 that were failing at a higher-than-expected rate, and in August 2018, Mueller

announced a separate $14.1 million charge to its warranty reserve.  But those charges do not

support an inference that Defendants thought the reserves were inadequate prior to when these

charges were made.  The law is well-settled that where a claim is based on the timing of an

accounting write down, "it is not sufficient to simply allege the write down should have occurred

earlier; instead, the complaint must include factual allegations from which a reader could infer

Defendants intentionally or recklessly failed to take write downs when they should have."  *In re*

*Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *7 (S.D.N.Y. May 24, 2018);

*accord In re Forcefield Energy Sec. Litig.*, 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017).[4]

---

[4] *See also Pirnik*, 2016 WL 5818590, at *8 (allegation that increase in warranty reserve estimate
was insufficient in light of the number of vehicles recalled and the later increase in warranty
reserve did not state a claim); *NECA-IBEC Pension Tr. Fund v. Bank of Am. Corp.*, 2012 WL
3191860 at *10 (S.D.N.Y. Feb. 9, 2012) ("That defendants later decided to revise the amount of
loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding

That is for good reason.  As Mueller's SEC filings, GAAP, and Plaintiffs' own SAC make clear, Mueller—like every other company—was required to consider the level of its warranty reserves and to either increase or decrease those reserves as it acquired more information.  SAC ¶ 127.  Mueller did so every quarter.  The amount in the reserves fluctuated quarter by quarter.  The two charges Plaintiffs highlight in the SAC were particularly large.  But there is nothing in the SAC that suggests that Mueller was aware of the need to make those increases to the reserves before Mueller actually took the charges and made those increases.  If Plaintiffs were able to state a claim for securities fraud by alleging that Mueller carried out its responsibilities and made an adjustment, then no company discharging its responsibilities would be free from a securities suit, and "a plaintiff with a largely groundless claim [may] simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Plaintiffs draw from these two charges the conclusion that Mueller should have taken the charges earlier, rather than the equally compelling conclusion that Mueller—as its accounting policies required—appropriately made the adjustments based on new information it acquired. But such an argument "mimics the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain."  *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *10

---

that defendants did not think [the] reserves were adequate at the time the registration statement and prospectus became effective"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 361 ("[A] 'massive increase' to loan loss reserves 'is not, in itself, an indicator that the previous reserve levels were inadequate.'") (citation omitted); *Plumbers & Steamfitters Local 773*, 694 F. Supp. 2d at 301 (rejecting plaintiff's assertion that defendant "should have recorded much larger write-downs earlier than it did" because "the securities laws do not allow fraud by hindsight claims," and "after-the-fact 'allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud'") (citation omitted).

(S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d

Cir. 2004).  Essentially, Plaintiffs' "theory is one of underestimation in hindsight," which "relies

on conclusory allegations to mask the legally insufficient contention at its core, which is that

defendants could not possibly have believed their own estimates, since plaintiffs interpret those

estimates to have proven inadequate."  *Student Loan Corp.*, 951 F. Supp. 2d at 498.[5]

      Finally, Plaintiffs have not sufficiently alleged that Defendants "omit[ted] information

whose omission ma[de] the [stated opinion] misleading to a reasonable investor."  *Sanofi*, 816

F.3d at 210.  The Supreme Court emphasized that meeting the standard for omissions "is no

small task for an investor," *Omnicare*, 575 U.S. at 194, and that a statement of opinion "is not

necessarily misleading when an issuer knows, but facts to disclose, some fact cutting the other

way," *id.* at 189.  That language squarely applies here.  Mueller stated the basis for its warranty

reserve calculations, which was inherently subjective.  *E.g.*, SAC ¶ 147 (Mueller "accrue[s] for

the estimated cost of product warranties at the time of sale if such costs are determined to be

reasonably estimable at that time"); *Pirnik*, 2016 WL 5818590, at *8 (requirement that standard

be assessed quarterly and adjusted "to reflect the current best estimate" is "not an 'objective

standard'").  Indeed, investors were told that warranty estimates could change "as better

information regarding warranty costs becomes available."  *See, e.g.*, Musoff Decl, Ex. B at F-10;

*see Omnicare*, 575 U.S. at 190 ("[A]n investor reads each statement within such a document,

whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers,

---

[5] For these reasons, Plaintiffs also fail to sufficiently allege that Defendants knew that a loss
contingency was "probable" and could be "reasonably estimated," or alternatively, that it was
"reasonably possible" that these returns would impair the warranty reserve to require disclosure
of an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be
made."  *See Sjunde AP-Fonden*, 417 F. Supp. 3d at 398; *Wyche v. Advanced Drainage Sys., Inc.*,
2017 WL 971805, at *16-17 (S.D.N.Y. Mar. 10, 2017), *aff'd*, 710 F. App'x 471 (2d Cir. 2017);
*Harris*, 135 F. Supp. 3d at 171.

and apparently conflicting information.").  For these and the reasons stated earlier, Plaintiffs

have failed to show "any serious conflict" between the facts they allege and Defendants' opinion

regarding the adequacy of the warranty reserves.  *Sanofi*, 816 F.3d at 212.

### 2.    Risk Disclosures

Plaintiffs also challenge Mueller's risk disclosures in its SEC filings.  The language in the

risk disclosures across the relevant SEC filings is substantially similar if not identical, and it

states:

> The long-term success of our newer technologies—such as smart metering and leak
> detection and pipe condition assessment—which are key to the Mueller
> Technologies businesses, depends on market acceptance and our ability to manage
> the risks associated with the introduction of new products and systems.
> . . .
> [T]he success of our new products and systems will depend on our ability to manage
> the risks associated with their introduction, including the risk that new products and
> systems may have quality or other defects or deficiencies in their early stages that
> result in their failure to satisfy performance or reliability requirements.  Our success
> will depend in part on our ability to manage these risks, including costs associated
> with manufacturing, installation, maintenance and warranties. These challenges can
> be costly and technologically challenging, and we cannot determine the ultimate
> effect they may have. . . . Failure to successfully manage these challenges could
> result in lost revenue, significant warranty and other expenses, and harm to our
> reputation.

SAC ¶ 134.

Plaintiffs argue that the language concerning the "risk that new products *may* have

quality or other defects or deficiencies" was false and misleading because it did not reveal that

"significant risks, deficiencies and failures associated with new products were already

occurring."  *Id.* ¶ 136.  Plaintiffs also argue that statements concerning the "risks, including costs

associated with . . . warranties," Mueller's inability to "determine in advance the ultimate effect

they may have" and warning that "[f]ailure to successfully manage these challenges could result

in . . . significant warranty expense" were materially false and misleading as the risks associated

with the cost of warranties were already occurring.  *Id.* ¶ 137.

Some courts in this Circuit have held that a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired. *See, e.g.*, *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516-17 (S.D.N.Y. 2013) (risk warned that increased mobile usage and product decisions may negatively impact Facebook's revenue but calls between defendants and analysts showed they already had); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *9-10 (S.D.N.Y. 2018) (risk warned that governmental authority might take a contrary position and subject defendant to an investigation when defendant had already been notified of an investigation); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (regulatory and legal risks concerning defendant's employees failed to disclose SEC and NYSE investigations into their trading practices). *But see In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010) (Sullivan, J.); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008).  The classic statement is that it is not sufficient for "someone [to] warn[] his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y. 1996) (discussing "bespeaks caution" doctrine).  The main inquiry is whether a "reasonable investor could have been misled about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).  "The more specific the caution, the more likely it is to mislead a reasonable investor.  For example, a caution that 'input prices may rise next quarter' would not cause a reasonable investor to conclude that the prices of all inputs had remained flat or declined in the previous quarter." *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *9.

Significantly, and read in context, Mueller's risk disclosures cannot be understood as a guarantee that none of the "new products and systems" that Mueller shipped or expected to ship would have defects or deficiencies that would require repair or replacement. The language it used was generic. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *11 (S.D.N.Y. 2016) (Sullivan, J.). It is evident and would have been evident to the ordinary investor that Mueller was not warranting that every one of its newer technologies was defect-free or would not incur a warranty charge. The disclosures reflected that there would naturally be issues or risks associated with the introduction of new technologies and that the success of those "new products and systems" would depend on Mueller's "ability to manage the risks associated with their introduction." *E.g.*, SAC ¶ 134. Mueller also disclosed that "[t]hese challenges can be costly and technologically challenging" and that "[f]ailure to successfully manage these challenges could result in lost revenue, [and] significant warranty and other expenses." *Id.* It would have been clear to an ordinary investor that Mueller would incur warranty and other expenses in connection with its products, including its new products and technologies. Otherwise, the language in the risk disclosures would have been unnecessary and the emphasis on management wholly superfluous if there were not, in fact, risks with new products, nor would the focus on "significant warranty and other expenses" be necessary if there were no warranty or other expenses associated with the introduction of the new technologies and products. Indeed, the purpose of the warranty reserve was to account for "customer costs for repair and/or replacement" that could occur for a number of reasons, including defective products. *See, e.g.*, Musoff Decl., Ex. B at F-10. Thus, the risk disclosure language can be understood to convey that, in addition to the costs for which Mueller had accrued and that it had determined should be disclosed pursuant to GAAP, there was a risk that Mueller would incur additional "significant"

expenses in connection with defects but that Mueller was not able to "determine in advance the ultimate effect they may have" or whether they even existed.  *See In re FBR Inc. Sec. Litig*, 544 F. Supp. 2d at 362.[6]

### 3.    Statements Regarding the $9.8 Million Warranty Charge[7]

Plaintiffs allege that certain statements made by Mueller in its Form 8-K announcing the $9.8 million warranty charge on April 27, 2017 and by Defendants Hall and Hart at an investor conference on April 28, 2017 were false and misleading.

In its Form 8-K, Mueller stated that it "recently became aware that some radio products produced between 2011 and 2014 were failing at a higher-than-expected rate."  SAC ¶ 159.  It added: "We have also carefully examined our product processes and accelerated lifestyle testing data with respect to radios manufactured after the period referenced above and expect our warranty experience to be in line with industry standards."  *Id.*  During the investor conference the following day, Defendant Hall stated that Mueller had "error-proofed the manufacturing process, so this particular failure mode won't repeat itself" and "instituted accelerated lifestyle

---

[6] Additionally, Plaintiffs have not adequately alleged that the product failures did in fact result in "lost revenue, significant warranty and other expenses, and harm to our reputation" at the time of these statements and before the two warranty charges, or that Defendants knew that these risks had materialized.  *See supra* at 27-30.  Even if they had, a "company's knowledge of unfavorable trends does not show that its [reserves] were misleading as of the time they were stated; previously known trends may later reveal themselves to be of a different magnitude or importance than initially expected."  *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *14 (S.D.N.Y. May 7, 2020).

[7] The Opposition does not advance arguments in support of its allegations regarding (1) Defendants' descriptions of the Company's warranty costs, (2) Defendants' statements during the April 28, 2017 conference call, (3) Defendants' statements during the May 8, 2018 conference call, and (4) Defendants' SOX certifications.  Thus, those claims are dismissed as abandoned.  *See Killoran v. Westhampton Beach Sch. Dist.*, 2020 WL 1325572, at *5 (E.D.N.Y. Feb. 12, 2020), *report and recommendation adopted*, 2020 WL 1433647 (E.D.N.Y. Mar. 11, 2020); *City of Perry, Iowa v. Procter & Gamble Co.*, 188 F. Supp. 3d 276, 287 (S.D.N.Y. 2016).  The Court discusses them herein for the purpose of completeness and as an alternative basis for dismissal.

testing on all of our radios." *Id.* ¶ 165.  As a result, Defendant Hall stated that he "believe[d] we have correctly scoped and addressed this problem and implemented the corrective steps to ensure that our products meet industry and Mueller standards for reliability." *Id.*  Defendant Hart added what had been said in the Form 8-K, which was that Mueller "recently became aware that in certain environments, some radio products produced between 2011 and 2014 were failing at a higher than expected rate." *Id.* ¶ 166.  In response to an analyst question about the Company's expectation with respect to warranty expense going forward, Defendant Hart added:

> [W]ith this particular issue, . . . we did record about $9.8 million in the quarter, and we were left with about an $8.4 million warranty reserve for this particular item. And I will note that back in Q1, we saw about $800,000 of expense for this particular problem and that was really the catalyst for us to take a more detailed look, do an in-depth study and refine our estimates to come up with a particular charge in the second quarter.  We think that the charge is adequate and sufficient to cover these issues with the radios produced between 2011 and 2014.  I think going forward, we'll just have a normal warranty charge provision that we've always had, and so there's really nothing expected from a large magnitude like this in the future.

*Id.* ¶ 167.

The Court examines these statements "together and in context," *In re Vivendi S.A. Sec. Litig.*, 838 F.3d at 250, and as they would have been understood by the "ordinary investor," *Omnicare,* 575 U.S. at 187.  "[P]laintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (citation omitted).

Plaintiffs do not allege facts demonstrating that Mueller's statement that it "recently" became aware that "some radio product were failing at higher-than-expected rates" was false and misleading.  Plaintiffs argue this statement was false because Defendants had been aware of product failures in the Version 3 radios "since at least January 2016."  SAC ¶ 162; *see also* Opp.

Br. at 21.  But Plaintiffs do not allege the "expected rate" for the "radio products produced between 2011 and 2014," much less that the information Mueller had about failures in such products in or before January 2016 was other than what was "expected."  CW2, who worked at Mueller between October 2016 through June 2018, provides no timeframe on when he "heard that failure rates on version 3 radios" were 20-30% and how those rates compared to Mueller's expected rates.  SAC ¶ 97.  CW3's "estimate" that the Version 3 radios had a 50% failure rate during the 2015/2016 timeframe says nothing about how that estimate compared to Mueller's expected or "higher-than-expected rate," let alone whether CW3's estimate was accurate, based on any internal reports, was known to Defendants, or otherwise contradicted the amount recorded for warranty reserves.  *Id.* ¶ 104.

Plaintiffs also allege no facts to show that the remaining statements alleged in the SAC were false and misleading.  Those statements included that: (1) Mueller "error-proofed the manufacturing process, so this particular failure mode won't repeat itself," SAC ¶ 165; (2) the $9.8 million warranty charge was "adequate and sufficient to cover these issues with the radios produced between 2011 and 2014," *id.* ¶ 167; and (3) Mueller "carefully examined [its] product processes and accelerated lifecycle testing data with respect to radios manufactured after the period referenced above," *id.* ¶ 159; and (4) Mueller "th[ought] that going forward, we'll just have a normal warranty charge provision that we've always had, and so there's really nothing expected from a large magnitude like this in the future," *id.* ¶ 167.

Read in context, Mueller did not state that there would never be a defect in any Version 3 radios going forward, much less that there would not be any future errors in the manufacturing of any Mueller products.  The statement regarding the error-proofing of the manufacturing process was made in the context of the particular failure mode in the Version 3 radios (*i.e.*, the podding

issue) and did not refer to all potential failure modes or all Mueller products.  *See id.* ¶ 165
("[W]e error-proofed the manufacturing process, so *this particular failure* mode won't repeat
itself.") (emphasis added).  Indeed, it is clear from Mueller's statements that there would be
defects and failures in the future—albeit Mueller expected that they would be ones that were
consistent with the "industry and Mueller standards for reliability."  *Id.*

       Plaintiffs still assert that these statements were false and misleading because in August
2018, Mueller announced a $14.1 million charge to increase its warranty reserve.  But that is just
impermissible fraud by hindsight.  As a matter of law, Mueller's statement about the reserve it
announced it was taking in August 2018 based on a study it had just completed in 2018 cannot
make Mueller's statements in April 2017 about what it had done and was doing in 2017 false and
misleading.  *See supra* at 29 n.4.  And, even if hindsight reasoning were permitted, the allegation
is flawed.  Of the $14.1 million charge announced in August 2018, only "a piece, maybe $1
million or so" related to "fixing whatever the cost overruns" had been with respect to the Version
3 radios for which Mueller announced a charge in April 2017.  SAC ¶ 207.  The remainder was a
"change in estimate" for expense and remediation Mueller expected to incur from *2019 through
2027.  Id.*[8]

---

[8] The Company's Form 10-Q for the second quarter of 2018 elaborated that the Company had
recorded a warranty expense of $9.8 million in the second quarter of 2017 as a result of "radio
products produced prior to 2017 and installed in particularly harsh environments failing at
higher-than-expected rates."  SAC ¶ 208.  The filing then explained that during the second
quarter of 2018, Mueller had completed a periodic analysis of its warranty experience and costs
and that, as a result of that analysis and based on "new information," it determined "that certain
Technologies products have been failing at higher-than-expected rates as well, and that the
average cost to repair or replace certain products under warranty was higher than previously
estimated and that as a result it had recorded an additional warranty expense of $14.1 million
associated with such products."  *Id.*

That leaves only Defendant Hart's statements that he thought "that the charge is adequate and sufficient to cover these issues with the radios produced between 2011 and 2014" and that "going forward, we'll just have a normal warranty charge provision that we've always had, and so there's really nothing expected from a large magnitude like this in the future." *Id.* ¶ 167.  But those statements are nonactionable opinion, if not forward-looking, statements. *See Malin*, 499 F. Supp. 2d at 144 (statements that defendant "believes the reserves are sufficient" and "think[s] we've turned a corner now" are opinion); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004) ("Forward looking statements include financial projections, descriptions of future plans or objectives of management, and discussions of future economic performance.") As the Second Circuit has instructed in a similar context, "this technique" of alleging that defendant's statement that a reserve was "adequate" was false because defendant later "ma[d]e a significant addition to it" is "sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994); *see Pirnik*, 2016 WL 5818590, at *8 (discussing similar).

    **4.**    **Statements Regarding the Results of the Second Quarter of 2018 on the May 8, 2018 Investor Conference Call**

On May 8, 2018, Mueller conducted an investor conference call to discuss its financial results for the second quarter 2018 released the prior day.  SAC ¶ 199.  During the call, a question was raised about Mueller's accounting for warranty expense and whether the charge Mueller had announced in April 2017 "should . . . be it then for expense going forward or does that continue to be an overhang in the following quarters?"  *Id.*  Defendant Hall responded, "I don't want to foreshadow one way or the other" and "[w]e do reliability studies on this stuff all the time," to which Defendant Zakas added that "this is something that we'll continue to evaluate

over time." *Id.* Defendant Hall further stated, "I wouldn't want [to] call [the warranty expense] an overhang" and "I'll reiterate it for everybody; ever since we put in the new plotting process, our experience with failure rates is way less than one half of 1%. So I think we've licked it." *Id.* Plaintiffs allege Hall and Zakas' statements were false or misleading in light of the $14.1 million warranty charge Mueller took the following quarter. *Id.* ¶ 200.

That argument fails for many of the same reasons stated above. The fact that Mueller took an additional warranty charge the following quarter is not evidence that Mueller's statements in May 2018 were false and misleading, particularly when that charge was based on a "new study of our historical warranty experience" that the Company had completed at some point during the third quarter, *id.* ¶¶ 201, 205, where Plaintiffs have not alleged that the Defendants knew about the study or that its results were final by May 8, 2018, and where "maybe $1 million or so" was based on "fixing whatever the cost overruns in that campaign" had been regarding the $9.8 million issue, *id.* ¶ 207. Nor have Plaintiffs pointed to facts indicating that Defendants Hart and Zakas did not believe their statements at the time they made them. *See supra* at 21-26.

### 5.  SOX Certifications

Finally, Plaintiffs challenge that Defendants' Sarbanes-Oxley ("SOX") certifications appended to each of Mueller's quarterly and annual SEC filings were false or misleading. Those certifications were signed by Mueller's CEO and CFO and represented that the filings did not contain any untrue statement of material fact or omissions and that they fairly presented in all material respects Mueller's financial condition, results of operation and cash flows. *Id.* ¶ 210. The certifications further stated that the CEO and CFO had evaluated and concluded that Mueller's "disclosure controls and procedures were effective" and that they had evaluated and

disclosed all significant deficiencies and material weaknesses in internal controls over financial report. *Id.* ¶¶ 211-12.

The premise of Plaintiffs' claim fails and thus the conclusion necessarily also fails. Having failed to plead that Mueller's financial statements had any misstatements or omissions, or that Individual Defendants did not honestly hold their opinions, there is no basis for Plaintiffs to challenge the statements of Mueller's CEO and CFO that, in their opinions, Mueller's financial statements did not contain any misstatements or omissions. *See In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019) ("SOX certifications do not 'constitute a standalone basis for liability.'") (quoting *Menaldi v. Och-Ziff Capital Mgmt. Grp LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017)); *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018) (not actionable where plaintiff failed to prove knowledge of unlawful payments).

## B.     Plaintiffs Fail to Raise Any Inference of Scienter

Even if the SAC adequately alleged a false or misleading statement, its claims would be dismissed for failure to plead scienter with particularity.

To establish scienter, a plaintiff must allege specific facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (same). A plaintiff is required to allege scienter "with respect to each act or omission," 15 U.S.C. § 78u-4(b)(2)(A). A "strong inference" of scienter is one that, after considering the full context and opposing inferences, is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. While the Court must assess all of the scienter allegations collectively, "[s]everal insufficient allegations of recklessness can never add up to a

compelling inference of scienter." *Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *6 (S.D.N.Y. Mar. 23, 2017).

### 1.       Motive and Opportunity

To establish a motive to engage in fraud, "plaintiffs must assert a concrete and personal benefit" to the individuals who allegedly carried out the fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs attempt to allege motive and opportunity only for Defendants Hyland and Hart and based only on 11 stock sales (six by Hyland and five by Hart) between February 6, 2017 and December 5, 2017. SAC ¶ 215; *see* Opp. Br. at 23.

Unusual insider sales during the class period may permit an inference of bad faith and scienter. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001); *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 86 (2d Cir. 1999). Courts consider a number of factors to determine if a sale was "unusual or suspicious": "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants' selling; (5) whether sales occurred soon after statements defendants are alleged to know to be misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans." *Glaser*, 772 F. Supp. 2d at 587.

The SAC does not identify the profits realized by either Defendant for any of the sales, which does not help to establish motive and opportunity as "proceeds alone say nothing about a seller's motive." *Glaser*, 772 F. Supp. 2d at 592; *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) (Plaintiffs must allege "defendants' net profits rather than their gross proceeds").[9] Instead, the SAC calculates that Hyland earned $15.3 million and Hart earned

---

[9] Plaintiffs cite to *Scholastic* and *Blanford* for the proposition that "courts routinely use gross proceeds to determine whether insider sales were unusual," Opp. Br. at 25, but in both cases, the

$6.4 million of proceeds.  SAC ¶ 215.  The SAC also does not allege the percentage of holdings sold or retained by Hyland and Hart; in the Opposition, Plaintiffs say for the first time that Hyland sold 44.6% and Hart sold 65.6% of their Mueller shares during the Class Period. *Compare* SAC ¶ 215, *with* Opp. at 22-23.  Defendants disagree with this calculation, arguing that Plaintiffs are including other sales that they did not allege earlier and that Hyland sold 8.6% and Hart sold 19.6% of their Mueller shares.  *See* MTD at 25; Reply at 7-8.  Regardless of which calculation is correct, Plaintiffs have not alleged facts demonstrating motive and opportunity.

The Forms 4 submitted by Defendants and of which this Court may take judicial notice demonstrates that six of the eleven sales were exercises of stock options set to expire.  Hyland's five sales on November 22, 24, 27-29, 2017 represented the exercise of an option scheduled to expire on November 29, 2017.  *See* Musoff Decl., Exs. K, L.  Hart's sale on November 3, 2017 also represented the exercise of an option scheduled to expire on November 29, 2017.  *See* Musoff Decl., Ex. M.  When "the timing of [defendant]'s transactions [i]s tied to the predetermined expiration of his employee stock options," the fact that defendant "exercised the expiring options and sold his newly-purchased shares does not, in and of itself, demonstrate a motive to defraud."  *City of Taylor Gen. Employees Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013); *see also N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (Sullivan, J.) ("[T]he exercise of expiring stock appreciation rights and the disposition of shares to pay taxes do not demonstrate a defendant's motive to defraud.").  As

---

Second Circuit analyzed profits, not proceeds.  *See Scholastic*, 252 F.3d at 74-75; *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308-09 (2d Cir. 2015).

Defendants argue, these sales suggest that Defendants "wished to exercise their options before they expired, not that they were engaged in fraud."  Reply at 8.

Significantly, those November 2017 sales were after Mueller disclosed the charge in April 2017 that caused the share price to drop 11%, SAC ¶ 160, and nine months before the second warranty charge announced in August 2018.  There is nothing about this timing that suggests these sales were "calculated to maximize the personal benefit from undisclosed inside information" such that these Defendants would have "rushed to cash out."  *City of Taylor*, 867 F. Supp. 2d at 800 (internal citations omitted).  "Indeed, courts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure."  *Reilly v. U.S. Physical Therapy, Inc.* 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) (citing cases).  For the same reasons, Hart's sales on November 8 and 29, 2017 cannot be said to be "unusual or suspicious" in their timing.  *Glaser*, 772 F. Supp. 2d at 587.

The remaining sales do not suggest motive and opportunity.  The first two sales were on February 6, 2017 by Hyland and Hart, four days after the Company filed its Form 10-Q for the first quarter of 2017.  SAC ¶¶ 153, 215.  But in the absence of other allegations suggesting motive, "trading after the release of financial information has been held to be appropriate and commonplace."  *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 500 (S.D.N.Y. 2011) (Sweet, J.); *see also City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008).  Nor do these dates correspond with any of the events or defects Plaintiffs allege in connection with the various municipality contracts for MAWC, San Diego, Chillicothe, or Santee.  And Plaintiffs have not provided an explanation for why, if Defendants knew about the defects as "early as January 2016" and were trying to "cash

out" before the warranty charge announced in April 2017, that they would not have sold their shares in March 2017, or even right before the February earnings announcement when the share price was higher.  *See* MTD at 26 n.13; *see also City of Taylor*, 967 F. Supp. 2d at 800 (no scienter where defendants sold shares throughout the class period at and at times when the trading price was low).

For Defendant Hyland in particular, he retired on January 22, 2017 and was not a Mueller officer for any of the sales that he made.  As former CEO, Hyland might have wanted to use his shares to finance other personal or business prospects upon his retirement.  Alternatively, as Defendants suggest, he might have been engaged in estate planning.  *See* MTD at 26.  In any event, that a CEO upon retiring from his position would choose to sell some of his shares is not inherently suspicious.  *See City of Taylor*, 967 F. Supp. 2d at 799 (citing cases); *Feasby v. Industri-Matematik Int'l Corp.*, 2000 WL 977673, at *4 n.5 (S.D.N.Y. July 17, 2000) (defendant's stock sales did not satisfy the scienter requirement when the defendant "sold his shares at the time he resigned from [the company], a frequent occurrence when a former executive no longer has a say in the management of the company"); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("The complaint acknowledges" that defendant "had retired" and "thus was an outside director during most of the class period").  As a former officer, Hyland was also arguably not in a position to have the opportunity to commit fraud.  *Cf. San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 n.14 (2d Cir. 1996).

The last sale occurred on December 5, 2017 by Hart, eight months before the second warranty charge was announced in August 2018 and before the end of the Class Period, and Plaintiffs have provided no explanation for why this timing would be unusual.  Hart's last sale

came a few weeks before he retired as CFO of the Company on December 31, 2017.  SAC ¶ 40.
Like Hyland, Hart may have had reasons for this sale unrelated to fraud.

Finally, Plaintiffs do not allege that the other Individual Defendants made suspicious
sales during the Class Period, such as Hall—who was the CEO during Hyland's sales and before,
throughout, and after the two warranty charges—and Zakas—who was CFO before and after the
warranty charge was announced in August 2018.  SAC ¶¶ 39, 41.  "The fact that the other
defendants did not sell their shares during the relevant class period undermines plaintiffs' claim
that defendants delayed notifying the public so that they could sell their stock at a huge profit."
*Acito*, 47 F.3d at 54; *see also In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261,
271-72 (S.D.N.Y. 2009) ("Plaintiffs have alleged insider trading by only two [company] insiders;
the absence of any allegations of other insider trades before [defendant] announced the impact of
the issues . . . undercuts any finding of the requisite strong inference of scienter.")

### 2.      Conscious Misbehavior or Recklessness

To establish scienter, a plaintiff must allege "facts that constitute[] strong circumstantial
evidence of conscious misbehavior or recklessness on the part of defendants."  *Novak*, 216 F.3d
at 308.  Plaintiffs must allege "at the least, conduct which is 'highly unreasonable' and which
represents 'an extreme departure from the standards of ordinary care . . . to the extent that the
danger was either known to the defendant or so obvious that the defendant must have been aware
of it.'"  *Novak*, 216 F.3d at 308 (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38,
47 (2d Cir. 1978)).  In addition, an "egregious refusal to see the obvious, or to investigate the
doubtful, may in some cases give rise to an inference of recklessness."  *Id.* (quoting *Chill v. Gen.
Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)).  The standard for pleading scienter in this manner
is stringent and subject to the heightened pleading standard of the PSLRA.  *See* 15 U.S.C.
§ 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 321-22.

Plaintiffs' allegations do not give rise to recklessness.  As discussed, Plaintiffs do not allege "defendants' knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308; *see supra* at 21-26.  Nor do they allege "defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Id.*  Rather, Plaintiffs argue only that Defendants were reckless given the size of the accruals and because they made "false exculpatory statements."  Opp. Br. at 29.

Plaintiffs' argument about the size of the accruals is a pure bootstrap.  It is true that the Second Circuit has held that, in some cases, the size of a write-off or restatement, when combined with other factors, can supply evidence of recklessness to support an inference of scienter.  *See, e.g.*, *Scholastic*, 252 F.3d at 77; *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *see also Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017).[10]  That is the case, however, where there is something about the write-off or restatement that supports the inference that the defendants knew information contradicting their public statements.  "Under GAAP, 'previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued.'"  *Fresno*, 268 F. Supp. 3d at 544 (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004)).  Where the restatement is large enough or takes place in a core part of the business, those facts may contribute to an inference of scienter.  But there was no restatement here.  And, "[w]hile there is case law supporting a strong inference

---

[10] *Fresno* is easily distinguishable.  There, Defendant disclosed that "as a result of certain instances of misconduct and errors in accounting determinations, the company should have recognized no revenue from these nonmonetary transactions" and would be required to restate its financial results for two years.  269 F. Supp. 3d at 537.  This disclosure came after an internal investigation into the misconduct that led to the resignation of key executives and the company's chairman, and it was plausibly alleged that the misconduct was designed to keep the share price afloat during merger negotiations.

of fraudulent intent when large restatements are alleged, the complaints in [those] cases [also] . . . all contained additional supporting allegations' indicating that a defendant had possessed and ignored contrary facts or obvious red flags." *Wyche*, 2017 WL 971805, at *16 (citing *Rothman*, 220 F.3d at 90, 92). As the Second Circuit has cautioned, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309.

There is nothing about the facts alleged here that gives rise to an inference that Defendants knew information that contradicted their public statements or that they made "false exculpatory statements." From what is alleged, Mueller's statements were accurate at the time they were made. Mueller revised its warranty cost estimates throughout the applicable periods as "better information regarding warranty costs be[c]ame[] available." SAC ¶ 147. Plaintiffs' factual allegations have not demonstrated that these estimates should have been revised earlier. They repeat that Defendants "were aware" of certain replacements or failure rates, *e.g.*, SAC ¶ 148, but as discussed, these allegations are either contradicted by other allegations in the SAC or are wholly unsupported by Plaintiffs' own factual pleading. The remaining generalized allegations as to what a particular Defendant "knows" are "particularly uninformative" where they "purport to read [the defendant's] mind." *Glaser*, 772 F. Supp. 2d at 595; *see In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) (allegations insufficient where plaintiffs "have not set forth any evidence" of defendants' knowledge, but merely "ask this Court to accept their conclusions about the reserves" and "to speculate that the [d]efendants must have known that the [p]laintiffs' conclusions were correct during the Class Period").

## C.   Section 20(a)

Plaintiffs argue that the Individual Defendants are liable under Section 20(a) because they acted as "controlling persons" of Mueller in the alleged securities fraud. Because Plaintiffs have

failed to plead a primary violation by Mueller, their Section 20(a) claim necessarily fails.  *See*

*Slayton v. Am. Exp. Co.*, 604 F.3d 758, 778 (2d Cir. 2010).

## CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss is GRANTED with

prejudice.

Plaintiffs made no request for leave to amend in the SAC or the Opposition, and Plaintiffs

did not make such an application at oral argument even when Defendants raised the issue.  *See*

Hr'g Tr. at 33:21-34:24, May 26, 2020.  The dismissal is thus with prejudice.  *See, e.g.*, *Campo*,

371 F. App'x at 218; *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999).

The Clerk of Court is respectfully directed to close Dkt. Nos. 38, 57.


SO ORDERED.

Dated: June 11, 2020
       New York, New York                          _____
                                                          LEWIS J. LIMAN
                                                    United States District Judge