UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GLEN CHAPMAN, ANDREA PETERSON,
AND KEVIN KELLY, Individually
and On Behalf of All others
Similarly Situated,,

                Plaintiffs,

         v.                          19 CV 3260 (LJL)

MUELLER WATER PRODUCTS, INC.,
GREGORY E. HYLAND, J. SCOTT
HALL, EVAN L. HART and
MARIETTA EDMUNDS ZAKAS,,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    May 26, 2020
                                    4:00 p.m.

Before:

                HON. LEWIS J. LIMAN,

                              District Judge

                    APPEARANCES

THE ROSEN LAW FIRM, P.A.
     Attorneys for Plaintiffs
BY:  SARA ESTHER FUKS

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     Attorneys for Defendants
BY:  SCOTT D. MUSOFF
     JAY B. KASNER

THE COURT: Good afternoon. This is Judge Liman. Who do we have on and who will be speaking for defendants?

MR. MUSOFF: Good afternoon, Judge Liman. For defendants, you have Scott Musoff and my partner, Jay Kasner. And I will be speaking today.

THE COURT: Good afternoon.

Who do we have on for the plaintiff?

MS. FUKS: Good afternoon, your Honor. We have Sara Fuks here for plaintiffs. And it is just us today.

THE COURT: Good afternoon. Thank you, everybody.

So what I'd like to do is I'll hear for about 25 minutes or so from you, Mr. Musoff. Then I'll hear from plaintiff's counsel for about half an hour. And then, Mr. Musoff, I can give you some time at the end to reply.

I've read the complaint. I've read all of the motion papers. I've read the exhibit to the declaration. So you don't need to repeat things that you've said. But it would be helpful on each side for you to highlight the points that you want to make sure that I focus on.

MR. MUSOFF: Thank you very much, your Honor. This is Scott Musoff from Skadden for defendants. And I also note that our client, Jason Carol, deputy general counsel, is on the line as well listening in.

Mueller is a manufacturer and marketer of products and services used in the water business, the distribution and

measurement of water, everything from fire hydrants to also products that they refer to in their technology division, which is what is at issue here.

And that relates to water meters and, in particular, what are known as smart meters which involve taking what's older technology and making it into essentially high technology.

In connection with knows smart meters, the company took two discrete warranty charges, essentially increases to previous warranty reserves, one in April of 2017 and one in August of 2018.

The one in April 2017, the company disclosed that it had recently become aware, and I highlight that they noted that it was due to recent events where they became aware that certain radio products on products that had been produced between 2011 and 2014 were failing at a higher than expected rate. And they therefore took a discrete $9.8 million charge to meet those current and future warranty obligations.

Then well over a year later, about 18 months later, in August of 2018, the company took an additional warranty charge based on a new study of historical warranty experience for products sold through 2017. And that's found on Exhibit F to my declaration.

And that charge was for warranty costs that the company expected to incur from 2019 to 2027. And it was based

on their experience to date and current expectations as fully disclosed. And that related to other technology than the discrete charge that was taken earlier.

THE COURT: Mr. Musoff, let me ask you a question just about the later charge.

You say it covers the years 2019 to 2027. But I assume, because these are all pursuant to ten-year warranties; correct?

MR. MUSOFF: That's correct.

THE COURT: So it would pick up potentially warranty costs associated with products that were sold prior to April of 2017. Is that right?

MR. MUSOFF: Yes. It would cover products before that. And it was based on a new study of historical warranty experience for products produced and sold through 2017.

But they do talk about how that was other technology than the ones from the earlier charge. But it is a ten-year warranty.

And that's an important point, your Honor, because there were always millions of dollars of warranty reserves. And they were increasing from 2014 to 2015, 2016. And then these were two additional increases that were taken based on experience, based on studies, based on recently learned information.

And warranty reserves are an inherently subjective and

uncertain expense.  They're an attempt to estimate future warranty claims based on a number of factors that apply across all of the company's products nationwide.

So because warranty reserves are the product of a significant amount of judgment, estimation, they're considered opinions subject to standards, as your Honor is aware, even more stringent than the already demanding standards governing securities fraud claims under the Private Securities Litigation Reform Act.

So under *Fait Omnicare Sanofi* and its progeny, in order to challenge such opinions, plaintiffs have to allege that both the reserve was inaccurate when made and was not an honestly held belief at the time.

And plaintiffs in our opposition brief contend that *Fait* and *Sanofi* are no longer good law after *Omnicare*, but that's simply not the case.

In addition to the cases we pointed out in our reply on page 1 in footnote 2, your Honor cited *Sanofi* in this very similar connection in the recent decision of *Gray v. Wesco* recognizing the difficulties in alleging that an opinion or an estimation or a projection were not honestly believed at the time.

And courts within this circuit have reiterated this specifically in connection with reserves such as Judge Furman's decision in *Pirnik v. Fiat Chrysler*, Judge Sullivan's division

in *Wachovia*, the *Student Loan Corp*. case we cite, and *Malin v. XL Capital*.

So now in an attempt to meet this difficult standard, plaintiffs rely essentially on two things:  One, publicly available articles and certain so-called "confidential witnesses."  Neither is helpful to plaintiffs.

As to the documents and the articles, plaintiffs mischaracterize these articles.  They take headlines and snippets misleadingly out of context.  But it's well-settled that if a document that plaintiff relies on or that the Court took judicial notice of contradicts an allegation in the complaint, it's the document that governs.

And we cite several cases for that in our briefs.  But your Honor also noted that in the *Wesco* decision from just a few weeks ago.

So when you look at the actual articles they cite, let's talk about certain regions in particular.  They cite articles about smart meters installed in the city of San Diego.

Well, as the article in Exhibit G states, what it really says is that some of those smart meters "could" have a glitch that prevents them from relying on relaying water use wirelessly.

But that potential glitch affected 250 smart meters. So it was 250 smart meters that were actually returned as cited in the article.  And in fact, Exhibit H, one of the articles

explains that Mueller shipped just under 400 replacement parts to San Diego, which was small compared with the 75,000 smart meter parts the city had gotten from Mueller since 2010.

And although the city of San Diego purchased more than 74,000 smart meters from Mueller, only 12,000 of those meters had actually been connected to the water system. That's in their article at Exhibit G.

And then it further explains in the article on Exhibit H that they weren't fully activated because they lacked certain radio equipment. What these articles really go to is a critique of the water systems and some of their actions.

It does not change in any way the number of returns that Mueller was experiencing, their experiences with those. And more importantly, the articles certainly don't discuss in any way, shape, or form that those events were not fully taken into account when reserving originally and then when the additional warranty reserves were taken.

THE COURT: Mr. Musoff, can you help me with respect to the allegations regarding I think it's MAWC. I read the attachments. And the way in which I read them or the articles therein is there's a figure of 850 Mueller meters that you cite that were returned to Mueller Systems. But there also is a figure of 23,000 water meters that were removed due to possible imperfections.

So my question really goes to whether one can infer

from that 23,000 figure that the real number with respect to removal and repair with respect to warranty costs would be closer to the 23,000 rather than the 850 or how to make sense of those two figures.

MR. MUSOFF: Yes, your Honor. Judge Liman, that report is at Exhibit J to my declaration. At page 13, the report does explicitly state that MAWC returned only 850 meters to Mueller. They did not return tens or hundreds of thousands of Mueller meters as plaintiffs say at page 7 of their opposition.

So the 23,000 meters were removed. And what the report says is they were removing many of them out of an abundance of caution and putting a stop. Out of those, there were only 1,116 that were on a list of defective serial numbers that were provided by Mueller. So the number is in no way tens or even hundreds of thousands as plaintiffs say.

Again, there are no documents whatsoever to suggest that Mueller wasn't keeping track of those and taking those into account in connection with its warranty reserving.

THE COURT: Is the figure for MAWC, in your view, closer to 1,800 or closer to 850? Whats your view?

MR. MUSOFF: From the final report which plaintiffs don't dispute -- the Court can take judicial notice of -- it talks about a total of 150 returned and a little over 1,000 that were on a list of potentially defective meters.

The report also states that MAWC took a more aggressive approach by removing more of the installed meters beyond the number range on the list of defective serial numbers.  That's at page 5 of the report, Exhibit J.

THE COURT:  As I understand your papers -- but I want to make sure I understand the argument -- I thought I saw an argument there that plaintiffs' factual allegations, once you look at attachments, are consistent with the adjustments made to the reserves and to the charges made to the reserves.

Can you walk me through that.

MR. MUSOFF:  Sure.  I think there are two points there, your Honor.  One is that when you look at the actual factual allegations, not the snippets and the out-of-context headlines, the number of returns don't suggest anything improper with the reserving at all.  So that's one issue.

I think it's also what they don't link is that the alleged defects, either in San Diego or with the Missouri Public Service Commission, the MAWC, were those that were the cause for the additional charges as well.

For example -- this goes to both the articles and the report -- one of the articles talked about problems in the gears with the water meter's register.

Yet some of the reserve charges relating to what they call a podding issue which I think of as sort of insulation for parts that send and receive radio signals.  And that's based on

their own allegations like paragraph 207.

So I think it's a combination that both the numbers that are actually in the documents and reports in no way can infer anything inconsistent with an honestly held belief at the time the reserves were taken into account.

And the first reserve that does talk about recently discovered higher rate of return for products from 2011 to 2014 suggests that the company did exactly what it's supposed to do. Based on more recent experiences, it increased its warranty reserve.

And when you look at numbers which are in Exhibits B and C on page F10 to my declaration which have the warranty reserves, you can even tell that each year it's incurring expenses that are in line with the warranty reserves as they needed to be increased based on more recent experience.

THE COURT:  Mr. Musoff, there's an allegation that confidential witness number 2 stated that the company had all-hands meetings in which product returns were a big issue both before and after Paul became CEO in January of 2017 and that Paul was hired to reorganize and focus on the warranty issue.

Isn't it fair to assume from that allegation that prior to the January 2017 financials, the company was aware that it would have to pay a charge and that it then delayed taking that charge until April 2017?

In other words, that the April 2017 charge was one that the company was aware that it would likely have to take in January of 2017 at the time of the change in CEO.

MR. MUSOFF:  Judge Liman, I think a couple of responses to that:  One, the fact that you're having an all-hands meeting because product returns were a big issue doesn't mean that the warranty reserves weren't accurate when made and certainly believed to be accurate when made.

As I mentioned, they did have millions of dollars of warranty reserves on the books even before the increase which is a lot of meters expected to potentially be returned.

The company also disclosed issues it was having with its technology and the fact that these were difficult products to come out.  So the fact that there were product problems is not the equivalent of having intentionally false warranty reserves.

And the idea that there is some motivation to have a warranty reserve before or right after a new CEO is actually contrary to the idea of having securities fraud.

If they were having these meetings both before and after, where is the nature of the fraud?  As the Second Circuit has routinely held, if you know the inevitable shoe is going to drop, what is the point of delay.

And they really provide nothing, no factual allegations whatsoever in the complaint, to suggest that they

wanted a short-term delay in increasing warranty reserves, as opposed to the more compelling and cogent inference that they were reviewing more recent experience as disclosed and, based on that more recent experience, increased their warranty reserves.

THE COURT: Can't you draw an inference from the fact that Paul is allegedly brought in to reorganize and focus on the warranty issue and from the fact that there is a sale by the CEO prior to April 2017 that a reason why there was a delay was so that the CEO could dump a bunch of his shares?

MR. MUSOFF: No. Your Honor, first on the change of CEO, to the extent that you can draw an inference that it had any impact, different judgments on warranty reserving doesn't render the prior reserves intentionally false when made.

These are judgment calls, and there's nothing to suggest even that was the cause; that it's the switch in CEOs. But even if you were going to take that inference, that in and of itself does not draw that.

Then in terms of the stock sales, I think it's important to note that out of the 11 alleged stock sales at issue, 6 of those sales involved the exercise of stock options set to expire.

And as Judge Sullivan held in the *MDC Partners* case, 2016 WL 5794774, where the individual defendants in that case, plaintiffs pointed to their exercise of stock options. As

Judge Sullivan has held, that cannot create an inference of scienter.

The remaining sales -- many of them occurred at times after the April announcement and at stock prices below prices that were higher just shortly before they made the sales, and the fact that it was made two months before the sale has been held to not create an inference of unusual scope or timing.

I think it's also important to note that when you look at the facts alleged about Mr. Hyland stepping down, retiring, and then passing away, very similar to the *Magna* case, the Court can look at a more cogent and compelling inference that his stock sales were in connection with retirement plans, stepping down a CEO, and estate planning, especially when you consider the undisputed fact that he passed away based on the timing of when he stepped down as well so that plaintiffs really have to come up with something far more than those sales to create inference, especially where -- and we're in no way saying that the fact that these were audited financials, that that's the full-stop immunity.

But it is a factor that this Court can take into account when assessing scienter, especially when we're talking about opinions and judgments under GAAP. So the fact that these were audited financials that were never restated is a factor that this Court can take into account in assessing scienter.

THE COURT: Why don't you wrap it up now.

MR. MUSOFF: Sure. I'll just wrap it up, your Honor, by saying that the other confidential witnesses fare no better. CW3 talks about certain failure rates, 50 percent failure rate during the 2015/2016 time frame.

Some of the allegations are internally inconsistent because the products stopped in 2014 and this confidential witness talks about them continuing past that date.

But most significantly, there is not one confidential witness that says that the warranty reserves were based on something different than what they allege or that the individual defendants or the company knew their estimates or views of the return rates.

So what you would expect to see and what the courts require is some internal document that suggests there's an inconsistency with the reserving.

Judge Sullivan in the *Wachovia* case sums that up by saying in the absence of particularized allegations that in that case *Wachovia* was experiencing or internally predicting losses exceeding their set reserves, the subsequent disclosures provide no basis to conclude that defendants recklessly misstated previous reserve levels.

So in other words, just like here, there were no particularized allegations that there were any internal predictions, modeling, data that was inconsistent with what was

publicly disclosed.  Thank you, your Honor.

THE COURT:  Thank you.

Plaintiff's counsel, I missed your name.  I'm sorry.

MS. FUKS:  It's Sara Fuks.

THE COURT:  I'll now from you for about half an hour.

MS. FUKS:  Okay.  Thank you, your Honor.

So under GAAP, companies are required to assess contingent liabilities each and every single quarter.  And this analysis is mandatory.  Financial statements who don't comply with GAAP are presumed to be misleading, and warranties are considered liabilities.

So not only does the SEC say the contingent liabilities are critical disclosures, they're even more critical for a business like Mueller that sell its smart meter products with ten-year warranties.

And as analysts have said, the warranty costs are part of doing business in the metering industry.  And When you understate warranty liabilities, you're destroying the company's profitability.

So while there's some subjectivity involved in assessing the exact amount of warranty liabilities, there are constant things the company looks at, namely, the failure rates associated with a certain product and the costs of repairing or replacing the product.  Then you have to do this analysis every single quarter.

THE COURT:  Help me with this a little bit because I had understood the point that you were making also from Mueller's financial statements that the warranty -- the amount that is in the warranty reserve is a function of the expected number of repairs and returns -- the expected number of failures, the expected number of repairs and returns which would be a function presumably of failures, and then factors such as the cost to repair or to replace.

Am I correct so far?

MS. FUKS:  Yes, your Honor.  So you look at it would be the price of not only the product itself but also the labor costs factored in there.

THE COURT:  Right.  So do I have any information in front of me -- you've given me information about the unit that failed.  I couldn't find in there any information about the costs associated per unit of failure, whether it's different for the version 3 radios versus the problem that was encountered in San Diego.

And I say that because in the absence of information about the costs, I'm not sure how meaningful your numbers really are.  They may be meaningful; they may not be.  But they're not inherently meaningful.

MS. FUKS:  Sure.  I take your point, your Honor.  So the financial statements break down the revenue in the technology segment, but it does not break down the revenue just

for the smart meters.

So you can't tell exactly what the cost is of replacing one particular meter. But what we do know is that the warranty liability and the $9.8 million write-down was 4.6 times the warranty liability for the previous quarter.

So in that sense, you can see the outside amount of the write-down and that the fact that if Mueller was honestly doing these assessments each quarter, which they had to do under GAAP, they couldn't possibly have written down that much all of a sudden.

THE COURT:  In the absence of there being some big event.  If there was some big event, then you might see a change in the warranty reserve.

MS. FUKS:  Correct.  Correct, your Honor.

THE COURT:  How do you deal with all of the law that there is that says that you can't infer from a subsequent charge to a reserve that the original reserve was improperly stated?

There are a legion of cases that refer to that as reasoning by hindsight and impermissible.

What's your best case against those?

MS. FUKS:  We would point to the *SAIC* case that says that even if defendants -- interpreting this as a false statement of fact.  So even if they say that the amounts were understated, even if defendants weren't required to accrue a

contingent liability, they were still required to disclose facts that could result possibly in additional liabilities and either estimate the potential liability or disclose that no estimate is possible.

So the failure to do so is a false statement of fact and not a false statement of opinion.

THE COURT:  That argument I don't get.  I may ask Mr. Musoff also to help me with it because I think I see your point a little bit.

But on the assumption that what the company is doing is trying to figure out an average failure rate, which I think is a fair assumption from the very disclosures that you rely upon, wouldn't that possibility of there being a need to take a charge be factored into the very charge that they're taking?

For no individual unit may it even be probable.  So what you're doing is collecting a whole bunch of possibles and deriving up probable from those whole bunch of possibles.

MS. FUKS:  Right.  When you look at the confidential witness allegations, and the confidential witness cites 50 percent failure, and defendants were aware of that.  And they were aware of what was happening in San Diego where they flew to San Diego in 2016.

They know that these products are defective any way that you slice it.  There are different things that are going wrong with the products.  It is in fact by hindsight that they

did not take into account this information that reserves simply would not have been that low.

THE COURT:  What do you say about Mr. Musoff's argument that if the company knew in 2016 of the issues in San Diego and it was taking a charge in April of 2017, a large charge to add to its reserve, it would have no obvious motive not to put in something extra for San Diego if it thought that something extra for San Diego was needed?  It would have just been added on to the 7 million or so that it was already taking in April of 2017.

In other words, why postpone the inevitable?

MS. FUKS:  Well, in securities cases, you look at what happened ex ante and not what happened --

THE COURT:  Yes.

MS. FUKS:  Especially with the insider sales and the retirement and the change of the CEO.

THE COURT:  Are you alleging that the April of 2017 reserve with the reserve charge was understated?

MS. FUKS:  Yes, your Honor.  We're alleging that even that $9.8 million charge was understated.

THE COURT:  How much do you believe it was understated by?

MS. FUKS:  Your Honor, we can't quantify exactly.  But 15 months later, they took an even larger $14.1 million charge. So I don't think that we have to be able to exactly quantify

the amount.  I don't think we can, absent discovery.

THE COURT:  All right.  So let's assume that it was understated by $3 million.  I'm just picking that out of a hat.

What motive would Mueller have had in April 2017 with a new CEO on board not to take a full $12.8 million charge?

Usually CEOs, new CEOs, try to clean out all of the old stuff so that their track record looks pretty good going forward.

You're asking me to infer that the new CEO or the management staff knew that there were millions that that 9.8 was off by, they were taking bad news, and they still didn't take all of the bad news?

MS. FUKS:  There are additional insider sales between the first and the second disclosures.

THE COURT:  Anything else besides those?  I say that because the additional sales after April 2017 don't include the million shares by the old CEO.  I mean the later sales -- a number of them were pursuant to options.  Not all of them.  The CFO had sales, as I read it, that were not pursuant to options.

MS. FUKS:  Oftentimes these write-downs do happen in a series.  Just so investors don't see humongous write-downs all at once, it often happens that there's one followed by another.

They did portray to investors that they were continuing to grow the AMI segment.  So it often cushions the blow by having two separate write-downs as opposed to just one

that was 26 million.

THE COURT:  Is it your view that the -- I'm just trying to understand it.

You're not disputing that in April of 2017 and in August of 2018 there were studies done that showed that the company needed to take that amount of reserve.  Correct?

MS. FUKS:  Well, we're not disputing that the studies were done.  But what we are alleging is that it was a GAAP violation not to have conducted that analysis in each quarter.

THE COURT:  Is that enough to -- where in the complaint do you -- I'm sorry for asking a lot of questions.

My first question is whether you're alleging that those studies in fact were done in earlier periods and somebody just didn't disclose the results.

MS. FUKS:  I mean, it would have been reckless for them not to undertake any analysis at the reserves.  On the other hand, we don't have facts to dispute that they actually did undertake some other historical study.

THE COURT:  Where in the complaint can I look to for the fact or the claim that Mueller was required in each quarter to do the type of studies that it did before the April 2017 and the August 2018 charges?

MS. FUKS:  So if you look starting at paragraph 122 and paragraph 125, starting with AFC75.

THE COURT:  I'm just looking for my copy of the

complaint. I'm not going to count the time against you. Just tell me what it says in paragraph 125 that you're relying on.

MS. FUKS: If you look at, for example, paragraph 75, it says: "Defendants were required to utilize those failure rates to estimate warranty liability and increase warranty liability each quarter to account for the steadily increasing failure rates."

THE COURT: I'm sorry. That's paragraph 75?

MS. FUKS: Yes.

THE COURT: Just give me a second.

MS. FUKS: And then if you look at paragraph 163, it states that GAAP requires an analysis each quarter of warranty liability.

THE COURT: So your theory is that if they were doing everything that they were supposed to do according to GAAP, they would have had some bigger charge in earlier quarters because of the quite large charge that they took in each of April 2017 and August of 2018.

MS. FUKS: That's correct, your Honor. And also the CEO and CFO certified the financial statements. The financial statements are management's responsibility.

THE COURT: Got it. Let me ask you another question just on the risk disclosures and the other statements that the complaint alleges.

On the risk disclosures, tell me what you think your

strongest statements are that the company made a misstatement in its risk disclosures.

MS. FUKS:  Well, these are, your Honor, just very boilerplate risk disclosures.  The disclosures state that our products may fail.  We may experience failure rates.

But at the time they're making these statements, they're experiencing these failure rates.  They're getting information from municipalities across the country from San Diego that the product's failure rates are increasing, and they're steadily increasing, year after year, quarter after quarter.

And the law says that these risk disclosures -- they have to change based on what's going on.  And if you look at the risk disclosures, they're the same exact risk disclosures up until the first write-down.

THE COURT:  But don't I look at the risk disclosures together with the other parts of the documents, including the warranty reserves themselves, which would reflect that the company knew that it would have product failures that it would have to pay out on a warranty for?

MS. FUKS:  If you look at the warranty liability, the amounts are small.  And in the conference calls -- I believe it was Holland who said that our warranty is in line or lower than industry standard, which is about .4 percent.

So any investor looking at these financial statements,

looking at the risk disclosures, looking at the warranty liability says, okay.  Everything is fine.  This company is not experiencing any unusual product failures.

If they listen to the conference call transcripts, this is in line with industry standards.  Sure these risks are -- these are normal risks with any company in the metering business.  This doesn't give investors any information that anything is amiss with the products.

THE COURT:  Well, that's not quite right.  The financial statements as a whole would indicate that there are going to be some amounts of failures.

What I can't get from your complaint is the significance of the thousands or hundreds of product failures that were experienced with Chillicothe or MWAC or San Diego and whether those would be what drives the warranty charges or it should be something else.

But an ordinary reader would know from the financial statements that there are product failures.  It's not just a there is a possibility that the product will fail.  There's a probability under GAAP that there will be product failures.

MS. FUKS:  I'm sorry, your Honor.  What I was referring to was that product failures would be out of line with the norm for what product failures have been historically for the company.

THE COURT:  Got it.  I've interrupted you a lot.

Continue on with your argument.

MS. FUKS:  Okay.  I just wanted to point out Mueller tells investors that these are high-margin products, and they tout these products to investors.

So the class period in this case is May 9, 2016, through August 6, 2018.  As I stated before, if you look at the company's class period financial statements up until April 27, 2017, when Mueller takes a $9.8 million warranty write-down, it's warranty liabilities are very modest.

In fact, Mueller actually decreases its warranty provision from 2.7 million through the quarter ending March 31, 2016, to a mere 2.1 million by the quarter ending December 31.

So, again, this modest warranty provision gives investors the picture that everything is fine; that the products are working; and that as Mueller tells investors, it's continuing to grow the company through increased sales in this higher margin segment.

Then all of a sudden on April 27, 2017, Mueller takes a $9.8 million warranty charge.  So to put this in perspective, this is 4.6 times the warranty liability of the prior quarter, and it also amounts to half of net sales in the whole technology segment.

Your Honor, our complaint shows that defendants knew that Mueller was going to eventually take a massive write-down. And they knew this because, as our complaint alleges, Mueller's

smart meters were breaking for multiple reasons and for multiple customers across the country.

In April 2016, you have Mueller reps flying to San Diego to meet with public utility managers, and they learn the meters are not functioning.  And Mueller admitted the glitch in the meters prevents them from relaying water used wirelessly, which is the whole point of the meters.

So the failure rates are high, and they're costly. And what the facts in the complaint show are that only one in six meters worked.  And that is based on the articles out of San Diego.

Defendants are essentially disputing the facts in the complaint, which is not appropriate on a motion to dismiss.  So if you look at other municipalities, they're having similar failure rates.  And the failure rates go up and up.

For Chillicothe, Missouri, the failure rate was 22 percent in 2015.  Then it jumped to 41.5 percent in 2016. So you also have what the confidential witnesses are saying which corroborates all of this.

So we have a ten-year employee, and he managed all of the western states.  And he states that the meters had all kinds of problems, not just specific problems involving humidity, for example, involving meters breaking in areas of high humidity, which is what defendants say.

He states they had problems with moisture in the nose

and cracking casings. He also states that there were all-hands meetings with senior executives to discuss product returns. For example, in 2016, you have a utility that's returning literally truckloads of products.

So Mueller was even shipping products that it knew would be returned. So as defendants are getting all this information, they're required to reevaluate the company's warranty liability provision.

And had they done so, they could have possibly been reducing warranty liability, which is what they did.

THE COURT: What do I have in front of me that gives me an indication of what proportion of Mueller's sales Missouri and San Diego represented? Anything?

MS. FUKS: So we can't allege the exact percentage that San Diego and Missouri represented. But what we do know is that from these failure rates, defendants were required -- there is no reason to think that these failure rates, especially you have ten states in the *American Water* settlement, actually 15. There's no reason for defendants to think that these failure rates were unusual. In fact, they were not.

And if defendants had this information in their possession, which they did, they're required to err on the side of caution and say, here we have failure rates of 22 percent. We need to assume that the same products that we've sold are

also going to experience those failures, those same failure rates.

THE COURT:  For securities fraud, wouldn't you have to allege -- maybe you have alleged it.  But wouldn't the test be that the information that management has is such that they know or they were reckless in not knowing that the reserves were understated?

It's not just a cautious manager would.  They're required to exercise caution.  You would need to show they were reckless at least.

I think those are sort of two separate issues.  What I'm saying in terms of setting the warranty reserves, the analysis that's required is to extrapolate from failure rates of similar products.  That's something that's mandated under GAAP.  So to not use that mandated analysis would be reckless.

THE COURT:  But you're assuming that they didn't do the analysis, and that assumption has to be predicated, it seems to me, on one of two things, either San Diego and Missouri being a sizable percentage of Mueller's sales or being able to extrapolate from the problems in San Diego and Missouri across all of the products for which warranties were given.

Isn't that right?  If there's a possibility it is right, what do you have in the complaint that would tell me either that San Diego and Missouri were sizable or that the problems were representative?

MS. FUKS:  In San Diego, your Honor, a $7 million contract at issue which is a material amount.  In addition to San Diego and Missouri, you have the *American Water* settlement which covers 15 states.

You have a suburb of San Diego saying that they took 50 percent of the meters, 50 percent failed, and they just replaced them with a different company's meters because they were "bad meters."

And then I think when you take that, together with what the confidential witnesses are saying, that the warranty issues that San Diego and Missouri have are representative of the whole company because the confidential witnesses say the failure rates are between 30 and 50 percent.  One says 50 percent; one says 20 to 30 percent.  So that just reinforces the notion that these failure rates are typical.

THE COURT:  I'm just looking at the complaint.  With respect to the 20 to 30 percent, your witness says he reports hearing the failure rates on the version 3 radios and hotrod radios were between 20 and 30 percent.

But for that to have significance to me, I would need to know something about the significance of the version 3 radios and hotrod radios.

I'd also need to know something a little bit harder; right?  I would need to know something that indicated that the people who made the statements had gotten that information.

Where do I have it wrong?

MS. FUKS:  You do have confidential witness 2 saying that these were all-hands meetings and that senior executives attended.  And then you also have confidential witness 3 talking about the people that he reported to who were higher up in the company.

THE COURT:  I just looked at the 50 percent for version 3.  The 50 percent is also for version 3 radios.  The company put a stop to manufacturing radio shipments in late 2015 or early 2016.

Again, that doesn't tell me very much about how much the version 3 radios contributed to the revenue of the company or to the warranty charges.  I'm struggling with this.  I'm looking for you to help me.

Why don't you wrap it up, and then if there are any last points to make.  And then I'll give it back to Mr. Musoff.

MS. FUKS:  Thank you, your Honor.

Just a point on scienter.  There are two ways to show scienter, either through recklessness or through motive. Motive is not required.  But here we have recklessness, and we also have motive via the stock sales.  And recklessness and motive are mutually reinforcing of one another.

In addition, there are other factors that enforce scienter, such as the large size of the write-down.

THE COURT:  All right.  Thank you very much.

Mr. Musoff, I'll give you a couple minutes. I would also, Mr. Musoff, ask, since it's your motion, that you order today's transcript on an expedited basis, to stay on with the court reporter after. That would be helpful to the Court.

Your adversary makes a powerful point that these charges to the reserve were not just little additions. They were multiples of what the reserve would have been in the past and what was charged in the past.

Isn't it a fair assumption that the company knew that it would have to take an additional charge to its reserve just from the sheer magnitude of the charges it ends up taking?

MR. MUSOFF: Yes, your Honor. Judge Liman, first of all, it's well-settled that just taking a large charge and then speculating that it should have been taken earlier is the quintessential fraud by hindsight rejected by the Second Circuit and courts within the Second Circuit.

But here, there's a lot more to it. What plaintiff does is it's mixing apples and oranges and snippets as to defects. Some defects -- most of what was just discussed are defects relating to meters, not radios. And there were different warranty charges taken for each of those.

And they don't allege and cannot allege that sometimes these defects come in batches. If they're installed in a certain year, a certain set of meters or radios might have defects that appear two years after they're installed.

So the fact that it recently came to their attention that they were getting higher-than-expected returns in the April 2017 warranty charge shouldn't be surprising, and there's not a single factual allegation to suggest that it wasn't based on recent knowledge.

In fact, if you really compare CW3 to the charge that was taken, even if you assume the worst of what he's saying and really assume that that is related directly to that charge, he's talking about things that are happening at the end of 2016 that are then taking the charge in April of 2017, shortly following their recent experience.

They are allowed to analyze. They have a CFO. They have an auditor. They have a process. They have a formula. I think, as your Honor pointed out, simply pointing to numbers here and there doesn't inherently tell you anything.

And I think Judge Furman in the *Fiat* case discussed that in particular on page star 8 of his opinion where he talks about reports that were cited by the plaintiff.

These were reports actually from Fiat about recalls. So it was even more directly tied to the company as opposed to articles where the water district is shifting blame and the like.

Judge Furman even notes that raw data is not itself a formula for estimating adequate recall reserves. And then he says, accordingly, *Fait* standards apply here. And he goes on

to say, so the number of vehicles recalled increasing significantly or the fact that Fiat Chrysler did increase its reserve estimate during the period -- that is simply not securities fraud. And that's exactly what's going on here.

I'll also note that plaintiffs are trying to allege that because there was an additional charge taken in 2018, the 2017 charge must have been intentionally false; that they intentionally committed securities fraud as opposed to what they did disclose, conducted a new study on "other products" and increasing the reserve.

And then to cite cases such as *SAIC* where there was a criminal investigation going on about overcharging the city of New York when the company's 10-K came out and they took no reserving for the payments or not adequate reserving for the payments is wholly distinct and different than what's alleged here.

And I think here, the confidential witnesses and the articles are not inconsistent at all with the reserving and the methodology taking place. And I said often today that plaintiffs do not and cannot allege.

I just do want to point out that when the case was before Judge Failla, when she denied plaintiffs' motion to transfer the case, she raised the issue about amendments at the time and asked plaintiffs and defendants to consider letting plaintiffs amend so that we would only have to do this once.

What she said in the transcript was we might as well have "a last, final chance for you to get the pleadings where you wanted them to be."

And I think accordingly, plaintiffs themselves have not even requested in their opposition papers leave to amend. But I did want to point that out because there was a lot of -- I mentioned many times that things aren't alleged in the complaint.

It's our position, because they cannot be alleged. But in any event, the plaintiffs were given multiple opportunities to amend the complaint already.

Unless the Court has further questions, we'll rest on our papers.

THE COURT:  I don't have any additional questions. This has been very helpful, very well argued on both sides.

Mr. Musoff, you'll order the transcript for us.

MR. MUSOFF:  Yes, your Honor.

THE COURT:  We'll take this under advisement.  Thank you both very, very much.  Stay safe and healthy.

MR. MUSOFF:  Thank you, your Honor.  Likewise.

MS. FUKS:  Thank you very much, your Honor.  Take care, everybody.

THE COURT:  Thank you.

(Adjourned)